**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

---

| | |
|---|---|
| **IN RE REGIONS MORGAN KEEGAN ERISA LITIGATION** | **Case No. 2:09-md-02009-SHM** |
| **This Document Relates to:** | **CORRECTED THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF ERISA** |
| *In re Region Morgan Keegan ERISA Litig.*, No. 2:08-cv-2192-SHM-dvk | |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   NATURE OF ACTION ....................................................................................... 1

III.  JURISDICTION AND VENUE ...................................................................... 10

IV.  PARTIES ........................................................................................................ 11

    A.    Plaintiffs ............................................................................................. 11

    B.    Defendants ......................................................................................... 14

        1.    Regions Trust, Morgan Keegan, And MAM Are Alter Egos
            And Instrumentalities Of Regions And Alter Egos *Inter Se* ................... 16

        2.    Legacy Plan Defendants ........................................................... 27

        3.    AmSouth Thrift Plan Defendants ............................................ 32

        4.    Regions 401(k) Plan Defendants ............................................ 35

        5.    Bond Fund Subclass Individual Defendants ........................... 39

V.    THE THREE REGIONS PLANS .................................................................... 39

    A.    Background ........................................................................................ 39

    B.    Plan Structures .................................................................................. 41

        1.    Plan Assets are Held in Trust ................................................... 41

        2.    Plan Eligibility ......................................................................... 41

        3.    Participant Contributions ......................................................... 43

        4.    Company Matching Contributions to the Plans ....................... 44

    C.    Funds in the Three Regions Plans .................................................... 46

        1.    Regions Common Stock ........................................................... 47

        2.    Bond Funds .............................................................................. 48

        3.    RMK Select Funds ................................................................... 48

i

VI.    THE ERISA PLANS ..................................................................................... 50

VII.   DEFENDANTS' FIDUCIARY STATUS .................................................... 52

    A.    The Nature of Fiduciary Status ........................................................ 52

    B.    Regions Financial Corporations' Fiduciary Status ............................ 54

    C.    Regions Bank's Fiduciary Status ...................................................... 56

    D.    Morgan Asset Management's Fiduciary Status ................................. 58

    E.    Morgan Keegan's Fiduciary Status................................................... 59

    F.    Plans' Compensation Committee Defendants' Fiduciary Status ....... 60

    G.    Legacy Plan Benefits Management Committee Defendants'
        Fiduciary Status .............................................................................. 61

    H.    Legacy Plan Benefit Administration Committee Defendants'
        Fiduciary Status .............................................................................. 62

    I.    Additional Legacy Plan Defendants' Fiduciary Status ..................... 63

    J.    AmSouth Thrift Plan Benefits Committee Defendants' Fiduciary
        Status................................................................................................ 63

    K.    Additional AmSouth Thrift Plan Defendants' Fiduciary Status ........ 64

    L.    Regions 401(k) Plan Benefits Management Committee
        Defendants' Fiduciary Status............................................................ 64

    M.   Regions 401(k) Plan Investment Committee Defendants' Fiduciary
        Status................................................................................................ 66

VIII.  FACTS ....................................................................................................... 67

    A.    Regions Common Stock .................................................................... 67

        1.    The Rise of Subprime Lending .............................................. 67

        2.    During the Company Stock Subclass Period, Regions
            Common Stock Was an Imprudent Investment for the Plans
            Due to Regions' Real Estate Loan Portfolio ........................... 74

        3.    Regions Failed to Reserve For Losses ................................... 78

4.      Regions Failed to Manage Its Risk Properly ........................................... 82

5.      Regions' Securities Portfolio Contains Massive Exposure
        to Risky Mortgage-Backed Securities ..................................................... 84

6.      Regions' Imprudent and Improperly Disclosed Off-Balance
        Sheet Exposure......................................................................................... 86

7.      Throughout the Company Stock Subclass Period, Regions
        Failed to Value Properly its Goodwill ..................................................... 88

8.      During the Common Stock Subclass Period, Regions
        Common Stock Was an Imprudent Investment for the Plans
        Due to the Company's Involvement in the Sale of Auction
        Rate Securities ........................................................................................ 89

9.      Regions Faces Substantial Downgrades Due to Its Failed
        Business Practices.................................................................................... 91

10.     Defendants Knew or Should Have Known that Regions
        Common Stock Was an Imprudent Investment. ...................................... 95

11.     Defendants Failed to Provide Plan Participants with
        Complete and Accurate Information about the True Risks
        of Investment in Regions Common Stock in the Plans........................... 96

B.      The Bond Funds Were Grossly Mismanaged ...................................................... 99

1.      The Bond Funds Were Invested in High Risk Assets,
        Mortgage-Backed Securities, and CDOs ................................................ 99

2.      During the Bond Fund Subclass Period, the Bond Funds
        Were Imprudent Investments for the ERISA Plans Because
        they Contained Mortgage and Asset Backed Securities and
        CDOs in Far Higher Percentages than was Appropriate
        Under the Circumstances ...................................................................... 102

3.      The Bond Funds' Over-Concentration in High-Risk
        Mortgage-Backed Securities and CDO Assets Comes to
        Light...................................................................................................... 110

4.      Defendants Maintained Investment in the Bond Funds to
        Benefit Regions and Its Subsidiaries Instead of the ERISA
        Plans and their Participants ................................................................. 114

C.      Excessive Fees and the RMK Select Funds .................................................... 122

iii

1.      The RMK Select Funds Were Imprudent Investments for the Legacy and Regions 401(k) Plans During the Excessive Fee Subclass Period and Defendants' Fiduciary Breaches Have Caused the Plans to Incur Substantial Losses............................ 122

2.      The Excessive Fees Charged by the RMK Select Funds Cannot Be Justified by Their Performance ........................................... 133

3.      Defendants Knew or Should Have Known That the RMK Select Funds Were Imprudent Investments ........................................... 134

4.      Defendants Failed to Provide Legacy and Regions 401(k) Plan Participants with Complete and Accurate Information Regarding the Excessive Fees Associated With the RMK Select Funds ........................................................................ 139

5.      Defendants Engaged in Prohibited Transactions Based on Their Selection of the RMK Select Funds as a Plan Investment Option ........................................................................ 140

IX.     THE RELEVANT LAW ........................................................................ 143

X.      CAUSES OF ACTION ........................................................................ 149

Count I:  Failure to Prudently and Loyally Manage the Plans and the Plans' Assets ........................................................................ 149

Count II:  Failure to Monitor Fiduciaries ................................................... 155

Count III:  Breach of Fiduciary Duty to Disclose Necessary Information to Co-Fiduciaries ........................................................................ 158

Count IV:  Breach of Fiduciary Duty: Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries ................. 159

Count V:  Co-Fiduciary Liability ................................................................ 162

Count VI: Failure to Prudently and Loyally Manage the ERISA Plans' Assets ........................................................................ 164

Count VII: Failure to Monitor Fiduciaries ................................................... 169

Count X: Co-Fiduciary Liability ................................................................ 171

Count XI:  Failure to Prudently and Loyally Manage the Legacy and Regions 401(k) Plans and the Plans' Assets ..................................... 174

iv

Count XII:  Failure to Monitor Fiduciaries ................................................................. 179

Count XIII: Breach of Fiduciary Duty: Failure to Provide Complete and
    Accurate Information to the Legacy and Regions 401(k) Plans'
    Participants and Beneficiaries .......................................................... 181

Count XIV:  Co-Fiduciary Liability ............................................................. 184

Count XV: Prohibited Transactions Regarding Revenue Sharing and Other
    Kickback Payments ............................................................................ 187

XI.    CAUSATION ..................................................................................................... 190

XII.    REMEDY FOR BREACHES OF FIDUCIARY DUTY .............................................. 191

XIII.    CLASS ACTION ALLEGATIONS ......................................................................... 193

XIV.    PRAYER FOR RELIEF ........................................................................................ 198

## I.    INTRODUCTION

1.      Plaintiffs Terry Hamby, Nancy Jackson, Robert H. Harrison, Caesar L. Smith, Barbara Williams, James K. Smith, II, Gary Shamblin, and the ERISA Plan Representative Trusts through and by C. Fred Daniels, as Trustee A*d Litem,* (collectively "Plaintiffs,") (identified and defined below), allege the following based upon personal information as to themselves and the investigation of Plaintiffs' counsel.

## II.    NATURE OF ACTION

2.      This is a class action brought on behalf of employee benefit plans (and trusts and custodial accounts for, or constituting, employee benefit plans) pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1132(a)(2) and (a)(3), against certain fiduciaries of and non-fiduciary parties in interest to those plans for violations of ERISA.  This action has three subclasses: the Company Stock Subclass, the Excessive Fee Subclass, and the Bond Fund Subclass.

3.      The plans at issue for the Company Stock and Excessive Fee Subclasses are retirement plans that are or have been sponsored by Regions Financial Corporation ("Regions," "Regions Financial," or the "Company").  Prior to a merger with AmSouth Bancorporation ("AmSouth"), Regions administered the first plan, the Regions Financial 401(k) Plan ("Legacy Plan"), for its employees.  On November 4, 2006, after Regions merged with AmSouth, Regions closed the Legacy Plan to contributions from new employees and began active administration of a second plan, the AmSouth Bancorp Thrift Plan (the "AmSouth Thrift Plan"), as the retirement plan for persons hired after January 1, 2007.  Thus, Regions actively maintained both the Legacy and AmSouth Thrift Plans, permitting investment in the Legacy Plan only by pre-merger Regions employees, and opening the AmSouth Thrift Plan to new hires.  On April 1, 2008, the

1

Legacy Plan merged into the AmSouth Thrift Plan, and the surviving plan, the third plan in the

Company Stock and Excessive Fee Subclasses, was renamed the Regions Financial Corporation

401(k) Plan (the "Regions 401(k) Plan"). *See* Regions Fin. Corp. 401(k) Plan, Annual Report

(Form 11-K) (Dec. 31, 2007) at 9 (hereinafter the "2007 11-K"). These three Regions-related

plans are collectively called "Plans" or "Plan" herein.

4.      The plans at issue in the Bond Fund Subclass (the "ERISA Plans") are all ERISA-

covered employee benefit plans (and any trusts or custodial accounts for or constituting such

plans) that had investments in any of the Bond Funds[1] at any time during the Bond Fund

Subclass Period, and for which Regions Bank d/b/a Regions Morgan Keegan Trust ("Regions

Bank" or "Regions Trust") was or is a trustee, custodian, or agent, or otherwise served as a

fiduciary. The Plans are included in the ERISA Plans.

5.      Named Defendants are fiduciaries of the Plans and the ERISA Plans and in

certain instances, non-fiduciaries who knowingly participated in fiduciary breaches. Plaintiffs'

claims arise from Defendants' failure to act solely in the interest of the Plans' and ERISA Plans'

participants and beneficiaries, and to exercise the required skill, care, prudence, and diligence in

administering, managing and investing the Plans' and ERISA Plans' assets.

6.      Plaintiffs assert claims with regard to three subclasses:[2]

1.      The "Company Stock Subclass:" Plan participants and beneficiaries whose Plan
        accounts were invested in Regions common stock. The class period for the
        Company Stock Subclass is from January 1, 2007 to the present ("Company Stock
        Subclass Period").

---

[1] With respect to the Bond Fund Subclass, the "Bond Funds" include without limitation the:
Regions Morgan Keegan ("RMK") Advantage Income Fund, RMK High Income Fund, RMK
Multi-Sector High Income Fund, RMK Strategic Income Fund, RMK Select High Income
Fund, RMK Select Intermediate Bond Fund, and RMK Select Short Term Bond Fund.
[2] The three subclasses are defined with greater precision in Section XIII below.

2

2.      "The Bond Fund Subclass:" ERISA Plan participants, beneficiaries, and/or fiduciaries on behalf of all ERISA Plans that had any plan assets invested in any of the Bond Funds at any time between November 9, 2006 and July 29, 2008 ("Bond Fund Subclass Period"), and has suffered losses to their accounts as a result of their accounts being invested in the Bond Funds.

3.      The "Excessive Fee Subclass:" Plans participants and beneficiaries whose Legacy and Regions 401(k) Plan accounts were invested in one or more of the RMK Select Funds or RMK Funds.[3]  The class period for the Excessive Fee Subclass is from May 1, 2003 to May 15, 2009 ("Excessive Fee Subclass Period"[4]).

7.      Plaintiffs allege that during the three subclass periods identified above (collectively, "the Subclass Periods"), Defendants imprudently caused, induced or permitted the investment of the Plans' and/or ERISA Plans' and their respective participants' assets in:

1.      Regions common stock, despite the fact that Defendants knew, or should have known, that such investment was unduly risky and imprudent due to the Company's serious mismanagement and improper business practices (**Company Stock Subclass Claims**);

---

[3] The "RMK Funds" or "RMK Select Funds" include those funds offered as investment options in the Legacy Plan and the Regions 401(k) Plan.  These include without limitation the: Regions Morgan Keegan ("RMK") Select Balanced Fund; RMK Select Ltd. Maturity Fixed Income Fund; RMK Select Growth Fund; RMK Select Value Fund; RMK Select Fixed Income Fund; RMK Select Core Equity Fund; RMK Select Mid Cap Growth Fund; RMK Select Mid Cap Value Fund; RMK Select Treasury Money Market Fund; RMK Select High Income Fund; RMK Select Intermediate Bond Fund; and RMK Select Short Term Bond Fund.  In addition, the Legacy Plan offered the following as investment options: Federated International Max Cap Institutional Fund; AIM Small Cap Growth Fund; and Fidelity Advisor Diversified International Fund.  2007 Form 11-K, at 10.  However, the Regions 401(k) Plan reduced the number of funds available within the Plan.  Specifically, it removed: the Pioneer Value Fund; the RMK Select Core Equity Fund; the Pioneer Oakridge Fund; the RMK Select Mid Cap Value Fund; the Fidelity Diversified International Fund; the RMK Select Ltd. Maturity Fixed Income Fund; and the RMK Select Treasury Money Market Fund.  R V Kuhns & Assocs. Plan Report, Feb. 22, 2008 at 1-2 (RMK00002049-00002050).  The following funds remained within the Regions 401(k) Plan, but frozen to new contributions: the RMK Select Fixed Income Fund; the RMK Select High Income Fund, the RMK Select Intermediate Bond Fund; the RMK Select Short Term Bond Fund; the Regions Stable Principal Fund; and the RMK Select LCV Fund.  *Id.*

[4] At this time, Plaintiffs have not included any ERISA plans in the Excessive Fee Subclass other than the Regions Plans.  Once discovery has been obtained regarding the nature and extent of Region's fiduciary role with regard to RMK Funds other than the Bond Funds, Plaintiffs will seek leave to amend the complaint as necessary and appropriate under the circumstances.

2.      The Bond Funds, despite the fact that Defendants knew, or should have known, that making or continuing to hold such investment was unduly risky and imprudent because the Bond Funds were grossly mismanaged (**Bond Fund Subclass Claims**); and

3.      The RMK Select Funds, despite the fact that Defendants knew, or should have known, that such investment options caused the Legacy and Regions 401(k) Plans to incur excessive fees and expenses that substantially diminished the retirement savings of Legacy and Regions 401(k) Plan participants (**Excessive Fee Subclass Claims**).

8.      With regard to each Subclass, Plaintiffs assert specific Counts.  Counts I-V address Defendants' fiduciary breaches with regard to the Company Stock Subclass.  In particular, in Count I,[5] Plaintiffs allege that the Company Stock Defendants[6] responsible for the investment of the Legacy, AmSouth Thrift, and Regions 401(k) Plans' assets breached their fiduciary duties to those Plans' participants in violation of ERISA by failing to prudently and loyally manage the Plans' investment in Regions common stock.

9.      In Count II, Plaintiffs allege that for the Company Stock Subclass Period, the Defendants responsible for the selection, monitoring, and removal of the other fiduciaries of the Legacy, AmSouth Thrift, and Regions 401(k) Plans failed to properly monitor the performance of their fiduciary appointees, and to remove and replace those whose performance was inadequate.

10.     In Count III, Plaintiffs allege that, as to each Plan, Defendants with fiduciary duties to disclose necessary information to co-fiduciaries breached their duties to provide their co-fiduciaries with complete and accurate information regarding the soundness and prudence of

---

[5] A chart of the claims is included as Exhibit 1 to this Complaint.
[6] Each defendant included in each group of defendants is named and listed in the Counts Section, Section X. *infra*.  This section is intended to be a summary, and not a replacement, of the Counts.

4

investing and holding retirement contributions in Regions common stock, and the impact of such investments on participants' retirement savings.

11.     In Count IV, Plaintiffs allege that the Defendants responsible for communicating with each Plan's participants breached their duties to inform the Plans' participants by failing to provide complete and accurate information regarding the soundness and prudence of investing and holding retirement contributions in Regions common stock.

12.     In Count V, Plaintiffs allege that all Defendants, except the Morgan Keegan Defendants, with respect to each Plan breached their duties and responsibilities as co-fiduciaries by participating knowingly in the breaches of other fiduciaries with regard to each Plan's continued investment in Regions stock, failing to undertake any effort to remedy these breaches despite their knowledge of them, and enabling other Defendants' breaches of fiduciary duty as a result of their own breaches.

13.     Counts VI-X address Defendants' fiduciary breaches with regard to the Bond Fund Subclass.  Specifically, in Count VI, Plaintiffs allege that the Defendants in Count VI (Regions Financial, Regions Bank, Morgan Keegan, MAM, Legacy Prudence Defendants, the AmSouth Thrift Prudence Defendants, and the Regions 401(k) Plan Prudence Defendants, with Individual Bond Fund Defendants as non-fiduciaries, collectively "the Bond Fund Defendants") who were responsible for management or investment of the ERISA Plans' assets breached their fiduciary duties to the ERISA Plans' participants in violation of ERISA by failing to prudently and loyally manage and monitor the ERISA Plans' investments in the Bond Funds, and to assure that the Bond Funds' investment strategies and holdings were consistent with the needs of the participants for long-term retirement savings and consistent with the purposes for which the Bond Funds were offered as an investment option.  Count VI includes the Legacy Prudence

Defendants, the AmSouth Thrift Prudence Defendants, and the Regions 401(k) Plan Prudence Defendants with respect to the Plans only.

14.     In Count VII, Plaintiffs allege that for the Bond Fund Subclass Period, Regions Bank, Regions Financial Corporation, and the Individual Bond Fund Defendants responsible for the selection, monitoring, and removal of the ERISA Plans' other fiduciaries (such as Morgan Keegan and MAM) (collectively the Bond Fund Monitoring Defendants) failed to properly monitor the performance of their fiduciary appointees, provide them with necessary information, and to remove and replace those whose performance was inadequate.

15.     In Count X,[7] Plaintiffs allege that the Bond Fund Co-Fiduciary Defendants breached their duties and responsibilities as co-fiduciaries, by knowingly participating in the breaches of other Bond Fund Defendant fiduciaries with regard to the Bond Funds, failing to undertake any effort to remedy these breaches despite their knowledge of them, and enabling other Bond Fund Defendants' breaches of fiduciary duty as a result of their own breaches.

16.     Counts XI-XV address Defendants' fiduciary breaches with regard to the Excessive Fee Subclass.  Specifically, in Count XI, Plaintiffs allege that the Excessive Fee Prudence Defendants responsible for the investment of the Legacy and Regions 401(k) Plans' assets breached their fiduciary duties to Plan participants in violation of ERISA by failing to prudently and loyally manage and monitor the Plans' investments in the RMK Select Funds.

17.     In Count XII, Plaintiffs allege that for the Excessive Fee Subclass Period, the Excessive Fee Monitoring Defendants responsible for the selection, monitoring, and/or removal

---

[7] This Third Amended Consolidated Complaint incorporates Counts VIII and IX from the Second Amended Consolidated Complaint into Count VI.  In order to maintain the same count numbering from the Second Amended Complaint, this Complaint omits Counts VIII and IX.

of the Legacy and Regions 401(k) Plans' other fiduciaries failed to properly monitor the performance of their fiduciary appointees, and to remove and replace those whose performance was inadequate.

18.     In Count XIII, Plaintiffs allege that the Excessive Fee Communications Defendants of the Legacy and Regions 401(k) Plans, defined *infra*, breached their duties to provide the Plans' other fiduciaries with complete and accurate information regarding the soundness and prudence of investing and holding retirement contributions in the RMK Select Funds, and the impact of such investments on participants' retirement savings.

19.     In Count XIV, Plaintiffs allege that the Excessive Fee Co-Fiduciary Defendants responsible for communicating with the Legacy and Regions 401(k) Plans' participants breached their duties to inform the Plan participants by failing to provide complete and accurate information regarding the soundness and prudence of investing, and holding retirement contributions in the RMK Select Funds.  Moreover, the Excessive Fee Co-Fiduciary Defendants breached their duties and responsibilities as co-fiduciaries by participating knowingly in the breaches of other fiduciaries with regard to each Plan's continued investment in RMK Funds, failing to undertake any effort to remedy these breaches despite their knowledge of them, and enabling other Defendants' breaches of fiduciary duty as a result of their own breaches.

20.     In Count XV, Plaintiffs allege that the Defendants responsible for the Legacy and Regions 401(k) Plans, including Morgan Keegan & Co. and MAM, two non-fiduciary parties in interest with regard to the Excessive Fee Subclass, engaged in prohibited transactions by causing the Plans to contract with Defendant Regions Bank d/b/a Regions Morgan Keegan Trust ("Regions Bank") in regards to the RMK Select Funds.  Regions Bank is the Plans' trustee

7

("Trustee"), a party-in-interest, and received and continues to receive excessive fees, revenue

sharing, and other "kickbacks" in contravention of ERISA § 406(a) and (b).

21.     As Regions' financial condition became known to the market, the Company's

stock fell from $37.40 on January 1, 2007, to $7.05 at the close of the market on May 13, 2011, a

decline of over 81 percent in share price during the Company Stock Subclass Period.

22.     In addition, the Bond Funds dramatically declined precipitously as a result of its

excessive risk and imprudent management.  For example, the RMK Select Intermediate Bond

Fund declined in value from $9.95 on November 9, 2006 to $1.15 on July 29, 2008, a decline of

over 88 percent during the Bond Fund Subclass Period.  The RMK Select High Income Fund

declined in value from $10.20 on November 9, 2006 to $1.47 on July 29, 2008, a decline of over

85 percent during the Bond Fund Subclass Period.

23.     During the Excessive Fee Subclass Period, the RMK Select Funds imposed fees

and expenses that reduced the Legacy and Regions 401(k) Plans' earnings by more than $13

million relative to the earnings the Plans would have experienced by investing in comparable

passively and actively managed investment alternatives.

24.     As more fully explained below, during all Subclass Periods, the Defendants

identified in the specific counts imprudently caused and permitted the Plans and ERISA Plans to

hold and acquire millions of dollars in: (1) Regions common stock, despite the dire financial

problems facing the Company; and/or (2) the Bond Funds, because, although contrary to the

Bond Funds' conservative fixed-income design and portrayal, the Bond Funds were heavily and

imprudently concentrated and invested in high-risk structured finance products; and/or (3) the

RMK Select Funds, despite the fact that they incurred unreasonably expensive fees and were

8

selected as Legacy and Regions 401(k) Plans investment options solely to benefit Regions, without regard for the best interests of Legacy and Regions 401(k) Plans participants.

25.     Based on publicly available information, Defendants' breach of duties have caused the Plans and ERISA Plans to lose millions of dollars of participants' retirement savings, in violation of ERISA §§ 404(a)(1)(A) and (B), 405(a) and 406.

26.     This action is brought on behalf of the Plans and ERISA Plans and seeks to recover losses to those plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

27.     ERISA §§ 409(a) and 502(a)(2) authorize participants, beneficiaries, and fiduciaries such as Plaintiffs to sue in a representative capacity for losses suffered by plans as a result of breach of fiduciary duties.  Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on behalf of participants, beneficiaries, and fiduciaries of the Plans and ERISA Plans whose plan accounts were invested: (1) in Regions common stock at any time from January 1, 2007 to the present; and/or (2) in any of the Bond Funds at any time from November 9, 2006 to July 29, 2008; and/or (3) in one or more of the RMK Select Funds at any time from May 1, 2003 to May 15, 2009, and with regard to each subclass, suffered losses during the respective Subclass Periods.

28.     Because the information and documents upon which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity made upon information and belief.  Plaintiffs have received only limited core Plan-

related documents from Defendants, and these limited documents have permitted only a narrow picture of the workings of the Plans and the specific actions/inactions of various Defendants. Once Plaintiffs have conducted full discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint or, if required, seek leave to amend, to add such other additional facts as are discovered that further support Plaintiffs' claims.

### III.   JURISDICTION AND VENUE

29.   **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

30.   **Personal Jurisdiction.**  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of Tennessee.

31.   **Venue.**  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as some Defendants reside in, have principal executive offices in, and/or regularly do business in this District.  Further, many of the fiduciary breaches for which relief is sought are believed to have occurred in this District.  Lawsuits by public investors challenging the unauthorized and undisclosed risks of investments by the Bond Funds are also currently pending in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Regions systematically and continuously does business in this District.

## IV.   PARTIES

### A.   Plaintiffs

32.   Terry Hamby is a resident of Pinson, Alabama.  She was employed by AmSouth from 1996 until April 4, 2006, when AmSouth merged with Regions and she became a Regions employee.  Ms. Hamby left employment with Regions in December 2007.  She is a "participant" in the AmSouth Thrift Plan within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7), and her account was invested in Regions common stock in the Regions Stock Fund until January 30, 2008.  Ms. Hamby is a member of the Company Stock Subclass.

33.   Nancy Jackson is a resident of Oakland, Tennessee.  She was employed by Regions from July 2003 until December 31, 2007.  She is a "participant" in the Legacy and Regions 401(k) Plans within the meaning of ERISA § 3(7), 29 U.S.C § 1002(7), and her accounts have been invested in Regions common stock in the Regions Stock Fund.  She is a participant of the current Regions 401(k) Plan.  Ms. Jackson is a member of the Company Stock Subclass.

34.   Robert H. Harrison is a resident of Muscle Shoals, Alabama.  He was employed by Regions from May 1999 until October 2007.  He is a "participant" in the Legacy Plan within the meaning of ERISA § 3(7), 29 U.S.C § 1002(7), and his account was invested in Regions common stock in the Regions Stock Fund and the RMK Select Funds during the applicable subclass periods.  Mr. Harrison is a member of the Company Stock and Excessive Fee Subclasses.

35.   Caesar L. Smith is a resident of Memphis, Tennessee.  He was employed by Regions from November 1998 until March 2008.  He is a "participant" in the Legacy Plan within the meaning of ERISA § 3(7), 29 U.S.C § 1002(7), and his account was invested in Regions

11

common stock in the Regions Stock Fund and the RMK Select Funds during the applicable subclass periods.  Mr. Smith is a member of the Company Stock and Excessive Fee Subclasses.

36.    Barbara Williams is a resident of Cumming, Georgia.  She was employed by Regions from July 11, 2002 to July 31, 2007.  She is a "participant" in the Legacy Plan, which merged with the AmSouth Plan and was renamed the Regions Financial Corporation 401(K) Plan, within the meaning of ERISA § 3(7) , 29 U.S.C. § 1002(7), and her account was invested in Regions common stock in the Regions Stock Fund from at least July 11, 2003 to the present.  In addition, Ms. Williams' account was invested in the RMK Select Tr. Money Market-A Fund during the Excessive Fee Subclass period.  As a result, Ms. Williams is a member of the Company Stock Subclass and Excessive Fee Subclass.

37.    Plaintiff Gary Shamblin is a resident of Hoover, Alabama.  He was employed by Regions from August 1996 until 2009.  He is a "participant" in the Legacy Plan and Regions 401(k) Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).  Mr. Shamblin's accounts were invested in Regions common stock in the Regions Stock Fund from at least January 1, 2007 to August 2007.  Further, his account was invested in the RMK Select High Income Bond Fund from April 1, 2003 to August 2007, and in the RMK Select Intermediate Bond Fund from January 4, 2005 to August 2007.  His account has been invested in one or more of the RMK Select Funds and one or more of the Bond Funds.  Mr. Shamblin is a member of three Subclasses: Company Stock Subclass, Excessive Fee Subclass, and the Bond Fund Subclass.

38.    Plaintiff James K. Smith, II is a resident of Hot Springs, Arkansas.  He is employed by the Keith Smith Company and is a participant in the Keith Smith Company Employee Profit Sharing Plan.  The Keith Smith Company Employee Profit Sharing Plan appointed Regions Bank d/b/a Regions Morgan Keegan Trust to serve as trustee of the plan.

Regions Bank in turn appointed Morgan Asset Management to serve as the investment manager. Mr. Smith has been a participant in the Keith Smith Company Employee Profit Sharing Plan since 1976. Mr. Smith's accounts were invested in the RMK Intermediate Bond Fund through August 2007. Mr. Smith is a member of the Bond Fund Subclass.

39.     Keith Smith Company Inc. Employee Profit Sharing Plan; Holt Audio Visual & Video, Inc. 401(k) Plan; Colle Towing Co., Inc. Profit Sharing Plan; and Briscoe Production Company Employees Retirement Plan (and the trusts or custodial accounts for or constituting such plans) (collectively, the "ERISA Plan Representative Trusts") bring this action by and through C. Fred Daniels as Trustee *ad Litem* ("TAL") in substitution for Regions Bank as trustee for the ERISA Plan Representative Trusts. As a result of conflicts of interests presented by Regions Bank's investments in the Bond Funds as trustee, directed trustee, custodian, or agent for trusts and custodial accounts (including, but not limited to, trusts and custodial accounts for, or constituting, the ERISA Plans), the Probate Court of Jefferson County, Alabama (where Regions and Regions Bank are headquartered) appointed C. Fred Daniels as Trustee *ad Litem* for the limited and specific purposes of monitoring, evaluating, participating in, and taking other litigation actions in, certain litigation involving the Bond Funds in substitution for Regions Bank. A copy of the June 20, 2008, Amended Order Appointing Trustee *ad Litem* is attached as Exhibit 5 and is incorporated by reference. The ERISA Plan Representative Trusts, by and through the TAL, are representative plaintiffs on behalf of all other trusts and custodial accounts for, or constituting, ERISA Plans (participating by and through their respective trustees or other fiduciaries, including the TAL), and which are all included within the Bond Fund Subclass.

13

**B.**     **Defendants**

40.     **Defendant Regions Financial Corporation ("Regions" or "Regions Financial")** is a Delaware corporation with its principal place of business at 1900 Fifth Avenue North, Birmingham, Alabama.  Regions is the successor by merger of several financial institutions, including Memphis-based Union Planters Corporation ("Union Planters"), which merged with Regions on July 1, 2004, and AmSouth Bancorporation, which merged with Regions on November 4, 2006.  Regions is a full-service provider of consumer and commercial banking, trust, securities brokerage, mortgage, and insurance products and services and, as of November 2007, was one of the nation's largest banks with $141 billion in assets.  Regions common stock is listed on the New York Stock Exchange and trades under the ticker symbol "RF."

41.     Regions exercises discretionary authority with respect to management and administration of the Plans, and/or management and disposition of the Plans' assets, and is therefore, a fiduciary to the Plans.  Regions acts through its board of directors ("Board of Directors" or "Board"), as well as through its officers, employees, and members of its administrative and/or investment committees appointed by Regions to perform Plan-related fiduciary functions.

42.     At all applicable times, Regions has had effective control over the activities of its directors, officers, and employees, including over their Plan-related activities.  Through its Board of Directors or other means, Regions has had the authority and discretion to hire and terminate its officers and employees.

43.     **Defendant Regions Bank d/b/a Regions Morgan Keegan Trust (aka "Regions Bank" or "Regions Trust")** is an Alabama-chartered commercial bank which has its principal

14

place of business at 1900 Fifth Avenue North, Birmingham, Alabama.  Regions Bank is a wholly-owned banking subsidiary of Regions and therefore a party in interest to the Plans. Regions Bank is one of the nation's largest trust companies with more than $87 billion in assets. Regions Bank serves as trustee for the Plans and as trustee or custodian for the ERISA Plans, and in these capacities exercises discretionary authority or discretionary control respecting management of the ERISA Plans, and exercises authority or control respecting management or disposition of the assets of the Plans and ERISA Plans, and, therefore, is a fiduciary under ERISA.  ERISA § 3(21), 29 U.S.C. § 1002(21).  *See also* Regions Financial Corporation 401(k) Plan Trust Agreement (March 25, 2008) at 1 (RFC00002544); Investment Advisory Services Agreements, Ex. 2 & 3 attached to this Complaint.

44. **Defendant Morgan Keegan & Co., Inc. (aka "Regions Morgan Keegan" or "Morgan Keegan")** is a wholly owned subsidiary of Regions Financial Corporation and is a regional brokerage and investment banking firm.  Morgan Keegan is one of the largest investment firms in the South, employing approximately 1,300 financial advisors in various offices.  Morgan Keegan offers a variety of financial services and products, including, during the relevant Subclass Periods, the RMK Funds and Bond Funds at issue in this Complaint.  It served or serves as the underwriter as well as the distributor of the RMK Funds and Bond Funds and as the shareholder servicing agent.  Morgan Keegan provides trust services pursuant to the trust powers of Regions Bank.  Morgan Keegan also serves as the conduit for the payment of certain investment professionals of the Bond Funds.  Based on its authority or control respecting management or disposition of the assets of the ERISA Plans, Morgan Keegan is a fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A).  In addition, Morgan Keegan is a party-in-interest that knowingly participated in other fiduciaries' violation of ERISA § 406(a) and (b)

15

by engaging in transactions prohibited by ERISA that caused substantial harm to the Plans and ERISA Plans.  Through its alter ego or instrumentality, Morgan Asset Management, Inc., Morgan Keegan was also a party to Investment Advisory Services Agreements (identified below) with Regions Bank pursuant to which Morgan Keegan provided investment management and investment advisory services to or for ERISA Plans for a fee. Allen Morgan served as Chairman and Executive Managing Director of Morgan Keegan & Co., director and Vice-Chairman of Regions Financial, and was a director of Morgan Asset Management.

45.    **Defendant Morgan Asset Management ("MAM")** is operated as an arm or division of Morgan Keegan and Regions Bank that provides investment management and advisement services.  Up until mid-2009, it was the Investment Advisor to the RMK Select Funds, and until mid-2008, it was the Investment Advisor to the Bond Funds.  MAM provided investment management and advisory services to the Plans and ERISA Plans during the Subclass Periods within the meaning of, *inter alia*, ERISA § 3(38), 29 U.S.C. § 1002(38), based at least in part on Investment Advisory Services Agreements it entered into with Regions Bank dated April 1, 2003, and February 5, 2007 (attached to this Complaint as Exs. 2 and 3, and incorporated by reference), or otherwise acted as an ERISA fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  For the Excessive Fee Subclass, MAM is a party-in-interest, because it provides services to the Plans, ERISA §§3(14)(A), 29 U.S.C. 1002(14)(A), and it knowingly participated in other fiduciaries' prohibited transactions under ERISA § 406(a) and (b).

    1.    **Regions Trust, Morgan Keegan, And MAM Are Alter Egos And Instrumentalities Of Regions And Alter Egos *Inter Se***

46.    Regions Bank, Morgan Keegan, and MAM are alter egos and instrumentalities of Regions and alter egos of each other.  Written Advisory Agreements were executed with the Bond Funds in the name of MAM to manage investments of the Bond Funds, and, in addition,

16

written Investment Advisory Services Agreements with Regions Trust were executed in the name of MAM to manage investments of the Plans and ERISA Plans (along with other trusts and custodian accounts) for which Regions Trust served as trustee.  Nonetheless, Regions and Morgan Keegan in public filings, press releases, and marketing materials have treated and described these services, and the income they generated, as having been provided or generated by Regions or Morgan Keegan rather than MAM.

47.     In public filings and statements, Regions, Regions Trust, MAM and Morgan Keegan have themselves treated and described services ostensibly undertaken in the name of each other, including the following examples (emphasis added):

"Regions Trust ... has been combined with Morgan Keegan Trust Co. to form Regions Morgan Keegan Trust . . . Regions is also combining the investment management expertise of Morgan Keegan and Regions Trust into Morgan Asset Management ...."

"Regions [Financial's] investment and securities brokerage, ***trust and asset management division, Morgan Keegan, Inc.,*** provides services from over 400 offices."

"Morgan Keegan . . . offers products and services including asset management . . . Morgan Keegan also manages the delivery of trust services, which are provided pursuant to the trust powers of Regions Bank."

"Regions [Financial] provides . . . brokerage and trust services in over 400 offices of Morgan Keegan . . ." **"Morgan Keegan's lines of business include . . . trust and asset management."**

"Regions [Financial's] primary source of brokerage, investment banking, and ***trust revenue*** is its subsidiary, ***Morgan Keegan***. ***Morgan Keegan's*** revenues are predominantly recorded in the brokerage and investment banking and ***trust department*** income lines ... [of Regions Financial's Form 10-K Annual Reports.]"

"In addition to General Banking/Treasury, Regions [Financial] has designated as distinct reportable segments the activity of its Investment Banking/Brokerage/Trust and Insurance divisions. Investment Banking/Brokerage/Trust includes *trust activities* and all brokerage and investment activities *associated with Morgan Keegan."*

48.     Morgan Keegan's website describes services contractually undertaken in the name of MAM as being in fact provided by Morgan Keegan rather than MAM (emphasis supplied):

> Determining who to trust to help grow, preserve and transfer your legacy to future generations is one of the most important decisions you can make in your lifetime.
>
> ….
>
> These decisions are often compounded in their complexity because they usually involve choosing between the stability of a bank or the investment resources of a brokerage firm. Now you can have the best of both worlds.  Regions Morgan Keegan Trust allows you the security of Regions Bank, a top 15 financial institution, and the resources of Morgan Keegan, a nationally known investment firm.
>
> ….
>
> Click on the topics in the menu above to learn more about Regions Morgan Keegan Trust, or contact **Morgan Keegan** today for more information about **our Trust Services**.

MAM is not mentioned.

49.     Elsewhere, Morgan Keegan's website describes "trust services" and "asset management services" as being provided by a "division" of Morgan Keegan; again, MAM is not even mentioned.

50.     Regions treats the revenue generated by MAM as generated by Morgan Keegan in Regions Financial's Form 10-K Annual Reports.

51.     According to Regions' 10-K Annual Reports for fiscal years ended December 31, 2006, 2007, and 2008, **Morgan Keegan** actually provided trust, asset management, and investment advisory services which were ostensibly contracted or provided by MAM for Regions Trust and the Bond Funds. Regions described trust, investment advisory, and investment

18

management services undertaken contractually by MAM as having in fact been provided by

Morgan Keegan or Regions instead:

> "Regions [Financial] provides brokerage, investment banking and ***trust services*** in over 300 offices of Morgan Keegan & Company, Inc. . . ."

2006 10-K, p. 35

> "Morgan Keegan & Company, Inc. ("Morgan Keegan"), a subsidiary of Regions Financial Corporation, is a full-service regional brokerage and investment banking firm. . . . Morgan Keegan also *manages the delivery of trust services, which are provided pursuant to the trust powers of Regions Bank*."

2008 10-K, p. 3.

> "Morgan Keegan is registered as an *investment adviser* in [numerous] following states: . . . ."

2006 10-K, p. 11

> "Morgan Keegan's pre-tax income was negatively affected during 2007 by $42.8 million in losses on investments in *two open-ended mutual funds* [Bond Funds] ***managed by Morgan Keegan . . . .***"

2007 10-K, p. 36

> "Also included in other assets during the year were investments of approximately $55.0 million in the Regions Morgan Keegan ("RMK") Select High Income Fund and approximately $75.0 million in the RMK Select Intermediate Bond Fund, purchased by Morgan Keegan to provide liquidity support to these funds. Both of these funds are *proprietary open-end mutual funds* [Bond Funds] ***managed by Morgan Keegan*** . . . ."

2007 10-K, p. 36

> "Morgan Keegan's pre-tax income was negatively affected during 2008 by $49.4 million in losses on investments in *two open-end mutual funds* [Bond Funds] ***managed by Morgan Keegan***."

2008 10-K, p. 43.

> "Included in professional fees during 2008 and 2007 were $7.4 million and $34.6 million, respectively, of merger-related charges. The 2008 increase is primarily due to higher *legal expenses incurred at Morgan Keegan*."

2008 10-K, p. 48 (emphasis supplied in above)

52.     The only mention of "Morgan Asset Management" in the Regions 2006, 2007, or 2008 10-K Annual Reports is a reference buried in a long list of over 50 subsidiaries included in a schedule to the report.

53.     Even though MAM is named as a defendant in most or all of the many lawsuits arising out of the Bond Funds, legal fees attributable to the litigation arising from the Bond Funds are described as being incurred solely by Morgan Keegan. 2008 10-K, p. 43.

54.     Regions' 2007 10-K Annual Report provides additional detail regarding its relationship with Morgan Keegan. Regions is said to have provided its trust services through Morgan Keegan: "Regions [Financial] provides investment banking, brokerage and *trust services* in over 400 offices of Morgan Keegan & Company, Inc. . . . , a subsidiary of Regions [Financial] and one of the largest investment firms based in the South. Morgan Keegan contributed $165.9 million to consolidated net income in 2007.  Its lines of business include private client retail brokerage services, fixed-income capital markets, equity capital markets, *trust and asset management*."  2007 10-K at 23.  "Regions [Financial's] *primary source of* brokerage, investment banking and *trust revenue* is its subsidiary, *Morgan Keegan*. Morgan Keegan's revenues are predominantly recorded in the brokerage and investment banking and *trust department* income lines of the consolidated statements of income, while a smaller portion is reported in other non-interest income." 2007 10-K at 36.  "In addition to General Banking/Treasury, Regions [Financial] has designated as distinct reportable segments the activity of its Investment Banking/Brokerage/*Trust* and Insurance divisions. Investment Banking/Brokerage/*Trust* includes *trust activities* and all brokerage and investment activities *associated with Morgan Keegan*." 2007 10-K at 127.  (emphasis supplied).

20

55.     In its 2007 10-K, Regions did not separately identify its 2007 operating results from its mutual fund management business, instead apparently including that activity with Morgan Keegan's "asset management division:"

> "Revenues from the private client division, which was the top revenue producing line of business, totaled $393.5 million, or 30 percent of Morgan Keegan's total revenue in 2007 compared to $305.1 million, or 30 percent in 2006. The private client line of business benefited from equity markets volatility, as well as the *increased number of financial advisors and branch outlets* in 2007 related to *opening Morgan Keegan offices in former AmSouth branches* throughout the footprint. *Fixed-income capital markets revenue* totaled $244.4 million and $187.4 million in 2007 and 2006, respectively, benefiting from higher trading volumes. Equity capital markets revenue totaled $103.3 million in 2007, essentially unchanged from the 2006 level. The *asset management division* produced $188.9 million of revenue in 2007 and $149.5 million in 2006." (Emphasis supplied).

2007 10-K at 36.

56.     According to Regions' 2007 10-K, "Asset Management," which—based on the absence of any reference to MAM—appears to include MAM's management of the Bond Funds and MAM's services under its Investment Advisory Services Agreements with Regions Trust, is treated as a "division" of Morgan Keegan, and "Asset Management" revenues are included in Morgan Keegan's operating results.

57.     MAM's federal Form ADV (Uniform Application For Investment Advisor Registration) shows that MAM's records, including account records and "compliance" records, were maintained not at offices of MAM, but instead at offices of Morgan Keegan and Regions Trust.  MAM ADV, pp. 27-34.

58.     Exhibits to a "Joint Notice Of Intent To Revoke Registration And Impose Administrative Penalty" ("State Regulatory Complaint")(Exhibit 4 to this complaint) filed against MAM and Morgan Keegan on April 7, 2010, by the Alabama Securities Commission, The Kentucky Department of Financial Institutions, The Mississippi Secretary of State's Office,

and the South Carolina Office of the Attorney General, further demonstrate that Morgan Asset Management was not operated as a separate and independent entity.  Instead, evidence in those Exhibits ("State Regulatory Complaint Exhibits") shows that Regions, Regions Trust, and Morgan Keegan dominated and controlled MAM and abused their control and domination of MAM.

59.     State Regulatory Complaint Exhibit 130 is a transcript of sworn testimony given by Carter Anthony on October 15, 2009.  Mr. Anthony was President of MAM from 2001 through 2006.

60.     Mr. Anthony reported to J. Kenneth (Ken) Alderman, who was President and CEO of "Regions Morgan Keegan Trust" (the trust department or division of Regions Bank), CEO and Vice-Chairman of MAM, and a senior officer of Regions.  Alderman in turn took orders from G. Douglas (Doug) Edwards, who was President and CEO of Morgan Keegan. Finally, Edwards took his orders from Allen B. Morgan, Jr., who was the Chairman of Morgan Keegan's Board of Directors and Vice-Chairman of Regions' Board of Directors.  Thus, a direct line of authority and control ran from an individual who was Vice-Chairman of Regions' Board and Chairman of Morgan Keegan's Board (Allen Morgan), to the CEO and President of Morgan Keegan (Doug Edwards), to an individual who was President and CEO of "Regions Morgan Keegan Trust," Executive Vice-President of Regions Financial, and CEO of MAM (Ken Alderman), down to the President of MAM (Carter Anthony).

61.     Regions and Morgan Keegan also exerted direct and active control over the "trust" department or division of Regions Trust known as "Regions Morgan Keegan Trust" and over MAM.  Mr. Anthony testified that "when Regions [Financial] bought Morgan Keegan . . . the trust department went over to Morgan Keegan . . . Morgan Asset Management was under the

22

bank trust department"; "[b]ut then when the merger came about, we became Morgan Asset Management we went over — as part of [Regions Morgan Keegan] Trust, we were over in Morgan Keegan."  Joint Notice of Intent to Revoke Registration and Impose Administrative Penalty, at Exhibit 130, pp. 7, 56-57, *In re: Morgan Asset Management, Inc., et al.*, Nos. Ala. SC-2010-0016; Ky. 2010-AH-021; Miss. S-08-0050; S.C. 08011 (Sep. 30, 2010), *available at* http://www.asc.state.al.us/Orders/2010/SC-2010-0016/MK%20Notice%20of%20Intent%20-%2009302010.pdf, (hereinafter "Anthony Dep.").  The control that Regions and Morgan Keegan exercised over MAM and the trust department or division of Regions Trust ["Regions Morgan Keegan Trust"] was not a matter of benign corporate ownership and organizational charts. Regions and Morgan Keegan actively exerted and abused their control over MAM and Regions Trusts' trust department or division improperly to further their own financial interests.

62.     Although MAM was the Investment Manager for the Bond Funds, and James C. (Jim) Kelsoe was ostensibly MAM's "Portfolio Manager" for the Bond Funds, Doug Edwards of Morgan Keegan and Allen Morgan of Morgan Keegan and Regions Financial personally directed MAM's President, Carter Anthony, to "leave Kelsoe alone." Anthony Dep., p. 17.

63.     Mr. Anthony, MAM's former President, testified under oath:

Time and time again I was told by [Allen] Morgan [of Morgan Keegan and Regions Financial] and [Doug] Edwards [of Morgan Keegan] to leave Kelsoe alone, he's doing what we want him to do, he's also a little bit strange, he gets mad easy, leave him alone; and I left him alone.  I did what I was told to do.

Now, what [Ken] Alderman . . . what went on with Doug [Edwards] and Ken [Alderman] I don't know.  They talked an awful lot.  Ken came down and said they have negotiated a new contract with Kelsoe, they are going to send it to you. When it comes down here, sign it.  Well, it came to me, Ken said to sign it, Allen Morgan has already signed it; I signed it.

Anthony Dep., pp. 17-18.

64.     Mr. Anthony, as President of MAM, was told by Doug Edwards, as President and CEO of Morgan Keegan, to give Kelsoe whatever he wanted or needed.  Mr. Anthony stated under oath:

> Jim, for lack of a better word, was sort of like an island out there.  And whenever he had . . . whenever he wanted something or needed something, he went to Doug [Edwards, of Morgan Keegan].  And then if it was something I could furnish, Doug would call me.

Anthony Dep., p. 21.

65.     Mr. Anthony, as President of MAM, knew and understood that because he and MAM were under the control of Morgan Keegan and Regions, and because Morgan Keegan and Regions were financially interested in the Bond Funds, if Mr. Anthony, as President of MAM, had openly advised trusts and custodial accounts at Regions Bank (including the Plans and the ERISA Plans) to avoid investing in the Bond Funds, he would have been fired.  He stated under oath:

> . . . you understand I'm walking a tightrope here.  I have to answer to Ken Alderman and Doug Edwards and Allen Morgan over here at Morgan Keegan. But I have got portfolio managers who have trust clients over here (indicating), so if I stand up and beat on the table and say we are not putting any of those Kelsoe funds [Bond Funds] in our trust accounts, I'm fired, I'm gone.
>
> *   *   *
>
> I mean, I could have pounded on the table and said don't buy those funds [the Bond Funds] and I would have been looking for a job.

Anthony Dep., pp. 39, 70.

66.     Mr. Anthony's testimony also establishes that operations of Regions, Regions Bank, Morgan Keegan, and MAM were so overlapping and intertwined, even the President of MAM could not understand the relationships.  It is clear, however, that Morgan Keegan and

24

Regions completely controlled Regions Bank and MAM and the investments made in the Plans

and ERISA Plans:

> Ken used to tell us [MAM] in meetings that we were part of Morgan Keegan and
> for reporting purposes only, that we were . . . the charter was still held by Regions
> Financial Corp. and we were still in the bank.  But we were over here in Morgan
> Keegan reporting through them, which gave Morgan Keegan a better revenue and
> net income line. . . .

*   *   *

> We had like some annual meetings and he would say stuff like well, you know,
> we really aren't part of Morgan Keegan, but it works better for Morgan Keegan if
> we are over there; we are not legally part of Morgan Keegan. . . .

*   *   *

> But Ken [Alderman] and Doug [Edwards] and Allen [Morgan] figured out that . .
> . probably that Morgan Keegan would look better if it had trust revenues and
> earnings. . . .  So they figured out it would be better to take Regions Trust and put
> it over in Morgan Keegan and call it Regions Morgan Keegan Trust.  And
> Morgan Asset Management was part of trust. . . .  But when the merger came
> about, we became Morgan Asset Management and we went over . . . as part of
> trust we were over in Morgan Keegan.

Anthony Dep., pp. 54-57.

> 67.     State Regulatory Complaint Exhibit 107 includes sworn testimony of defendant

Michelle Wood at a Financial Industry Regulatory Authority ("FINRA") arbitration proceeding

against Morgan Keegan.  Ms. Wood testified that:

> [I]n April 2006 I became Chief Compliance Officer for Regions Morgan Keegan
> Select Funds [Bond Funds] and for Morgan Asset Management.

Joint Notice of Intent to Revoke Registration and Impose Administrative Penalty, at Exhibit 107,

pp. 504, *In re: Morgan Asset Management, Inc., et al.*, Nos. Ala. SC-2010-0016; Ky. 2010-AH-

021; Miss. S-08-0050; S.C. 08011 (Sep. 30, 2010), *available at*

http://www.asc.state.al.us/Orders/2010/SC-2010-0016/MK%20Notice%20of%20Intent%20-

%2009302010.pdf.  But although she was the Chief Compliance Officer for MAM:

25

A.     My paycheck comes from Morgan Keegan.

Q.     Have you ever received any paychecks over the past couple of years from Morgan Asset Management?

A.     No.

*Id.* at 505.  In addition to serving as Chief Compliance Officer for MAM and the Bond Funds, Ms. Wood was also a Senior Attorney and First Vice President of Morgan Keegan.

68.     In addition to Ms. Wood, all other individuals who ostensibly served as MAM's compliance personnel were actually Morgan Keegan employees:

Q.     The other people who performed compliance functions for Morgan Management, were all of them Morgan Keegan employees?

A.     Yes.

*Id.* at 508.

69.     James (Jim) Kelsoe served as a Senior Portfolio Manager for MAM, but he was actually employed by Morgan Keegan and was registered with FINRA as a representative of Morgan Keegan.

70.     MAM officers have been presented as though they were officers of Regions Trust. At annual investment luncheons sponsored by Regions Bank at "The Club" in Birmingham, Alabama, presentations were made by persons who were presented as Regions Trust officers, but who were ostensibly officers and/or employees of MAM.

71.     In the second half of 2007, when the Bond Funds suffered a precipitous drop in their net asset values and share prices, Regions caused another of its subsidiaries, Morgan Properties, LLC, to prop up those share prices and net asset values by purchasing a large volume of shares in certain Bond Funds (many of which were soon sold).

26

### 2.    Legacy Plan Defendants

72.    **Legacy Plan Compensation Committee Defendants**.  As explained in more

detail below, the Legacy Plan Compensation Committee of the Regions Board of Directors was

appointed by the Board and has oversight responsibility over the Legacy Plan.  Specifically, the

Compensation Committee has the "authority and responsibility to establish, administer, amend

and terminate employee benefit plans for [Regions] and its subsidiaries . . . and to delegate

certain of those responsibilities to individuals or a committee appointed by the Compensation

Committee."  Regions Meeting Minutes (July 14, 2004) at 1 (RMK00004971).  Defendants

identified in this paragraph are referred to collectively as the "Legacy Plan Compensation

Committee Defendants."  The Legacy Plan Compensation Committee appointed the Legacy Plan

Benefits Management Committee.  Plaintiffs list as John and Jane Does 1-20 the individual

Legacy Plan Compensation Committee Member Defendants, because the documents identifying

these individuals are held by Defendants.  Once the Legacy Compensation Committee Members

are identified, Plaintiffs will seek leave to join them under their true names.

73.    **Legacy Plan Benefits Management Committee Defendants**.  As explained

more fully below, the Compensation Committee established the Benefits Management

Committee, which has the "authority and responsibility" to amend the Plan, provide

recommendations to the Compensation Committee regarding amendments to the Plan, and

establish, amend, or terminate the Plan.  Compensation Committee Board Meeting Minutes (July

14, 2004) at 1 (RMK00004971).  The Benefit Management Committee owes a fiduciary duty to

the Legacy Plan.  Through limited discovery of core plan documents, Plaintiffs have identified

only a limited number of members of the Legacy Benefit Management Committee.  Plaintiffs list

as John and Jane Does 21-40 those Legacy Plan Benefits Management Committee Member

27

Defendants who remain unknown.  Once the additional Legacy Plan Benefits Management

Committee Defendants are identified, Plaintiffs will seek leave to join them under their true

names.  The Legacy Plan Benefits Management Committee and its members (including John and

Jane Does 21-40) are referred to collectively as the "Legacy Plan Benefits Management

Committee Defendants."  Those members currently identified include:

1. **Defendant Ken Alderman**.  Defendant Alderman was the Chairman of the Benefits Management Committee for the Legacy Plan as of at least September 17, 2004.  Defendant Alderman became a non-voting member as of at least June 7, 2007.  Benefits Management Committee Minutes at RFC00005067.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Alderman's service on the Committee.

2. **Defendant Alan Deer**.  Defendant Deer was a member of the Benefits Management Committee as of at least September 17, 2004.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Deer's service on the Committee.

3. **Defendant Bryan Jordan**.  Defendant Jordan was a member of the Benefits Management Committee as of at least September 17, 2004.  Plaintiffs are without specific information as to the termination date, of Defendant Jordan's service on the Committee.

4. **Defendant Harry Dinken**.  Defendant Dinken was a member of the Benefits Management Committee as of at least September 17, 2004.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Dinken's service on the Committee.

5. **Defendant John Daniel**.  Defendant Daniel was a member of the Benefits Management Committee as of at least September 17, 2004.   Plaintiffs are without specific information as to the termination date, if any, of Defendant Daniels' service on the Committee.

6. **Defendant David B. Edmonds**.  Defendant Edmonds was a member of the Benefits Management Committee as of at least December 28, 2006.  As of at least March 14, 2007, he was the Chairman of the Committee.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Edmonds' service on the Committee.

7. **Defendant W. Charles Mayer, III**.  Defendant Mayer was a member of the Benefits Management Committee as of at least December 28, 2006.  Plaintiffs are

without specific information as to the termination date, if any, of Defendant Mayer's service on the Committee.

8.     **Defendant William C. Wells, II**.  Defendant Wells was a member of the Benefits Management Committee as of at least December 28, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Wells's service on the Committee.

9.     **Defendant O. B. Grayson Hall, Jr**.  Defendant Hall was a member of the Benefits Management Committee as of at least December 28, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Hall's service on the Committee.

10.    **Defendant Candice W. Bagby**.  Defendant Bagby was a member of the Benefits Management Committee as of at least December 28, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Bagby's service on the Committee.

11.    **Defendant John Buchanan**.  Defendant Buchanan was a member of the Benefits Management Committee as of at least March 14, 2007.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Buchanan's service on the Committee.

12.    **Defendant David Turner**.  Defendant Turner was a non-voting member of the Benefits Management Committee as of at least March 14, 2007.  As of at least August 15, 2007, Defendant Turner was a non-voting member of the Committee. (RFC00005073).  Plaintiffs are without specific information as to the termination date, if any, of Defendant Turner's service on the Committee.

13.    **Defendant Jill Shelton**.  Defendant Shelton was a non-voting member of the Benefits Management Committee as of at least March 14, 2007.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Shelton's service on the Committee.

14.    **Defendant Chris Glaub**.  Defendant Glaub was a non-voting member of the Benefits Management Committee as of at least March 14, 2007.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Glaub's service on the Committee.

15.    **Defendant Alton E. Yother**.  Defendant Yother, previously identified as a Director Defendant, was a member of the Benefits Management Committee as of at least June 7, 2007.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Yother's service on the Committee.

16.    **Defendant Tim Laney**.  Defendant Laney was a member of the Benefits Management Committee as of at least August 15, 2007.  Plaintiffs are without

29

specific information as to the termination date, if any, of Defendant Laney's service on the Committee.

74.     **Legacy Plan Benefits Administration Committee Defendants**.  The Compensation Committee of the Regions Board of Directors also created and appointed the Legacy Plan Benefits Administration Committee, which was appointed as the Plan Administrator with responsibility to select Plan investments until at least February 2007.  The Compensation Committee granted the Benefits Administration Committee the authority to administer all employee benefit plans of the Company and its subsidiaries, and to establish procedures for such administration.  *See* Benefits Administration Committee Claims, *Procedure for Retirement and Non-Medical Benefits Determinations*, at 1 (RMK00001185).  This included the authority to oversee Plan administration, interpret Plan provisions, issue rules and regulations, determine eligibility for benefits, decide claims, appoint consultants and advisors for the efficient administration of the Plan, maintain Plan records, file tax returns, and make recommendations to the Benefits Management Committee.  Compensation Committee Meeting Minutes (July 14, 2004) at 3 (RMK00004973).  Upon information and belief, the Benefits Administration Committee also had duties to communicate with Plan participants.  The identities of the Legacy Plan Benefits Administration Committee Defendants are largely unknown to Plaintiffs, although those who are known are listed below.  The remaining unknown members of the Committee are named as John and Jane Does 41-60.  Once additional Legacy Plan Benefits Administration Committee Defendants are identified, Plaintiffs will seek leave to join them under their true names.  The Legacy Plan Benefits Administration Committee Defendants (including John and Jane Does 41-60) are referred to collectively as the "Legacy Plan Benefits Administration Defendants."  The members currently identified are:

30

1.      **Defendant Tusa McNary**.  Defendant McNary was the chairperson of the Benefits Administration Committee as of at least February 8, 2005 through at least January 31, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant McNary's service on the Committee.

2.      **Defendant Ronnie Jackson**.  Defendant Jackson was a member of the Benefits Administration Committee as of at least February 8, 2005 through at least January 31, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Jackson's service on the Committee.

3.      **Defendant Tom Thompson**.  Defendant Thompson was a member of the Benefits Administration Committee as of at least February 8, 2005 through at least January 31, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Thompson's service on the Committee.

4.      **Defendant Lea Stokes**.  Defendant Stokes was a member of the Benefits Administration Committee as of at least February 8, 2005 through at least April 5, 2005.  Upon information and belief, Defendant Stokes was no longer a member of the Committee as of September 6, 2005.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Stokes's service on the Committee.

5.      **Defendant Sharon Davis**.  Defendant Davis was a member of the Benefits Administration Committee as of at least September 6, 2005 through at least January 31, 2006.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Davis's service on the Committee.

75.     **Additional Legacy Plan Defendants**.  Through investigating Plan materials,

Plaintiffs have identified several persons and parties that are Plan Fiduciaries and Legacy Plan

Defendants.  They are referred to herein as the "Additional Legacy Plan Defendants."  They are:

1.      **Defendant Dowd Ritter.**  Defendant Ritter has been the Director of Regions since November 2006.  He has also been the Chairman, President, and CEO of Regions and Regions Bank since January 2008.  As Director, Chairman, President, and CEO of Regions, he has been a fiduciary to the Legacy Plan with authority to appoint the Compensation Committee members.

2.      **Defendant Harry J. Dinken**.  In addition to serving on the Member Benefits Committee, Defendant Dinken was Plan Administrator to the Legacy Plan, as disclosed in the 2003 Form 5500, filed July 13, 2004.  He was also designated as Plan Sponsor/Employer/DFE for that year.

3.      **Defendant Tusa McNary**.  In addition to serving as Chairperson to the Benefits Administration Committee, Defendant McNary was the Plan Administrator to the

31

Legacy Plan according to the Form 5500 for the plan year ending December 31, 2004, which is dated October 14, 2005.  Defendant McNary was also the Plan Administrator to the Legacy Plan for the plan year ending December 31, 2005, according to the Form 5500 dated October 11, 2005.

4.    **Defendant Sherry Anthony**.  Defendant Anthony was the Plan Administrator to the Legacy Plan according to the Form 5500 for the plan year ending on December 31, 2005, which is dated October 11, 2006.

5.    **Defendant Christopher Glaub**.  In addition to being a member of the Benefits Management Committee, Defendant Glaub was the Plan Administrator to the Legacy Plan according to the Form 5500 for the plan year ending on December 31, 2006, which is dated October 12, 2007.  Defendant Glaub was also the Plan Administrator to the Legacy Plan for the plan year ending December 31, 2007, according to the Form 5500 dated August 27, 2008.

6.    **Defendant John Daniel**.  In addition to serving on the Benefits Management Committee, Defendant Daniel was Executive Vice President and Director of Human Resources of Regions Financial Corporation as of June 23, 2006.  He signed the Legacy Plan's 11-K forms on behalf of the Plan on June 23, 2006 and June 28, 2005.  Upon information and belief, Defendant Daniel served as a Plan fiduciary who exercised control and authority over Legacy Plan assets and/or managed and administered the Plan.

**3.    AmSouth Thrift Plan Defendants**

76.    **AmSouth Thrift Plan Compensation Committee Defendants.**  As explained more fully below, the Regions Compensation Committee has oversight responsibility over the AmSouth Thrift Plan.  Defendants identified in this paragraph are referred to collectively as the "AmSouth Thrift Plan Compensation Committee Defendants."  The AmSouth Thrift Plan Compensation Committee appointed the AmSouth Thrift Plan Benefits Management Committee. Based on review of limited core plan documents obtained from Defendants, Plaintiffs allege that the AmSouth Thrift Plan Compensation Committee Defendants are as follows:

1.    **Defendant Claude B. Nielsen**.  Defendant Nielsen was the chairman of the Committee as of at least November 9, 2006.  Defendant Nielsen is also identified as a member of the Director Defendants.

32

2.      **Defendant George W. Bryan**.  Defendant Bryan was a member of the Committee as of at least **November** 9, 2006.  Defendant Bryan is also identified as a member of the Director Defendants.

3.      **Defendant Earnest W. Deavenport, Jr**.  Defendant Deavenport was a member of the **Committee** as of at least November 9, 2006.  Defendant Deavenport is also identified as a member of the Director Defendants.

4.      **Defendant Susan W. Matlock**.  Defendant Matlock was a member of the Committee as of at **least** November 9, 2006.  Defendant Matlock is also identified as a member of the Director Defendants.

5.      **Defendant Martha R. Ingram**. Defendant Ingram was a member of the Committee as of **at** least November 9, 2006.  Defendant Ingram is also identified as a member of the Director Defendants.

6.      **Defendant Lee J. Styslinger III**.  Defendant Styslinger was a member of the Committee as of at least November 9, 2006.  Defendant Styslinger is also identified as a member of the **Director** Defendants.

77.     **AmSouth Thrift Plan Benefits Committee Defendants**.  As explained more fully below, the AmSouth Thrift Plan assigned the roles of Plan Administrator and named fiduciary to the AmSouth Benefits Committee.  As Plan Administrators, the AmSouth Thrift Plan Benefits Committee members have full authority and power to administer and construe the AmSouth Thrift Plan, and to the extent not delegated to an Investment Committee, have the responsibility for selecting the investment funds in the AmSouth Thrift Plan, and responsibility for monitoring the performance of those funds.  Through limited disclosures from Defendants, Plaintiffs have identified some of the AmSouth Thrift Plan Benefits Committee Defendants.  Plaintiffs name unidentified Committee members as John and Jane Does 61-70.  Once additional AmSouth Thrift Plan Benefits Committee Defendants are identified, Plaintiffs will seek leave to join them under their true names.  The AmSouth Thrift Plan Benefits Committee and its members (including John and Jane Does 61-70) are referred to collectively as the "AmSouth Thrift Plan Benefits Committee Defendants."   Based on limited core plan documents obtained

33

from Defendants, Plaintiffs allege that the following individuals were the AmSouth Thrift Plan

Benefits Committee Defendants as of at least August 24, 2006:

1.    **Defendant Edmonds**.  Defendant Edmonds, previously identified as the Chairman of the Legacy Plan Benefits Management Committee, is identified as the Chairman of the AmSouth Benefits Committee as of at least August 24, 2006. Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

2.    **Defendant Buchanan**.  Defendant Buchanan, previously identified as a member of the Legacy Plan Benefits Management Committee, was a member of the AmSouth Benefits Committee as of at least August 24, 2006.   Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

3.    **Defendant Susan Martinez**.  Defendant Martinez was a member of the AmSouth Benefits Committee as of at least August 24, 2006.  Upon information and belief she retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

4.    **Defendant Mayer III**.  Defendant Mayer, previously identified as a member of the Legacy Plan Benefit Management Committee, was a member of the AmSouth Benefits Committee as of at least August 24, 2006.   Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

5.    **Defendant Alton E. Yother**.  Defendant Yother, previously identified as a member of the Legacy Plan Benefit Management Committee, was a member of the AmSouth Benefits Committee as of at least August 24, 2006.   Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

6.    **Defendant Rusty Stephenson**.  Defendant Stephenson was a member of the AmSouth Benefits Committee as of at least May 11, 2006.  Upon information and belief he retained this role up to and beyond the merger of the AmSouth Plan with the Legacy Plan on April 1, 2008.

78.    **Additional AmSouth Plan Defendants**.  Through investigating Plan materials,

Plaintiffs have identified several persons and parties that are Plan Fiduciaries and AmSouth Plan

Defendants.  They are referred to herein as the "Additional AmSouth Plan Defendants."  They

are:

1.      **Defendant Dowd Ritter.**  Defendant Ritter has been the Director of Regions since November 2006.  He has also been the Chairman, President, and CEO of Regions and Regions Bank since January 2008.  As Director, Chairman, President, and CEO of Regions, he has been a fiduciary to the AmSouth Thrift Plan with authority to appoint the Compensation Committee members.

2.      **Defendant Barbara H. Watson**.  Defendant Watson was a Senior Vice President of AmSouth.  She signed the Form 11-K on behalf of the AmSouth Thrift Plan as a Trustee on June 29, 2007.  Upon information and belief, Defendant Watson served as a fiduciary to the AmSouth Plan who exercised authority and control over Plan assets and/or managed and administered the Plan.

3.      **Defendant Chris A. Glaub**.  Defendant Glaub, previously identified as member of the Legacy Benefits Management Committee and Plan Administrator of the Legacy Plan, was the designated Plan Administrator to the AmSouth Thrift Plan for the year ending December 31, 2006, as identified in the Form 5500 signed on October 12, 2007.  He is also identified as the Employer/Plan Sponsor/DFE for that year.  Defendant Glaub was also the designated Plan Administrator to the AmSouth Thrift Plan for the year ending December 31, 2007, as identified on the Form 5500 he signed on October 14, 2008.  He is also identified as the Employer/Plan Sponsor/DFE for that year.

**4.      Regions 401(k) Plan Defendants**

79.      **Regions 401(k) Plan Compensation Committee Defendants.** As explained more fully below, the Compensation Committee of the Regions Board of Directors is appointed by the Board and has oversight responsibility over the Regions 401(k) Plan.  Defendants identified in this paragraph are referred to collectively as the "Regions 401(k) Plan Compensation Committee Defendants."  The Regions 401(k) Plan Compensation Committee appointed the Regions 401(k) Plan Benefits Management Committee.  On information and belief, the Regions 401(k) Compensation Committee Defendants are as follows:

1.      **Defendant George W. Bryan.  Defendant Bryan** is a current member of the Compensation Committee and has served as a member since the initiation of the Regions 401(k) Plan.  Defendant Bryan is also identified as a Director Defendant.

2.      **Defendant Earnest W. Deavenport, Jr.** is a current member of the Compensation Committee and has served as a member since the initiation of the Regions 401(k) Plan.  Defendant Deavenport is also identified as a Director Defendant.

35

3.  **Defendant James S.M. French** served as a member of the Compensation Committee as of the initiation of the Regions 401(k) Plan.  Defendant French is also identified as a Director Defendant.

4.  **Defendant Martha R. Ingram** served as a member of the Compensation Committee as of the initiation of the Regions 401(k) Plan.  Defendant Ingram is also identified as a Director Defendant.

5.  **Defendant Susan W. Matlock** is a current member of the Compensation Committee and has served as a member since the initiation of the Regions 401(k) Plan.  Defendant Matlock is also identified as a Director Defendant.

6.  **Defendant Claude B. Nielsen** is a current member of the Compensation Committee and has served as a member since the initiation of the Regions 401(k) Plan.  Defendant Nielsen is also identified as a Director Defendant.

7.  **Defendant Michael S. Starnes** served as a member of the Compensation Committee as of the initiation of the Regions 401(k) Plan.  Defendant Starnes is also identified as a Director Defendant.

8.  **Defendant Lee J. Styslinger III** is a current member of the Compensation Committee and has served as a member since the initiation of the Regions 401(k) Plan.  Defendant Styslinger is also identified as a Director Defendant.

9.  **Defendant Kemmons Wilson, Jr.** served as a member of the Compensation **Committee** as of the initiation of the Regions 401(k) Plan.  Defendant Wilson is also identified as a Director Defendant.

80.  **Regions 401(k) Plan Benefits Management Committee Defendants**.  As explained more fully below, the Regions 401(k) Plan assigned the roles of Plan Administrator and named fiduciary to the Regions Financial Corporation Benefits Management Committee.  As Plan Administrator, the Benefits Management Committee has full authority and power to administer and construe the Regions 401(k) Plan, and to the extent not delegated to an Investment Committee, has the responsibility for selecting the investment funds in the Regions 401(k) Plan and for monitoring the performance of those funds.  The identities of the Regions 401(k) Plan Benefits Management Committee Defendants are currently unknown to Plaintiffs and are therefore named as John and Jane Does 71-80.  Once the Regions 401(k) Plan Benefits

36

Management Committee Defendants are identified, Plaintiffs will seek leave to join them under their true names.  The Regions 401(k) Plan Benefits Management Committee and its members (John and Jane Does 71-80) are referred to collectively as the "Regions 401(k) Plan Benefits Management Committee Defendants."  Those members of the Committee currently known include:

1. **Defendant Edmonds**.  Defendant Edmonds, previously identified as the Chairman of the Legacy Plan Benefit Management Committee, is the Chairman of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Edmonds' service on the Committee.

2. **Defendant Hall, Jr**.  Defendant Hall, previously identified as a member of the Legacy Plan Benefit Management Committee, is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Hall's service on the Committee.

3. **Defendant Laney**.  Defendant Laney, previously identified as a member of the Legacy Plan Benefit Management Committee, is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008.   Plaintiffs are without specific information as to the termination date, if any, of Defendant Laney's service on the Committee.

4. **Defendant Wells**.  Defendant Wells, previously identified as a member of the Legacy Plan Benefit Management Committee, is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Wells's service on the Committee.

5. **Defendant Buchanan**.  Defendant Buchanan, previously identified as a member of the Legacy Plan Benefit Management Committee, is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Buchanan's service on the Committee.

6. **Defendant Irene Esteves**.  Defendant Esteves is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008.  Plaintiffs are without specific information as to the termination date, if any, of Defendant Esteves's service on the Committee.

7. **Defendant David Rupp**. Defendant Rupp is a member of the Regions 401(k) Plan Benefit Management Committee as of at least June 2, 2008. Plaintiffs are without specific information as to the termination date, if any, of Defendant Rupp's service on the Committee.

81. **Regions 401(k) Plan Investment Committee Defendants**. As explained more fully below, to the extent that the Regions 401(k) Plan Benefits Management Committee appointed such a committee and delegated to it such authority, the Regions 401(k) Plan Investment Committee Defendants have the responsibility for selecting the investment funds in the Plan and for monitoring the performance of those funds. The identities of the Regions 401(k) Plan Investment Committee Defendants are currently unknown to Plaintiffs and are therefore named as John and Jane Does 81-90. Once the Regions 401(k) Plan Investment Committee Defendants are identified, Plaintiffs will seek leave to join them under their true names. The Regions 401(k) Plan Investment Committee Defendants (John and Jane Does 81-90) are referred to collectively as the "Regions 401(k) Plan Investment Committee Defendants."

82. **Additional Regions 401(k) Defendants**. Through investigating Plan materials, Plaintiffs have identified several persons and parties that are Plan Fiduciaries and Regions 401(k) Plan Defendants. They are referred to herein as the "Additional Regions 401(k) Plan Defendants." They are

1. **Defendant Dowd Ritter.** Defendant Ritter has been the Director of Regions since November 2006. He has also been the Chairman, President, and CEO of Regions and Regions Bank since January 2008. As Director, Chairman, President, and CEO of Regions, he has been a fiduciary to the Regions 401(k) Plan with authority to appoint the Compensation Committee members.

38

### 5. Bond Fund Subclass Individual Defendants

83.     The following individuals are, at a minimum, non-fiduciaries who knowingly participated in the ERISA violations alleged as to the Bond Fund Subclass.[8]  These individuals are referred to as "the Individual Bond Fund Defendants" herein:

1.  **J. Kenneth Alderman**, President and CEO of Regions Morgan Keegan Trust, CEO of Morgan Asset Management, Inc., and Executive Vice President of Regions Financial Corporation.

2.  **G. Douglas Edwards**, President and CEO of Morgan Keegan & Co.

3.  **Allen B. Morgan**, Vice Chairman and Director of Regions Financial Corporation, Chairman and Director of Morgan Keegan & Co., and Director of Morgan Asset Management, Inc.

4.  **Brian Sullivan**, President and Chief Investment Officer of Morgan Asset Management, Inc.  Mr. Sullivan signed the Investment Advisory Agreements between MAM and Regions Bank on behalf of MAM.

## V.   THE THREE REGIONS PLANS

### A.   Background

84.     As described above, three Plans were harmed by fiduciary conduct with respect to the Company Stock, Excessive Fee, and Bond Fund Subclasses.  All three Plans are related because, *inter alia*, Regions and many of the individual defendants were fiduciaries of one or more of the Plans during the Company Stock, Excessive Fee, and Bond Fund Subclass Periods.

85.     Regions has provided retirement benefits to eligible employees since it initiated the Legacy Plan on January 1, 1976 (REGIONS401(k)000486 (SPD)).

---

[8] Plaintiffs lack discovery to establish whether the Individual Bond Fund Defendants exercised discretionary decision-making authority with respect to the ERISA Plans investment in the Bond Funds.  If discovery establishes that these individual defendants did have discretionary decision-making authority with regard to the management of investment of the Bond Funds, Plaintiffs will seek leave to amend the complaint to name these Individual Bond Fund Defendants as fiduciaries.

86.     This remained true after Regions merged with Union Planters Corporation effective July 1, 2004, and with AmSouth Bancorporation effective April 4, 2006.

87.     After the Union Planters merger with Regions, the Regions Member Benefits Management Committee oversaw the merger of the Union Planters 401(k) Plan into the Legacy Plan. Regions Benefits Administration Committee Minutes (Jan. 31, 2006) at 1 (RMK00001202). When the Plans merged, all Union Planter 401(k) funds were mapped over to the "Regions platform." *Id.* At the time, there were approximately 28,000 participants in the Union Planters 401(k) Plan. *Id.* Upon information and belief, those participants became vested members of the Legacy Plan with investment in the Regions Common Stock Fund as of at least January 31, 2006.

88.     The April 4, 2006 merger of Regions and AmSouth Bancorporation made Regions the Plan Sponsor of two plans simultaneously, the Legacy Plan and the AmSouth Thrift Plan. Following the merger, Regions continued to operate the Legacy Plan, but limited it to employees hired by Regions before January 1, 2007 (RFC00003453). Regions continued to operate the AmSouth Thrift Plan for AmSouth employees hired by AmSouth prior to November 3, 2006, and for new Regions employees hired after the merger. AmSouth Bancorporation Thrift Plan Summary Plan Description, Jan. 2007 ("AmSouth Thrift Plan SPD 2007"), at 1 (RFC00003396);[9] *see* Regions Financial Corporation 401(k) Plan Amended and Restated Effective as of January 1, 2002, dated March 2008 (the "March 2008 Plan Document"), at 1 (REGIONS401(k)000185).

_____

[9] Plaintiffs note that employees hired by Regions between November 4, 2006 and January 1, 2007 were eligible for either the Legacy Plan or the AmSouth Thrift Plan.

89.     Effective April 1, 2008, Regions merged the Legacy Plan and the AmSouth Thrift Plan, and changed the Plan's name to the Regions 401(k) Plan.  March 2008 Plan Document at 2 (REGIONS401(k)000186).

90.     The Company Stock Subclass and the Excessive Fee Subclass claims are filed on behalf of participants in: (1) the Legacy Plan at any time from May 1, 2003 to April 1, 2008; (2) the AmSouth Thrift Plan at any time between January 1, 2007 and April 1, 2008, and whose 401(k) accounts were invested in Regions stock; and (3) the Regions 401(k) Plan since its inception on April 1, 2008.  The Bond Fund Subclass claims are filed on behalf of participants in the ERISA Plans at any time between November 9, 2006 and July 29, 2008.

**B.     Plan Structures**

**1.     Plan Assets are Held in Trust**

91.     The Plans are defined contribution plans and are subject to the provisions of ERISA.  The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, plans are neither defendants nor plaintiffs.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is on behalf of the Plans for the benefit of the Plans and their participants and beneficiaries.

**2.     Plan Eligibility**

92.     **Legacy Plan**.  As of January 1, 2003, participants were eligible to participate in the Legacy Plan as soon as they had completed three months of service.  Regions Financial Corp. 401(k) Summary Plan Description Effective January 1, 2003 ("Legacy SPD 2003") at 8 (RFC00005272).  Employees who were rehired immediately became eligible so long as they were eligible at termination.  *Id.*  In 2005, however, employees immediately became eligible to

41

participate on the first day of the payroll period beginning after their initial date of employment, so long as the employee had entered a contribution election.  Regions Financial Corp. 401(k) Summary Plan Description, Jan. 2005 ("Legacy SPD 2005") at 6 (RFC00002213); Addendum II to March 2008 Plan Document at 22 (REGIONS401(k)000361).  Employees remained eligible until termination or transfer to a Regions affiliate that did not offer the Plan.  Legacy SPD 2005, at 6.  As of August 2007, employees hired after January 1, 2007 were not eligible to participate in the Legacy Plan. Regions Financial Corp. 401(k) Summary Plan Description, Aug. 2007 ("Legacy SPD 2007"), at 6 (RFC00003453).  However, employees hired before the merger with AmSouth on November 4, 2006 were eligible "in general."  *Id.*  Employees hired after November 4, 2006 but before January 1, 2007 were eligible to participate in the Plan if they were hired into a legacy Regions department.  *Id.*  With a valid contribution election, eligible employees could participate on the first day of the payroll period after their initial date of employment.  *Id.* at 7 (RFC00003454).

93.    **AmSouth Thrift Plan**.  Prior to January 1, 2006, AmSouth employees became eligible to participate in the AmSouth Plan following their completion of 1,000 hours of service during the eligibility computation period.  AmSouth Employees who were not participants on January 1, 2006 and employees hired on or after that date by AmSouth or by Regions after the April 4, 2006 merger were eligible to participate in the AmSouth Thrift Plan after completing one year of service.  Effective January 1, 2007, any employee hired by AmSouth on or before November 3, 2006 or hired by Regions on or after November 4, 2006 became eligible to participate in the AmSouth Thrift Plan.  AmSouth Bancorporation Thrift Plan Summary Plan Description, Jan. 2007 ("AmSouth Thrift Plan SPD 2007"), at 2 (RFC00003396).  This excluded associates hired on or after November 4, 2006 on the PeopleSoft payroll system.  For non-Highly

42

Compensated Employees,[10] participation could commence on the first day of the month following the date of hire. *Id.* Highly Compensated Employees could participate following the completion of one year of service. *Id.* Employees paid by the hour who worked fewer than thirty hours per week were required to complete 1,000 hours before becoming eligible. *Id.* Effective January 1, 2008, Regions employees, excluding Highly Compensated Employees, were immediately eligible to make personal contributions to the AmSouth Thrift Plan. March 2008 Plan Document at 12, 29-30 (REGIONS401(k)000196 REGIONS401(k)000213-214).

94.     **Regions 401(k) Plan**. Eligibility for the Regions 401(c) Plan differed from Legacy Plan eligibility. Employees who were participants in the Legacy Plan became eligible to participate in that Plan effective April 1, 2008, unless they are employed by a subsidiary that participates in a different plan. Regions Financial Corp. 401(k) Plan Summary Plan Description, Apr. 2008 ("Regions 401(k) SPD 2008"), at 5 (REGIONS 401(k)000490). Similarly, prior participants in the AmSouth Thrift Plan are eligible to participate on the first day of the payroll period beginning after the date their enrollment is processed. *Id.* However, Highly Compensated Employees are only eligible after completing one year of service. *Id.* Employees who qualify as "seasonal workers," meaning those working for more than five months per year, are not eligible to participate in the Plan. *Id.*

   3.     **Participant Contributions**

95.     Legacy Plan Participants were permitted to contribute up to 80 percent of their pre-tax annual compensation, subject to Internal Revenue Code limitations. Legacy SPD 2005, at 7 (REGIONS401(k)000461); Regions 401(k) SPD 2008 at 6 (REGIONS401(k)000491); 2007

---

[10] The term "Highly Compensated Employees" is used herein as defined in the Internal Revenue Code.

11-K at 4; March 2008 Plan Document at 34 (REGIONS401(k)000218).  As of January 2005,

AmSouth Thrift Plan participants, were only allowed to contribute up to 25 percent of pre-tax

salary to that Plan.   AmSouth Thrift Plan Summary Plan Description, Jan. 2005 ("AmSouth SPD

2005"), at 75 (RFC00006335).  After Regions became plan sponsor for the AmSouth Thrift Plan,

however, the contribution/deferral level increased to 80 percent of pretax annual compensation.

AmSouth Thrift Plan Summary Plan Description, Jan. 2007 ("AmSouth Thrift SPD 2007"), at 2

(RFC00003396).  The Regions 401(k) Plan had the same 80 percent contribution/deferral limit.

Regions 401(k) SPD 2008 at 6 (REGIONS401(k)000491).

### 4.      Company Matching Contributions to the Plans

96.      Individual accounts are maintained for each participant and are credited with the

participant's contributions, Company matching contributions ("Company Matching

Contributions"), and earnings.

97.      Legacy Plan participants were immediately vested in their contributions and

earnings on those contributions.  Legacy SPD 2003, at 15 (RFC00005278).  However, the

Legacy Plan required three years of service for an employee to become 100 percent vested in the

Company Matching Contributions.  *Id.*  Effective January 1, 2003, Regions made Company

Matching Contributions to the Regions Common Stock Unitized Fund.  *Id.* at 13

(RFC00005276).  Regions made matching contributions on a graduated scale based on up to 3

percent of a participant's Plan contributions.  *Id.*  For participants employed from three months

to four years, Regions contributed 150 percent of the first 3 percent that the participant placed

into the Plan.  *Id.*  For participants employed for between five and nine years, Regions

contributed 175 percent of the first 3 percent that the participant placed into the Plan.  *Id.*  For

participants employed for ten years or more, Regions contributed 200 percent of the first 3

percent that the participant placed into the Plan.  *Id.*  Company Matching Contributions were made with the same frequency as employee contributions.  *Id.* at 14 (RFC00005277).

98.    Effective January 1, 2005, Company Matching Contributions to the Legacy Plan changed.  Legacy SPD 2005, at 8 (RFC00002215).  The Company agreed to match dollar-for-dollar the first 6 percent of pre-tax employee contributions not to exceed $12,600 in Company Matching Contributions in 2005, so long as the employee contributed at least 6 percent of his or her eligible compensation for each pay period.  *Id.*  If the employee contributed less, the Company calculated its matching contribution based on the employee's percent of compensation deferred into the Plan.  *Id.*

99.    Effective August 1, 2007, Company Matching Contributions to the Legacy Plan changed again.  Legacy SPD 2007, at 8 (RFC00003455).  Employees with at least one year of service were to receive a matching contribution equal to 100 percent of the employee's pre-tax contribution, up to 6 percent of the employee's eligible compensation.  *Id.*  The maximum Company contribution for 2007 was $13,500.  *Id.*

100.    As of January 1, 2005, AmSouth Thrift Plan participants were to receive a dollar-for-dollar match of up to 4 percent of their pre-tax compensation in a match of Regions common stock ("Company Stock Match"), and only 50 cents for every dollar of post-tax compensation added to a Plan account.  AmSouth Thrift SPD 2005, at 76 (RFC00006336).  Effective January 1, 2007, AmSouth Thrift Plan participants become eligible for Company Matching Contributions upon completion of one year of service.  March 2008 Plan Document at 31 (REGIONS401(k)000215).

101.    Effective January 1, 2007, Legacy and AmSouth Thrift Plan participants immediately became 100 percent vested in the Company Matching Contributions and were

45

allowed to diversify out of the Company Stock Match that was held in the Regions Financial Corporation Stock Fund ("Regions Stock Fund") through April 1, 2008.  2007 11-K at 4. Previously, participants could not diversify out of the Company Stock Match for one year.  *Id.*

102.    Regions 401(k) Plan participants are immediately vested in their contributions and in the actual earnings on those contributions.  Regions 401(k) SPD 2008 at 7 (REGIONS401(k)000492); 2007 11-K at 5.  For Regions 401(k) Plan participants with at least one year of service, Regions makes matching contributions equal to 100 percent of the participant's pre-tax contributions, up to 6 percent of eligible compensation, and will make a matching contribution equal to 50 percent of after-tax contributions, up to 6 percent of eligible compensation.  The combined match is made, first, on pre-tax deferrals and, second, after tax contributions, with the combined match limited to 6 percent.  Regions 401(k) SPD 2008, at 7 (REGIONS 401(k)000483).  Matching contributions are made in Regions common stock.

103.    For pre-Plan merger Legacy Plan participants, all Company Matching Contributions after January 1, 2005 are 100 percent vested and/or credited to participants' accounts.  2005 SPD at 9 (REGIONS401(k)000463); Regions 401(k) SPD 2008, at 8 (REGIONS401(k)000494).

## C.    Funds in the Three Regions Plans

104.    Throughout the three Subclass Periods, the Plans' fiduciaries, by and through the Legacy and Regions 401(k) Benefits Management Committees and the AmSouth Benefits Committee and as otherwise noted, selected the Plans' investment options.  April 2008 SPD at 8 (REGIONS 401(K)000493).

105.    Selection of the Plans' investment options was a discretionary decision made by Defendants subject to the fiduciary duty requirements of ERISA.  Nothing in the Plans limits the

46

ability of the Plans' fiduciaries to remove particular Plan investment options or divest assets invested in any Plan investment options as prudence dictates.

### 1. Regions Common Stock

106.    All three Plans have continued to offer Regions common stock in the Regions Stock Fund as an investment alternative.

107.    As reported in the 2007 Form 11-K, the Regions Stock Fund represented 36.5 percent of the Legacy Plan's assets at the end of 2006.  2007 11-K at 2.  As reported in the 2007 11-K for the AmSouth Thrift Plan, the Regions Stock Fund represented roughly 43 percent of the AmSouth Thrift Plan's assets at the end of 2006.  As of September 30, 2008, roughly 20 percent of the Regions 401(k) Plan's assets were invested in the Regions Stock Fund (RMK00002178).

108.    As a result of Regions' serious mismanagement and improper business practices, the stock price has decreased nearly 93 percent since the beginning of the Company Stock Class Period, causing hundreds of millions in losses to the Plans.

109.    Throughout the Subclass Periods, the Legacy Plan Benefits Administration Committee, the AmSouth Thrift Plan Benefits Committee, and the Regions 401(k) Plan Benefits Management and Investment Committees selected the investment options made available to participants of the Plan.  *See* Legacy Plan Document Amended and Restated as of Jan. 1, 2001, at 8 (REGIONS401(k)000013) (authorizing the Plan Administrator responsible for investment selection to "make a number of investment options available under the Plan, with a view to providing Participants and Beneficiaries investment options differing in anticipated risk and rate of return"); Addendum 3 to Plan Document effective Apr. 1, 2008, at 9 (REGIONS401(k)000348).  Thus the decision to offer Regions common stock as an investment alternative is and has been discretionary—one made by the Plan fiduciaries.

47

110.    Regardless of any language in the Plan documents purporting to mandate that the fiduciaries offer Regions common stock, ERISA mandates that plan fiduciaries follow plan documents only to the extent that they are consistent with ERISA's requirements.  Accordingly, the Legacy Plan Benefits Administration Committee, the AmSouth Thrift Plan Benefits Committee, and the Regions 401(k) Plan Benefits Management and Investment Committees had the authority and responsibility to require that Plan participants transfer their investment in the Regions Common Stock Fund to another Plan investment option and liquidate those investments, once it became imprudent to remain invested in the Regions common stock and the Regions Common Stock Fund, to the extent that it was comprised of Regions stock.

### 2.    Bond Funds

111.     The Bond Funds were offered to and held by the Bond Fund Subclass members, which includes the three Regions-related Plans (as well as the other ERISA Plans.)  The Bond Funds offered as retirement investments to participants in Plans and the ERISA Plans suffered huge losses during the Bond Fund Subclass Period.  As a result of the mismanagement of the Bond Funds by the Bond Fund Subclass Defendants, the Bond Funds became an unduly risky and imprudent investment alternative for the Plans and ERISA Plans.

### 3.    RMK Select Funds

112.    During the Excessive Fee Subclass Period, the Legacy and Regions 401(k) Plans maintained several investment funds, the overwhelming majority of which were the RMK Select Funds.[11]  Regions Fin. Corp. 401(k) Plan, Annual Report (Form 11-K) (Dec. 31, 2002) (hereinafter the "2002 11-K") at Schedule H; Regions Fin. Corp. 401(k) Plan, Annual Report (Form 11-K) (Dec. 31, 2003) (hereinafter the "2003 11-K") at Schedule H; Regions Fin. Corp.

401(k) Plan, Annual Report (Form 11-K) (Dec. 31, 2004) (hereinafter the "2004 11-K") at
Schedule H; Regions Fin. Corp. 401(k) Plan, Annual Report (Form 11-K) (Dec. 31, 2005)
(hereinafter the "2005 11-K") at Schedule H; Regions Fin. Corp. 401(k) Plan, Annual Report
(Form 11-K) (Dec. 31, 2006) (hereinafter the "2006 11-K") at 11; 2007 11-K at 7.

113.    The RMK Select Funds are advised and/or managed by subsidiaries and affiliates
of Regions.

114.    Of the RMK Select Funds offered in the Legacy and Regions 401(k) Plans,
three—the RMK Select Balanced Fund, the RMK Select Limited Maturity Fixed Income Fund,
and the RMK Select Growth Fund—were offered to Plan participants even though those funds
had no track record of investment performance that the fiduciaries (and participants) could
review.  For example, the RMK Select Mid Cap Value Fund had a relatively high expense ratio
and estimated transaction costs of 3.48 percent of assets and, according to Morningstar,
underperformed its category on both a 3 and 5 year basis.  Three other funds also
underperformed their categories according to Morningstar on a 3 and 5 year basis—RMK Select
High Income, RMK Select Intermediate Bond Fund, and RMK Select Short Term Bond.  Despite
these insufficiencies, and without regard to the best interests of Plan participants, Regions
offered these funds as the Plans' investment options.

115.    On information and belief, Plaintiffs state that the RMK Select Funds offered
under the Legacy and Regions 401(k) Plans to Plan participants were not selected exclusively for
the benefit of the Plan participants but rather were selected because of the income, fees and other

---

[11] See footnote 3 *infra* for list of RMK Select Funds.

benefits they would yield to Regions and its subsidiaries and affiliates. A prudent investment selection and monitoring process would not have yielded this array of funds in the Plans.

## VI.   THE ERISA PLANS

116.    The ERISA Plans are ERISA-covered employee benefit plans (and any trusts or custodial accounts for or constituting such plans) for which Regions Bank, acting by and through its Trust Department, Regions Morgan Keegan Trust, serves as trustee, directed trustee, custodian, or agent, or otherwise as a fiduciary. In its capacity as trustee, custodian, or agent for the ERISA Plans (as well as other trusts or custodial accounts), Regions Bank entered into Investment Advisory Services Agreements with MAM in which Regions Bank appointed and authorized MAM to acquire, manage, dispose of, and provide investment advice concerning assets held or controlled by Regions Bank in its capacity as trustee, custodian, asset manager or agent, including with respect to the ERISA Plans. The scope of MAM's authority under the Investment Advisory Services Agreements included authorization to initiate the purchase or sale of securities or other assets without prior approval from Regions Bank. Although MAM was ostensibly Regions Bank's counterparty to the Investment Advisory Services Agreements, MAM also entered into those contracts as the instrumentality, alter ego, or agent of Morgan Keegan and Regions Financial. Under the Investment Advisory Services Agreements, MAM, Morgan Keegan, Regions Bank and Regions Financial were responsible for: (a) determining the "securities, money market investments, and other investments to be purchased for or sold from [the ERISA Plans]; (b) "60-day reviews of assets held in [ERISA Plans];" (c) providing "[r]egularly updated list[s] of approved securities for [ERISA Plans]; and (d) "exercis[ing] investment discretion with respect to [ERISA Plans] and to initiate the purchase or sale of securities or other assets therefore . . . ."

117.   Shares of the Bond Funds were offered to, purchased for, and/or held by the ERISA Plans for which the Bond Fund Subclass Defendants exercised discretionary authority or control of Plan assets, and, thus, served in fiduciary capacities under ERISA.

118.   Morgan Keegan and MAM (collectively, the "Morgan Keegan Defendants") managed the Bond Funds.  In addition, through their role as investment manager and investment advisor for ERISA Plans for which Regions Bank served as trustee, directed trustee, custodian, or agent, or otherwise through their authority, control, or duties respecting management or disposition of the assets of the ERISA Plans, as well as their status as alter ego of Regions and Regions Bank, the Morgan Keegan Defendants were responsible for prudently and loyally managing the ERISA Plans' assets that were invested in the Bond Funds.

119.   Collectively, hundreds of millions - if not billions - of dollars were invested in the Bond Funds.  The Bond Funds were managed pursuant to a common strategy by a handful of the individuals, led by Senior Portfolio Manager Jim Kelsoe.  Because all of the Bond Funds were centrally managed by a small group of Morgan Keegan employees, led by Portfolio Manager Jim Kelsoe, these Defendants' imprudent conduct with respect to the Bond Funds affected all ERISA Plans that invested in the Bond Funds in exactly the same manner, that is, they were all similarly exposed to the same unacceptable risk and suffered losses because of the same imprudent investment management by the Morgan Keegan Defendants.

120.   As discussed more fully below, as a result of the mismanagement of the Bond Funds and the failure to discontinue and divest investments of plan assets in the Bond Funds, the investments of the Plans and ERISA Plans and their participants suffered huge losses during the Bond Fund Subclass Period.

## VII.   DEFENDANTS' FIDUCIARY STATUS

### A.      The Nature of Fiduciary Status

121.    **Named Fiduciaries.**  Every ERISA plan must have one or more "named fiduciaries."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

122.    *De Facto* **Fiduciaries.**  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  A person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

123.    **Investment Manager**.  Under ERISA, an investment manager is a fiduciary who acquires, manages, and disposes of plan assets.  ERISA defines investment manager as:

> (38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102 (a)(2) of this title)—
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;
>
> (B) who (i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 *et seq.*];
>
> (ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b–3a (a)], is registered

as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

ERISA §3(38), 29 U.S.C. § 1002(38).

124.    Each Defendant was a fiduciary with respect to the relevant ERISA Plans and owed fiduciary duties to that ERISA Plan and the participants under ERISA in the manner and to the extent set forth in the ERISA Plans' documents, through their conduct, and under ERISA.

125.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the plans and the plans' investments solely in the interest of the plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  *Id.*

126.    Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the ERISA Plans' management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion, authority, and duties assigned to, or undertaken by, each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion, authority, and duties.

127.    Instead of delegating all fiduciary responsibility for the Plans to external service providers, on information and belief, Regions chose to assign the appointment and removal of

53

fiduciaries to the monitoring Defendants named herein.  These persons and entities in turn selected Regions employees, officers, and agents to perform most fiduciary functions. ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan Sponsor.

**B.      Regions Financial Corporations' Fiduciary Status**

128.     Regions Financial Corporation ("Regions Financial" or "Regions") was at all applicable times, on information and belief, the Plan Sponsor of the Plans.  Regions was a fiduciary of the Legacy Plan because it had the power to appoint and remove the Trustee and to appoint and remove the Plan Administrator.  Regions Financial Corporation 401(k) Plan Document Amended and Restated as of January 1, 2001, at 2, 19 (REGIONS401(k)000001 & REGIONS401(k)000024).  Regions was a fiduciary of the AmSouth Thrift Plan because it had the power to appoint and remove the Trustee and to appoint and remove the Plan Administrator. *See* Regions Plan Document at 2, 20 (REGIONS401(k)000341 & REGIONS401(k)0003359). Regions is a fiduciary of the Regions 401(k) Plan because it has the power to appoint and remove the Trustee and to appoint and remove the Plan Administrator.  March 2008 Plan Document at 24 (REGIONS401(k)000208).  Regions, therefore, had a duty to monitor the Plan Administrator and the Trustee for each Plan.  Regions has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plans and, on information and belief, can hire or appoint, terminate, and replace such employees at will.  Regions, therefore, is responsible for the activities of its employees through traditional liability principles of agency and *respondeat superior*.

54

129.     In addition, under basic tenets of corporate law, Regions is imputed with knowledge regarding the misconduct alleged herein of certain other Defendants, such as Regions' officers, directors, and employees.

130.     Consequently, in light of the foregoing duties, responsibilities, and actions, Regions was, on information and belief, a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Subclass Periods because it exercised discretionary authority or discretionary control over management of the Plans, exercised authority or control over management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

131.     During the Subclass Periods, on information and belief, Regions relied on the Compensation Committee Defendants to carry out Regions' fiduciary responsibilities under the Plans and ERISA.  Thus, the Compensation Committee Defendants acted on behalf of Regions in this regard.

132.     With respect to the ERISA Plans, Regions is a fiduciary.  Under an alter ego theory, Regions did not operate as a separate legal entity from Regions Bank and Morgan Keegan.  Rather, and as discussed more fully above, the decision makers at Regions Bank, Regions Financial, Morgan Keegan and MAM were the same.  For example, during the Subclass Periods, Allen Morgan served as Chairman and Executive Managing Director of Morgan Keegan & Co., director and Vice-Chairman of Regions Financial, and director of MAM.  Ken Alderman served simultaneously as President of Regions Morgan Keegan Trust Company, CEO of MAM, and Executive Vice President of Regions Financial.  According to Regions Financial Annual Reports, the following officers and directors of Regions Bank and Regions Financial held the following same positions at Regions Financial and Regions Bank:

55

1. Jackson W. Moore - Executive Chairman and Director (2006, 2007)

2. C. Dowd Ritter - President and Chief Executive Officer and Director (2006)

3. Candice W. Bagby - Senior Executive Vice President and Consumer Banking Group Head (2006)

4. R. Alan Deer - Executive Vice President, General Counsel; Corporate Secretary (2006)

5. David B. Edmonds - Senior Executive Vice President and Head of Human Resources (2006)

6. David C. Gordon - Senior Executive Vice President and Director of Operations and  Technology (2006)

7. O. B. Grayson Hall, Jr. - Senior Executive Vice President and Head of General Banking  Group, Operations & Technology and Properties

8. Richard D. Horsley - Head of Transaction and Integration

9. D. Bryan Jordan - Senior Executive Vice President and Chief Financial Officer

10. W. Charles Mayer, III - Senior Executive Vice President

11. Samuel E. Upchurch, Jr. - Senior Executive Vice President

12. William C. Wells, II - Senior Executive Vice President and Chief Risk Officer

13. Alton E. Yother - Executive Vice President and Controller

14. G. Timothy Laney - Senior Executive Vice President and Head of Business

15. Irene M. Esteves - Chief Financial Officer and Senior Executive Vice President

16. John B. Owen - Senior Executive Vice President and Head of Operations and Technology

17. David H. Rupp - Senior Executive Vice President and Head of Consumer Services Group

**C.      Regions Bank's Fiduciary Status**

133.    Defendant Regions Bank is a Plan fiduciary of the Legacy and Regions 401(k)

Plans and the ERISA Plans, and the AmSouth Thrift Plan from April 4, 2006 to April 1, 2008,

because it served as Plan "trustee" within the meaning of ERISA § 403, 29 U.S.C. § 1103.  As

56

the Plans' Trustee or custodian, Regions Bank holds and controls the plans' investment assets and executes transactions.  2007 11-K at 9.  Under the Region's 401(k) Trust Agreement, Regions Bank is "free to manage the investment and reinvestment of" all of the plan's assets Regions 401(k)000553.  On information and belief, Regions Bank similarly served as the trustee, or otherwise served as an ERISA fiduciary under ERISA § 3(21)(A), to all the ERISA Plans. Regions Bank was not a "directed trustee" for the Plan or ERISA Plans within the meaning of ERISA § 403(a)(1), 29 U.S.C. § 1103(a)(1).  To the extent that Regions Bank purported to be a directed trustee for the Plans, it was improperly conflicted because it was deeply involved and, thus, possessed knowledge of the conduct complained of below, including but not limited to: (1) facilitating or causing Regions' exposure to losses from residential construction loans and mortgages; (2) failing to maintain adequate risk management controls; and (3) failing to report on Regions' books and records the full extent of financial problems and risks related to the Company's involvement with the Bond Funds, which were grossly mismanaged.  Regions Bank also caused the Legacy and Regions 401(k) Plans to engage in prohibited transactions in violation of ERISA.  Thus, to the extent Regions Bank followed directions to invest in company stock (or the RMK Funds or the Bond Funds) in the Plans, it failed to act in accordance with the terms of the ERISA Plans (which require prudent investing), and breached it's fiduciary duties by following directions that it knew or should have known were contrary to ERISA.  Similarly, to the extent that Regions Bank was directed to invest in the Bond Funds, it breached its fiduciary duties by following directions that were contrary to ERISA.  Regions Bank, by and through its affiliation and involvement in the management of the Bond Funds, and its knowledge of the problems with the Bond Funds had access to and possessed material non-public information regarding the Bond Fund funds, and, thus, was duty-bound by ERISA to take actions

57

to protect the ERISA Plans from continuing to make or maintain investment in the Bond Funds under the circumstances described herein.

### D.      Morgan Asset Management's Fiduciary Status

134.     MAM is a fiduciary of the ERISA Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised authority or control respecting management or disposition of the assets of the ERISA Plans, and because it "render[ed] investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan[s], or ha[d] . . . authority or responsibility to do so."  MAM contracted with the ERISA Plans' trustee or custodian, Regions Bank, to serve as an investment manager within the meaning of ERISA § 3(38), 29 U.S.C. § 1002(38) for the ERISA Plans, or otherwise served as an ERISA fiduciary for the ERISA Plans.  In this capacity, MAM was responsible for prudently and loyally managing, acquiring, and disposing of the ERISA Plans' assets that were invested in the Bond Funds.

135.     MAM expressly acknowledged its discretionary responsibility with regard to the management of assets that Regions Bank held in trust on behalf of its clients, including the ERISA Plans, in the Investment Advisory Services Agreements dated April 1, 2003 and February 5, 2007, attached to this Complaint as Exs. 2 and 3, and incorporated by reference.

136.     MAM is a wholly owned subsidiary of MK Holdings Co., which is a wholly owned subsidiary of Regions Financial.  Though MAM is represented as an "arm" of Morgan Keegan, in actuality, MAM operated out of the Regions Bank Trust Department, called Regions Morgan Keegan Trust.  MAM, Regions Morgan Keegan Trust, and Morgan Keegan & Co. operated as a single, unitary enterprise.  The President of MAM, Carter Anthony, reported to Ken Alderman, the President and CEO of Regions Morgan Keegan Trust, who reported to Doug Edwards, the President and CEO of Morgan Keegan.  Dep. Tr. of Carter Anthony, Ex. 130 to

Joint Notice of Intent to Revoke Registration and Impose Administrative Penalty at 47 (Ex. 4 to

Complaint).  To the extent that MAM acted as an agent, instrumentality or alter ego of Regions

Bank, it is alternatively a fiduciary by virtue of it serving as a Plan and ERISA Plan "trustee"

within the meaning of ERISA § 403, 29 U.S.C. § 1103.

### E.  Morgan Keegan's Fiduciary Status

137.    Defendant Morgan Keegan & Co. is a fiduciary of the ERISA Plans under ERISA

§ 3(21)(A), 29 U.S.C. § 1002(21)(A) because it served as the investment manager or investment

advisor for the ERISA Plans by virtue of its status as MAM's alter ego.  MAM is not a separate

legal entity apart from Morgan Keegan.  Morgan Keegan treated MAM as a unit of its company.

In Morgan Keegan's annual report's operating results, "Asset Management" revenues from

MAM are included in Morgan Keegan's revenues, and MAM is not listed as a separate company.

2007 10-K at 3.  Moreover, Jim Kelsoe, who served as Chief Fixed Income Investment Officer

for MAM and as portfolio manager over the Bond Funds, was employed by Morgan Keegan.

Jim Kelsoe served as a Managing Director of Morgan Keegan and was registered with FINRA as

a representative of Morgan Keegan.

138.    Morgan Keegan also did not function as a separate or independent legal entity

from Regions Bank, the ERISA Plans' trustee or fiduciary in other capacities.  Morgan Keegan

acted and advertised itself as the "investment and securities brokerage, trust and asset

management division" of Regions Bank and Regions Financial.  According to Regions' 2007

Annual Report, "Morgan Keegan also manages the delivery of trust services, which are provided

pursuant to the trust powers of Regions Bank."  2007 10-K at 3.  Morgan Keegan calls itself the

"investment arm" of Regions Bank.  *See* Regions Private Banking Services,

http://www.regions.com/personal_banking/private_banking.rf (last visited May 16, 2011).

Regions Morgan Keegan Trust, the Trust Department of Regions Bank, is also listed as a "division" of Morgan Keegan. Regions Fin. Corp., Annual Report (Form 10-K) at 56.

139.    Based on information discovered to date, MAM was treated as a unit of Morgan Keegan, and Morgan Keegan acted as the investment arm within Regions Bank and Regions Financial. Thus, Morgan Keegan was responsible for prudently and loyally managing the plan assets that were invested in the Bond Funds as both the investment manager or advisor and as a fiduciary of the ERISA Plans.

**F.    Plans' Compensation Committee Defendants' Fiduciary Status**

140.    The Compensation Committee is a committee of Regions' Board of Directors. Variously composed, the Compensation Committee has been and is a fiduciary to the Legacy Plan, AmSouth Thrift Plan, and the Regions 401(k) Plan. According to the Compensation Committee's Charter, the Compensation Committee Defendants had various responsibilities, including the authority and responsibility to:

> Review periodically the administration of all of the Company's pension, profit sharing, and welfare employee benefit plans, other than executive compensation plans ("Plans"), select and appoint Plan administrators, trustees, Named Fiduciaries, actuaries and investment managers (and allocate assets of the Plans among investment managers, if any) and, consistent with the terms of the Plans the committee may  delegate, to the fullest extent permitted by applicable law, to the Chief Executive Officer of the Company or another body or committee the authority to make such selections, appointments and allocations.

> Review annually the actuarial assumptions and reports for the Plan.

> Establish and, as appropriate, review the investment and funding policies and objectives of the Plans.

*See* Charter of the Compensation Committee at 4 http://media.corporate-ir.net/media_files/irol/65/65036/corpgov/compensation1.pdf (last visited May 11, 2011).

141.    Accordingly, on information and belief, the Compensation Committee Defendants, acting on behalf of the Company, exercised oversight responsibility for the Plans and appointed the members of the Benefits Management Committee and the Trustee.  As to the latter function, the Compensation Committee Defendants had the duty to monitor and to remove their appointees.  Thus, according to Department of Labor ("DOL") regulations, the Compensation Committee Defendants exercised a fiduciary function under ERISA.  29 C.F.R. § 2509.75-8 (D-4).

142.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Compensation Committee Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Subclass Periods in that they exercised discretionary authority or discretionary control over management of the Plans, exercised authority or control over management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

**G.    Legacy Plan Benefits Management Committee Defendants' Fiduciary Status**

143.    The Legacy Benefits Management Committee was a "named fiduciary" of the Legacy Plan, as that term is defined under ERISA, with authority to manage and control the operation and administration of the Plan.  *See* Amended and Restated Employees' Profit-Sharing Trust of First Alabama Bancshares, Inc. ("Legacy Trust Agreement") at 3 (RFC00005392) ("The Committee, as appointed under the terms of the Plan, shall be the named fiduciary and administrator of the Plan and Trust.").

144.    To comply with ERISA, the Legacy Benefits Management Committee was responsible for communicating with participants regarding the Legacy Plan in a plan-wide and uniform manner by providing participants with information and materials required by ERISA.

61

*See, e.g.*, ERISA § 101(a)(1) (requiring the plan administrator to furnish a summary plan description to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan).  On behalf of the Company, on information and belief, the Legacy Benefits Management Committee disseminated the Plan documents and related materials which, among other things, incorporated by reference misleading filings which Regions made with the Securities and Exchange Commission ("SEC"), thus converting such materials into fiduciary communications.  *See* Regions 401(k) Plan Summary Plan Description (Apr. 2008) at 12.

145.    Further, the Legacy Benefits Management Committee has the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds. *See* Legacy Trust Agreement at 9 (RFC00005398).

146.    Consequently, on information and belief, the Benefits Management Committee Defendants were both named fiduciaries of the Legacy Plan pursuant to ERISA §402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**H.    Legacy Plan Benefit Administration Committee Defendants' Fiduciary Status**

147.    On information and belief, the Legacy Plan's Benefit Administration Committee is a "named fiduciary" of the Legacy Plan for investment purposes as that term is defined under ERISA.

148.    On information and belief, the Legacy Plan Benefit Administration Committee Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. §

1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## I.    Additional Legacy Plan Defendants' Fiduciary Status

149.    On information and belief, the Additional Legacy Plan Defendants include "named fiduciaries" of the Legacy Plan for administrative purposes as that term is defined under ERISA.

150.    Many of the Additional Legacy Plan Defendants are Plan Administrators, having full authority and power to administer and construe the Legacy Plan. All of the Additional Legacy Plan Defendants had fiduciary responsibilities to the Plan.

151.    On information and belief, the Additional Legacy Plan Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, and exercised discretionary authority or discretionary responsibility in the administration of the Plan.

## J.    AmSouth Thrift Plan Benefits Committee Defendants' Fiduciary Status

152.    On information and belief, the AmSouth Thrift Plan's Benefits Committee is a "named fiduciary" to the AmSouth Thrift Plan for investment purposes as that term is defined under ERISA. *See* AmSouth Bancorporation Thrift Plan (Revised Feb. 2002) at 20 (RFC00002382).

153.    The AmSouth Thrift Plan Benefits Committee Defendants had the responsibility for selecting the investment funds in the AmSouth Thrift Plan and for monitoring the performance of those funds.

63

154. On information and belief, the AmSouth Thrift Plan Benefits Committee Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**K.   Additional AmSouth Thrift Plan Defendants' Fiduciary Status**

155. On information and belief, the Additional AmSouth Thrift Plan Defendants include "named fiduciaries" of the AmSouth Thrift Plan for administrative purposes as that term is defined under ERISA.

156. Many of the Additional AmSouth Thrift Plan Defendants are Plan Administrators, having full authority and power to administer and construe the AmSouth Thrift Plan. All of the Additional AmSouth Thrift Plan Defendants had fiduciary responsibilities to the Plan.

157. On information and belief, the Additional AmSouth Thrift Plan Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, and exercised discretionary authority or discretionary responsibility in the administration of the Plan.

**L.   Regions 401(k) Plan Benefits Management Committee Defendants' Fiduciary Status**

158. The Benefits Management Committee is a "named fiduciary" of the Regions 401(k) Plan, as that term is defined under ERISA, with authority to manage and control the operation and administration of the Plan (March 2008 Plan Document at 23 (REGIONS401(k)000207)) as well as the Plan Administrator. SPD 2005, at 25 (REGIONS401(k)000479); Regions 401(k) SPD 2008, at 24 (REGIONS401(k)000509).

159.     As Plan Administrator, the Regions 401(k) Benefits Management Committee has the duty to "administer the Plan for the exclusive benefit of the Participants and their beneficiaries [having] full and exclusive discretion and authority to determine all questions of coverage and eligibility arising under the Plan, and full power and discretion to construe the provisions of the Plan" as well as being "charged with the general administration of the Plan" and having "the authority to appoint one or more Investment Managers." March 2008 Plan Document at 23-27 (REGIONS401(k)000207-211).

160.     To comply with ERISA, the Regions 401(k) Plan Benefits Management Committee exercised responsibility for communicating with participants regarding the Regions 401(k) Plan in a plan-wide, uniform manner by providing participants with information and materials required by ERISA.  *Id*. at 27 (REGIONS401(k)000207-211);  *see, e.g.*, ERISA § 101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description). On behalf of the Company, on information and belief, the Benefits Management Committee disseminated the Plan documents and related materials which, among other things, incorporated by reference Regions' misleading SEC filings, thus converting such materials into fiduciary communications.

161.     Further, to the extent that it did not delegate such authority to an Investment Committee, the Regions 401(k) Benefits Management Committee has the responsibility for selecting the investment funds in the Plans and for monitoring the performance of those funds. March 2008 Plan Document at 17, 97, Addendum 3, at 9, 49 (REGIONS401(k)00017, 000281, 000348, 000388).

65

162.     Consequently, on information and belief, the Regions 401(k) Benefits Management Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**M.     Regions 401(k) Plan Investment Committee Defendants' Fiduciary Status**

163.     On information and belief, to the extent one exists, the Investment Committee is a "named fiduciary" of the Regions 401(k) Plan for investment purposes as that term is defined under ERISA.  Mar. 2008 Plan Document, Addendum 3, at 9 (REGIONS401(k)000348).

164.     To the extent that the Regions 401(k) Benefits Management Committee delegated such responsibility to the Regions 401(k) Investment Committee, the Regions 401(k) Investment Committee Defendants have the responsibility for selecting the investment funds in the Regions 401(k) Plan and for monitoring the performance of those funds.

165.     The Regions 401(k) Plan Investment Committee Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

66

## VIII.  FACTS

### A.     Regions Common Stock

166.     During the Company Stock Subclass Period, Regions consistently touted itself as a sound financial institution, conservative in focus, with a stable portfolio that gave it the ability to manage risk in the real estate market.  Contrary to this false image, Regions was a poorly managed corporation that failed to maintain a diverse, stable portfolio, manage its risk, and make known complete and accurate information about its financial condition.  Indeed, details of Regions' risky and imprudent management have been publically disclosed only slowly, incompletely, and in piecemeal.  Throughout the Company Stock Subclass Period, Defendants knew or should have known that Regions' common stock was over-inflated and too risky an investment alternative for the Plans.  The Company now sits on the brink of total collapse.

### 1.     The Rise of Subprime Lending

167.     The term "subprime" generally refers to "borrowers who do not qualify for prime interest rates because they exhibit one or more of the following characteristics: weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios."  Sandra F. Braunstein, Dir., Div. of Consumer & Cmty. Affairs, Fed. Reserve Bd., *Subprime Mortgages: Testimony Before the Subcommittee on Financial Institutions and Consumer Credit*, Comm. on Fin. Serv., Mar. 27, 2007, http://www.federalreserve.gov/newsevents/ testimony/Braunstein20070327a.htm (last visited May 11, 2011).  Subprime mortgage lending generally involves issuing high or variable interest loans to individuals who otherwise would not qualify under underwriting standards used by prime lenders.

168.     Originating subprime mortgages has become increasingly popular in recent years–climbing from $120 billion in 2001 to $625 billion in 2005.  Ruth Simon & James Hagerty, *More Borrowers With Risky Loans Are Falling Behind–Subprime Mortgages Surged As Housing Market Soared; Now, Delinquencies Mount*, Wall St. J., Dec. 5, 2006, at A1.  Between 2003 and 2005, loans to subprime borrowers industry-wide increased from 8 percent to 20 percent of total originations.  By 2004, many mortgage originators across the United States began to focus on so-called "innovative" subprime products that relied on, among other things, inappropriately lax underwriting standards and temporary payment reductions which greatly increased risk for borrowers and lenders alike.  Plaintiffs do not have the figures related to the increase in such originations by Regions during that period, but Regions has admitted that it was actively involved in "non-conforming" real estate loan originations.

169.     To take advantage of this new market, some lenders began weakening their underwriting standards.  For example, lenders lowered the minimum credit score borrowers needed to qualify for certain loans, allowed borrowers to finance a greater percentage of their home's value, and, in some cases, allowed borrowers to carry a higher debt load (*e.g.*, "no money down").  *See* Ruth Simon, *Mortgage Lenders Loosen Standards–Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1; *see also* Noelle Knox, *43% of First-time Home Buyers Put No Money Down*, USA Today, Jan. 18, 2006, at A1.

170.     In addition to lowering underwriting standards, lenders began offering novel loan products to entice borrowers, including interest-only mortgages, pick-a-payment loans, and adjustable rate loans.  *See* Sandra Block, *"Pick-a-Payment" Mortgage Risks are High*, USA Today, July 18, 2005, at B3; *see also* Ruth Simon, *New Type of Mortgage Surges in Popularity–*

68

*Fixed-Rate Interest-Only Loans Offer Lower Initial Payments but Delay Debt Reduction*, Wall St. J., Apr. 19, 2006, at D1.

171.     When home prices are appreciating and interest rates are low, subprime borrowers are generally able to stay current on or refinance their loans because their equity interest in their property is rising.  However, when housing prices depreciate, default rates increase, often dramatically.  The rise of subprime lending unsurprisingly led to high rates of borrower defaults. Regions and its subsidiaries and affiliates made an imprudent number of subprime loans to persons whom Regions or its subsidiaries and affiliates knew or should have known were unlikely to repay the loans, and who have proven unable to do so.

172.     Trouble in the housing market emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes, which caused the interest rates on variable rate loans, including mortgage loans, to rise.  In response, "bank regulators issued their first-ever guidelines for credit-risk management for home-equity lending" in May 2005.  Simon, *Mortgage Lenders Loosen Standards*, *supra*.

173.     However, most subprime lenders, including Regions, failed to heed these and other warnings.  "Despite rising interest rates and general housing market cooling in 2005, many lenders continued to offer borrowers credit under weakened lending standards.  Many lenders kept introductory 'teaser' rates low even after short-term interest rates began rising in June 2005."  Simon & Hagerty, *supra*.  Subprime borrowers, in particular, had difficulty meeting their monthly payment obligations after their introductory "teaser" rate resulted in significantly higher rates.  And because housing prices were falling, borrowers could not readily re-sell their property for a profit when they could not pay their increased monthly payments, causing a rapid rise in mortgage defaults.

174. By the end of 2005, foreclosures and delinquency rates had risen substantially. Simon & Hagerty, *supra*. As of October 2005, the delinquency rate recorded on new subprime loans had doubled from a year earlier. *Id.*

175. Nonetheless, subprime mortgage exposure grew even riskier in 2006 as lenders originated a large number of no-documentation and low-documentation loans, also known as "liar loans." This practice constituted as much as 40 percent of subprime mortgages issued in 2006, up from 25 percent in 2001. Gretchen Morgenson, *Crisis Looms In Market for Mortgages*, N.Y. Times, Mar. 11, 2007, at 1. In April 2006, mortgage industry research revealed that 90 percent of borrowers had overstated their incomes by 5 percent or more and had inflated their incomes by more than half in 60 percent of these cases. *Id.*

176. In September 2006, Reuters reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against subprime-related securities since late 2005." Al Yoon, *"Irrational" Mortgage Bond Prices Polarize Market*, Reuters, Sept. 25, 2006.

177. In response to the increasing risks inherent in subprime lending, "the Federal Reserve and the other banking agencies issued guidance on nontraditional mortgage products" on September 29, 2006. Testimony of Sandra L. Thompson, *supra*. The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and the National Credit Union Administration jointly issued the *Interagency Guidance on Nontraditional Mortgage Product Risks* ("OCC Guidance"). (Sept. 29, 2006, http://www.federalreserve.gov/boarddocs/srletters/ 2006/SR0615a2.pdf.) The OCC Guidance directed financial institutions to address and mitigate the risks inherent in nontraditional or "subprime" mortgage products by ensuring that loan terms

70

and underwriting standards were consistent with prudent lending practices, which entail a credible analysis of a borrower's repayment capacity.  *See Id.*

178.    The OCC Guidance provided that subprime loans should be underwritten based on a borrower's ability to make fully amortizing payments at the fully indexed interest rate.  *Id.* For products like payment option adjustable rate mortgages ("ARMs") that permit negative amortization, the OCC Guidance provided that a lender's underwriting analysis should be based on the initial loan amount plus any balance increase that could accrue given the maximum potential amount of negative amortization permitted by the loan.

179.    The OCC Guidance also addressed the practice of relying on reduced documentation, particularly unverified income, to qualify borrowers for subprime mortgages.  *Id.* This practice substituted assumptions and alternative information for verified data in analyzing a borrower's creditworthiness and ability to pay.  Because such practices presented significant risk, including the risk of fraud, they were to be used sparingly.  Accordingly, the OCC Guidance cautioned that reduced documentation should be accepted <u>only</u> where there were mitigating factors that minimized the need for verification of repayment capacity.

180.    On December 20, 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market.  Ron Nixon, *Study Predicts Foreclosure for 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006, at C1.  Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC and resulting in several bankruptcy filings.  *Id.*

181.    On January 3, 2007, *Consumer Affairs* published an article that warned that "as the housing market slows to a crawl, many subprime lenders are collapsing faster than homes made of substandard materials, and the signs point to even more pain in the housing market as a

71

result."  Martin H. Bosworth, *Subprime Lender Implosion: Bad Omen For Housing*, Consumer

Aff., Jan. 3, 2007, http://www.consumeraffairs.com/news04/2007/01/mln_subprime.html.

      182.    Notably, after experiencing a sharp increase in defaults from new borrowers,

Ownit Mortgage Solutions, Inc. closed its doors in early December 2006 and filed for Chapter 11

bankruptcy just a few weeks later.  E. Scott Reckard, *Demise of Ownit Mortgage Hits Home*,

L.A. Times, Jan. 3, 2007, at C1.  "Across the industry, 2.6 percent of the subprime loans

securitized in the second quarter of 2006 had been foreclosed on or repossessed within six

months.  That is up from 1 percent for loans securitized in the second quarter of 2005," as

reflected in the chart below:



Vikas Bajaj & Christine Haugheny, Tremors at the Door - More People With Weak Credit Are

Defaulting on Mortgages, N.Y. Times, Jan. 26, 2007, at C2.

      183.    On March 11, 2007, *The New York Times* reported that more than two dozen

subprime mortgage lenders had failed or filed for bankruptcy.  Morgenson, *Crisis Looms In*

*Market for Mortgages*, *supra.*

184.     Two weeks later, the *Wall Street Journal* reported that New Century Financial Corp., the largest U.S. subprime lender, was on the "brink of bankruptcy," because it could not pay back loans it took from Wall Street banks.  Gregory Zuckerman, *How Street Hit Lender – 'Subprime' King New Century Was Down but Not Quite Out; Then, Banks Shut Cash Spigot*, Wall St. J., Mar. 29, 2007, at C1.

185.     Four days later, New Century filed for Chapter 11 bankruptcy.  Julie Creswell & Vikas Bajaj, *Home Lender is Seeking Bankruptcy*, N.Y. Times, Apr. 3, 2007, at C1.

186.     In total, from the end of 2006 through July 1, 2007, 15 mortgage companies had gone bankrupt and close to 50 more had suspended loans or closed entirely.  Rick Green, *Lehman Shuts Unit; Toll of Lenders Tops 100: Subprime Scorecard*, Bloomberg.com, Aug. 23, 2007, http://www.bloomberg.com/apps/news?pid=20601206&sid=aQBUrPcefMtc&refer= real estate.

187.     The *Wall Street Journal* reported that in 2006 alone, roughly 80,000 subprime borrowers had fallen into delinquency, many shortly after loan origination.  Simon & Hagerty, *supra*.

188.     It is against this backdrop that Regions sold subprime mortgages in areas subject to the most dramatic over-inflation of home values.  Given facts about the risks and potential failures of the subprime lending market and Defendants' high-level positions within the Company, Defendants named in the Company Stock Subclass knew or should have known that, by the start of the Company Stock Subclass Period, Regions common stock was an imprudent investment alternative for the Plans.

73

189.     The Company Stock Defendants had a fiduciary duty under ERISA to monitor and control the level of risk to which the Plans were exposed and to take action to protect the Plans from massive losses caused by imprudent investment in Regions common stock.

   **2.      During the Company Stock Subclass Period, Regions Common Stock Was an Imprudent Investment for the Plans Due to Regions' Real Estate Loan Portfolio**

190.     Throughout the Company Stock Subclass Period, Regions' real estate loan portfolio was rife with imprudent and improperly managed risks.  The real estate loan portfolio contained excessive subprime loans to mortgage buyers, housing contractors, and for home equity lines of credit, loans concentrated in regions with over-inflated home values, and risky commercial loans.  Given the opacity of Regions' public filings and Regions' failure to show in a timely manner how the housing crisis would impact future losses in the loan portfolio, it is virtually impossible for plan participants to assess whether underwriting and credit quality standards were maintained for the loans held in the portfolio.  However, it is clear that recent huge increases in underperforming loans indicate that Regions had undisclosed credit quality issues.  Rather than being a victim of the credit crisis, as it now portrays itself, Regions was a major contributor to it, because it engaged in precisely the kinds of activities and transactions that caused the credit crisis.

191.     Upon information and belief, Regions increased its volume of riskier subprime mortgages to feed more loan product into asset-backed securities.  By lowering its lending standards, Regions increased its subprime mortgage originations, adjustable rate mortgages, lower documented Alt-A mortgages, home equity loans, and similar risky products.  Regions also sold loans to real estate contractors whose ability to repay the loans turned on the unrealistic assumption that the real estate boom would last forever.  Moreover, Regions made numerous

74

loans which it never would have made only a few years earlier because the new loans involved higher loan-to-value ratios than the Bank had allowed historically. Regions did not realistically estimate the likely losses on such loans and failed to reasonably adjust its assumptions based on the greater risk of default on these new, riskier loans.

192.     There were increasing indications during this period that at least portions of the country were in an unstable housing bubble. Regions was particularly active in some of those areas, including Florida and other parts of the Southeast. However, on information and belief, Regions predicted risk assuming that real estate values would increase at a rate unprecedented before 2000. Regions was unreasonably slow to recognize the problems of a depreciating real estate environment to the assumptions it used for properly reserving for losses. Moreover, Regions' lack of a geographically diverse real estate loan portfolio exposed the Company to even greater risk of loss.

193.     As a result of these activities, Regions was increasingly engaged in unprecedentedly risky lending well into the collapse of subprime lending. At least by January, 2007, Regions knew or should have known about the risks of its involvement in these highly risky lending activities.

194.     In January 2007, Regions announced that it would be exiting the subprime mortgage business by selling EquiFirst Corporation ("EquiFirst"), Regions' wholly owned subprime origination business, and that mortgage originations had increased notwithstanding "a challenging environment." Regions Fin. Corp., Current Report (Form 8-K) (Jan. 19, 2007) at Ex. 99.1. Given the downturn in the subprime market, sale of EquiFirst proved difficult.

195.     On December 31, 2006, EquiFirst held subprime loans for sale totaling $1.17 billion. Yet, just weeks later on January 19, 2007, Regions announced that it would receive only

$225 million for EquiFirst, less than a quarter of the value of loans for sale on EquiFirst's books just three weeks earlier. Moreover, when Barclays finalized the purchase of EquiFirst on March 30, 2007, the price Regions received was only $76 million. Indeed, Regions has disclosed that "[p]rior to the sale of EquiFirst, Regions recorded, during 2007, approximately $142 million in after-tax losses related to the operations of EquiFirst." 2007 10-K. Regions reported a mere $1 million gain on the transaction.

196.     Regions' exposure to subprime mortgages was not the only source of risk Regions faced from its real estate dealings. In an important strategic error, Regions took an enormous stake in the Florida real estate market by concentrating a huge portion of its real estate loans there. By 2005 it was widely reported that Florida's housing market was one of the biggest housing bubbles, with prices soaring at unsustainable and unrealistic rates. *See* Robert Trigaux, *Florida's housing bubble, is it ready to burst?*, St. Petersburg Times, May 25, 2005. The precise percentage of Regions' investment in Floridian real estate is not currently known, but Regions has admitted it was substantial. *See* Regions Fin. Corp. (Form 10-Q) (June 30, 2008) at 31 (hereinafter "June 30, 2008 10-Q"). For example, Regions had 427 branches in Florida as of December 31, 2007, which constituted nearly one quarter of all Regions' branches that spread across 16 states. 2007 10-K at 3. Indeed, Regions increased its loans concentration in Florida from 13 percent in 2005 to 24 percent in 2006. Moreover, by the end of 2007, 27.9 percent of Regions' residential homebuilder portfolio was concentrated in Florida. 2007 10-K at 45. Regions' lack of geographical real estate loan diversification was imprudent and not properly disclosed to Plan Participants. By staking much of its real estate loan portfolio, subprime and prime, on Floridian real estate, Regions exposed itself and the plans to massive losses.

76

197.     Indeed, on July 21, 2009, Regions reported that the increases in provisions for loan loss were "primarily attributable to most stressed portfolios - homebuilder, condo and home equity second liens in Florida."  Regions Fin. Corp., Current Report (Form 8-K) (July 21, 2009) Ex. 99.2, at 1 (hereinafter "July 21, 2009 8-K").  Moreover, Regions reported that with regard to home equity lines of credit, "[n]et charge-offs in Florida [are] approximately 5.3 times [higher than] non-Florida net charge-off rate," indicating that Florida is a source of substantial losses for Regions.  *Id.* at 22.

198.     The percentage of Regions' real estate portfolio invested in residential real estate also exposed the Company to greater risks.  The Regions 2007 10-K reported that: "For residential real estate mortgages, home equity lending, and other consumer-related loans, individual products are reviewed on a group basis or in loan pools (e.g., residential real estate mortgage pool).  The total of all residential loans, including residential real estate mortgages and home equity lending, represents approximately 34 percent of total loans."  2007 10-K at 29.  If one includes the residential construction loans and home equity loans, the total percentage of Regions' residential exposure is much closer to 50 percent, a figure showing an acute lack of diversification.  *Id.* at 43.

199.     For example, the day after the Company filed its 2007 10-K, on February 28, 2008, Regions reported that a major borrower, a condominium developer in Fort Lauderdale, filed Chapter 11 proceedings, leaving Regions and a lending partner with $18.6 million in unpaid loans.  These non-performing loans in Regions' commercial loan portfolio have increased throughout the Company Stock Subclass Period.

200.     In addition to residential loans, Regions' commercial real estate loans presented further risk of loss.  Regions invested heavily in commercial real estate projects in areas with

artificially inflated real estate values, where the loan repayment was contingent on the commercial projects being completed.  As the demand for new building and commercial ventures slowed in these over-saturated markets, Regions' loan portfolio took a substantial hit.  Regions lacked proper loan diversification and risk management.  In its 2007 10-K, Regions disclosed that roughly 50 percent of its real estate loan portfolio was commercial-related.  This heavy concentration in commercial loans, especially in areas of artificially inflated real estate prices, exposed the Company to huge risks.

201.   Regions' unsound, risky, and unstable real estate loan portfolio, the core of its financial statement, exposed the Company, and therefore the plan participants, to massive risks of loss.  Because of their high-level positions as directors, officers, and executives at Regions, Defendants knew or should have known about these risks and taken actions to protect the plans.

**3.   Regions Failed to Reserve for Losses**

202.   Throughout the Company Stock Subclass Period, Regions improperly reserved for losses arising out of its real estate lending practices.  Specifically, it failed to increase its provisions for loan losses and allowance for loan losses.[12]  Such failures are unsurprising, as the Company took every step to cover up the weaknesses of its real estate loan portfolio to keep its stock artificially inflated.

203.   Throughout the Company Stock Subclass Period, Company Stock Defendants knew or should have known that they needed to increase Regions' provisions for loan loss and

---

[12] A provision for loan loss is generally an expense set aside as an allowance for bad loans.  The provision for loan loss is charged against the corporation's income on its financial statements.  An allowance for loan loss, however, is not an expense, but essentially a pool of money set aside by a corporation to cover potential future losses.  It is not deducted from the corporation's income.  Plaintiffs use the term "allowance for loan loss" rather than the synonymous term "loan loss reserve" in order to track the language used by Regions on its financial statements.

allowance for loan loss.  *See* Section VIII.A.1, *supra*.  For example, in October 2006, the

*American Banker* reported:

> The Southeast has been one of the nation's stronger markets for loan growth, but analysts said they plan to watch how banking companies there reserved for such growth in the third quarter.
>
> In recent quarters the hot topic was margin pressure and its effects on earnings. But analysts and executives now call margin compression an obvious and inevitable headwind and are shifting their commentary to asset quality . . . .

Paul Davis, *Reserves Under Microscope in Southeast*, Am. Banker, Oct. 16, 2006.

204.     Notwithstanding this "obvious and inevitable headwind," "Regions Financial

Corp . . . gave little indication that it is preparing for a slide in credit quality." *Id.*  Rather,

Regions "increased its allowance for loan losses **marginally** from a quarter earlier, adding $25

million of provisions in the third quarter, compared with $24.3 million of net charge-offs." *Id.*

(emphasis added).  Thus, despite taking on greater risks, Regions did not provide for

commensurate loan loss reserves.

205.     Regions failed to reserve properly for loan losses as the loan portfolio's value

deteriorated, and the Defendant fiduciaries knew or should have known about this problem.

206.     For example, Regions lowered its underwriting standards but failed to timely

adjust its allowance for loan losses and reserves consistent with the Company's changing risk

profile.  Throughout the Company Stock Subclass Period, Regions rapidly expanded the riskier

aspects of its business, including construction and development loans for residential projects,

residential mortgages in areas of high real estate speculation, and secondary home equity loans.

Regions consistently described its asset value as "strong" without regard to the lowered quality

of many of its assets and, until very recently, delayed providing appropriate loan loss reserves.

As recently as in its August 3, 2007 Quarterly Report, Regions claimed to maintain "a high

quality credit portfolio" which is "well-diversified . . . by product type, collateral and geography."  Regions Fin. Corp. Quarterly Report (Form 10-Q) (Aug. 3, 2007) at 41 ("hereinafter "Aug 3. 2007 10-Q").

207.    Specifically, Regions sharply increased its provisions for loan losses at near exponential rates, without giving adequate indication of such a need.  Between 2006 and 2007, Regions' provision for loan loss jumped from $143 million to $555 million.  Remarkably, between 2007 and 2008, Regions was forced to provide over $2 billion for loan losses, a near 400 percent increase from the year before.

208.    Regions knew or should have known that it needed to increase its allowances for loan loss in response to assuming substantially increased risks.  Defendants, given their positions as directors, officers, and executives within Regions, knew or had access to information, including, but limited to, publically available and internal information about the need to increase allowances for loan loss and provisions for loan loss.  Moreover, delaying recognition of troubled assets inflated the value of the Company while the Plans continued to purchase shares of Regions stock.

209.    In 2008, Regions identified a startling volume of loan assets as "troubled," with their value more than tripling in eighteen months.  "Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status.  Impaired loans totaled approximately $1,246.3 million at June 30, 2008, compared to $660.4 million at December 31, 2007 . . . ."  *Id.* at 32.  As of December 31, 2006, impaired loans were $237.5 million.  Regions Fin. Corp. Quarterly Report (Form 10-Q) (June 30, 2007) at 26 (hereinafter "June 30, 2007 10-Q). Similarly, Regions nearly doubled its inventory of foreclosed property and real estate, going

from $72.7 million by the end of 2006, to $120.5 million by the end of 2007. Regions 2007 Form 10-K at 68.

210.  In addition to provisions for loan loss, Regions' allowance for loan losses spiked up at astonishing rates, suggestive of Regions' risky real estate loan portfolio that was rapidly deteriorating. Not increasing the provision of loan losses directly increased Regions' bottom line. Regions did so to protect its bottom line, since as provisions for loan loss goes up, net income goes down. Thus, the allowances were kept too small for too long; Regions knew or should have known to increase its allowances for loan loss much earlier.

211.  Specifically, Region's allowances for loan loss jumped from $1.05 billion in the Fourth Quarter of 2006, to $1.321 billion in the Fourth Quarter of 2007. Regions' allowances for loan loss rose sharply again to $1.826 billion in the Fourth Quarter 2008. Such large increases in allowances for loan loss provide further evidence of the risks inherent in Regions' real estate loan portfolio.

212.  The marked increases in allowance for loan loss, provisions for loan losses, and non-performing assets have not stopped. Regions announced on July 21, 2009 that it had increased its allowance for loan loss to $2.282 billion for the Second Quarter 2009. July 21, 2009 8-K at 2. Moreover, Regions raised its loan loss provision by an astounding $487 million to $912 million for the Second Quarter 2009, more than doubling its $425 million loan loss provision for the First Quarter 2009. *Id.* at 13. In addition, Regions increased its non-performing assets from $1.935 billion in the First Quarter 2009, to a remarkable $3.057 billion for the Second Quarter 2009. *Id.* The enormous and dramatic uptick in non-performing assets and provisions for loan loss is a clear indication that Regions has failed to report properly and truthfully the value of its loan portfolio. The huge increases in these figures follow closely on

81

the "stress test" that the Federal government performed on Regions. *UPDATE 2-Regions Financial posts Q2 loss on bad loans*, Reuters, July 21, 2009.

213.    Upon release of these dismal figures, Regions' stock dropped over 15 percent on July 21, 2009, to close at $3.42.

214.    Defendants, given their positions and access to critical information, knew or should have known by the start of the Company Stock Subclass Period that Regions' unsound real estate loan portfolio required it to provide for and allow for losses commensurate to its risks. The failure to do so caused Regions' common stock to be over-inflated during the Subclass Period, exposing the Plans to huge and sudden losses.

### 4.    Regions Failed to Manage Its Risk Properly

215.    On May 16, 2005, the OCC, the Board of Governors of the Federal Reserve System ("Federal Reserve"), the Federal Deposit Insurance Corporation ("FDIC"), the Office of Thrift Supervision ("OTS") and the National Credit Union Administration issued "*Credit Risk Management Guidance for Home Equity Lending*" ("Credit Risk Guidance"). The Credit Risk Guidance stated that the agencies had "found that, in many cases, institution's credit risk management practices for home equity lending have not kept pace with the product's rapid growth and easing of underwriting standards." The Credit Risk Guidance also stated that financial institutions "may not be fully recognizing the risk embedded in these portfolios."

216.    The Credit Risk Guidance instructed that management needed to "actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values."

217.    The Credit Risk Guidance also found that "prudently underwritten home equity loans should include an evaluation of a borrower's capacity to adequately service the debt.

82

Given the home equity products' long-term nature and the large credit amount typically extended to a consumer and evaluation of repayment capacity should consider a borrower's income and debt levels and not just a credit score."

218.   Upon information and belief, Regions delayed assessing or ignored its portfolio's vulnerability and relied upon asset valuations and modeling that failed to take into account the possibility of wide-scale decreases in real estate property values.

219.   As late as mid-2007, Regions claimed that while the number of its non-performing loans had increased, the loans were all "well-secured by real estate collateral."  June 30, 2007 10-Q at 24.  Many of the loans were based on extremely high loan-to-value ratios, on the assumption that real estate values would increase.  Similarly, Regions made substantial builder loans with high loan-to-value ratios where there was little real estate collateral because many of the projects had not been built.

220.   Despite the mid-2005 Credit Risk Guidance, it was not until late 2007 and the first half of 2008 that Regions significantly increased its loan allowances related to "losses within the home equity portfolio."  "Home equity credits accounted for over half of the increase in net charge-offs, rising to an annualized 1.94 percent of outstanding loans and lines during the second quarter of 2008 . . . .   These loans and lines represent approximately $5.4 billion of Regions' total home equity portfolio.  Of that balance . . . second liens, which total $3.5 billion are the main source of losses."  June 30, 2008 10-Q at 31.

221.   Had Regions properly managed its risk, it would have maintained a diverse real estate loan portfolio that was not geographically limited, overly invested in real estate, or concentrated in regions where home values were over-inflated.  Moreover, Regions failed to abide by the Credit Risk Guidance.

5.     **Regions' Securities Portfolio Contains Massive Exposure to Risky Mortgage-Backed Securities**

222.    Regions invested the lion's share of its securities portfolio (its investment portfolio) in mortgage-backed securities ("MBS") despite being in a position to know the risks presented by this investment.  Regions touted its "securities portfolio [a]s one of Regions' primary sources of liquidity."  2007 10-K at 60.  Yet, Regions' belief that "[m]aturities of securities provide a constant flow of funds available for cash needs" was based on completely inappropriate assumptions and improper risk management.  Regions could in no way rely on cash flow from illiquid MBS.

223.    Indices tracking mortgage-backed securities put or should have put Regions on notice of the risks inherent in its investment portfolio  For example, the ABX 06-2 index, used to track the value of securities backed by subprime mortgages, lost 80 percent of its value from the fall of 2006 to the end of 2007.  By January 2008, Regions knew or should have known from this and other similar indices tracking mortgage-backed securities to diversify its investment portfolio to avoid losses.  However, Regions failed to heed this red flag and, instead, continued to maintain roughly two-thirds of its investment portfolio in MBS through 2007 and, upon information and belief, to the present.  *See* Regions Fin. Corp., Annual Report (Form 10-K) (Hereinafter "2006 10-K"); 2007 10-K at 47; Regions Quarterly Fin. Corp., Report (Form 10-Q) (Oct. 30, 2008) at 36 (showing that as of Sept. 31, 2008, over two-thirds of Regions' investment portfolio was concentrated in MBS).

224.    The risks of mortgage-backed securities are directly tied to the default rates on the mortgages that compose the securities.  Thus, the downturn in subprime mortgages had particularly adverse impact on MBS composed of such loans.  Upon information and belief, these MBS were particularly invested in subprime mortgages.  Thus, Defendants knew or should

have known that the downturn in the subprime lending and mortgage market had and would continue to adversely impact its securities portfolio.  Regions' failure to maintain a diversified investment portfolio exposed the Company and the Plans to an imprudent level of risk.

225.    Regions had substantial exposure to subprime securities through its large investment in MBS.  Regions reported in its 2006 Annual Report that *roughly two-thirds of its securities available for sale were mortgage-backed securities*.  2006 10-K at 53.  The total amount of MBS in Regions' portfolio was over $12 billion in 2006.  In 2007, Regions reported a slight drop in MBS value to just over $11 billion, but MBS still comprised over two-thirds of its investment portfolio.  2007 10-K at 47.

226.    Such a massive wager on mortgage-backed securities was imprudent given what Regions knew or should have known about the risks of its MBS investment, particularly in light of its own high-risk lending activities.  The investment in MBS also caused Regions to increase its exposure to the risks already captured in its real estate portfolio, given that the MBS were tied to the same unstable and risky real estate market.  Indeed, the MBS market began to freeze in 2007 as mortgage default rates rose and investors lost confidence in subprime mortgages as collateral.  By 2008, the entire market was essentially frozen.  As a result, Regions' substantial MBS holdings are now potentially worthless and at the least, incredibly risky.

227.    Regions' failure to diversify its securities portfolio has now left it with two-thirds of its investment portfolio invested in the riskiest securities available on the market.  These poor business decisions are further examples of serious mismanagement of the Company that exposed the Plans to massive losses.  Such improper business management caused the Plans' investment in Regions common stock to be imprudent throughout the Company Stock Subclass Period.  ERISA does not require companies to be well-managed, but when a company decides, as

Regions did, to load up its retirement plan with Company stock, the Plans' fiduciaries–

Defendants in this action–must take action to protect the Plans from the consequences of the

mismanagement.

      **6.**    **Regions' Imprudent and Improperly Disclosed Off-Balance Sheet Exposure**

     228.    Regions common stock was also exposed to substantial risk because of Regions'

off-balance sheet holdings.

     229.    Regions disclosed in its 2007 10-K that "Regions issues off-balance sheet

financial instruments in connection with lending activities."  The credit risk associated with the

off-balance sheet financial instruments at the end of 2007 and 2006 was $39.6 billion and $41.9

billion respectively, an amount equivalent to more than 40 percent of Regions' deposit base.

Regions also nearly doubled its loan commitments from June 30, 2006, when they were $22.0

billion, to $41.3 billion by June 30, 2007.  Standby letters of credit also greatly increased from

$3.6 billion on June 30, 2006, to $6.9 billion by June 30, 2007.  June 30, 2007 10-Q at 19.  Off-

balance sheet financial instruments have many beneficial purposes, such as allowing Regions to

reduce regulatory capital requirements and funding costs, and increasing critical financial ratios.

The high potential exposure to loss for Regions in off-balance sheet activity puts Plan

participants' holdings of company stock at risk.  Also, Regions' minimal financial statement

disclosures make it more difficult, if not impossible, for Plan participants to have complete and

accurate information for investment decisions.

     230.    Off-balance sheet financing has become a highly, if not completely, illiquid

activity.  Off-balance sheet financial instruments, which were once considered risk-free

investments, are now worth as much as the paper they were written on.

231.    In its 2007 10-K, Regions states that its off-balance sheet exposure is one of its greatest risks: "Regions' business risks, uncertainties and other factors include . . . Regions' ability to manage fluctuations in the value of assets and liabilities and off-balance sheet exposure so as to maintain sufficient capital and liquidity to support Regions' business." Regions' sees its off-balance sheet exposure as a business risk factor concerning the Company's ability to maintain sufficient capital and liquidity.

232.    Regions' recent acknowledgment of the off-balance sheet loss exposure, similar to the sudden and massive impairment to goodwill, described *infra*, is a major source of uncertainty and risk to Plan participants. Under the accounting rules, it is easy for Regions to avoid fully disclosing its off-balance sheet activity. The Enron debacle was a classic example of the riskiness of off-balance sheet activity and the way this risk can be left out of the financial statements. The immediate cause of the Enron bankruptcy was a loss of confidence among investors caused by the company's misleading disclosure of off-balance sheet activity. Regions' incomplete and opaque disclosures regarding its off-balance sheet exposure raises substantial questions as to the risks these assets pose to Plan participants. What is clear, however, is that the markets to which Regions have off-balance sheet exposure has become increasingly frozen, and, therefore, illiquid.

233.    Corporate balance sheets should properly disclose and make transparent a company's financial condition. Here, the Defendant fiduciaries knew or should have known that Regions' off-balance sheet exposure was not and could not be adequately known or evaluated by Plan participants, and required monitoring, disclosure, and prudent consideration by Regions in maintaining Company Matching Contributions in Company common stock and offering Company stock as an investment option for retirement savings in the Plan.

87

**7.      Throughout the Company Stock Subclass Period, Regions Failed to Value Properly its Goodwill**

234.    Regions recently announced a $6 billion write-down of its goodwill.  *See* Regions Fin. Corp., Current Report for the Fourth Quarter of 2008 (Form 8-K) at Ex. 99.1.  This included a loss of $9.01 per diluted share for the quarter ending December 31, 2008.  By allocating this write-down to goodwill, the Company was able to claim that the "[r]egulatory and tangible capital ratios were unaffected by the goodwill impairment."  *Id.*

235.    Pursuant to the Financial Accounting Standards Board Standard No. 142, the goodwill testing should have been performed at the occurrence of "an event . . . or circumstance that would more likely than not reduce the fair value of a reporting unit below its carrying amount."  FASB Standard No. 142, at 28.  Examples of such events include:

1.      A significant adverse change in legal factors or business climate;

2.      An adverse action or assessment by a regulator;

3.      Unanticipated competition;

4.      A loss of key personnel;

5.      A more-likely-than-not expectation that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of;

6.      The testing for recoverability under Statement 144 of a significant asset group within a reporting unit; or

7.      Recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

*Id.*

236.    Regions claims that it repeatedly and consistently tested its goodwill for impairment.  In 2006, for example, the Company stated that it "tested for impairment on an annual basis, or more often if events or circumstances indicate that there may be impairment."  2006 10-K at 86.  In the Second Quarter 2008 Quarterly Report, Regions stated that:

> During the second quarter of 2008, Regions performed an interim impairment test due to the downturn in the economic environment. The interim impairment test indicated that the fair value of the respective reporting units is greater than the carrying value (including goodwill); therefore, goodwill was not impaired as of June 30, 2008. Regions will continue to assess the economic environment and determine whether or not further testing of goodwill is appropriate.

Regions Second Quarter 2008 Report (Form 10-Q).  Regions then reported in its Third Quarter 2008 Report that:

> During the third quarter of 2008, Regions performed an interim impairment test due to the downturn in the economic environment.  The interim impairment test indicated that the fair value of the respective reporting units is greater than the carrying value (including goodwill); therefore, goodwill was not impaired as of September 30, 2008. Regions will continue to assess the economic environment and determine whether or not further testing of goodwill is appropriate.

Regions Third Quarter 2008 Report (Form 10-Q).

237.    During the Second and Third Quarters of 2008 alone, Regions experienced a massive decline in the value of its stock with the inevitable implosion of the mortgage industry. By at least the Fourth Quarter of 2007, Regions should have written down its goodwill substantially, given the fact that its stated book value greatly exceeded its market value.  These factors should have caused it to test and downgrade its goodwill well before it reported the $6 billion impairment in the Fourth Quarter of 2008.  Regions' failure to undertake any proper accounting of its goodwill caused its stock to be over-inflated and is further evidence of financial mismanagement.

**8.    During the Common Stock Subclass Period, Regions Common Stock Was an Imprudent Investment for the Plans Due to the Company's Involvement in the Sale of Auction Rate Securities**

238.    Through its subsidiary Morgan Keegan, Regions was involved in the sale of auction rate securities ("ARS") as an alternative to money market funds.  Plaintiffs have been unable to determine the full extent of that involvement.  However, on May 31, 2006, the SEC

89

settled a proceeding against a number of broker-dealers, including Morgan Keegan, for engaging in practices that violated federal securities laws with respect to the ARS market. *See* SEC Press Release, *15 Broker-Dealer Firms Settle SEC Charges Involving Violative Practices in the Auction Rate Securities Market*, May 31, 2006, http://www.sec.gov/news/press /2006/2006-83.htm. The SEC alleges that Morgan Keegan violated the securities laws by, *inter alia*, allowing customers to place open or market orders in auctions; intervening in auctions by bidding for a firm's proprietary account or asking customers to make or change orders to prevent failed auctions, to set a "market" rate, or to prevent all-hold auctions; submitting or changing orders, or allowing customers to submit or change orders, after auction deadlines; not requiring certain customers to purchase partially filled orders even though the orders were supposed to be irrevocable; having an express or tacit understanding to provide certain customers with higher returns than the auction clearing rate; and providing certain customers with information that gave them an advantage over other customers in determining what rate to bid. *Id.*

239.    Until at least 2005, the ARS were improperly marketed and accounted for as cash equivalents when they were, in fact, securities. Even after that time, Regions, through its subsidiary Morgan Keegan, continued to fail to disclose the real risks of these ARS. In February 2008, the market for ARS collapsed, and hundreds if not thousands of auctions (which are not really auctions) collapsed. Plaintiffs have been unable to determine whether the Plan held or holds ARS or the extent of the effect, if any, of the collapse of the ARS market on Regions, its affiliates, and the Plans, but will further investigate this matter in discovery.

240.    Regions disclosed in a May 11, 2009 filing with the SEC that the SEC served a Wells Notice on Morgan Keegan, the Regions subsidiary involved in ARS, "indicating that the SEC staff intends to recommend that the Commission take civil action against Morgan Keegan."

90

Regions Fin. Corp., Quarterly Report (Form 10-Q) (May 11, 2009) at 25.  On July 21, 2009, the

SEC followed up on the Wells Notice and filed suit against Morgan Keegan, alleging that it

stranded clients with $1.2 billion in ARS while the ARS market collapsed last year.  David

Scheer & Laurence Viele Davidson, *Regions Morgan Keegan Sued Over Auction-Rate Bonds*

*(Update1)*, Bloomberg, July 21, 2009.   The SEC has demanded that Morgan Keegan pay fines

and buy back the instruments it sold to customers before March 20, 2008.  *Id.*

### 9.       Regions Faces Substantial Downgrades Due to Its Failed Business Practices

241.     Regions' recent history has been marked by internal turmoil, including

replacement its Chief Financial Officers with startling regularity.  *See* Crystal Jarvis, *CFO*

*Turnover at Regions raises analyst questions*, Birmingham Bus. J., Feb. 22, 2008.  Since 1990,

Regions and AmSouth have collectively had *six* CFOs, including Regions' current CFO, Irene

Esteves.  *Id.*  Esteves replaced Alton E. Yother in February 2008, after Yother had served less

than a year.  Prior to Yother's tenure, which began in April 2007, D. Bryan Jordan served as

Regions' CFO.  *Id.*  This history prompted Jeff Davis, senior analyst and managing director of

FTN Midwest Security Corporation's Nashville office, to state that "[a]nother CFO at the

company will raise questions with investors that something is amiss in the executive offices."  *Id.*

Tony Plath, a finance professor at University of North Carolina at Charlotte added: "That's a

huge number . . . . That's a real cause for concern—anytime you see a revolving door in the CFO

office."  *Id.*  Plan fiduciaries should have investigated this problem to determine its impact on the

prudence of maintaining company stock in the Plans.

242.     As Regions' mismanagement has come to light, the Company has received

continuing downgrades from financial analysts.

91

243.     Indeed, during the first quarter of 2008, Regions was downgraded by a number of analysts and credit reporting agencies.  S&P Equity Research downgraded Regions from Hold to Sell on January 31, 2008.  Citi's Greg Ketron downgraded his recommendation on Regions to Sell on February 8, 2008.  Moody's downgraded Regions on March 11, 2008, citing concerns about commercial lending.  Such downgrades further affect Regions' capital costs, its ability to raise capital and, in turn, its liquidity.

244.     On March 28, 2008, Fitch Rating downgraded Regions' to "B."  Fitch stated in pertinent part as follows:

> The downgrades and Outlook revision reflect Fitch's increased concerns regarding the company's asset quality, specifically its U.S. residential homebuilder portfolio. Contributing to the rating action, [Regions'] profitability will likely remain pressured given asset quality deterioration and a challenging operating environment.

245.     As further evidence of threat of Regions' collapse, on Friday, October 25, 2008, Regions announced that it had received a $3.2 billion investment by the United States government from the $700 bailout funding approved by Congress under the Troubled Asset Relief Program ("TARP").  As of March 18, 2011, Regions had not completed the repayment of TARP monies it received for the bailout. On January 7, 2009, Credit Suisse downgraded Regions stock from neutral to "Underperform."

246.     On January 7, 2009, Credit Suisse downgraded Regions stock from neutral to "Underperform."

247.     Regions stock has fallen steadily, closing at $4.14 a share on January 29, 2009. The Company also announced that it may cut dividends by 90 percent because there "is no likelihood of the company's earnings turning positive in 2009."  *Regions Financial may cut*

92

*dividend by 90 pct*, Reuters, Jan. 26, 2009.  The Company's ongoing viability has been and remains in serious question.

248.     On the coattails of this dismal news, Regions stock closed at $2.92 on February 2, 2009, after Moody's downgraded it from a B- to a C+ and its long-term deposits from A1 to A2. Moody's explains its ratings as follows: "Obligations rated C are the lowest rated class of bonds and are typically in default, with little prospect for recovery of principal or interest."  Moody's Rating Symbols & Definitions (Aug. 2003) at 6.  A company whose debt is rated as low-level and highly speculative is not an appropriate investment for participants' retirement savings. Indeed, on news of this downgrade, the Company stock fell 15 percent from the prior day's trading.

249.     Indeed, as a continued sign of Regions' instability, on March 25, 2009, Fitch Rating downgraded Regions' credit over concerns that Regions would have to increase loan loss provisions and that it would have other difficulties servicing its debt.  *Fitch Downgrades Regions Financial's IDR to 'A'; Outlook Stable*, Bus. Wire, Mar. 25, 2009.  And on April 15, 2009, DBRS, a credit rating agency, downgraded Regions' credit rating over "steep asset quality deterioration . . . and further declines in credit quality."  *DBRS downgrades Regions Financial's long-/short-term ratings*, ADP Debt News, Apr. 15, 2009.

250.     Shortly thereafter, on April 16, 2009, Regions cut its quarterly dividend to a penny per share, down from 10 cents per share.  *Regions Financial slashes quarterly dividend*, AP Online, Apr. 16, 2009.  Then, on April 21, 2009, Regions announced that its first quarter earnings were down 92 percent as compared to the year before.  *UPDATE 2-Regions Financial's first quarter profit plummets*, Reuters, Apr. 21, 2009.  On May 7, 2009, the "stress test" performed by the Federal Supervisory Capital Assessment Program found that Regions needed to

raise another $2.5 billion, nearly the full amount of its then market capitalization.  Marcy

Gordon, *5 regional banks must raise $8.2B after tests*, AP Online, May 8, 2009. On May 18,

2009, Moody's Investor Service cut Regions' senior credit by three notches to Baa3, on the

belief that Regions would suffer further losses "largely . . . attributable to its concentrations in

residential home builder and home equity loans, particularly in Florida."  *Moody's cuts Regions*

*Financial's senior debt to Baa3*, Reuters, May 18, 2009.  On May 20, 2009, Regions announced

it would make a public offering of common stock to raise capital, which may dilute common

stock up to 68 percent according to ratings analysts.  *Regions Announces Successful $1.85 Billion*

*Capital Raise; Company Prices Common and Mandatory Convertible Preferred Offerings*, Bus.

Wire, May 20, 2009.

251.    The downgrades continued through June 2009.  On June 16, 2009, Fitch

downgraded Regions and placed it on negative watch, stating that "the company continues to

face elevated risk due to its exposure to problematic markets, including multiple types of real

estate exposures in Florida" and that Fitch "anticipates that RF will be unable to return to

profitability in 2009 . . . ."  *Fitch Downgrade L/T IDR of Regions & Affiliates; Outlook Negative*,

Bus. Wire, June 16, 2009.  On June 17, 2009, S&P also downgraded Regions.  Linda Chen, *U.S.*

*Banks Slide After S&P Rating Cuts on Regulation (Update1)*, Bloomberg, June 17, 2009.

Regions' stock closed at $3.99 on June 17, 2009, down nearly 8 percent from opening at $4.33

on June 16, 2009.  On November 1, 2010, Regions and Regions Bank's credit rating was

downgraded below investment grade, a serious problem for a large financial institution because it

significantly increases the costs of credit.  This downgrade further reflected that the two entities

have yet to solve their financial problems.

94

252.     These events further highlight that Regions remains in perilous condition with little sign of recovery from the brink of collapse, and as such continues to be an unduly risky and imprudent investment for Plan participants' retirement savings.

**10.     Defendants Knew or Should Have Known that Regions Common Stock Was an Imprudent Investment.**

253.     During the Company Stock Subclass Period, as described herein, Regions' stock was an imprudent investment for the Plans because of, among other things, the Company's: (1) risky real estate loan portfolio containing geographically undiversified, subprime and prime loans; (2) failure to provide for and reserve for losses; (3) inadequate risk management controls; (4) imprudent and undiversified focus of two-thirds of its investment portfolio in risky and illiquid MBS; (5) off-balance sheet exposure to risky markets; (6) improper valuation of its goodwill; and (7) risky and improper ARS practices.  These improper business practices artificially inflated Regions common stock and placed Regions in dire financial circumstances. In addition, repeated downgrades, sell recommendations, and various objective measures of Regions' dire financial condition should have alerted Defendants to the imprudence of continued investment in Regions common stock.

254.     Members of the Compensation Committee, which had oversight over and monitored all other Plan-related committees, were also members of Regions' Board of Directors and therefore knew or should have known of the mismanagement and risks within the Company that exposed the Plans to great risk of loss by continued investment in Regions Company Stock. Moreover, Defendants had access to all necessary information to understand and react to the risks to Regions common stock.

255.     Defendants had several available options that would have satisfied or contributed to satisfying their fiduciary duties, including: (1) making appropriate public disclosures, as

necessary; (2) divesting the Plans of Regions stock; (3) discontinuing further investment in Regions stock under the Plans; (4) consulting independent fiduciaries regarding appropriate measures that would prudently and loyally serve the Plans' participants; and/or (5) resigning as Plan fiduciaries to the extent that as a result of their employment by or association with Regions, they were unable to loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Regions stock.

256.   In the end, when the severity of the circumstances came to light, the Plans suffered enormous losses, all or some of which could have been avoided had the Plans' fiduciaries acted prudently and loyally to protect the interests of Plan participants, as required by ERISA.

257.   A reasonably prudent fiduciary would have and should have taken a different approach to managing the Plan assets in light of the imprudence of Regions Company Stock as an investment alternative.

**11.   Defendants Failed to Provide Plan Participants with Complete and Accurate Information about the True Risks of Investment in Regions Common Stock in the Plans**

258.   ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.

259.   During the Company Stock Subclass Period, on information and belief, Defendants made direct and indirect communications to Plan participants which included statements regarding investments in Company stock.  These communications included, but were

not limited to, SEC filings, annual reports, and press releases that were incorporated by reference into Plan documents and/or Plan-related materials.  Since these communications were incorporated into the Plans, they were undertaken in a fiduciary capacity.  However, the Company Stock Defendants failed to disclose that Company stock was not a prudent retirement investment.  The Company regularly communicated with employees, including Plan participants, about the performance and future financial and business prospects of the Company's common stock, which was, far and away, the single largest asset of the Plans during much of the Company Stock Subclass Period.

260.    Public reporting and disclosure by Regions has been and continues to be in many material aspects so opaque as to render it incomprehensible to Plan participants.  By failing to properly record and disclose its financial condition, Regions has lost its reputation for integrity, and undermined the confidence of investors.

261.    Throughout the Company Stock Subclass Period, Company Stock Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company.  As such, participants in the Plans could neither assess nor appreciate the true risks presented by investments in Company stock, and therefore could not make informed decisions regarding their investments in Company stock in the Plans.

262.    Defendants have failed to provide the Plans' participants with complete and accurate information regarding the Company's risky real estate loan portfolio, which was over-invested in subprime loans, lacked geographical diversity, and was over-concentrated in areas of over-inflated real estate values.  Rather than disclose these risks, Regions consistently touted its

conservative risk culture and high underwriting standards.  *See, e.g.*, 2007 10-Q (Aug. 3, 2007) at 41; Regions Fin. Corp. Current Report (Form 8-K) (Oct. 16, 2007) at Ex. 99.1.

263.    Throughout the Company Stock Subclass Period, Company Stock Defendants have failed to provide the Plans' participants with complete and accurate information about the Company's inadequate allowance for and provision for loan losses.  Instead, Regions consistently described its asset value as "strong," even though Defendants knew or should have known that the quality was poor.  *See* 10-Q at 41 (Aug. 3, 2007).

264.    Additionally, Company Stock Defendants continue not to provide the Plans' participants with complete and accurate information about its inadequate risk management controls.  Instead, Regions has told Plan participants that it lacked exposure to the subprime market's downturn, that it had sufficient reserves for loan losses, and that its loans were all "well-secured by real estate collateral."  (June 30, 2007) 10-Q at 24, 31.  These inaccurate and incomplete statements made it impossible for Plan participants to understand the risks of investment in the Regions Stock Fund.

265.    Similarly, Regions has failed to provide complete and accurate information about the risks of its massive investment in MBS.  Rather than explain that the MBS market was rife with risks and uncertainty, Regions told Plan participants that its investment in MBS was its "primary source[] of liquidity" that would "provide a constant flow of funds available for cash needs."  2007 10-K at 60.  This made it impossible for Plan participants to understand and appreciate the risks of investing in the Regions Common Stock fund throughout the Company Stock Subclass Period.

266.    Throughout the Company Stock Subclass Period, Regions have failed to make complete and accurate disclosures about its off-balance sheet exposure.  Although Regions has

stated that its off-balance sheet exposure is one of its greatest risks, it has never made available for public view what constitutes its off-balance sheet exposure. *See* 2007 10-K. This lack of clear disclosure makes it impossible for Plan participants to understand the risks of investment in the Regions Common Stock fund.

267.    Similarly, Regions has not properly disclosed complete and accurate information about the value of its goodwill. Regions told Plan participants that it constantly tested any impairment to goodwill, which was inaccurate. Had Regions so tested its goodwill, it knew or should have known to write down its goodwill well before it did so in January 2009.

268.    Lastly, throughout the Company Stock Subclass Period, Regions has not provided complete and accurate information about the risk of its ARS practices. Regions kept accurate and information from Plan participants by improperly marketing and accounting ARS as cash equivalents instead of as securities. This deception made it impossible for Plan participants to understand the risk and impacts of Regions' ARS practice on the prudence of investing in the Regions Common Stock fund.

269.    The complexity of the financial transactions engaged in by Regions combined with the opacity of its financial disclosures prevented Plan participants from having access to complete and accurate information of the risks of receiving, selecting, and maintaining retirement assets in Regions common stock in the Plans. These failures caused substantial losses to the Plans throughout the Company Stock Subclass Period.

**B.    The Bond Funds Were Grossly Mismanaged**

**1.    The Bond Funds Were Invested in High Risk Assets, Mortgage-Backed Securities, and CDOs**

270.    During the Bond Fund Subclass Period, the Bond Funds were grossly mismanaged and were, or became, imprudent investments for retirement savings in the Plans and

ERISA Plans.  Among the myriad of other problems, the Bond Funds held portfolios of high-risk assets that exposed the Bond Funds to huge losses.  The Bond Funds also failed to diversify their holdings sufficiently to meet even their own policy restrictions.  As a result, the Bond Funds posed an unduly high risk of significant loss that could not prudently be borne by ERISA plans.

271.    These risks were exacerbated by inaccurate and incomplete statements about the value of the Bond Funds and faulty assumptions in valuations of the Bond Funds' underlying assets.  A fiduciary has a duty of prudence which includes a duty not to ignore circumstances, such as those here, which increase the risk of loss for ERISA Plan participants and beneficiaries—and the overall magnitude of that potential loss—to an imprudent and unacceptable level.

272.    A variety of circumstances contributed to the unacceptable level of risk born by ERISA Plan participants as a result of the ERISA Plans' investment in the Bond Funds, including, but not limited to:

1.    The Bond Funds' reckless investment in high-risk mortgage-backed and asset-backed securities and CDOs throughout the Bond Fund Subclass Period, despite recognizable signs of distress in the mortgage and credit markets, including rapidly rising delinquency rates on subprime loans;

2.    The decision to drastically alter the Bond Funds' risk profiles without putting in place managers who had the knowledge and skill-sets  to understand the changing circumstances and to manage the corresponding risk created by these changes;

3.    The Bond Funds' aggressive concentration in thinly-traded structured investment vehicles despite clear signs of a collapsing market for these products;

4.    The deteriorating market for CDOs, which led Defendants to deviate from the Bond Funds' investment policy restrictions and hold an excessive concentration of high-risk, illiquid assets;

5.    The continued inflation of the Bond Funds' Net Asset Values ("NAV") due to calculations based on false assumptions about the actual value and liquidity conditions affecting the market for asset-backed securities and CDOs;

100

6.      Defendants' failure to adequately diversify the Bond Funds' holdings to protect against deteriorating conditions in one market;

7.      Defendants invested Bond Fund assets in the lower, implicitly leveraged and most risky slices or "tranches" of structured or securitized debt instruments;

8.      Even though different Bond Funds were offered and marketed for different investment objectives, they were in fact heavily invested in the same types and classes of assets, so that investment in different Bond Funds would not result in prudent portfolio diversification;

9.      The sheer magnitude of the Bond Funds' exposure to loss in complex structured debt products, which made it difficult, if not impossible, to shield Plan participants from substantial losses as the real value of the Bond Funds' assets came to light; and

10.     The incomplete and inaccurate information regarding the dire circumstances the Bond Funds faced as a result of their concentrated investments in high-risk structured finance products, which artificially inflated the NAVs of the Bond Funds.

273.    Astonishingly, given the purpose of the ERISA Plans–to allow employees to save for retirement–and the skyrocketing risks of investment in the Bond Funds during the Bond Fund Subclass Period, the Bond Fund Defendants[13] did not undertake any meaningful action to protect the ERISA Plans from losses in the Bond Funds.  As a result of the interrelationship among Regions, Regions Bank, Morgan Keegan and MAM, the Bond Fund Defendants knew of the mismanagement of the Bond Funds.  Moreover, given the overlap between the Boards of Morgan Keegan and Regions, The Bond Fund Defendants had access to and responsibility to access the information about the mismanagement of the Bond Funds.  A prudent fiduciary facing similar circumstances would not have stood idly by as the ERISA Plans' and their participants' investments in the Bond Funds were destroyed.

---

[13] The precise identity of the Bond Funds Defendants with respect to the Plans and the ERISA Plans is plead with greater specificity in Count VI, below.

## 2. During the Bond Fund Subclass Period, the Bond Funds Were Imprudent Investments for the ERISA Plans

274.    The Bond Funds were not managed according to the stated purpose and level of risk.  For example, the Bond Fund Defendants represented the RMK Select Intermediate Bond Fund as a fixed-income fund with standard investment directives similar to many fixed-income products marketed by other investment firms.  However, in truth the Bonds Funds were invested in an extremely risky portfolio of holdings that exposed the Bond Funds to significant losses far out of step with the level of risk disclosed by the Bond Fund Defendants.  The Bond Funds were managed recklessly and deviated greatly from how a prudent fund manager would manage a fixed-income bond portfolio.

275.    Despite the fact that prudent investment management generally requires a diversified portfolio and despite representations that the Bond Funds provided such a diversified portfolio, in reality the Bond Funds were heavily concentrated in high risk, asset-backed securities, and other below-investment grade assets that significantly increased the riskiness of the Bond Funds as investment options.  On April 7, 2010, the Financial Industry Regulatory Authority (FINRA) filed a complaint against Morgan Keegan charging that Morgan Keegan marketed and sold the Bond Funds using false and misleading sales materials, which cost investors over $1 billion.  *Department of Enforcement v. Morgan Keegan & Co., Inc.*, Disciplinary Hearing No. 2007011164501 (FINRA April 7, 2010) (hereinafter "FINRA Complaint").  Among these "false and misleading sales materials" were quarterly glossies issued with respect to each of the Bond Funds.  These glossies misrepresented the extent to which the assets in the Bond Funds were diversified, while at the same time they highlighted the benefits of diversification and stated that that the Bond Funds were "diversified not only with regard to issuer, but also industry, security type, and maturity."  *Id.* at ¶¶ 23, 42.

102

**Short Term Bond Fund Glossy:**



**Intermediate Bond Fund Glossy:**



276.    Although all of the advertising glossies Morgan Keegan used during the review

period contained pie charts depicting the Short Term fund holding assets in 9-12 different classes

and the Intermediate Fund holding assets in 10-13 different asset classes, contemporaneous fund

materials depicted the Short Term Fund as having only five asset classes and the Intermediate

Fund as having only 5-6 asset classes.  *Id.* at ¶¶ 24, 43.  Moreover, the majority of the Short

Term Funds assets fell into two categories that shared many of the same risks: Asset Backed

Securities and Mortgage Backed Securities.  *Id.* at ¶ 43. Similarly, the majority of the

Intermediate Fund's assets fell into two similar categories:  Asset Backed Securities and CMOs.

*Id.* at ¶ 24.  Thus, the assets in these funds were far from "diversified."

277.     In fact, the Bond Funds invested heavily in poor quality, high risk mortgage and
asset-backed securities and CDOs to a far greater extent than appropriate.  Gretchen Morgenson
of *The New York Times* reported in December 2007 that 17 percent of the Intermediate Bond
Fund's net assets were invested in mortgage-related securities.  Gretchen Morgenson, *The Debt
Crisis, Where It's Least Expected*, N.Y. Times, Dec. 30, 2007.  Similarly, the FINRA Complaint
quoted a Morningstar analyst who observed that nearly 60% of the Intermediate Fund's assets
were rated in the three lowest investment grade categories, which was "about three times the
[intermediate-term bond] category average."  *FINRA Complaint*, at ¶ 12.  Morgan Keegan's own
due diligence analyst predicted in 2007, in a never-issued report, that the fund's "specialization
in less traditional sectors" put the fund "at risk of periodic underperformance when these areas
are out of favor."  *Id.* at ¶ 13.  In a May 15, 2007 internal e-mail, the Director of Morgan
Keegan's Investments Department commented that the magnitude of that potential
underperformance was "comparatively large." *Id.*

278.     The RMK Select High Income Bond Fund was invested in similarly risky assets.
As of March 31, 2007, the Fund, was invested in extremely high-risk structured derivatives as
follows:

| | |
|---|---|
| Asset-backed Securities-Investment Grade (including CDO's, CBO's, equipment lease and home equity loan securities) | 16.2% |
| Asset-backed Securities-Below Investment Grade or Unrated (including CDO's, CBO's, CLO's and equipment lease, franchise and home equity loan securities) | 35.1% |

| | |
|---|---|
| Mortgage-backed Securities-Investment Grade (CMOs) | 8.0% |
| Mortgage-backed Securities-Below Investment Grade or Unrated (CMOs) | 12.4% |
| Total | 71.7% |

279.     Thus, 20.4 percent of the High Income Fund's net assets were invested in mortgage-backed securities, most of them below investment grade.  Another 53.3 percent were invested in asset-backed securities based in part on risky home equity loans, 35.1 percent of which were below investment grade.  Fully 47.5 percent of the portfolio was below investment grade.

280.     Moreover, these figures fail to disclose the full extent of the risk associated with the assets in the Funds because the Funds falsely classified risky asset-backed securities as relatively less risky stock and bonds.  In fact, as of March 31, 2007, the Funds falsely classified approximately $217.8 million of ABS—or 16.4% of the Funds' combined initial gross market capitalization—as corporate bonds and preferred stocks in SEC filings.  Broken out by Fund, as of March 31, 2007, the false asset classifications equate to 18%, 14%, 17%, and 17% of RMK High Income, RMK Strategic Income, RMK Advantage Income, and RMK Multi-Sector High Income funds respective initial gross market capitalizations.

281.     Compounding the problem, the Bond Funds were supposed to be managed in the manner necessary to achieve a disciplined, risk-controlled investment process that would protect investors from risk driven by random and unpredictable events.  In reality, the management of the Bond Funds was far from disciplined and risk-controlled.  Defendants often failed to investigate or adequately evaluate bonds held in the Bond Funds until after they had already been purchased.  For example, on February 23, 2007, Albert L. Landers, Jr., a MAM Portfolio Analyst

105

who was known to be Jim Kelsoe's confidant, sent the following e-mail to Evan Kestenberg, a broker at United Capital Markets, Inc., inquiring into an ABS purchased by the Funds called NORMA:

> I think we bought NORMA 07-1A E from you guys . . . . [C]an you tell me what kind of CDO it is (CLO, RMBS, Trust Pfd, CRE, etc)? Also, if you have any docs and/or mktg materials for it please pass those along.

Joint Notice of Intent to Revoke Registration and Impose Administrative Penalty, at Exhibit 104A, *In re: Morgan Asset Management, Inc., et al.*, Nos. Ala. SC-2010-0016; Ky. 2010-AH-021; Miss. S-08-0050; S.C. 08011 (Sep. 30, 2010), (hereinafter "State Regulatory Complaint") *available at* http://www.asc.state.al.us/Orders/2010/SC-2010-0016/MK%20Notice%20of%20Intent%20-%2009302010.pdf.

282.    That same day, Landers sent a second e-mail to Kim Pandick, a broker at Stifel, Nicolaus & Co., asking her to "tell me what kind of CDO Silver Elms is (RMBS, CLO, Trust Pfd, CRE, etc)." State Regulatory Complaint, at Exhibit 104B.

283.    Similarly, on June 26, 2007, Landers sent another e-mail to Kastenberg seeking documentation regarding a Broderick CDO which the Funds had purchased three months prior. In this e-mail, Landers admitted:

> I'm trying to get a handle on how much subprime exposure we have in our CDO's (we're getting asked a lot of questions by shareholders, as you can probably imagine), so I'm hoping those docs might clue me in to how much is in this deal.

State Regulatory Complaint, at Exhibit 104G.  The State Regulatory Complaint detailed numerous additional e-mails from Landers that demonstrated that the Morgan Keegan Fund Managers had little understanding of the nature of—the risks associated with—the assets they had purchased on behalf of the Bond Funds.

106

284.     Further adding to the risks associated with the Bond Funds was the failure of Morgan Keegan to conduct due diligence and to monitor the activities the of Fund managers, including Kelsoe.  For example, according to Morgan Keegan's Due Diligence Policy, Kim Escue, a Morgan Keegan Vice President and fixed income analyst, was scheduled to conduct an on-site review during which she was required to observe Kelsoe in person while the market was open.   However, in two e-mails sent to Chet Pinckernell, Manager of Morgan Keegan's due diligence group, Escue described Kelsoe's efforts to evade this review.  Escue describe that although Kelsoe had initially agreed to meet with her on June 6, 2007, he immediately backed out and stopped responding to Escue's calls and e-mails after he was informed by Escue on June 4, 2007, that Escue wanted to "sit with [Kelsoe] while he worked to get a better idea of what he was doing."  State Regulatory Complaint, at Exhibit 109.

285.     After failing to hear from Kelsoe or his team for weeks, Escue called the Funds and advised a woman named Jennifer Brown that if she "could not get [her] onsite meeting [she] would need to go ahead and put out a report . . . and would have to indicate that [Kelsoe] would not see [her]." *Id.*  Kelsoe called her back within an hour, but again only offered to meet with Escue after the bond markets had closed.  *Id.*  After this meeting, Escue left certain requests for information with Kelsoe, but "never received any of [her] information requests back."  *Id.*

286.     Escue later explained to Pinkernell that she believed the only reason the Funds eventually called her back was because "they know . . . we will no longer need the info I have requested . . . ."  State Regulatory Complaint, at Exhibit 110.  She further explained that she had been "stalled and put off [by Kelsoe] since the get go," and finally recommended that it was in Morgan Keegan's "best interest to drop coverage if we cannot do our regular due diligence."  *Id.*

107

287.    The result of this high concentration of subprime assets, the lack of professional management and risk control, and the absence of adequate oversight was that the Bond Funds were in an exposed position.  Thus, although pressures felt by the bond markets in 2007 affected all bond funds, the losses suffered by the Bond Funds were far more significant because they resulted from portfolios that were more highly concentrated in poor-quality, high-risk assets than other similar investment products in the general bond fund market.  In an article analyzing the tiered ramifications of the subprime collapse, the *Wall Street Journal* tracked the effects of increasing mortgage default rates to losses in the Bond Funds:

> One buyer was Mr. Kelsoe, a senior portfolio manager at the asset-management unit of Morgan Keegan & Co., a Memphis, Tenn., investment firm and unit of Regions Financial Corp. At the time, Mr. Kelsoe was riding the housing boom by investing heavily in mortgage-backed securities. At the end of 2005, his RMK Select High Income Fund showed a five-year average annual gain of nearly 14%, according to Morningstar Inc. That performance beat all U.S. high-yield funds as well as the Dow Jones Industrial Average.

> . . .

> Mr. Kelsoe's big returns, though, depended heavily on the good fortune of [subprime] borrowers such as Mr. Rodriguez.

> Through various of his funds, Mr. Kelsoe invested nearly $8 million in one of the Soundview 2005-1 trust's riskiest pieces. The B-3 tranche, as it was called, offered a return of at least 3.25 percentage points above the London interbank offered rate -- a key short-term rate at which banks lend to each other. But if borrowers like Mr. Rodriguez began to default on their loans, any losses exceeding 1.25% of the entire loan pool could eat into the value of the B-3 tranche.

*Behind Subprime Woes, A Cascade of Bad Bets -- One Loan's Journey Shows Culture of Risk*,

Wall St. J., Oct. 17, 2007.

288.    Criticism of the Bond Funds continued to grow.  Russell Kinnell, director of research at Morningstar, cited the two former Regions Morgan Keegan mutual funds as "example[s] of the horrendous performance" among the mutual funds that had "miserable

108

returns" in 2008.  Geraldine Fabrikant, *How Safe Is That Nest Egg, Anyhow?*, N.Y. Times, Jan. 11, 2009, Sunday Business at 18.  *The New York Times* noted that the Select High Income fund fell 75.8 percent and the Select Intermediate Bond Fund was down 84.5 percent in 2008.  According to *The New York Times*, Mr. Kinnel explained that the Regions Morgan Keegan Select High Income Fund's problem "was that it overweighted mortgage bonds and underweighted other types of corporate debt that backfired when the mortgage market collapsed."  *Id.*  *The New York Times* reported that although these losses may not have been predicted, "the funds' atypically high returns in previous years may have indicated that something was amiss.  In 2004 and 2005, for example, Select High Income was in the top 1 percent in performance for high-yield category.  'It was clear then that it was not doing what everyone else was doing,' Mr. Kinnel said."  *Id.*  A spokesman for Regions Morgan Keegan, Eric Bran, stated that "[t]hese funds were unfortunately on the leading edge of the credit crisis."  *Id.*

289.    In July 2009, the SEC commenced an investigation of certain Bond Funds formerly managed by Morgan Asset Management.  *See* Regions Fin. Corp., Current Report (Form 8-K) (July 15, 2009).  Specifically, on July 15, 2009, Regions disclosed in an SEC filing that "Morgan Keegan & Company, Inc., . . . Morgan Asset Management, Inc., and three employees" were served with a Wells Notice on July 9, 2009 "from the Staff of the Atlanta Regional Office of the United States Securities and Exchange Commission (the 'Commission') stating that the Staff intends to recommend that the Commission bring enforcement actions for possible violations of the federal securities laws" related to "certain mutual funds formerly managed by Morgan Asset Management, Inc."  *Id.*

3.     **The Bond Funds' Over-Concentration in High-Risk Mortgage-Backed Securities and CDO Assets Comes to Light**

290.     As insiders who either themselves managed the Bond Funds, or worked closely with the managers in a variety of overlapping capacities, the Bond Fund Defendants knew or should have known that the Bond Funds were not being managed appropriately and faced an ever increasing risk of collapse.  Conditions in the mortgage and asset-backed securities markets in 2007 (including the collapse of two prominent Bear Stearns hedge funds in the fall of 2007), together with the Bond Fund Defendants' access to information and knowledge of the Bond Funds' problems, should have signaled to the Bond Fund Defendants, that it would have been prudent to decrease ERISA Plans' exposure to the Bond Funds.

291.     Indeed, during this time, the Bond Funds stood out with their extensive losses and glaring risk-management failures.  The *Wall Street Journal* pinpointed victims of the suffering market, including investors in the Bond Funds:

> Fund manager Jim Kelsoe has written several items this summer, in one case outlining exact subprime-loan holding percentages in certain closed-end funds. His Regions Morgan Keegan Select High Income Fund has been particularly hard hit by the turmoil, and is down more than 30% so far this year; the next-worst performer in the junk-bond fund category is down about 5% in that period.

Diya Gullapalli, *Fund Firms Draw Back the Curtain*, Wall St. J., Sept. 6, 2007.

292.     The Bond Funds' balance sheets were so overloaded with thinly traded illiquid assets that the Bond Funds could not generate enough cash to maintain self-sufficiency.  A capital crisis struck the Bond Funds.  Investors sought to withdraw before they suffered additional losses.  The Bond Funds were so strapped for cash during the Bond Fund Subclass Period that they had to be bailed out for liquidity purposes.  According to the *Wall Street Journal*:

110

> The annual report that covers these funds also outlines some important steps taken by the funds' adviser and affiliates to help cope with recent losses.  These include stepping in to buy about $55.2 million in shares of the High Income Fund and $30 million in the Intermediate Bond Fund from the beginning of July to the end of August to help provide liquidity.

Diya Gullapalli, *Mutual Fund Opens a Subprime Window -- Regions Morgan Keegan Says One Is Down 35%*, Wall St. J., Oct. 5, 2007.

293.    The Bond Funds were forced to liquidate assets when prices were depressed and buyers were scarce, reducing the NAVs of the Bond Funds to handle redemptions. According to the *Wall Street Journal*:

> The Intermediate Bond Fund was hit hard amid the turmoil in the credit markets since this summer, as many of fund's investments in mortgage-backed and other asset-backed securities couldn't find buyers.  The fund also had redemptions from investors, which forced the managers to sell in a down market and reduced the value of the portfolio.
>
> The fund is currently down around 45% since the start of the year, the worst performer in the intermediate-term bond-fund category of funds, according to research firm Morningstar Inc.  The average fund in this category is up 5% since the start of the year.

Shefali Anand, *First the Losses, Now Bond-Fund Lawsuits -- Indiana Charity Is Latest To Seek Recourse as Values of Debt Portfolios Decline*, Wall St. J., Dec. 6, 2007.

294.    According to *Bloomberg L.P.,* as of May 5, 2008, the Intermediate Fund's NAV was down more than 75 percent from a year previous.  Compared to other funds in the same Morningstar category, the Intermediate Fund was disproportionately invested in complex structured investment vehicles tied to the subprime mortgage market.  This management failure caused the Bond Funds to collapse—an unusual event even within current market conditions.  Indeed, the Bond Funds have the dubious distinction of being the worse performing fixed-income bond funds in the country.  Defendants knew or should have known that the Bond Funds managers had violated their own investment objectives and guidelines, taken on astonishingly

high levels of risk, and transformed themselves from fixed-income retirement savings funds to high-risk gambles.

295.    The following chart demonstrates the RMK Intermediate Fund's standard fixed-income returns changing course as a result of the fund's reckless, high-risk speculation in poor-quality, high-risk securities:



296.    The Intermediate Bond Fund suffered a precipitous decline in 2007 through spring of 2008 as the Intermediate Bond Fund essentially became worthless.

297.    According to *Bloomberg L.P.,* as of May 5, 2008, the High Income Fund NAV was down more than 75 percent from the previous year.  Similar to the Intermediate Fund, the RMK Select High Income Fund's assets were disproportionately concentrated in complex structured finance vehicles compared to other funds in its Morningstar category.  The High

112

Income Fund suffered a precipitous decline beginning in July of 2007 and continuing through the spring of 2008 as the High Income Fund became worthless.



298.    On April 21, 2008, Morgan Keegan Select Fund, Inc., the issuer for some of the Bond Funds, announced that Jim Kelsoe of Morgan Asset Management. would be replaced by Hyperion Brookfield Asset Management, Inc.

299.    Transfer of management of all of the Bond Funds to Hyperion was effective July 29, 2008.  On July 29, 2008, Hyperion announced a strategy to "reposition the portfolios in favor of investment grade and high yield corporate securities along with asset-backed securities." Hyperion explained the benefits of greater diversification:

> Achieving better diversification across different sectors of the fixed income market should allow the funds to increase the predictability of income, provide a base for net asset value stability, and preserve total return potential.

Hyperion characterized the new strategy as "portfolio repositioning."

300.    The firing and replacement of the high flying Jim Kelsoe as fund manager and the new managers' dramatic "portfolio repositioning" provides strong evidence of the utter failure of the Bond Fund management, a failure which wiped out plan participants' Bond Fund investments.

301.    Prior to and during the Bond Funds' collapse in value, the Bond Fund Defendants took no steps to remove the Bond Funds as investment options in the ERISA Plans and otherwise failed to protect the interests of the participants and beneficiaries of these plans.  They failed to do so even though they had full access to information regarding the investments in the Bond Fund, and, thus, they knew or should have known that the Bond Funds were being grossly mismanaged and exposed to enormous risks that were not appropriate for the risk profile and stated purpose of the Bond Funds.  Instead, the Bond Fund Defendants sought to downplay and conceal the extent of the problems with the Bond Funds.  For example, Morgan Keegan blamed the country's economic problems and made public statements that any assertions of wrongdoing were "meritless" and based on "hindsight" when in fact, insiders knew that the Bond Funds had been managed in a reckless and inappropriate manner.

### 4.    Defendants Maintained Investment in the Bond Funds to Benefit Regions and Its Subsidiaries

302.    During the Bond Fund Subclass Period, as described herein, the Bond Fund Defendants caused the ERISA Plans to remain invested in the Bond Funds when Bond Fund Defendants knew or should have known that less risky, better-performing, comparable funds were available from unaffiliated financial services companies.

303.    Rather than engaging in a prudent process to evaluate the merits of continued investment in the Bond Funds, the Defendants made the imprudent decision to continue offering Bond Funds to the ERISA Plans and maintaining investments in the Bond Funds, for the

apparent purpose of providing Regions with ongoing business for its wholly-owned subsidiary, Morgan Keegan, and profits for Regions, Regions Bank, Morgan Keegan and MAM.

304.    Given that the Morgan Keegan Defendants ran the Bond Funds and is an integral component of Regions Financial, the Bond Fund Defendants knew or should have known that the Bond Funds were improper plan investments.  Moreover, given the overlap between the Morgan Keegan and Regions Boards, the Bond Fund Defendants had access to and should have known that the Bond Funds were imprudent plan investments.  Despite this, the Bond Fund Defendants failed to act to protect plan assets.

**5.      The Defendants Failed To Disclose the Risks Associated with the Bond Funds' Assets.**

305.    During the Bond Fund Subclass Period, on information and belief, Regions, Regions Bank, and the Morgan Keegan Defendants failed to disclose crucial information about the true risk of the Bond Funds to the participants and beneficiaries of the ERISA Plans. Specifically, these Defendants omitted information that would have alerted participants to the Bond Funds': (a) deviation from sector-wide risk management and investment practices; (b) undisclosed, disproportionate investment in poor quality complex structured investment vehicles tied to the subprime mortgage market; (c) failure to adjust risk management practices; and (d) inability to generate enough cash to maintain the Bond Funds' balance sheets, which were overloaded with thinly traded illiquid assets.  As such, the ERISA Plans' participants were not informed of the true risks of investing their retirement assets in the ERISA Plans in the Bond Funds.

306.    Indeed, as recently reported in the four state Joint Notice of Intent to Revoke Registration and Impose Administrative Penalty (attached hereto as Exhibit 4), the Bond Fund Defendants breached their duties "by failing to disclose the risks associated with the Funds;

misrepresenting the nature of the Funds; misclassifying the securities held within the Funds;

comparing the performance of the Funds to inappropriate peer groups (benchmarks); failing to

accurately represent the amount of structure debt securities held in the Funds; and after the

collapse of the Funds, recommending that investors should hold and/or continue to buy the

Funds."  Ex. 4, at 3.

307.    Additionally, marketing materials published by MAM misrepresented the nature

of the assets held in the funds.  For example, as noted by FINRA in its complaint, the Fund's

March 31, 2007, advertising materials listed "capital preservation" as the Fund's first objective.

*See FINRA Complaint*, at ¶ 22.  However, the fund was not managed in the manner necessary to

preserve capital.  Far to the contrary, the fund engaged in highly risky and speculating trading

activities.



308.    Moreover, the marketing materials stated that the Fund provided "a diversified portfolio of *investment-grade* debt instruments," whereas, in reality, as the Defendants were well aware, the fund held a significant quantity of below-investment grade assets.

309.    The March 31, 2007 marketing brochure for the Select Short Term Bond Fund similarly misrepresented the objectives of the fund.  The first objective listed on the glossy was "stable net asset value."  *See FINRA Complaint*, at ¶ 41.



310.    As FINRA explained in its complaint, "'Stable net asset value" is an investment objective typical of money market funds that manage the portfolio to achieve the same NAV from day to day, whereas a 'preservation of capital' goal permits NAV fluctuation."  *Id.*

311.    Upon information and belief, the same type of incomplete and inaccurate information was provided in the context of the ERISA Plans and the Plans such that, on a plan-

117

wide and uniform basis, material information necessary to make an informed decision was omitted.

312.    Moreover, on April 7, 2010, the Securities and Exchange Commission (SEC) issued an Order Instituting Administrative Cease-and-Desist Proceedings (hereinafter "SEC Order") against MAM, Morgan Keegan, James Kelsoe, and Joseph Weller charging that during various periods between at least January 2007 and July 2007, the daily NAV of the Bond Funds was materially inflated as a result of the fraudulent conduct of the Respondents.  These charges, and the factual allegations restated herein, were based on an investigation conducted by the SEC Division of Enforcement.  SEC Order at 1.

313.    The SEC Order indicates that the Fund Accounting Department ("Fund Accounting") "accepted unsubstantiated 'price adjustments' submitted by Kelsoe that inaccurately inflated the price of certain securities, contrary to the Funds' policies and procedures." SEC Order at ¶ 12.  Between January 2007 and July 2007, Kelsoe had his assistant send approximately 262 "price adjustments" to Fund Accounting, many of which were "arbitrary and did not reflect fair value." *Id*. at ¶ 19.  Moreover, Fund Accounting did not request, and Kelsoe did not supply, supporting documentation for these adjustments. *Id*. at ¶ 22.

314.    The SEC Order also indicates that Kelsoe, in an effort to skirt fund procedures which required prices assigned to securities to be periodically validated through broker-dealer quotes, "actively screened and manipulated" dealer quotes sent to Fund Accounting and the Funds' Independent Auditor.  *Id.* at ¶ 13.  Even though Fund Accounting received month-end dealer quotes for securities held by the Funds, Fund Accounting "routinely allowed Kelsoe to determine whether dealer quotes were used or ignored." *Id.* at ¶ 24.  Moreover, whenever Fund Accounting or the Independent Auditor sent requests for dealer quotes to one particular broker-

dealer, Kelsoe would confer by e-mail or phone with his contact at the broker-dealer in an effort to increase its quotes. *Id*. at ¶ 28. Such conversations occurred at least with respect to month-end quotes for December 31, 2006, February 28, 2007, and March 31, 2007. *Id*.

315.    Additionally, Kelsoe would request, and the broker-dealer would often provide, interim quotes that were higher than the initial quotes that the broker-dealer intended to provide and which "enable[d] [Kelsoe] to avoid marking down the securities to the fair value in one adjustment." Id. at 29. For example, the broker-dealer priced down one Long Beach bond from $81 to $65 as an "interim" step, which was approximately half of the mark-down to $50 that the broker-dealer's trading desk initially had instructed be communicated to the Independent Auditor. Id. at ¶ 31. Amazingly, even with this inflated "interim" step, Kelsoe proceeded to value the Long Beach bond at $72. Id.

316.    On another occasion, Kelsoe told the broker-dealer not to provide a quote for the Knollwood bond (which Kelsoe had valued at $92) unless it was $87.50 or higher. *Id*. at ¶ 35. When Kelsoe was told that the trading desk had quoted the bond at $65, Kelsoe threatened to stop doing business with the broker-dealer. *Id*. As a result of Kelsoe's comments, the broker-dealer omitted its quote for the Knollwood bond when it reported its quotes to Morgan Keegan. *Id*. Kelsoe proceeded to implement a "price adjustment" for the Knollwood bond at $88. Id.

317.    Finally, the SEC Order reveals that contrary to the assertions in SEC filings that the fair value of securities would be determined by MAM's Valuation Committee, the Valuation Committee—which was primarily staffed by Morgan Keegan—"left pricing decisions to lower level employees in Fund Accounting who did not have the training or qualifications to make fair value pricing determinations." *Id.* at ¶17. Moreover, Weller, as head of Fund Accounting and a member of the Valuation committee, "knew, or was highly reckless in not knowing, of the

119

deficiencies in the implementation of the valuation procedures . . . and did nothing to remedy them or otherwise to make sure fair-valued securities were accurately priced . . . ." Id. at ¶ 26.

318.    In the summer of 2007, the Bond Fund Defendants acknowledged that there may be tough times in the near future, but made numerous statements that served to allay investor concerns about the long-term health of the funds.  For example, in the 2006-2007 Annual Report, filed with the SEC on June 6, 2007, Kelsoe reassured investors that although the "mortgage-backed securities market has undergone serious turmoil, . . . this downward volatility . . . has also provided an opportunity to buy assets at considerably higher yields than have been available for more than two years."  Kelsoe further insisted that although "redeploying assets during this market upheaval may be difficult from a net asset value perspective for a period of time, . . . this is also the best opportunity we have seen in years to secure better portfolio earnings for quarters to come."

319.    Even as late the third quarter of 2007, when the values of the Bond Funds had begun to decrease markedly, the Bond Fund Defendants continued to assert that these decreases were caused by short-term market glitches that were independent from the management of the funds.  At the Annual Meeting for Shareholders of RMK Closed-End Funds on July 13, 2007, Kelsoe asserted that "[t]here's been a lot of very negative media hype that has adversely affected both the bad and good mortgage-backed securities."  Kelsoe further explained that "[t]he markets that we are involved in are being particularly hard hit by a lack of liquidity more so than actual credit events."  These explanations were coupled with reassurances that the Funds "have not experienced an elevated or unusually high level of defaults" and that "earnings continue to come in at or above our expectations to date."

320.     During the subsequent months, Kelsoe took the additional steps of issuing comforting commentaries on the Morgan Keegan website.  On August 10, 2007, Kelsoe issued a commentary in which he asserted "[d]uring my 20 year career, these are truly unprecedented times.  Amidst these difficult circumstances, I assure you of my continuing commitment to do all that I can to take care of our shareholders' best interests."  Kelsoe also continued to blame the poor performance of the Funds on external, temporary market forces.  For example, he asserted that "[i]n my opinion, the de-leveraging, or sell-off of securities, by hedge funds and other financial institutions has created an excessive supply of all types of fixed income securities."  Moreover, he asserted that "the rating agencies' sudden and drastic action in downgrading securities have exacerbated these problems . . . ."

321.     On November 15, 2007, Morgan Keegan CEO and President, Doug Edwards, reassured investors Morgan Keegan was "committed to these funds."  He further commented:

> We have done as good a job as anybody in the industry has..…You couldn't find a harder working bunch of individuals, and a more conscientious bunch of individuals than the people you do have working to solve these problems. *So, I would ask you to hang in there*.  Again, I think Jim's done about all he can do through this period, and, you know, he's done it in a way that really exemplifies, you know, our commitment to doing the right thing for our customers.

State Regulatory Complaint, at Exhibit 70 (emphasis added).  Similarly, Allen Morgan—who served as Chairman and Executive Managing Director of Morgan Keegan & Co., director and Vice-Chairman of Regions Financial, and director of Morgan Asset Management— commented that:

> I own all these funds myself personally. And I have family members that do, and I certainly have clients like the rest of you that do. ….. today I would tell you that the problems in the credit markets are terrible, *but we do have some real value there and it looks to me like we should try to see this through* ….. It will correct itself at some point. I think we're closer to a bottom certainly than we've been to a top. …..There are better times after there are bad times, always.

121

*Id.* (emphasis added).

**C.      Excessive Fees and the RMK Select Funds**

**1.      The RMK Select Funds Were Imprudent Investments for the Legacy and Regions 401(k) Plans During the Excessive Fee Subclass Period and Defendants' Fiduciary Breaches Have Caused the Plans to Incur Substantial Losses**

*Fees and Expenses Charged by the RMK Select Funds Were Excessive*

322.    There is no shortage of reasonably priced, well managed investment options in the 401(k) plan marketplace.  Nonetheless, Excessive Fee Defendants ignored these options and instead assembled for the Legacy and Regions 401(k) Plans a list of proprietary mutual funds managed by a subsidiary of Regions that charged unreasonably high fees and expenses.  Indeed, proprietary funds selected by the Excessive Fee Defendants had expense ratios in some cases upwards of *six times* the expense ratios for readily available comparable funds.  As a result, the Legacy and Regions 401(k) Plans wasted participants' retirement savings–large sums of money– on inferior investment products.

323.    By failing to implement a prudent and adequate procedure for evaluating, selecting, and monitoring fund investment options and for ensuring that reasonably priced, prudent investment options were selected for the Legacy and Regions 401(k) Plans, Defendants caused the Legacy and Regions 401(k) Plans to incur substantial losses.  Thus, Defendants violated their fiduciary duties under ERISA.

324.    An adequate investigation in this respect would have revealed to Defendants that the RMK Select Funds were imprudent, and a reasonably prudent fiduciary would have acted differently under the circumstances.  Defendants failed to comply with this duty.  Moreover, given the available alternatives which would have generated the same or better return on investment without the excessive fees of the RMK Select Funds, Defendants breached their

122

fiduciary duties under ERISA to the Excessive Fee Subclass.  Upon information and belief, the

Defendants failed to undertake any prudent or reasonable investigation of investment alternatives

that would not have caused Plaintiffs and the Excessive Fee Subclass to incur such substantial

monetary losses.

325.    Many of the RMK Select Funds hold Retail Class shares.  Retail Class shares are

generally intended for individual investors, not large pools of retirement savings.  Large

retirement plans, such as the Legacy and Regions 401(k) Plans, have the ability to obtain

Institutional Class shares for company-sponsored retirement plans.  Institutional Class shares are

far cheaper than Retail Class shares, while offering the same or better performance.  For this

reason, prudent retirement plan fiduciaries often select Institutional Class shares for inclusion in

large plans.  The relatively higher fees for the Retail Class shares held by the Legacy and 401(k)

Plans in some RMK Select Funds were unwarranted when better options featuring Institutional

Class shares were readily available.

326.    Further, the RMK Select Funds predominantly were actively managed funds.

Upon even the most cursory inspection of fund performance, one can see that many of the

actively-managed funds selected by Defendants frequently yielded lower returns than passively-

managed funds in the same categories due at least in part to the higher cost to the Legacy and

Regions 401(k) Plans.  Even as compared to other actively managed funds, the performance of

the RMK Select Funds did not justify the high fees that the Plans paid to Regions and its

affiliates.

327.    To demonstrate the extent of losses in Legacy and Regions 401(k) Plans

participants' retirement savings caused year after year by Defendants' failure to ensure that the

fees and expenses charged to the Legacy and Regions 401(k) Plans were reasonable, Plaintiffs

provide the following tables that: (1) summarize the expense ratios of the RMK Select Funds; (2)

compare the RMK Select Funds to less expensive investment alternatives available in the

marketplace; and (3) provide an estimate of the losses to the Plan from December 31, 2002 to

December 31, 2007, the dates during the Excessive Fee Subclass Period for which Legacy and

Regions 401(k) Plans asset information is available.[14]  The estimated losses are based on rates

published by Vanguard, a prominent investment management company.  On information and

belief, investment houses such as Vanguard offer even lower rates than those included in the

tables below to large institutional clients like Regions with tens of millions of dollars to invest.

Thus, to the extent that the Legacy and Regions 401(k) Plans could have negotiated even lower

fees, or excessive fees continued to be assessed against the funds after December 31, 2007, the

actual losses to the Legacy and Regions 401(k) Plans are even greater than these estimates.

Plaintiffs reserve the right to claim such higher damages following discovery.

328.    As of December 31, 2008, the Regions 401(k) Plan had in excess of $103 million

in the RMK Select Balanced Fund (the "Balanced Fund").  2008 11-K at 15.  Even though the

Plans had over $103 million invested in the Balanced Fund, the Regions 401(k) Plan (and

previously the Legacy Plan) held Class A shares, which are Retail Class shares within the

Balanced Fund.  As discussed above, Institutional Class shares, which should have been

available for the Plans' investment in the Balanced Fund given the size of the investment, are

less expensive than Retail Class shares, yet provide the same or better performance.  The

participants' investments were assessed a gross expense ratio of 1.25 percent.  The Defendants

---

[14] All calculations of losses use actively-managed and passively-managed Vanguard funds of the
same Morningstar category as points of comparison. These funds are chosen as examples of
investment products available in the marketplace.

chose this fund despite the existence of high-quality alternatives with lower fees that are available in the market place.  *For example*: Vanguard's Asset Allocation Fund, an actively managed fund in the same Morningstar category as the Balanced Fund, offers an expense ratio of 0.37 percent to *retail* investors.  The Plans' investments in the Balanced Fund resulted in more than $5.6 million in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund. The contrast is even starker when the Balanced Fund is compared to either a retail or institutional index fund in the same asset category.

| Mutual Fund Name: | RMK Select Balanced Fund |
|---|---|
| Expense Ratio: | 1.25% |
| Actively Managed Alternative Expense Ratio: | 0.37% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.19% |
| Initial Plan Assets in Fund: | $64,244,510 |
| Estimated Losses (Active): | ($5,631,111) |
| Estimated Losses (Passive – Retail Class): | ($6,370,159) |

329.    As of December 31, 2008, the Plans had in excess of $28 million in the RMK Select Mid Cap Growth Fund (the "Mid Cap Growth Fund").  2008 11-K at 15.  Even though the Plans had over $28 million invested in the Mid Cap Growth Fund, the Plans held Class A shares in the Mid Cap Growth Fund, which are Retail Class shares.  The participants' investments were assessed a gross expense ratio of 1.23 percent.  Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class that are available in the marketplace.  *For example*: Vanguard's Mid Cap Growth Fund, an actively managed fund in the same Morningstar category as the Mid Cap Growth Fund, offers an expense ratio of 0.56 percent to *retail* investors.  The Plans' investments in the Mid Cap Growth Fund resulted in more than $1.8 million in losses due to excessive fees and unreasonable expenses during the Excessive Fee

125

Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund.  On information and belief, the Regions 401(k) Plan continued to incur the excessive fees linked to the RMK Select Funds through the end of the subclass period.

| Mutual Fund Name: | RMK Select MidCap Growth Fund |
|---|---|
| Expense Ratio: | 1.23% |
| Actively Managed Alternative Expense Ratio: | 0.56% |
| Initial Plan Assets in Fund: | $31,126,152 |
| Estimated Losses (Active): | ($1,800,920) |

330.    As of December 31, 2008, the Plans had in excess of $44 million in the RMK Select Growth Fund (the "Growth Fund").  2008 11-K at 15.  Even though the Plans had over $44 million invested in the Growth Fund, the Plans held Class A shares within the Growth Fund, which are Retail Class shares.  The participants' investments were assessed a gross expense ratio of 1.21 percent.  Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace.  *For example*: Vanguard's U.S. Growth Fund, an actively managed fund in the same Morningstar category as the Growth Fund, offers an expense ratio of 0.50 percent to *retail* investors.  The Plans' investments in the Growth Fund resulted in more than $2.2 million in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund.  The contrast is even starker when the Growth Fund is compared to either a retail or institutional index fund in the same asset category.  On information and belief, the Regions 401(k) Plan continued to incur the excessive fees linked to the RMK Select Funds through the end of the subclass period.

| Mutual Fund Name: | RMK Select Growth Fund |
|---|---|
| Expense Ratio: | 1.21% |
| Actively Managed Alternative Expense Ratio: | 0.50% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.22% |
| Initial Plan Assets in Fund: | $50,538,048 |
| Estimated Losses (Active): | ($2,231,068) |
| Estimated Losses (Passive – Retail Class): | ($2,977,363) |

331.   As of December 31, 2008, the Plans had in excess of $34 million in the RMK

Select Value Fund (the "Value Fund").  2008 11-K at 15.  Even though the Plans had over $34

million invested in the Value Fund, the Plans held Class A shares within the Value Fund, which

are Retail Class shares.  The participants' investments were assessed a gross expense ratio of

1.22 percent.  Defendants chose this fund despite high-quality alternatives with lower fees and

expenses in the same asset class available in the marketplace.  *For example*: Vanguard's Growth

and Income Fund, an actively managed fund in the same Morningstar category as the Value

Fund, offers an expense ratio of 0.31 percent to *retail* investors.  The Plans' investments in the

Value Fund resulted in more than $1.2 million in losses from excessive fees and unreasonable

expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund

with a less expensive, actively managed retail fund.  The contrast is even starker when the Value

Fund is compared to either a retail or institutional index fund in the same asset category.  On

information and belief, the Regions 401(k) Plan continued to incur the excessive fees linked to

the RMK Select Funds through the end of the subclass period.

| Mutual Fund Name: | RMK Select Value Fund |
|---|---|
| Expense Ratio: | 1.22% |
| Actively Managed Alternative Expense Ratio: | 0.31% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.15% |
| Initial Plan Assets in Fund: | $19,941,934 |
| Estimated Losses (Active): | ($1,275,667) |
| Estimated Losses (Passive – Retail Class): | ($1,480,682) |

127

332.     As of December 31, 2007, the Legacy Plan had in excess of $5 million in the RMK Select High Income Fund (the "High Income Fund").  2007 11-K at 10.  The participants' investments were assessed a gross expense ratio of 0.89 percent.  Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace.  ***For example***: Vanguard's High Yield Corporate Fund, an actively managed fund in the same Morningstar category as the High Income Fund, offers an expense ratio of 0.25 percent to ***retail*** investors.  The Plans' investments in the High Income Fund resulted in more than $135,000 in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive actively managed retail fund. On information and belief, the Legacy and Regions 401(k) Plans continued to incur the excessive fees linked to the RMK Select Funds through the end of the subclass period.

| Mutual Fund Name: | RMK Select High Income Fund |
|---|---|
| **Expense Ratio:** | 0.89% |
| **Actively Managed Alternative Expense Ratio:** | 0.25% |
| **Initial Plan Assets in Fund:** | $30 |
| **Estimated Losses (Active):** | **($135,527)** |

333.     As of December 31, 2008, the Plans had in excess of $11 million in the RMK Select Fixed Income Fund (the "Fixed Income Fund").  2008 11-K at 15. The participants' investments were assessed a gross expense ratio of 1.00 percent.  Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace.  ***For example***: Vanguard's Intermediate-Term Investment-Grade Fund, an actively managed fund in the same Morningstar category as the Fixed Income Fund, offers an expense ratio of 0.21 percent to ***retail*** investors.  The Plans' investments in the Fixed Income

128

Fund resulted in more than $826,000 in losses from excessive fees and unreasonable expenses

during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less

expensive, actively managed retail fund.  The contrast is even starker when the Fixed Income

Fund is compared to either a retail or institutional index fund in the same asset category. On

information and belief, the Regions 401(k) Plan continued to incur the excessive fees linked to

the RMK Select Funds through the end of the subclass period.

| Mutual Fund Name: | RMK Select Fixed Income Fund |
|---|---|
| Expense Ratio: | 1.00% |
| Actively Managed Alternative Expense Ratio: | 0.21% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.18% |
| Initial Plan Assets in Fund: | $23,148,166 |
| Estimated Losses (Active): | ($826,338) |
| Estimated Losses (Passive – Retail Class): | ($837,080) |

334.    As of December 31, 2007, the Legacy Plan had in excess of $11 million in the

RMK Select Ltd. Maturity Fixed Income Fund (the "Ltd. Maturity Fixed Income Fund").  2007

11-K at 10.  Even though the Legacy Plan had over $11 million invested in the Ltd. Maturity

Fixed Income Fund, the Plan held Class A shares within the Ltd. Maturity Fixed Income Fund,

which are Retail Class shares.  The participants' investments were assessed a gross expense ratio

of 0.96 percent.  The Defendants chose this fund despite high-quality alternatives with lower fees

and expenses in the same asset class available in the marketplace.  *For example*: Vanguard's

Short-Term Investment-Grade Fund, an actively managed fund in the same Morningstar category

as the Ltd. Maturity Fixed Income Fund, offers an expense ratio of 0.21 percent to *retail*

investors.  The Plans' investments in the Ltd. Maturity Fixed Income Fund resulted in more than

$799,000 in losses from excessive fees and unreasonable expenses during the Excessive Fee

Subclass Period, based solely on a comparison of the fund with a less expensive, actively

129

managed retail fund. The contrast is even starker when the Ltd. Maturity Fixed Income Fund is compared to either a retail or institutional index fund in the same asset category. On information and belief, the Legacy and Regions 401(k) Plans continued to incur the excessive fees linked to the RMK Select Funds through the end of the subclass period.

| Mutual Fund Name: | RMK Select Ltd. Maturity Fixed Income Fund |
|---|---|
| Expense Ratio: | 0.96% |
| Actively Managed Alternative Expense Ratio: | 0.21% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.18% |
| Initial Plan Assets in Fund: | $30,769,121 |
| Estimated Losses (Active): | ($799,577) |
| Estimated Losses (Passive – Retail Class): | ($836,881) |

335.    As of December 31, 2007, the Legacy Plan had in excess of $3 million in the RMK Select Intermediate Bond Fund (the "Intermediate Bond Fund"). 2007 11-K at 10. The participants' investments were assessed a gross expense ratio of 0.60 percent. Defendants chose this fund despite high-quality alternatives with lower fees and expenses in the same asset class available in the marketplace. *For example*: Vanguard's Intermediate-Term Investment-Grade Fund, an actively managed fund in the same Morningstar category as the Intermediate Bond Fund, offers an expense ratio of 0.21 percent to *retail* investors. The Plans' investments in the Intermediate Bond Fund resulted in more than $41,000 in losses from excessive fees and unreasonable expenses during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less expensive, actively managed retail fund. The contrast is even starker when the Intermediate Bond Fund is compared to either a retail or institutional index fund in the same asset category. On information and belief, the Legacy and Regions 401(k) Plans continued to incur the excessive fees linked to the RMK Select Funds through the end of the subclass period.

| Mutual Fund Name: | RMK Select Intermediate Bond Fund |
|---|---|
| Expense Ratio: | 0.60% |
| Actively Managed Alternative Expense Ratio: | 0.21% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.18% |
| Initial Plan Assets in Fund: | $30 |
| Estimated Losses (Active): | ($41,455) |
| Estimated Losses (Passive – Retail Class): | ($48,224) |

336.     As of December 31, 2007, the Legacy Plan had in excess of $5 million in the

RMK Select Short Term Bond Fund (the "Short Term Bond Fund").  2007 11-K at 10.  The

participants' investments were assessed a gross expense ratio of 0.65 percent.  Defendants chose

this fund despite high-quality alternatives with lower fees and expenses in the same asset class

available in the marketplace.  *For example*: Vanguard's Short-Term Investment-Grade Fund, an

actively managed fund in the same Morningstar category as the Short Term Bond Fund, offers an

expense ratio of 0.21 percent to *retail* investors.  The Plans' investments in the Short Term Bond

Fund resulted in more than $72,000 in losses from excessive fees and unreasonable expenses

during the Excessive Fee Subclass Period, based solely on a comparison of the fund with a less

expensive, actively managed retail fund.  The contrast is even starker when the Short Term Bond

Fund is compared to either a retail or institutional index fund in the same asset category.  On

information and belief, the Legacy and Regions 401(k) Plans continued to incur the excessive

fees linked to the RMK Select Funds through the end of the subclass period.

| Mutual Fund Name: | RMK Select Short Term Bond Fund |
|---|---|
| Expense Ratio: | 0.65% |
| Actively Managed Alternative Expense Ratio: | 0.21% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.18% |
| Initial Plan Assets in Fund (as of 12/31/05): | $8,722,364 |
| Estimated Losses (Active): | ($72,031) |
| Estimated Losses (Passive – Retail Class): | ($77,642) |

337.    As of December 31, 2007, the Legacy Plan had in excess of $15 million in the

RMK Select Mid Cap Value Fund (the "Mid Cap Value Fund").  2007 11-K at 10.  Even though

the Plan had over $15 million invested in the Mid Cap Value Fund, the Legacy Plan held Class A

shares in the Mid Cap Value Fund, which are retail class shares.  The participants' investments

were assessed a gross expense ratio of 1.31 percent.  Defendants chose this fund despite high-

quality alternatives with lower fees and expenses in the same asset class available in the

marketplace.  *For example*: Vanguard's Strategic Equity Fund, an actively managed fund in the

same Morningstar category as the Mid Cap Value Fund, offers an expense ratio of 0.25 percent

to *retail* investors.  The Plans' investments in the Mid Cap Value Fund resulted in more than

$409 thousand in losses from excessive fees and unreasonable expenses during the Excessive

Fee Subclass Period, based on a comparison of the fund to an actively managed alternative.  The

contrast is even starker when the Mid Cap Value Fund is compared to either a retail or

institutional index fund in the same asset category.  On information and belief, the Legacy and

Regions 401(k) Plans continued to incur the excessive fees linked to the RMK Select Funds

through the end of the subclass period.

| Mutual Fund Name: | RMK Select Mid Cap Value Fund |
|---|---|
| Expense Ratio: | 1.31% |
| Actively Managed Alternative Expense Ratio: | 0.25% |
| Passively Managed Alternative Expense Ratio (Retail): | 0.21% |
| Initial Plan Assets in Fund (as of 12/31/03): | $5,684,996 |
| Estimated Losses (Active): | ($409,155) |
| Estimated Losses (Passive – Retail Class): | ($420,051) |

338.    As of December 31, 2008, total estimated losses to the Legacy and Regions

401(k) Plans for the Excessive Fee Subclass Period from excessive fees and expenses charged to

the Plans by the RMK Select Funds were as follows:

132

| | Estimated Losses |
|---|---|
| Alternative Actively Managed Funds | ($13,222,850) |
| Alternative Passively Managed Funds (Retail Class) | ($13,048,082) |

339.    Upon information and belief, damages to the Regions 401(k) Plan were incurred due to the excessive fees charged by the RMK Select Funds through the end of the subclass period.

340.    Defendants selected the RMK Select Funds because they are proprietary funds that provide substantial fees to Regions and its affiliates, and not because they were and are in the best interests of Plan participants.  The excessive fees derived by Regions and its affiliates were and are not credited back to the Plans and are not the result of services provided by the RMK Select Funds to the Plans.  Nor are the 12b-1 and other fees charged by the RMK Select Funds reasonable or paid to parties unaffiliated with Regions.  Instead, the high fees are taken by Regions and its affiliates for their own use and benefit to the detriment of participants' retirement savings.

**2.     The Excessive Fees Charged by the RMK Select Funds Cannot Be Justified by Their Performance**

341.    Unlike performance, costs are entirely predictable and certain.  Therefore, prudent plan fiduciaries focus not only on performance, but also on investment fees and expenses to ensure that selected funds charge reasonable fees.  There is no excuse for throwing away money on excessive fees.  Imprudent fiduciaries sometimes attempt to justify unreasonably high fees by pointing to fund performance.  This generally is regarded as an unduly risky approach to retirement asset management, since performance can change overnight but excessive fees will always be excessive.

133

342.     Here, however, if Defendants attempt to justify the excessive fees based on fund

performance, their effort will fail.  The performance of the Legacy and Regions 401(k) Plans

investment options frequently fell short of far less expensive alternatives in the same

Morningstar categories.  Moreover, the Bond Funds charged excessive fees while frequently

under-performing other mutual funds in their respective Morningstar categories.

343.     Thus, Defendants caused the Legacy and Regions 401(k) Plans to pay too much

for the Plan investment options, which were inferior products in any event.  Defendants' conduct

is an egregious violation of the duties of prudence and loyalty under ERISA.

### 3.     Defendants Knew or Should Have Known That the RMK Select Funds Were Imprudent Investments

344.     During the Excessive Fee Subclass Period, as described herein, Defendants knew

or should have known that the RMK Select Funds were imprudent investments for the Legacy

and Regions 401(k) Plans because there were more reasonably priced, high-quality investment

options available in the marketplace.  Defendants could, and should, have selected investment

options for the Legacy and Regions 401(k) Plans with lower fees and expenses that provided

comparable and/or better performance than the RMK Select Funds.  Defendants also knew that

the RMK Select Funds were selected solely because they are proprietary funds from which

Regions and its affiliates derive substantial revenue, and not because the funds were or are in the

best interest of Plan participants.

345.     As a result of these fiduciary breaches, the RMK Select Funds continued to be

offered in the Legacy and Regions 401(k) Plans and caused participants to lose a significant

portion of their retirement savings.

346.     Defendants failed to conduct an appropriate investigation into whether the RMK

Select Funds were prudent investments for the Legacy and Regions 401(k) Plans and, in

connection therewith, failed to provide the Plans' participants with information regarding the impact that excessive fees and unreasonable expenses had on participants' retirement savings so that participants could make informed decisions regarding their investments in the Legacy and Regions 401(k) Plans.  Defendants knew or should have known that less expensive comparable funds yielding superior results were available in the marketplace, but failed to communicate this information to participants.  Instead, Defendants selected high-cost options that caused the Legacy and Regions 401(k) Plans to squander vast sums on unnecessary fees.  Defendants also failed to inform participants that the RMK Select Funds were selected because Regions and its affiliates earned substantial fees from the Plans' investment in the Funds and not because the Funds were in the best interest of the Plan participants.

347.    A reasonable fiduciary would not have invested in these funds, given that the fees were unreasonable and not justified in light of other investment alternatives.

348.    Presumably, Defendants, as Plan fiduciaries of an ERISA Plan with over $700 million in assets, were familiar with DOL guidance on the prudent selection of investment options.  The DOL urges employers and fiduciaries to take their duty to select retirement plan investment options very seriously.  Evaluation of fees are part of their fiduciary responsibilities: Why Consider Fees?

> Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

> In recent years, there has been a dramatic increase in the number of investment
> options, as well as level and types of services, offered to and by plans in which
> participants have individual accounts. In determining the number of investment
> options and the level and type of services for your plan, it is important to
> understand the fees and expenses for the services you decide to offer. The
> cumulative effect of fees and expenses on retirement savings can be substantial.

*Understanding Retirement Plan Fees And Expenses*, U.S. Dep't of Labor, May 2004,

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.

349.    In addition, the DOL also has repeatedly cautioned employers that the investment

style of a particular fund, *i.e.*, whether it is actively or passively managed, has a major impact on

fees.  When funds such as index funds are "passively managed," "little research" is required, and

fees should be much lower:

> Funds that are "actively managed" (i.e., funds with an investment adviser who
> actively researches, monitors, and trades the holdings of the fund to seek a higher
> return than the market as a whole) generally have higher fees than funds that are
> "passively managed" (see below).  The higher fees are associated with the more
> active management provided and increased sales charges from the higher level of
> trading activity. While actively managed funds seek to provide higher returns than
> the market, neither active management nor higher fees necessarily guarantee
> higher returns.
>
> Funds that are "passively managed" generally have lower management fees.
> Passively managed funds seek to obtain the investment results of an established
> market index, such as the Standard and Poor's 500, by duplicating the holdings
> included in the index. Thus, passively managed funds require little research and
> less trading activity.

*Id*.

350.    Accordingly, if actively managed funds are offered in an ERISA-protected

retirement plan, the fiduciaries must ensure that the performance of those investment options

justifies the increased expense of the funds.  Paying high fees for a fund that underperforms the

applicable index is financially unsound as a matter of basic prudence.

136

351.    The detrimental impact excessive fees have on retirement savings is substantial, as the DOL has noted.  Over the course of an individual's participation in a 401(k) plan, excessive fees can result in a loss of tens of thousands of dollars, if not more, in retirement savings.

352.    *For example*: the DOL has postulated an example which assumes that an employee with 35 years until retirement has a current 401(k) account balance of $25,000.  If returns on investments in his account over the next 35 years average 7 percent, and fees and expenses reduce the average returns by 0.5 percent, his account balance would grow to $227,000 at retirement, even if there were no further contributions to the account.  However, if fees and expenses are 1.5 percent, his account balance would grow to only $163,000 at retirement.  The 1 percent difference in fees and expenses reduces the account balance at retirement by a shocking 28 percent.



*See* Employee Benefits Sec. Admin., U.S. Dep't of Labor, A Look at 401(k) Plan Fees 2 (Aug. 1998), http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf.

353.    Because of the enormous impact that excessive fees and expenses can have on participants' retirement savings, plan fiduciaries are required to monitor fees and expenses carefully to ensure that amounts charged against plan accounts are reasonable.

354.    An adequate or even cursory investigation by Defendants would have revealed to a reasonable fiduciary that, under these circumstances, the RMK Select Funds were unduly expensive and, thus, imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses and would have made different investment decisions.

355.    Because Defendants knew or should have known that the RMK Select Funds were not prudent investment options for the Legacy and Regions 401(k) Plans, Defendants had a fiduciary duty to protect the Plans and its participants from unreasonable and entirely predictable losses incurred as a result of the RMK Select Funds.

356.    Despite the ready availability in the marketplace of investment options that charge reasonable fees and expenses and provide comparable and often better performance, Defendants failed to take any action to protect participants from losses resulting from the Legacy and Regions 401(k) Plans RMK Select Funds.

357.    In addition, Defendants failed to review adequately the performance of the other fiduciaries of the Legacy and Regions 401(k) Plans to ensure that they were fulfilling their fiduciary duties under the Plans and ERISA.  Had they paid meaningful attention to the RMK Select Funds, the process by which the options were presented, the bases for inclusion of these funds as Plan investment options, the fees and expenses charged to the Legacy and Regions

138

401(k) Plans year after year for the RMK Select Funds, and their mediocre performance, millions

of dollars of participants' retirement savings could have been saved.

> **4.     Defendants Failed to Provide Legacy and Regions 401(k) Plan Participants
> with Complete and Accurate Information Regarding the Excessive Fees
> Associated With the RMK Select Funds**

358.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan and its

participants which includes the duty to speak truthfully to the plan and its participants when

communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA

includes an obligation not to materially mislead, or knowingly allow others to materially

mislead, plan participants and beneficiaries.

359.    During the Excessive Fee Subclass Period, Excessive Fee Defendants, as the

Legacy and Regions 401(k) Plans' fiduciaries, knew or should have known certain basic facts

about the impact that fees and expenses charged by fund options can have on an individual's

retirement savings, including the following:

1.      Fees charged by the RMK Select Funds were paid directly from Legacy and
Regions 401(k) Plan assets, meaning that every excessive dollar paid is a dollar
unnecessarily and inappropriately taken from participants' retirement savings;

2.      Excessive fees have a devastating impact on the total retirement savings of
Legacy and Regions 401(k) Plan participants, decreasing total savings by a
substantial percentage over time;

3.      Given the impact of excessive fees on participants' retirement savings, prudent
selection of reasonably priced, high-quality fund options is of paramount
importance to prudent plan management and administration; and

4.      Selection of expensive Retail Class shares within the RMK Select Funds for a
plan the size of the Legacy or Regions 401(k) Plan is imprudent given the ready
availability of Institutional Class shares, and both retail and institutional index
funds that offer comparable and often better performance at a fraction of the cost.

360.    During the Excessive Fee Subclass Period, Excessive Fee Defendants failed to

provide complete and accurate information to Legacy and Regions 401(k) Plan participants

regarding the impact excessive fees charged by the RMK Select Funds have on their retirement savings, the bases for the Defendants' selection of the RMK Select Funds, and the ready availability of far less expensive, comparable, and better performing options in the marketplace. Accordingly, participants in the Legacy Plan could neither assess nor appreciate the true risks presented by the RMK Select Funds and therefore could not make informed decisions regarding their investments in the Plans.

361.    Of particular note, Defendants failed to disclose to Legacy and Regions 401(k) Plan participants that the sole reason the RMK Select Funds were selected was because they were proprietary funds for which Regions received excessive fees, rather than as a result of a prudent process that evaluates the merits of the funds and compares them to less expensive, comparable, and better performing funds that were readily available in the marketplace.

362.    These facts were material to Plan participants, who needed to know and appreciate this information to manage their retirement investments in a sound and prudent manner.  Armed with this information, participants could have evaluated whether to invest part or all of their retirement savings in vehicles outside of the Plans, confronted the Defendants regarding the imprudent selection of the RMK Select Funds as Plan investment options, complained to the Department of Labor or other relevant authorities, or, more generally, better understand the operation and administration of the Plans.

**5.      Defendants Engaged in Prohibited Transactions Based on Their Selection of the RMK Select Funds as a Plan Investment Option**

363.    Furthermore, during nearly all of the Excessive Fee Subclass Period, the RMK Select Funds have provided kickbacks and royalties to Regions directly and through its wholly-owned subsidiaries, MAM and Morgan Keegan.  MAM has been the Investment Adviser to the RMK Select Funds from at least 2003 to July 29, 2008, when Hyperion Brookfield became the

Investment Advisor.  *See* RMK Select Funds Form 485APOS filed Dec. 3, 2003; RMK Select Funds Form 485APOS filed Dec. 1, 2004; RMK Select Funds Form 485APOS filed Jan. 30, 2006; RMK Select Funds Form 2008 Prospectus at 1, 85; Regions (Apr. 1, 2008).  From at least 2003 to 2008, Morgan Asset Management was designated to receive anywhere from .20 percent to .80 percent of each Fund's average daily net assets as an "Investment Advisory Fee." Moreover, the Legacy and Regions 401(k) Plans paid 12b-1 and other related fees to Morgan Keegan & Co. as part of the Plans' investment in the RMK Select Funds.  Upon information and belief, Morgan Keegan & Co. also used or caused Legacy and Regions 401(k) Plan assets to pay commissions to Regions affiliates related to the purchase and sale of RMK Select Fund shares in the Legacy and Regions 401(k) Plans.

364.    According to a Form N-8F filing with the SEC on August 18, 2009, certain RMK Select Funds were acquired by Pioneer Investment Management, Inc., and merged into existing Pioneer Funds.  The following RMK Funds were acquired and renamed by Pioneer Investment Management, Inc.:

| Acquired Fund | Surviving Fund |
|---|---|
| RMK Select Core Equity Fund | Pioneer Fund |
| RMK Select Growth Fund | Pioneer Growth Fund, a series of Pioneer Series Trust I |
| RMK Select Value Fund | Pioneer Cullen Value Fund, a series of Pioneer Series Trust III |
| RMK Select Mid Cap Value Fund | Pioneer Mid Cap Value Fund |
| RMK Select Balanced Fund | Pioneer Classic Balanced Fund, a series of Pioneer Series Trust IV |
| RMK Select Fixed Income Fund | Pioneer Bond Fund |
| RMK Select Limited Maturity Fixed Income Fund | Pioneer Short Term Income Fund |
| RMK Select Intermediate Tax Exempt Bond Fund | Pioneer Intermediate Tax Free Income Fund, a Series of Pioneer Trust I |

141

| RMK Select Treasury Money Market Fund | Pioneer Treasury Reserves Fund, a series of Pioneer Series Trust IV |
| RMK Select Money Market Fund | Pioneer Cash Reserves Fund, a series of Pioneer Money Market Trust |
| RMK Select Mid Cap Growth Fund | Pioneer Select Mid Cap Growth Fund, a series of Pioneer Series Trust I |

365.    Regions Bank caused the Legacy and Regions 401(k) Plans to engage in transactions that each of them knew or should have known constituted a direct or indirect furnishing of services or transactions of Plan assets between the Legacy and Regions 401(k) Plans, on the one hand, and parties in interest, on the other.

366.    Regions caused the Legacy and Regions 401(k) Plans to enter a contract or other arrangements through which the Plans paid for services and/or transferred Plan assets to Morgan Asset Management and/or Morgan Keegan & Co., both parties in interest, in relation to the Plans' investment in the RMK Select Funds.  This includes, but is not limited to, sales commissions charged by Morgan Keegan & Co.  These arrangements or contracts caused the Plans to make payments for services which were not reasonable, especially when compared to other comparable, available mutual funds.  To the extent that these fees were kickbacks and royalties, they were not and cannot be reasonable as a "service" charge.  Moreover, given that these fees were paid to Regions' affiliates, the fees were unreasonable because Regions was using Plan assets to pay itself for services which caused it no increase in value.

367.    Regions received revenue sharing and other kickback payments from Morgan Keegan and/or MAM, and did so at the expense of Legacy and Regions 401(k) Plans participants or beneficiaries as the revenue sharing and other kickback payments were not credited to the Plans, but instead were kept by Regions.  Regions passed the cost of the revenue sharing and other kickback payments through to the Plan by increasing the fees and expenses charged to the

142

Plans by the RMK Select Funds.  Thus, Regions dealt with Plan assets for its own benefit and received consideration from parties in interest by having the Plan invest in and/or offer as an investment option the RMK Select Funds.

368.    The arrangements described above, including the kickbacks and royalties, constitute prohibited transactions under ERISA.  *See* ERISA §§ 406(a)(1)(C) & (D), 406(b)(1) & (3).  These actions were not in the best interest of the Plan participants.

## IX.   THE RELEVANT LAW

369.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

370.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

371.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.  This applies to non-fiduciary parties in interest that knowingly participate in a violation of ERISA.  *See Harris Trust & Savs. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 245 (2000).

372.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

143

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent person acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims.

373.   These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the

duties of loyalty, exclusive purpose, and prudence and are the "highest known to the law."

*Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).  They entail, among other things:

1.   The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Regions Stock Fund, which invested in Regions stock, the Bond Funds, and the RMK Select Funds to ensure that each investment is a suitable option for the Plans and ERISA Plans;

2.   The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

3.   The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

374.   Also relevant to Plaintiffs' Complaint is ERISA § 3(38), 29 U.S.C. §1002(38),

which provides, in pertinent part, that investment managers who are designated by the Named

Fiduciary to manage, acquire, or dispose of the plan assets owe fiduciary duties to the plan.

375.   ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary,"

provides, in pertinent part:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

376.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as determining the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would have an incentive to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

[I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . .  [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor.  The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

377.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and parties in interest.  Both ERISA § 406(a)(1)(C) and (D) are relevant to Plaintiffs' Complaint.  Specifically, ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect:
>
> > (A)     sale or exchange, or leasing, or any property between the plan and a party in interest;
> >
> > (B)     lending of money or other extension of credit between the plan and a party in interest;
> >
> > (C)     furnishing of goods, services, or facilities between the plan and a party in interest;
> >
> > (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
> >
> > (E)     acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

ERISA § 408(b)(2) provides an exemption for these transactions, but *only* "if no more than reasonable compensation is paid."  Naturally, if the compensation is not "reasonable," then the exemption does not apply.  *See, e.g.*, *Arakelian v. Nat'l W. Life Ins. Co.*, 680 F. Supp. 400, 406 (D.D.C. 1987).

378.     Also relevant to Plaintiffs' Complaint, is ERISA § 406(b)(1), 29 U.S.C. §1106(b)(1), which prohibits fiduciaries from themselves dealing with assets of the plan for their own interest or account.  Additionally, ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), prohibits fiduciaries from receiving any consideration for their own account from anyone who conducts a transaction with the plan that involves plan assets.

379.     The Department of Labor has explained that the "prohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes

146

such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act." 29 C.F.R. § 2550.408b-2(e)(1).  Moreover, "a fiduciary may not use the authority, control, or responsibility which makes such person a fiduciary to cause a plan to pay an additional fee to such fiduciary (or to a person in which such fiduciary has an interest which may affect the exercise of such fiduciary's best judgment as a fiduciary) to provide a service." *Id.*

380.    The Department of Labor has created an exemption to both ERISA § 406(a) and (b) for "the acquisition or sale of shares of an open-end investment company . . . by an employee benefit plan covering only employees of such investment company, employees of the investment adviser or principal underwriting for such investment company, or employees of any affiliated person . . . of such investment adviser or principal underwriter."  PTE 77-3, Fed. Reg. 18,743 (1977).  In relevant part, this exemption can only apply if the "plan does not pay an investment management, investment advisory, or similar fee to such investment adviser, principal underwriter or affiliated person."  *Id.*  Such fees are only acceptable if the mutual fund provider, adviser, underwriter, or affiliate, and not the plan, pays such fees.  *Id.*

381.    The Department of Labor has also created an exemption to both ERISA § 406(a) and (b) for "the purchase or sale by an employee benefit plan of shares of an open-end investment company registered under the Investment Company Act of 1940, the investment advisor for which is also a fiduciary with respect to the plan (or an affiliate of such fiduciary)." PTE 77-4 § II, 42 Fed. Reg. 18,732 (1977).  The exemption governs a plan's acquisition of mutual fund shares, in exchange for which the plan gives value to the mutual fund provider who is a fiduciary or an affiliate of a fiduciary.  The exemption mentions no other transfer of plan assets, and no other transfer of non-plan property, goods, services, or credit; nor does it mention

147

any party-in-interest other than the mutual fund provider.  Consequently, this exemption does not
immunize kickbacks from a mutual fund back to the plan fiduciary.  The exemption is expressly
inapplicable if the plan "pay[s] a sales commission in connection with such purchase or sale."
PTE 77-4, § II(a).  The Department of Labor, in Advisory Opinion 2002-05A, has "caution[ed] .
. . that where a plan fiduciary, who is an investment adviser to a fund, causes the plan to pay
commissions to a broker-dealer who is an affiliate of such adviser or of the fund, such
commission payments would be *separate prohibited transactions* under section 406(b) of the Act
for which no relief is available under [the exemption in] PTE 77-4."  Dep't of Labor Adv. Op.
2002-05A (June 7, 2002).  Thus, any payment from a mutual fund provider to a plan fiduciary or
affiliate thereof (*i.e.*, a kickback or royalty), even if the two are just affiliates, constitutes a
separate prohibited transaction from the plan fiduciary's transfer to the mutual fund provider.

382.     In addition, PTE 77-4 does not permit the mutual fund company to cause the *plan*
to pay an "investment management, investment advisory, or similar fee," PTE 77-4, § II.c,
except under certain limited circumstances.  Specifically, PTE 77-04, § II.c permits payment of
investment advisory fees by the "plan based on total plan assets from which a credit has been
subtracted representing the plan's pro rate share of investment advisory fees paid by the
investment company."  *Id*.  Lastly, PTE 77-4, § II.c states that "during any fee period for which
the plan prepaid its investment management, investment advisory or similar fee" then the fee is
permissible if the prepaid fee was (1) "anticipated and subtracted from the prepaid fee at the time
of payment," (2) "is returned to the plan no later than during the immediate following fee period,
or (3) is offset against the prepaid fee for the immediately following fee period."  *Id.*  Without
complete satisfaction of these parameters, PTE 77-4 does not excuse a violation of ERISA §
406(a) or (b).

148

383.     Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breach of fiduciary duties by Defendants for violations under ERISA §§ 404(a)(1), 405(a) and 406.

384.     The duty of loyalty includes a duty to avoid conflicts of interest and to resolve them promptly if they occur.  A fiduciary must administer a plan with an "eye single" to the interests of participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  As such, ERISA's prohibited transaction provisions prohibit fiduciaries, such as Defendants here, from causing plans to engage in transactions with the plan sponsor or its subsidiaries and affiliates, here Regions, Regions Bank, Morgan Keegan and Morgan Asset Management, including causing a plan to invest assets in investment management and other products offered by a party-in-interest or plan fiduciary and the payment of investment management and other fees in connection with such investments.

## X.     CAUSES OF ACTION

### Counts Relevant to the Company Stock Subclass

#### Count I:  Failure to Prudently and Loyally Manage the Plans and the Plans' Assets

385.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

386.     This Count alleges fiduciary breach against: (1) Regions Financial Corporation; Regions Bank; the Legacy Plan Compensation Committee Defendants; the Legacy Plan Benefits Management Committee Defendants; the Legacy Plan Benefits Administration Committee Defendants; and the Additional Legacy Plan Defendants (collectively, the "Legacy Prudence Defendants"); (2) the Regions Financial Corporation, Regions Bank, the AmSouth Thrift Compensation Committee Defendants, the AmSouth Thrift Plan Benefits Committee

Defendants, and the Additional AmSouth Thrift Plan Defendants (collectively, the "AmSouth
Thrift Prudence Defendants"); and (3) the Regions Financial Corporation, Regions Bank, the
Regions 401(k) Compensation Committee Defendants, the Regions 401(k) Plan Benefits
Management Committee Defendants, the Additional Regions 401(k) Defendants, and the
Regions 401(k) Benefit Investment Committee Defendants (collectively, the "Regions 401(k)
Plan Prudence Defendants").  These three groups of Defendants are referred to collectively as the
"Company Stock Prudence Defendants or "Company Stock Defendants."

387.    As alleged, during the Company Stock Subclass Period, the Company Stock
Prudence Defendants were named fiduciaries of their respective Plans pursuant to ERISA
§402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA
§3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty,
exclusive purpose, and prudence for each individual Plan for which they were responsible.

388.    As alleged, the scope of the fiduciary duties and responsibilities of the Company
Stock Prudence Defendants included, on information and belief, managing the assets of the Plans
for the sole and exclusive benefit of the Legacy, AmSouth Thrift, and Regions 401(k) Plan
participants and beneficiaries, respectively, and with the care, skill, diligence, and prudence
required by ERISA.  The Company Stock Prudence Defendants were directly responsible for,
among other things, selecting prudent investment options, eliminating imprudent options;
determining how to invest employer contributions to the Legacy, AmSouth Thrift, and Regions
401(k) Plans and directing the trustee regarding the same; evaluating the merits of the Legacy,
AmSouth Thrift, and Regions 401(k) Plans' investments on an ongoing basis and taking all
necessary steps to ensure that the three Plans' assets were invested prudently.

389.    In contravention of their duties and obligations under ERISA, the Company Stock

Prudence Defendants failed to loyally and prudently manage the assets of the Legacy, AmSouth

Thrift, and Regions 401(k) Plans.  Specifically, during the Company Stock Subclass Period,

these Defendants knew or should have known that Regions common stock was no longer a

suitable and appropriate investment for the Plans, but was, instead, a highly speculative and risky

investment in light of Region's undisclosed exposure to losses due to risky business strategies,

including, without limitation, the deteriorating quality of its real estate loan portfolio, inadequate

provisions and reserves for losses, inadequate risk management, risky investment in MBS, off-

balance sheet exposure, improper valuation of Goodwill, and ARS activities.  These actions

artificially inflated the price of Regions common stock.  These improper and imprudent

endeavors and strategies put the viability of the Company in jeopardy, and caused its stock to

collapse.  Nonetheless, during the Company Stock Subclass Period, these Defendants continued

to offer Regions common stock as an investment option for participant contributions.  The

Company Stock Prudence Defendants also continued to provide Company Matching

Contributions in Regions common stock and to maintain the Plans' significant investment in the

stock.

390.    The Company Stock Prudence Defendants were obliged to prudently and loyally

manage all of the Plan's assets, including its investment in Regions common stock.

391.    The Company Stock Prudence Defendants' duties of prudence and loyalty were

especially significant with respect to Regions common stock because: (a) company stock is a

particularly risky and volatile investment, even in the absence of company misconduct, *see*

*Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006) ("[A]n ESOP is

imprudent per se, though legally authorized.  This built-in 'imprudence' (for which the trustee is

of course not culpable) requires him to be especially careful to do nothing to increase the risk

faced by the participants still further."); *see Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995); and

(b) participants tend to underestimate the likely risk and overestimate the likely return of

investment in company stock.  In view of this, the Company Stock Prudence Defendants were

obliged to have in place a regular, systematic procedure for evaluating the prudence of

investment in Regions common stock.  Had these Defendants conducted a reasonable

investigation of the prudence of investment in Company Stock, as required under *Kuper*,

Defendants would not have continued to offer Company Stock as an investment.  Upon

information and belief, they failed to have such a procedure.

392.    Moreover, the Company Stock Prudence Defendants failed to conduct an

appropriate investigation into the merits of continued investment in Regions common stock

despite significant losses to the Company and Regions' highly risky and inappropriate mortgage

origination practices, lack of real estate loan portfolio diversification, inadequate provisions for

loss, improper risk management, excessive and imprudent investment in MBS, off-balance sheet

exposure, improper valuation of goodwill, and risky ARS activities.  Such an investigation would

have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and

maintain investment in Regions common stock under these circumstances and the imprudence of

these investment options for the retirement savings of the Plans' participants.

393.    The Company Stock Prudence Defendants' decisions with regard to the Plans'

investment in Regions common stock, under the circumstances alleged, constituted an abuse of

their discretion as ERISA fiduciaries because a prudent fiduciary acting under similar

circumstances would have made different investment decisions.  Specifically, based on the

above, a prudent fiduciary could not have reasonably believed that further and continued

investment of the Plans' contributions and assets in Regions common stock was in keeping with the Plans' settlors' expectations of how a prudent fiduciary would operate.

394.     With respect to Region's common stock, the Company Stock Prudence Defendants knew that the stock had declined precipitously, and that Regions was being seriously mismanaged and faced dire financial circumstances as a result.  Though this allegation is not required to state a claim, Regions' mismanagement has created a genuine risk of imminent collapse.

395.     The Company Stock Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence, under the circumstances then prevailing, that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

396.     According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

397.     Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

1.     A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary

153

has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

2.      Consideration of the following factors as they relate to such portion of the portfolio:

- The composition of the portfolio with regard to diversification;

- The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

- The projected return of the portfolio relative to the funding objectives of the plan.

398.    Given the conduct described above, the Company Stock Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Regions common stock.

399.    A fiduciary's duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  On information and belief, the compensation and tenure of the Company Stock Prudence Defendants was tied to the performance of Regions common stock and/or the publicly reported financial performance of Regions.  To comply with the duty of loyalty, fiduciaries laboring under such conflicts must make special efforts to assure that their decision-making process is untainted by the conflict and that their decisions are made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

400.    The Company Stock Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, (a) failing to engage prudent independent

advisors who could make independent judgments concerning the Plans' investments in Regions common stock; (b) failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Regions common stock unsuitable investments for the Plans; (c) failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; (d) failing in each of the foregoing particulars in order to avoid adversely impacting their own compensation or drawing attention to Regions' inappropriate practices; and (e) otherwise placing their own and Regions' improper interests above the interests of the participants with respect to the Plans' investments in Regions common stock.

401.     As a consequence of the Company Stock Prudence Defendants' breach of fiduciary duties alleged in this Count, the Plans suffered significant losses.  If the Company Stock Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged, the Plans, and indirectly the Plaintiffs and the other Company Stock Subclass members, lost millions of dollars of retirement savings.

402.     Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Company Stock Prudence Defendants are liable to restore the losses to the Plans caused by their breach of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### Count II:  Failure to Monitor Fiduciaries

403.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

404.     This Count alleges fiduciary breach against the following Defendants: Regions

Financial Corporation; the Legacy Plan Compensation Committee Defendants; the Legacy Plan

Benefits Management Committee Defendants; the AmSouth Thrift Plan Compensation

Committee Defendants; the AmSouth Thrift Plan Benefits Committee Defendants; the Regions

401(k) Plan Compensation Committee Defendants; and the Regions 401(k) Plan Benefits

Management Committee Defendants (collectively, the "Company Stock Monitoring

Defendants").

405.     As alleged, during the Company Stock Subclass Period the Company Stock

Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C.

§ 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and

prudence.

406.     As alleged, the scope of the fiduciary responsibilities of the Company Stock

Monitoring Defendants included the responsibility to appoint and remove, and thus monitor, the

performance of other fiduciaries.

407.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries

are performing their fiduciary obligations, including their obligations regarding the investment

and holding of plan assets, and must take prompt and effective action to protect the plan and

participants when the monitored fiduciaries fail to do so.

408.     The monitoring duty further requires that appointing fiduciaries have procedures

in place so they may review and evaluate on an ongoing basis whether the "hands-on" fiduciaries

are doing an adequate job.  For example, appointing fiduciaries may require periodic reports on

the work of the hands-on fiduciaries and the plan's performance, and ensure that they have a

prudent process for obtaining the information and resources they need.  In the absence of a meaningful process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants, or for deciding whether to retain or remove them.

409.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.  Failure to provide such needed information may have an extreme adverse impact on the plan and the fiduciaries' investment decisions regarding the plan.

410.    The Company Stock Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as their respective Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Regions common stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Regions' highly risky and inappropriate business practices and the likely impact of such practices on the value of the Plans' investment in Regions stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate and who breached their fiduciary duties under ERISA by continuing to make and maintain investments in Regions common stock despite their knowledge of practices that rendered these investments imprudent during the Company Stock Subclass Period for participants' retirement savings in the Plans.

157

411.     As a consequence of the Company Stock Monitoring Defendants' breaches of
fiduciary duties, the Plans suffered tremendous losses.  If the Company Stock Monitoring
Defendants had discharged their fiduciary monitoring duties as described, the losses suffered by
the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of
the breaches of fiduciary duty alleged, the Plans, and indirectly the Plaintiffs and other Company
Stock Subclass members, lost millions of dollars of retirement savings.

412.     Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),
1132(a)(2) and (a)(3), the Company Stock Monitoring Defendants are liable to restore the losses
to their respective Plans caused by their breaches of fiduciary duties alleged in this Count, and to
provide other equitable relief as appropriate.

**Count III:  Breach of Fiduciary Duty to Disclose Necessary Information to Co-Fiduciaries**

413.     Plaintiffs incorporate by reference the allegations contained in the previous
paragraphs of this Complaint as if fully set forth herein.

414.     This Count alleges fiduciary breach against Defendant Regions and the
Compensation Committee Defendants of each of the three Plans.

415.     Pursuant to the duties of prudence and loyalty which every ERISA fiduciary owes
to the plans that he or she serves pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C.
§ 1104(a)(1)(A) and (B), such fiduciaries are required to disclose to their co-fiduciaries
information that they know is unavailable to them, but that such co-fiduciaries need to protect the
interests of the plan.  *Krohn v. Huron Mem. Hosp.*, 173 F.3d 542 (6th Cir. 1999).

416.     Defendants Regions and the Compensation Committees possessed non-public
information during the Company Stock Subclass Period about the risks posed by Regions
common stock which they knew could be used by other fiduciaries of the Plans (in particular,

158

each Plan's Compensation Committee Defendants, Benefits Management Committee

Defendants, the Benefit Administration Committee Defendants, and Regions Bank) to protect the

Plans and their participants and beneficiaries.  Defendants Regions and the Compensation

Committees were *de facto* fiduciaries that exercised authority and control over the conduct of

each Plan's respective Compensation Committee Defendants, Benefits Management Committee

Defendants, Benefit Administration Committee Defendants, and Regions Bank.

417.    Each Plan's Compensation Committee Defendants, Benefits Management

Committee, Benefit Administration Committee, and Regions Bank should have sought

information concerning the risks posed by an investment in Regions common stock as part of a

thorough and careful investigation of the merits of each of these investments during the

Company Stock Subclass Period, but failed to do so.  Nonetheless, the fiduciaries in possession

of such knowledge, including, without limitation, Regions and each Plan's Compensation

Committee Defendants, should have supplied that information to each Plan's respective Benefits

Management Committee Defendants, Benefit Administration Committee Defendants, and

Regions Bank, the Trustee to each Plan, to fulfill the fiduciary duties they owed to their

respective Plans.

418.    Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),

1132(a)(2) and (a)(3), Defendant Regions is liable to restore the losses to the Plans caused by its

breach of fiduciary duties alleged in this Count, disgorge any profits made through its breach,

and provide other equitable relief as appropriate.

### Count IV:  Breach of Fiduciary Duty: Failure to Provide Complete and Accurate Information to the Plans' Participants and Beneficiaries

419.    Plaintiffs incorporate by reference the allegations contained in the previous

paragraphs of this Complaint as if fully set forth herein.

420.     This Count alleges fiduciary breach against the Benefits Management Committee Defendants of the Legacy and Regions 401(k) Plans and the AmSouth Thrift Plan Benefits Committee Defendants (the "Company Stock Communications Defendants").

421.     At all relevant times, as alleged, the Company Stock Communications Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

422.     At all relevant times, the scope of the fiduciary responsibility of the Company Stock Communications Defendants included the communications and material disclosures to the Plans' participants and beneficiaries.

423.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing incomplete or inaccurate information regarding plan investment options, so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan.  This duty applies to all of the Plans' investment options, including investment in Regions common stock, the Bond Funds, and the RMK Select Funds.

424.     Because investments in the Plans were not diversified (*i.e.*, the Defendants chose to invest the Plans' assets, and/or allow those assets to be invested heavily in Regions common stock), such investments carried with them an inherently high degree of risk.  This inherent risk made the Company Stock Communications Defendants' duty to provide complete and accurate information particularly important with respect to those investment options.

160

425.    The Company Stock Communications Defendants breached their duty to inform

participants by failing to provide complete and accurate information regarding:

1.      Regions' high risk loan origination practices;

2.      Regions' undiversified and risky real estate loan portfolio;

3.      Regions' insufficient provisions for loan loss;

4.      Regions' inadequate risk management controls;

5.      Regions' risky and excessive investment in MBS;

6.      Regions' improper off-balance sheet exposure;

7.      Regions' inadequate and improper valuation of its goodwill;

8.      Regions' risky ARS activities;

9.      Regions' artificial inflation of Regions common stock values, the Company's net
        income and financial results; and

10.     The dire circumstances created by Regions' improper business and accounting
        practices.

These failures were particularly devastating to the Plans and their participants because the

resultant losses had a significant impact on the value of participants' retirement assets.

426.    The Company Stock Communications Defendants' omissions were material to

participants' ability to exercise informed control over their Plan accounts.  In the absence of this

information, participants did not know the true risks presented by the Plans' investments in

Regions common stock.

427.    The Company Stock Communications Defendants' alleged omissions and

incomplete statements were Plan-wide and uniform.  The Company Stock Communications

Defendants failed to provide complete and accurate information to any of the Plans' participants.

428.    The Company Stock Communications Defendants were unjustly enriched by the

fiduciary breaches described in this Count.

161

429.    As a direct and proximate result of the breach of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Company Stock Subclass members, lost a significant portion of their retirement investments.

430.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Company Stock Communications Defendants are liable to restore the losses to the Plan caused by their breach of fiduciary duties alleged in this Count.

## Count V:  Co-Fiduciary Liability

431.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

432.    This Count alleges co-fiduciary liability against all Defendants, except the Morgan Keegan Defendants (the "Co-Fiduciary Defendants").

433.    As alleged, during the Company Stock Class Period the Co-Fiduciary Defendants were, on information and belief, named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. §1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

434.    As alleged, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if the fiduciary knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three of these provisions.

435.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such

other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the

breach.  Here, each Defendant knew of the breaches by the other fiduciaries and made no efforts,

much less reasonable ones, to remedy those breaches.  In particular, Defendants did not

communicate their knowledge of Regions' improper activity to the other fiduciaries.

436.    Regions, through its officers and employees, was unable to meet its business

goals, engaged in highly risky and inappropriate business practices, withheld material

information from the market, and profited from such practices.  Thus knowledge of such

practices is imputed to Regions as a matter of law.

437.    Because the Co-Fiduciary Defendants knew of Regions' failures and

inappropriate business practices, they also knew that each Plan's Prudence Defendants were

breaching their duties by continuing to invest in Regions common stock.  Yet, they failed to

undertake any effort to remedy these breaches.  Instead, they compounded them by downplaying

the significance of Regions' failed and inappropriate business practices and obfuscating the risk

that the practices posed to Regions and, thus, to the Plans.

438.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a

breach of fiduciary responsibility of another fiduciary with respect to the same plan if he

participates knowingly in, or knowingly undertakes to provide inaccurate or incomplete

information concerning an act or omission of such other fiduciary, knowing that such act or

omission is a breach.  Regions knowingly participated in the fiduciary breaches of each Plan's

Prudence Defendants in that it benefited from the sale or contribution of its stock at prices that

were disproportionate to the risks for the Plans' participants.  Likewise, each Plan's Monitoring

Defendants knowingly participated in the breaches of the respective Plan's Prudence Defendants

because, as alleged, they had actual knowledge of the facts that rendered Regions stock an

163

imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted each Plan's Prudence Defendants to breach their duties.

439.     ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

440.     Each Plan's Monitoring Defendants' failure to monitor the Prudence Defendants for their respective Plans, particularly the respective Plan's Benefits Management Committee and the Investment Committee, enabled those committees to breach their duties.

441.     As a direct and proximate result of the breaches of fiduciary duties alleged, the Plans, and indirectly the Plaintiffs and the Company Stock Subclass members, lost millions of dollars of retirement savings.

442.     Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to their respective Plans caused by their breach of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**Counts Relevant to the Bond Fund Subclass**

**Count VI: Failure to Prudently and Loyally Manage the ERISA Plans' Assets**

443.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

444.     This Count alleges fiduciary breach against Defendants Morgan Keegan and MAM, Regions Bank, Regions Financial, Legacy Prudence Defendants, the AmSouth Thrift Prudence Defendants, the Regions 401(k) Plan Prudence Defendants, and the Individual Bond

Fund Defendants, Douglas Edwards, Allen Morgan, Brian Sullivan, and Kenneth Alderman (collectively, the "Bond Fund Defendants").  The Legacy Prudence Defendants, the AmSouth Thrift Prudence Defendants, the Regions 401(k) Plan Prudence Defendants are named in this Count VI as defendants with respect to the Plans only.

445.    Regions Financial, Regions Bank, Morgan Keegan, and MAM are fiduciaries with respect to the ERISA Plans and the Plans.  The Legacy Prudence Defendants, the AmSouth Thrift Prudence Defendants, the Regions 401(k) Plan Prudence Defendants are fiduciaries with respect to the Plans only.  The Individual Bond Fund Defendants are non-fiduciary Defendants that knowingly participated in ERISA violations.

446.    As alleged, during the Bond Fund Subclass Period, the Bond Fund Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both, and/or were investment managers to the ERISA Plans within the meaning of ERISA § 3(38), 29 U.S.C. § 1002(38).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

447.    As alleged above, the scope of the fiduciary duties and responsibilities of the Bond Fund Defendants included managing the assets of the ERISA Plans, and taking necessary actions to protect the ERISA Plans.

448.    The Bond Fund Defendants were obligated to discharge their duties with respect to the ERISA Plans' investment in the Bond Funds with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

449.     Contrary to their duties and obligations under ERISA, the Bond Fund Defendants failed to loyally and prudently manage investments of the assets of the ERISA Plans in the Bond Funds.  Specifically, the Bond Fund Defendants breached their duties, in violation of ERISA § 404(a), by, *inter alia;* (a) failing to invest and manage the assets of the ERISA Plans in the manner of a reasonably prudent fiduciary acting under similar circumstances; (b) failing to conduct a reasonable and appropriate investigation of the merits of continued investment of the assets of the ERISA Plans in the Bond Funds in light of what the Bond Fund Defendants knew (and with respect to certain of the Defendants, should have known) regarding the undue, and undisclosed risk of continued investment in the Bond Funds, including but not limited to, the Bond Funds' (i) deviation from the Bond Funds' investment strategy to include investments fundamentally inconsistent with the stated purposes of the Bond Funds; (ii) excessive levels of risk through inappropriate leverage and accumulation of investments in mortgage-related debt instruments and financial derivatives; (iii) failure to maintain sufficient diversification in the investments held by the Bond Funds in light of their stated objectives; (iv) failure to use the appropriate benchmarks for purposes of index comparisons; (v) failure to lawfully and accurate price the NAVs of the Bond Funds; (vi) omission of material information regarding the true risk of investing in the Bond Funds in communications and marketing materials that were disseminated by the Bond Fund Defendants to the ERISA Plans; (vii) and with regard to all such practices, ignoring these facts and circumstances despite the fact that these practices caused the Bond Funds to be wholly inappropriate and impudent investments for the participants' retirement savings in the ERISA Plans; and (c) continuing to make and maintain investment of the ERISA

166

Plans' assets in the Bond Funds in order to benefit themselves and other parties in interest in violation of their duties of both prudence and loyalty under ERISA;[15] (d) failing to suspend the Bond Funds as investment options for the ERISA Plans, and failing to divest the ERISA Plans of their Bond Fund holdings notwithstanding their knowledge of or access to information regarding the imprudence of continued investment in the Bond Funds.

450.    A reasonable investigation would have revealed to a reasonably prudent (and impartial) fiduciary the imprudence of continuing to make or maintain investments of ERISA Plans' assets in the Bond Funds in the manner alleged herein.

451.    A fiduciary's duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves.  The Bond Fund Defendants breached their duties to avoid conflicts of interest and to promptly resolve them by, *inter alia*, selecting and maintaining investments in the Bond Funds based on Regions and Regions Banks' own pecuniary interest in the funds; failing to engage prudent independent advisors who could make independent judgments concerning the ERISA Plans' investments in the Bond Funds; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; failing in each of the foregoing particulars in order to avoid adversely impacting their own compensation or drawing attention to their inappropriate practices; and otherwise improperly placing their own interests above the interests of the participants with respect to the ERISA Plans' investments in the Bond Funds.

_____

[15] Investments in the Bond Funds were selected and maintained because of the fees earned by

452.    To the extent that Regions Bank or any of the other Bond Fund Defendants served in the capacity of a directed trustee for any of the ERISA Plans, they breached their fiduciary duties under ERISA in this capacity.  A directed trustee may not follow a direction that it knows or should know is contrary to ERISA or applicable Plan documents.  In addition, where a directed trustee has access to material non-public information that it knows or should know is necessary for a prudent decision, as the Bond Fund Defendants possessed here, it cannot follow a direction without regard to this knowledge.  Moreover, where public information calls into serious question the ongoing viability of a security, a directed trustee has a duty not to follow a direction to invest in the security.  In light of these specific duties and responsibilities under ERISA, to the extent Regions Bank or any of the other Bond Fund Defendants followed a participant direction to invest in the Bond Funds during the Bond Fund Subclass Period, such action violated ERISA.

453.    The Bond Fund Defendants were unjustly enriched by the fiduciary breaches described in this Count.

454.    The Bond Funds were grossly mismanaged and collapsed.  As a result, the Bond Fund Defendants' imprudent decision and actions to continue making, maintaining, advising, or allowing investment in the Bond Funds caused the ERISA Plans to incur massive losses.  Had the Bond Fund Defendants discharged their fiduciary duties to prudently manage and invest the ERISA Plans' assets, the losses suffered by the ERISA Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the participants lost hundreds of millions of dollars of retirement savings.

---

Morgan Keegan and/or MAM, affiliated entities and wholly owned subsidiaries of Regions

455.     Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),

1132(a)(2) and (a)(3), the Bond Fund Defendants are liable to restore the losses to the ERISA

Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other

equitable relief as appropriate.

### Count VII: Failure to Monitor Fiduciaries

456.     Plaintiffs incorporate by reference the allegations contained in the previous

paragraphs of this Complaint as if fully set forth herein.

457.     This Count alleges fiduciary breach against Regions Bank, Regions Financial and

the Individual Bond Fund Defendants (collectively, Bond Fund Monitoring Defendants).

458.     As alleged, during the Bond Fund Subclass Period, Regions Bank was a named

fiduciary pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or otherwise a fiduciary under

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, it was bound by the duties of

loyalty, exclusive purpose, and prudence.  Regions Financial was a fiduciary as an alter ego of

Regions Bank.  The Individual Bond Fund Defendants are non-fiduciaries who knowingly

participated in the fiduciary's breaches.

459.     As alleged, the scope of the fiduciary responsibilities of Regions Bank included

the responsibility to appoint and remove, and thus monitor the performance of, other fiduciaries.

460.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries

are performing their fiduciary obligations, including their obligations regarding the investment

and holding of plan assets, and must take prompt and effective action to protect the plan and

participants when the monitored fiduciaries fail to do so.

461.     The monitoring duty further requires that appointing fiduciaries have procedures

in place so that on an ongoing basis they may review and evaluate whether the "hands-on"

169

fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a meaningful process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

462.    Furthermore, monitoring fiduciaries must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries should have in order to prudently manage the plan and plan assets. Failure to provide such needed information may have an extreme adverse impact on the plan and the fiduciaries' investment decisions regarding the plan.

463.    The Bond Fund Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a)  failing to monitor their appointees, the Morgan Keegan Defendants, failing to evaluate the Morgan Keegan Defendants' performance, or to have any system in place for doing so, and standing idly by as the ERISA Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the Bond Funds and investments of ERISA Plan assets in the Bond Funds; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of the Bond Funds' imprudent investment in undisclosed high-risk assets that exposed the Bond Funds and plan participants to huge losses; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the ERISA Plans' assets; and (d) failing to remove appointees whose performance was inadequate and who breached their fiduciary duties under ERISA by continuing

170

to make, permit, induce, and/or maintain investments in the Bond Funds despite their knowledge

of practices that rendered this investment imprudent during the Bond Fund Subclass Period for

the ERISA Plans.  On information and belief, the Individual Bond Fund Defendants knowingly

participated in these breaches by participating in the decision by Regions Bank to not carry out

its monitoring duties while knowing that the Morgan Keegan Defendants were imprudently

investing or keeping the ERISA Plans' assets in the Bond Funds.

464.    As a consequence of the Bond Fund Monitoring Defendants' breach of fiduciary

duties, the ERISA Plans suffered tremendous losses.  If these Defendants had discharged their

fiduciary monitoring duties as required, the losses suffered by the ERISA Plans would have been

minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary

duty alleged, the ERISA Plans, and indirectly the Plaintiffs with investments in the Bond Funds

and the other Bond Fund Subclass members, lost millions of dollars of retirement savings.

465.    Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),

1132(a)(2) and (a)(3), the Bond Fund Monitoring Defendants are liable to restore the losses to

the ERISA Plans caused by their breaches of fiduciary duties alleged in this Count and to provide

other equitable relief as appropriate.

## Count X: Co-Fiduciary Liability[16]

466.    Plaintiffs incorporate by reference the allegations contained in the previous

paragraphs of this Complaint as if fully set forth herein.

---

[16] This Third Amended Consolidated Complaint incorporates Counts VIII and IX from the
Second Amended Consolidated Complaint into Count VI.  In order to maintain the count
numbering from the Second Amended Complaint, the omission of Counts VIII and IX is not
inadvertent.

467.     This Count alleges co-fiduciary liability against Regions Bank, Regions Financial,

Morgan Keegan, and MAM (collectively, the "Bond Fund Co-Fiduciary Defendants").

468.     As alleged, during the Bond Fund Subclass Period,  the Bond Fund Co-Fiduciary

Defendants were, on information and belief, named fiduciaries pursuant to ERISA § 402(a)(1),

29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29

U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive

purpose, and prudence.

469.     As alleged, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes on fiduciaries, in

addition to any liability which a fiduciary may have under any other provision, liability for a

breach of fiduciary responsibility of another fiduciary if the fiduciary knows of a breach and fails

to remedy it, knowingly participates in a breach, or enables a breach.  The Bond Fund Co-

Fiduciary Defendants breached all three of these provisions.

470.     Specifically, ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a

fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same

plan if he participates knowingly in an act or omission of such other fiduciary, knowing that such

act or omission is a breach.  Here, the Bond Fund Co-Fiduciary Defendants, because of their

involvement in and acceptance of the imprudent investment decisions or advice made by the

Bond Fund Defendants, participated in the breaches of the Bond Fund Defendants.

471.     ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if by

failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his

specific responsibilities which give rise to his status as a fiduciary, he has enabled another

fiduciary to commit a breach.  The Bond Fund Co-Fiduciary Defendants' own breaches with

regard to the Bond Funds also enabled the breaches of other persons, including those whose performance they were required to monitor under ERISA.

472.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Each Bond Fund Co-Fiduciary Defendant knew of the breaches by the other fiduciaries and made no effort to remedy those breaches.  Among other things, they, *inter alia*, did not communicate their knowledge of the serious mismanagement of the Bond Funds to the other fiduciaries, and did not communicate their knowledge that the Bond Funds were not, or were no longer, prudent investments for the ERISA Plans.

473.    Because the Bond Fund Co-Fiduciary Defendants knew that the Bond Funds were selected and maintained as ERISA Plans investment options for disloyal and imprudent reasons, knew that the Bond Funds were being seriously mismanaged, and knew that the Bond Funds were not and/or were no longer prudent investments for the ERISA Plans, they thus also knew that the Bond Fund Defendants were breaching their duties by continuing to invest (or induce investment) in the Bond Funds and not timely causing liquidation of (or inducing timely liquidation of) the ERISA Plans' investments in the Bond Funds.  Yet, they failed to undertake any effort to remedy these breaches.  Instead, the Bond Fund Co-Fiduciary Defendants compounded these breaches (and, thus, knowingly participated in them) by downplaying the problems with the Bond Funds and by obfuscating the risks that the practices posed to the Bond Funds and, thus, to the ERISA Plans.

474.     As a direct and proximate result of this alleged breach of fiduciary duties, the ERISA Plans, and indirectly the Plaintiffs with investments in the Bond Funds and the Bond Fund Subclass members, lost millions of dollars of retirement savings.

475.     Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Bond Fund Co-Fiduciary Defendants are liable to restore the losses to the ERISA Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## Counts Relevant to the Excessive Fee Subclass

### Count XI:  Failure to Prudently and Loyally Manage the Legacy and Regions 401(k) Plans and the Plans' Assets

476.     Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

477.     This Count alleges fiduciary breach against the Legacy and Regions 401(k) Prudence Defendants described in Count I, referred to herein as the "Excessive Fee Prudence Defendants" or "Excessive Fee Defendants."[17]

478.     As alleged, during the Excessive Fee Subclass Period, the Excessive Fee Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.

---

[17] Plaintiffs are not currently including in the Excessive Fee Subclass ERISA plans other than the Regions Plans because discovery is necessary to ascertain more specific information regarding Regions Bank's role in the selection of plan investment options for the ERISA Plans.  Plaintiffs will amend the complaint accordingly if discovery shows that Regions Bank exercised discretionary authority with regard to the selection of RMK Funds for the ERISA Plans.

§ 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

479.     As alleged, the scope of the fiduciary duties and responsibilities of the Excessive Fee Prudence Defendants included, on information and belief, managing the assets of the Legacy and Regions 401(k) Plans for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  The Excessive Fee Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Legacy and Regions 401(k) Plans and directing the trustee regarding the same, evaluating the merits of the Plans' investments on an ongoing basis, and taking all necessary steps to ensure that the Plans' assets were invested prudently.  ERISA explicitly commands fiduciaries to act solely in the interest of the participants and beneficiaries of the plan by "defraying the reasonable expenses of the plan."  ERISA § 404(a)(1)(A)(ii), 29 U.S.C. § 1104(a)(1)(A)(ii).

480.     In contravention of their duties and obligations under ERISA, the Excessive Fee Prudence Defendants failed to loyally and prudently manage the assets of the Legacy and Regions 401(k) Plans.  Specifically, during the Excessive Fee Subclass Period, these Defendants knew or should have known that the RMK Select Funds charged unreasonably high fees and expenses and were selected because of the substantial fees Regions and its affiliates earned by offering the RMK Select Funds to the Plans.  Nonetheless, during the Excessive Fee Subclass Period, these Defendants continued to offer the RMK Select Funds as investment options for participant contributions.  The Excessive Fee Prudence Defendants were obliged to prudently

and loyally manage all of the Legacy and Regions 401(k) Plans' assets, including its investments in the RMK Select Funds.

481.    The Excessive Fee Prudence Defendants failed to conduct an appropriate investigation of the merits of continued investment in the RMK Select Funds, and the particular dangers that this posed to the Legacy and Regions 401(k) Plans.  Such an investigation would have revealed to a reasonably prudent fiduciary that the RMK Select Funds charged fees that were far in excess of what was necessary or prudent given that comparable but far less expensive funds were readily available in the marketplace.  Such an investigation also would have revealed that the funds were selected for inclusion in the Plan on an impermissible basis – namely that Regions itself profited from the fees and expenses charged by the funds.  Accordingly, under these circumstances, the Excessive Fee Prudence Defendants breached their duties of prudence and loyalty by offering and maintaining the RMK Select Funds as investment options for the Legacy and Regions 401(k) Plan participants.

482.    The Excessive Fee Prudence Defendants' decisions with regard to the Legacy and Regions 401(k) Plans' investment in the RMK Select Funds, under the circumstances alleged, constitute an abuse of their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

483.    The Excessive Fee Prudence Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

176

484. According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

485. Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

1. A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

2. Consideration of the following factors as they relate to such portion of the portfolio:

   - The composition of the portfolio with regard to diversification;

   - The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

   - The projected return of the portfolio relative to the funding objectives of the plan.

486. Given the conduct described above, the Excessive Fee Prudence Defendants could not possibly have acted prudently when they continued to invest the Legacy and Regions 401(k) Plans' assets in the RMK Select Funds.

177

487.     A fiduciary's duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  The Excessive Fee Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to engage prudent independent advisors who could make independent judgments concerning the Plans' investments in the RMK Select Funds; failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made the RMK Select Funds unsuitable investments for the Legacy and Regions 401(k) Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; failing in each of the foregoing particulars in order to avoid adversely impacting their own compensation or drawing attention to Regions' inappropriate practices; and otherwise placing their own and Regions' improper interests above the interests of the participants with respect to the Plans' investments in the RMK Select Funds.

488.     As a consequence of the Excessive Fee Prudence Defendants' breach of fiduciary duties alleged in this Count, the Legacy and Regions 401(k) Plans suffered significant losses.  If the Excessive Fee Prudence Defendants had discharged their fiduciary duties to prudently invest the Legacy and Regions 401(k) Plans' assets, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments in the RMK Select Funds and the other Excessive Fee Subclass members, lost millions dollars of retirement savings.

489.     Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),

1132(a)(2) and (a)(3), the Excessive Fee Prudence Defendants are liable to restore the losses to

the Legacy and Regions 401(k) Plans caused by their breach of fiduciary duties alleged in this

Count and to provide other equitable relief as appropriate.

### Count XII:  Failure to Monitor Fiduciaries

490.     Plaintiffs incorporate by reference the allegations contained in the previous

paragraphs of this Complaint as if fully set forth herein.

491.     This Count alleges fiduciary breach against the following Defendants: Regions

Financial, the Legacy and Regions 401(k) Plan Compensation Committee Defendants, the

Legacy and Regions 401(k) Plan Benefits Management Committee Defendants, the Regions

401(k) Plan Investment Committee Defendants, and Additional Legacy Plan Defendants, and the

Additional Regions 401(k) Defendants (collectively, the "Excessive Fee Monitoring

Defendants").

492.     As alleged, during the Excessive Fee Subclass Period the Excessive Fee

Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C.

§ 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and

prudence.

493.     As alleged, the scope of the fiduciary responsibilities of the Excessive Fee

Monitoring Defendants included the responsibility to appoint and remove, and thus monitor the

performance of, other fiduciaries.

494.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries

are performing their fiduciary obligations, including their obligations regarding the investment

179

and holding of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to do so.

495.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a meaningful process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

496.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.  Failure to provide such needed information may have an extreme adverse impact on the plan and on the fiduciaries' investment decisions regarding the plan.

497.    The Excessive Fee Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Legacy and Regions 401(k) Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to the RMK Select Funds; (b) failing to ensure that the monitored fiduciaries appreciated the impact of the RMK Select Funds' unreasonably high fees and expenses; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently

180

informed fiduciary decisions with respect to the Legacy and Regions 401(k) Plans' assets; and

(d) failing to remove appointees whose performance was inadequate and who breached their

fiduciary duties under ERISA in that they continued to make and maintain investments in the

RMK Select Funds despite their knowledge of practices that rendered these investments

imprudent during the Excessive Fee Subclass Period for participants' retirement savings in the

Legacy and Regions 401(k) Plans.

498.     As a consequence of the Excessive Fee Monitoring Defendants' breach of

fiduciary duties, the Legacy and Regions 401(k) Plans suffered tremendous losses.  If the

Excessive Fee Monitoring Defendants had discharged their fiduciary monitoring duties as

described, the losses suffered by the Legacy and Regions 401(k) Plans would have been

minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary

duty alleged, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments

in the RMK Select Funds and the other similarly situated Subclass members, lost millions of

dollars of retirement savings.

499.     Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a),

1132(a)(2) and (a)(3), the Excessive Fee Monitoring Defendants are liable to restore the losses to

the Legacy and Regions 401(k) Plans caused by their breaches of fiduciary duties alleged in this

Count and to provide other equitable relief as appropriate.

### Count XIII: Breach of Fiduciary Duty: Failure to Provide Complete and Accurate Information to the Legacy and Regions 401(k) Plans' Participants and Beneficiaries

500.     Plaintiffs incorporate by reference the allegations contained in the previous

paragraphs of this Complaint as if fully set forth herein.

501.     This Count alleges fiduciary breach against the Legacy and Regions 401(k)

Benefits Management Committee Defendants (the "Excessive Fee Communications

Defendants").

502.     At all relevant times, as alleged, the Excessive Fee Communications Defendants

were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they

were bound by the duties of loyalty, exclusive purpose, and prudence.

503.     At all relevant times, the scope of the fiduciary responsibility of the Excessive Fee

Communications Defendants included the communications and material disclosures to the

Legacy and Regions 401(k) Plans' participants and beneficiaries.

504.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to

participants, not to mislead them regarding the plan or plan assets, and to disclose information

that participants need in order to exercise their rights and interests under the plan.  This duty to

inform participants includes an obligation to provide participants and beneficiaries of the plan

with complete and accurate information regarding plan investment options so that participants

can make informed decisions with regard to the prudence of investing in such options made

available under the plan.  This duty applies to all of the Plan's investment options, including

investment in the RMK Select Funds.

505.     Because investments in the Legacy and Regions 401(k) Plans were not diversified

(*i.e.,* the Defendants chose to invest the Legacy and Regions 401(k) Plans' assets, and/or allow

those assets to be invested heavily in Regions common stock, the Bond Funds, and in the RMK

Select Funds), such investments carried with them an inherently high degree of risk.  This

inherent risk made the Excessive Fee Communications Defendants' duty to provide complete

and accurate information particularly important with respect to those investment options.

506.    The Excessive Fee Communications Defendants breached their duties to inform participants by failing to provide complete and accurate information regarding:

1.    The RMK Select Funds' excessive fees and expenses that were substantially higher than the fees and expenses charged in readily available and comparable fund options;

2.    The performance of the RMK Select Funds could not justify the excessive fees charged as far less expensive passively and actively managed funds offered comparable and often better performance;

3.    The excessive fees and expenses charged by the RMK Select Funds substantially reduced participants' retirement savings because, among other things, all such fees and expenses were paid from Legacy and Regions 401(k) Plan assets; and

4.    The RMK Select Funds were selected and maintained as Plan investment options because Regions itself profited from inclusion of the funds in the Plans.

These failures were particularly devastating to the Legacy and Regions 401(k) Plans and their participants as the losses had a significant adverse impact on the value of participants' retirement assets.

507.    The Excessive Fee Communications Defendants' omissions were material to participants' ability to exercise informed control over their Legacy and Regions 401(k) Plan accounts.  In the absence of this information, participants did not know the true risks presented by the Legacy and Regions 401(k) Plans' investments in the RMK Select Funds, and, thus, could not make informed decisions regarding investment of their retirement savings in the funds.

508.    The Excessive Fee Communications Defendants' alleged omissions and incomplete statements were Plan-wide and uniform because these Defendants failed to provide complete and accurate information to any of the Legacy and Regions 401(k) Plans' participants.

509.    The Excessive Fee Communications Defendants were unjustly enriched by the fiduciary breaches described in this Count.

183

510.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments in the RMK Select Funds and the Plans' other participants and beneficiaries, including the Excessive Fee Subclass, lost a significant portion of their retirement investment.

511.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Excessive Fee Communications Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breaches of fiduciary duties alleged in this Count.

### Count XIV:  Co-Fiduciary Liability

512.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

513.    This Count alleges co-fiduciary liability against all of Excessive Fees Prudence Defendants described on Count XI (the "Excessive Fee Co-Fiduciary Defendants").

514.    This Count alleges fiduciary breach against the Legacy and Regions 401(k) Prudence Defendants described in Count I, referred to in this Count XIV as the "Excessive Fee Co-Fiduciary Defendants."

515.    As alleged, during the Excessive Fee Subclass Period the Excessive Fee Co-Fiduciary Defendants were, on information and belief, named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

516.    As alleged, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of

fiduciary responsibility of another fiduciary with respect to the same plan if the fiduciary knows

of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The

Excessive Fee Co-Fiduciary Defendants breached all three of these provisions.

517.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a

fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such

other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the

breach.  Each Excessive Fee Co-Fiduciary Defendant knew of the breaches by the other

fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In

particular, they did not communicate to the other fiduciaries their knowledge of Regions'

improper activity in selecting and maintaining the RMK Select Funds as Plan investment

options.

518.    The Excessive Fee Co-Fiduciary Defendants knew that the Excessive Fee

Prudence Defendants were breaching their duties by continuing to invest in the RMK Select

Funds.  Yet, they failed to undertake any effort to remedy these breaches.  Instead, they

compounded them by obfuscating the excessive nature of the fees charged by the RMK Select

Funds.

519.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a

breach of fiduciary responsibility of another fiduciary with respect to the same plan if he

participates knowingly in, or knowingly undertakes to provide incomplete or inaccurate

information concerning an act or omission of such other fiduciary, knowing that such act or

omission is a breach.  Regions knowingly participated in the fiduciary breaches of the Excessive

Fee Prudence Defendants in that it benefited from the investment in RMK Select Funds while

exposing the Legacy and Regions 401(k) Plan participants to increased losses.  Likewise, the

Excessive Fee Monitoring Defendants knowingly participated in the breaches of the Excessive Fee Prudence Defendants because, as alleged, they had actual knowledge of the facts that rendered the RMK Select Funds an imprudent retirement investment, and yet, ignoring their oversight responsibilities, permitted the Excessive Fee Prudence Defendants to breach their duties.

520.    ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

521.    The Excessive Fee Monitoring Defendants' failure to monitor the Excessive Fee Prudence Defendants, particularly the Legacy and Regions 401(k) Benefits Management Committees and the Legacy and Regions 401(k) Investment Committees, if any, enabled those committees to breach their duties.

522.    As a direct and proximate result of the breach of fiduciary duties alleged, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments in the RMK Select Funds and the Plans' other participants and beneficiaries, including the Excessive Fee Subclass members, lost millions of dollars of retirement savings.

523.    Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Excessive Fee Co-Fiduciary Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### Count XV: Prohibited Transactions Regarding Revenue Sharing and Other Kickback Payments

524.    Plaintiffs incorporate by reference the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

525.    This Count alleges prohibited transactions against Defendants Regions, Regions Bank, Morgan Keegan, MAM, and the Legacy and 401(k) Prudence Defendants (collectively the "Prohibited Transaction Defendants").  As alleged, the Prohibited Transaction Defendants, except Morgan Keegan and MAM, are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they are bound by the duties of loyalty, exclusive purpose, and prudence, and the prohibited transaction provisions set forth in ERISA § 406, 29 U.S.C. § 1106.  As non-fiduciary parties in interest, Morgan Keegan and MAM are liable under ERISA § 502(a)(3), 29 U.S.C. §1132(a)(3) for their knowing participation in violation of ERISA § 406, 29 U.S.C. § 1106.

526.    As alleged, except for Morgan Keegan and MAM, the scope of the Prohibited Transaction Defendants' fiduciary duties includes managing and administering the Legacy and Regions 401(k) Plans and Plans' assets, selecting Plan investment options, and through the exercise of their discretionary authority as fiduciaries, causing the Legacy and Regions 401(k) Plans to enter into transactions with parties in interest.  Morgan Keegan and MAM are non-fiduciary parties in interest who knowingly participated in transactions involving Plan assets.

527.    The Prohibited Transaction Fiduciary Defendants engaged in transactions prohibited by ERISA § 406(a)(1)(C) by causing the Legacy and Regions 401(k) Plans to engage in transactions that each of the Prohibited Transaction Fiduciary Defendants knew or should have known constituted a direct or indirect furnishing of services between the Legacy and Regions 401(k) Plans, on the one hand, and parties in interest, on the other.  This includes but is

187

not limited to the following: Regions caused the Legacy and Regions 401(k) Plans to enter a

contract or other arrangements through which the Plans paid for services provided by MAM

and/or Morgan Keegan, both parties in interest, related to the RMK Select Funds, in violation of

ERISA § 406(a)(1)(C).  While the value of the services that Regions Bank, MAM, and Morgan

Keegan purportedly provided in exchange for revenue sharing and other kickback payments are

arguably a small percentage of the RMK Select Funds' daily average balance, the payments are

nonetheless substantial.  Moreover, many of the fees charged were not for actual services

performed, but were merely kickbacks for inclusion of the RMK Select Funds in the menu of

funds made available to Plan participants.  Thus, the amounts paid by the Plans were not and

cannot be reasonable pursuant to ERISA § 408(b)(2).

528.    The Prohibited Transaction Fiduciary Defendants engaged in transactions

prohibited by ERISA § 406(a)(1)(D) by causing the Legacy and Regions 401(k) Plans to engage

in transactions that each of the Prohibited Transaction Fiduciary Defendants knew or should

have known constituted a direct or indirect transfer of Plan assets from the Legacy and Regions

401(k) Plans to parties in interest.  This includes, but is not limited to, the following: Regions

caused the Legacy and Regions 401(k) Plans to enter a contract or other arrangements which

caused Plan assets to be transferred to MAM and/or Morgan Keegan, both parties in interest, for

the use and benefit of MAM and/or Morgan Keegan in violation of ERISA § 406(a)(1)(D).

These transfers of Plan assets to MAM and Morgan Keegan constituted revenue sharing and

other kickback payments, not payments for actual services performed, but merely kickbacks for

inclusion of the RMK Select Funds in the menu of funds made available to Plan participants.

Thus, the amount of fees paid by the Plans was not and cannot be reasonable pursuant to ERISA

§ 408(b)(2).

529.     Additionally Regions violated ERISA § 406(b)(1) and (3) by receiving revenue sharing and other kickback payments from Morgan Keegan and/or MAM at the expense of Legacy and Regions 401(k) Plans' participants and/or beneficiaries, as the revenue sharing and other kickback payments were not credited to the Plans but instead were kept by Regions. Regions passed the cost of the revenue sharing and other kickback payments through to the Plan by increasing the fees and expenses charged to the Plans by the RMK Select Funds.  This violated ERISA § 406(b)(1) and (3), as Regions dealt with Plan assets for its own benefit, and received consideration from parties in interest by having the Plans invest in and/or offer as an investment option the RMK Select Funds.

530.     PTE 77-3 does not apply to the allegations alleged herein, because, but not limited to the following: the Legacy and Regions 401(k) Plans paid investment advisory fees, 12b-1 fees, and sales commissions to Morgan Keegan and/or MAM due to the Plans' investment in the RMK Select Funds.  These fees were not paid by Regions, but by the Plans themselves.

531.     PTE 77-4 does not apply to the allegations alleged herein, because of, but not limited to, the following:

1.     Upon information and belief, employees of Morgan Keegan were eligible to participate, and participated in the Legacy and Regions 401(k) Plans.  Thus, Morgan Keegan, the mutual fund provider, was the employer of employees covered by the Plans;

2.     In addition, the prospectuses indicate that RMK Select Funds may charge a sales commission in connection with the purchase or sale of RMK shares.  To the extent that sales commissions were in fact charged to the Plans, Defendants violated the PTE 77-4, § II.c, for this reason as well;

3.     The Legacy and Regions 401(k) Plans paid investment advisory and other related fees to Morgan Keegan and/or MAM, wherein the fees charges were not based on Plans' pro rata share of the Plans' investment in the RMK Select Funds;

4.     Upon information and belief, the Legacy and Regions 401(k) Plans did not prepay any fees for investment management, advisory or similar fees to Morgan Keegan

189

and/or MAM, and consequently the Plans never received any return of such fees; and

5.     The Legacy and Regions 401(k) Plans paid 12b-1 fees, sales commissions, and other related fees to Morgan Keegan and/or MAM.

532.    As a direct and proximate result of the alleged prohibited transactions, the Legacy and Regions 401(k) Plans, and indirectly the Plaintiffs with investments in the RMK Select Funds and the other Excessive Fee Class members, lost millions of dollars of retirement savings.

533.    Pursuant to ERISA §§ 409(a), 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), the Prohibited Transaction Defendants are liable to restore the losses to the Legacy and Regions 401(k) Plans caused by their breach of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XI.   CAUSATION

534.    The Legacy, AmSouth Thrift, and Regions 401(k) Plans suffered millions of dollars in losses because Defendants imprudently invested or allowed to be invested substantial assets of the three Plans in Regions common stock throughout the Company Stock Subclass Period, in breach of Defendants' fiduciary duties.

535.    The Legacy and Regions 401(k) Plans and the ERISA Plans suffered millions of dollars in losses because Defendants imprudently invested or allowed to be invested substantial assets of the Plans and ERISA Plans in the Bond Funds throughout the Bond Fund Subclass Period, in breach of Defendants' fiduciary duties.

536.    The Legacy Plan and Regions 401(k) Plan suffered millions of dollars in losses because Defendants in the Excessive Fee Subclass imprudently invested or allowed to be invested substantial assets of the Plans in the RMK Select Funds during the Excessive Fees Subclass Period, in breach of Defendants' fiduciary duties.

190

537.    Defendants of the relevant Plans and the ERISA Plans are liable for those plans'

losses in this case because, *inter alia*: (a) the investment in Regions common stock was the result

of the Prudence Defendants' decision to invest Company contributions in Regions common

stock; (b) the Prudence Defendants are liable for losses stemming from the portion of the Plans'

assets invested in Regions common stock, the Bond Funds, and the RMK Select Funds, because

they failed to take the necessary and required steps to ensure effective and informed independent

participant control over the investment decision-making process, as required by ERISA § 404(c),

29 U.S.C. § 1104(c), and the regulations promulgated thereunder; and (c) the Bond Fund

Defendants continued to offer, permit, make, and maintain Bond Fund investments in the ERISA

Plans when they knew or should have known that such investments were not, or were no longer,

appropriate investments for the ERISA Plans.

538.    Had Defendants properly discharged their fiduciary and co-fiduciary duties,

including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated

duties of prudence and loyalty, as well as eliminating Regions common stock, the Bond Funds

and the RMK Select Funds as investment alternatives when they became imprudent and

divesting the Plans and the ERISA Plans of these investments when continuing and maintaining

such investments became imprudent, the Plans and ERISA Plans would have avoided some or all

of the losses that they, and indirectly, their participants, suffered.

## XII.   REMEDY FOR BREACHES OF FIDUCIARY DUTY

539.    Defendants breached their fiduciary duties in that they knew or should have

known the facts as alleged, and therefore knew or should have known that Plans' and ERISA

Plans assets should not have been invested in Regions common stock, the Bond Funds, and the

RMK Funds during the relevant Subclass Periods.

540.     As a consequence of the Defendants' breaches, the Plans and the ERISA Plans suffered significant losses.

541.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant or fiduciary to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries…to make good to such plan any losses to the plan . . . ."  ERISA § 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

542.     With respect to calculation of the losses to the Plans and the ERISA Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans and the ERISA Plans would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' and ERISA Plans' assets in the most profitable alternative investment available to them. Alternatively, in determining losses that resulted from the imprudent investment in Regions common stock, damages may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of Regions common stock that the Plans would have acquired had the Plans' fiduciaries taken appropriate steps to protect the Plan.  The Court should adopt the measure of loss most advantageous to the Plans and the ERISA Plans.  In this way, the remedy restores the Plans' and the ERISA Plans' lost value and puts the participants in the position they would have been in had the Plans and the ERISA Plans been properly administered.

543.     Plaintiffs and the Subclasses are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plans and the ERISA Plans to make good to the Plans and the ERISA Plans the losses to the Plans and ERISA Plans resulting from the breaches of

fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

544.     Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans and the ERISA Plans to which that Defendant owed a fiduciary duty.

## XIII.  CLASS ACTION ALLEGATIONS

545.     **Class Definitions.**  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following three classes of persons similarly situated (the "Subclasses").

546.     The first Subclass, the Company Stock Subclass, is defined as:

All persons, other than Defendants, who were participants in or beneficiaries of the Legacy, AmSouth, and/or Regions 401(k) Plans at any time between January 1, 2007 and the present and whose Plan accounts were invested in Regions common stock at any time during this period.

547.     The second Subclass, the Bond Fund Subclass, is defined as:

ERISA Plan participants, beneficiaries, and/or fiduciaries on behalf of all ERISA Plans that had any plan assets invested in any of the Bond Funds at any time between November 9, 2006 and July 29, 2008, and has suffered losses to their accounts as a result of their accounts being invested in the Bond Funds.

548.     The third Subclass, the Excessive Fee Subclass, is defined as:

193

All persons, other than Defendants, who were participants in or beneficiaries of the Legacy and/or Regions 401(k) Plans at any time between May 1, 2003 and May 15, 2009 and whose Plan accounts were invested in one or more of the RMK Select Funds at any time during this period.  The RMK Funds include those funds offered as investment options to the Legacy Plan and the Regions 401(k) Plan. These include without limitation the: Regions Morgan Keegan ("RMK") Select Balanced Fund, RMK Select Ltd. Maturity Fixed Income Fund, RMK Select Growth Fund, RMK Select Value Fund, RMK Select Fixed Income Fund, RMK Select Core Equity Fund, RMK Select Mid Cap Growth Fund, RMK Select Mid Cap Value Fund, RMK Select Treasury Money Market Fund, RMK Select High Income Fund, RMK Select Intermediate Bond Fund, and RMK Select Short Term Bond Fund.  The Legacy Plan also offered the following as investment options: Federated International Max Cap Institutional Fund; AIM Small Cap Growth Fund; and Fidelity Advisor Diversified International Fund.

549.  **Class Periods.**  Plaintiffs allege three distinct Subclass Periods.

A.  For the Company Stock Subclass, the fiduciaries of the Legacy, AmSouth Thrift, and Regions 401(k) Plans knew or should have known at least by January 1, 2007 that the Company's material weaknesses were so pervasive that Regions common stock could no longer be offered as a prudent investment for retirement Plan assets.  Thus, the Company Stock Subclass Period is defined as from January 1, 2007 to the present.

B.  For the Bond Fund Subclass, the fiduciaries of the ERISA Plans knew or should have known at least by November 9, 2006 that because of over investment in poor quality mortgage backed securities and CDOs and other mismanagement, the Bond Funds could no longer be offered or held as a prudent investment for retirement Plan assets.  Thus, the Bond Fund Subclass Period is defined as from November 9, 2006 to July 29, 2008.

C.  For the Excessive Fee Subclass, the fiduciaries of the Legacy and/or Regions 401(k) Plans knew or should have known at least by May 1, 2003 that the RMK Select Funds charged excessive fees and underperformed similar funds in their investment class and, therefore, could no longer be offered as a prudent investment for retirement Plan assets.  Thus, the Excessive Fee Subclass Period is defined as from May 1, 2003 to May 15, 2009.

194

550.   **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, based on the Plan's Form 5500 for Plan year 2005, more than 22,500 individuals in the Excessive Fee and Company Stock Subclasses.  Hundreds of ERISA Plans are included in the Bond Funds Subclass.

551.   **Commonality.**  Common questions of law and fact exist as to all members within each Subclass and predominate over any questions affecting solely individual members within each Subclass.

a.   Among the questions of law and fact common to the Company Stock Subclass are:

1.   whether each of the Company Stock Defendants was a fiduciary and owed a fiduciary duty to Plaintiffs and members of the Company Stock Subclass;

2.   whether the relevant Plan documents required prudent selection, monitoring and oversight of the investment in Company Stock;

3.   whether the Company Stock Defendants had prudent processes for the selection, monitoring and oversight of the investment in Company Stock, including giving appropriate consideration to the significant problems at Regions;

4.   whether the Company Stock Defendants  breached their fiduciary duties to Plaintiffs and members of the Subclasses by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries with respect to the continued investment in Company Stock as Regions financial condition deteriorated, and as Regions was failing to disclose material information about its problems;

5.   whether any of all of the Company Stock Defendants violated ERISA; and

6.   whether the Plan has suffered losses from any fiduciary's breaches and, if so, what is the proper measure of damages.

b.   Among the questions of law and fact common to the Bond Fund Subclass are:

1.   whether each of the Bond Fund Defendants was a fiduciary and owed a fiduciary duty to Plaintiffs and members of the Bond Fund Subclass;

2.   whether the relevant plan documents required prudent selection, monitoring and oversight of the investment in the Bond Funds;

3.   whether the Bond Fund Defendants breached their fiduciary duties to Plaintiffs and members of the Bond Fund Subclass by failing to act prudently and solely in the interests of the ERISA Plans' participants and beneficiaries with respect to the continued investment in the Bond Funds as the investments varied from the purposes of the Bond Funds and their assets deteriorated;

4.   whether any or all of the Bond Fund Defendants violated ERISA; and

5.   whether the ERISA Plans have suffered losses from any fiduciary's breaches and, if so, what is the proper measure of damages.

c.   Among the questions of law and fact common to the Excessive Fees Subclass are:

1.   whether each of the Excess Fees Defendants was a fiduciary and owed a fiduciary duty to Plaintiffs and members of the Excessive Fees Subclass;

2.   whether the relevant plan documents required prudent selection, monitoring and oversight of the fees in the RMK Funds;

3.   whether the Excessive Fee Defendants had prudent processes for the selection, monitoring and oversight of the investment in the RMK Funds in light of their performance and their excessive fees;

4.   whether the Excessive Fee Defendants breached their fiduciary duties to Plaintiffs and members of the Excessive Fee Subclass by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries with respect to the continued investment in RMK Select Funds;

5.   whether any or all of the Excessive Fee Defendants violated ERISA;

6.   whether the Plan has suffered losses from any fiduciary's breaches and, if so, what is the proper measure of damages; and

7.   whether the Plan has suffered losses from any fiduciary's breaches and, if so, what is the proper measure of damages.

196

552.   **Typicality.**  Plaintiffs' claims are typical of the claims of the members of the Subclasses because: (a) to the extent that Plaintiffs seek relief on behalf of the Plans and ERISA Plans pursuant to ERISA § 502(a)(2), their claim on behalf of the Plans and ERISA Plans is not only typical of but identical to a claim under this section brought by any relevant Subclass member; and (2) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect each Subclass member equally.

553.   **Adequacy.**  Plaintiffs will fairly and adequately protect the interests of the members of the Subclasses and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Subclasses.

554.   **Fed. R. Civ. P. 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Subclasses would create a risk of adjudications with respect to individual members of the Subclasses which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

555.   **Other Fed. R. Civ. P. 23(b) Requirements.**  Class action status is also warranted under the other subsections of Fed. R. Civ. P. 23(b) because: (1) prosecution of separate actions by the members of the Subclasses would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Subclasses, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Subclasses as a whole; and (3) questions of law or fact common to members within each Subclass predominate over any questions affecting only

197

individual members within each Subclass, and a class action is superior to the other available

methods for the fair and efficient adjudication of this controversy.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.      A Declaration that Defendants, and each of them, have breached their ERISA

fiduciary duties to the participants and beneficiaries;

B.      A Declaration that Defendants, and each of them, are not entitled to the protection

of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      An Order compelling Defendants to make good to the Plans and ERISA Plans all

losses to the Plans and ERISA Plans resulting from Defendants' breaches of their fiduciary

duties, including losses to the Plans and ERISA Plans resulting from imprudent investment of the

Plans' and ERISA Plans' assets, and to restore to the Plans and ERISA Plans all profits the

Defendants made through use of the Plans' and ERISA Plans' assets, and to restore to the Plans

and ERISA Plans all profits which the participants would have made if Defendants had fulfilled

their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendant was

unjustly enriched at the expense of the Plans and ERISA Plans as the result of breaches of

fiduciary duty;

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to

participate in the management of the Plans' and ERISA Plans' investment in Regions common

stock;

F.      Actual damages in the amount of any losses the Plans and ERISA Plans suffered,

to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

199

DATED this 15th day of July, 2011.

Respectfully Submitted,

/s/ Karin B. Swope
Lynn L. Sarko
Derek W. Loeser
Margaret E. Wetherald
Karin B. Swope
KELLER ROHRBACK L.L.P
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.:  (206) 623-1900
Fax:  (206) 623-3384
Email: lsarko@kellerrohrback.com
   dloeser@kellerrohrback.com
   mwetherald@kellerrohrback.com
   kswope@kellerrohrback.com

*Interim Co-Lead Counsel for the Class and Co-Counsel for Plaintiffs Harrison, C. Smith and J. Smith*

Ellen M. Doyle
Pamina Ewing
Stephen M. Pincus
Edward J. Feinstein
STEMBER FEINSTEIN DOYLE & PAYNE, LLC
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Tel: (412) 281-8400
Fax:(412) 281-1007
Email: edoyle@stemberfeinstein.com
   pewing@stemberfeinstein.com
   spincus@stemberfeinstein.com
   efeinstein@stemberfeinstein.com

*Interim Co-lead Counsel for the Class and Co-Counsel for Plaintiffs Hamby and Jackson*

200

Peter H. Burke (BPR024012)
Richard S. Frankowski
BURKE HARVEY & FRANKOWSKI, LLC
2151 Highland Ave. S., Suite 120
Birmingham, AL  35205
Tel.:  (205) 930-0991
Email: pburke@bhflegal.com
        rfrankowski@bhflegal.com

*Co-Counsel for Plaintiff Shamblin*

Crawford S. McGivaren
R. Carlton Smyly
CABANISS, JOHNSTON, GARDNER
    DUMAS & O'NEAL, LLP
Suite 700, Park Place Tower
2001 Park Place North
Birmingham, AL 35203
Phone:  (205) 716-5200
Fax:  (205) 716-5389
Email: rcs@cabaniss.com

*Trustee Attorney for Plaintiff*

Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
KESSLER TOPAZ MELTZER & CHECK, L.L.P.
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email: jmeltzer@btkmc.com
        ecioko@btkmc.com
        jweeden@btkmc.com

*Counsel for Plaintiff Williams*

201

Gregory Porter
McTIGUE & PORTER LLP
5301 Wisconsin Ave., NW, Suite 3500
Washington, DC 20015
Tel: (202) 364-6900
Fax: (202) 364-9960
Email: gporter@mctiguelaw.com

*Counsel for Plaintiff Shamblin*

Jeffrey Harris
Elizabeth Hutton
STATMAN, HARRIS & EYRICH
441 Vine Street
3700 Carew Tower
Cincinnati, OH 45202
Tel: (513) 621-2666
Fax: (512) 345-8289
Email: jharris@statmanharris.com
        lhutton@statmanharris.com

*Co-Counsel for Plaintiffs Harrison and Smith*

Albert C. Harvey, Esq. (7955)
THOMASON, HENDRIX, HARVEY,
JOHNSON & MITCHELL, PLLC
40 South Main, Suite 2900
Memphis, TN 38103-5529
Telephone: (901) 525-8721
Email: harveya@thomasonlaw.com

*Additional Counsel Of Record For The Trustee Ad Litem And ERISA Plan Representative Trusts*

Jon C. Goldfarb
WIGGINS CHILDS QUINN
    & PANTAZIS, LLC
The Kress Building
301 19th Street N
Birmingham, AL 35203
Tel.: (205) 314-0500
Fax: (205) 254-1500
Email: jgoldfarb@wcqp.com

*Local Counsel for Plaintiffs Hamby and Jackson*

202

## CERTIFICATE OF SERVICE

I hereby certify that I have on July 15, 2011 filed HAMBY PLAINTIFFS'
CORRECTED THIRD AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATION OF ERISA electronically with the Clerk of Court, which will send
notification of such filing to counsel in this matter.

| | | |
|---|---|---|
| W. Brantley Phillips<br>bphillips@bassberry.com | Matthew M. Curley<br>mcurley@bassberry.com | Michael A. Brady<br>mbrady@bassberry.com |
| Michael L. Dagley<br>mdagley@bassberry.com | Shepherd D. Tate<br>state@bassberry.com | Christopher J. Rillo<br>crillo@groom.com |
| Grace Robinson Murphy<br>gmurphy@maycooper.com | Jeffrey A. Lee<br>jlee@maynardcooper.com | Sarah A. Zumwalt<br>szumwalt@groom.com |
| Thomas F. Fitzgerald<br>tff@groom.com | Thomas S. Gigot<br>tsg@groom.com | William B. Wahlheim<br>wwahlheim@maynardcooper.com |
| Peter S. Fruin<br>pfruin@maynardcooper.com | Robert E. Craddock, Jr.<br>rcraddock@wyattfirm.com | Kristen M. Wilson<br>kwilson@wyattfirm.com |

s/ Karin B. Swope
Karin B. Swope

203