# Exhibit D

**UNITED STATES OF AMERICA**
Before the
**SECURITIES AND EXCHANGE COMMISSION**

SECURITIES ACT OF 1933
Release No. 9116 / April 7, 2010

SECURITIES EXCHANGE ACT OF 1934
Release No. 61856 / April 7, 2010

INVESTMENT ADVISERS ACT OF 1940
Release No. 3009 / April 7, 2010

INVESTMENT COMPANY ACT OF 1940
Release No. 29203 / April 7, 2010

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 3125 / April 7, 2010

ADMINISTRATIVE PROCEEDING
File No. 3-13847

| | |
|---|---|
| **In the Matter of**<br><br>MORGAN ASSET MANAGEMENT, INC.;<br>MORGAN KEEGAN & COMPANY, INC.;<br>JAMES C. KELSOE, JR.; and<br>JOSEPH THOMPSON WELLER, CPA,<br><br>Respondents. | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933, SECTIONS 4C, 15(b) AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934,  SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940, SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940 AND RULE 102(e)(1)(iii) OF THE COMMISSION'S RULES OF PRACTICE |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Morgan Asset Management, Inc. ("Morgan Asset"); Morgan Keegan & Company, Inc. ("Morgan Keegan");

James C. Kelsoe, Jr. ("Kelsoe"); and Joseph Thompson Weller, CPA ("Weller") (collectively "Respondents"); pursuant to Section 15(b)(4) of the Exchange Act against Morgan Keegan; pursuant to Section 15(b)(6) of the Exchange Act against Morgan Asset, Kelsoe and Weller; pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against Morgan Asset and Morgan Keegan; pursuant to Sections 203(f) and 203(k) of the Advisers Act against Kelsoe and Weller; and pursuant to Section 4C[1] of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice against Weller.[2]

II.

After an investigation, the Division of Enforcement alleges that:

A.   RESPONDENTS

1.   Morgan Asset, incorporated in Tennessee on April 10, 1986, has been an investment adviser registered with the Commission at all relevant times. Morgan Asset's principal place of business is in Memphis, Tennessee. Morgan Asset is a wholly-owned subsidiary of MK Holding, Inc., which in turn is a wholly-owned subsidiary of Regions Financial Corporation.

2.   Morgan Keegan, incorporated in Tennessee on June 27, 1969, has been registered with the Commission as a broker-dealer at all relevant times and as an investment adviser since July 27, 1992. During the relevant time period, Morgan Keegan served as the principal underwriter and sole distributor of shares of the open-end Funds. Morgan Keegan's principal place of business is in Memphis, Tennessee.

3.   Kelsoe, 46 years of age, is a resident of Memphis, Tennessee. During 2007, Kelsoe was a senior portfolio manager for Morgan Asset. He also was a Managing Director of Morgan Keegan. Kelsoe is a Chartered Financial Analyst and previously held Series 7 and 65 licenses.

---

[1] Section 4C provides, in relevant part, that:

The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others . . . (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations thereunder.

[2] Rule 102(e)(1)(iii) provides, in pertinent part, that:

The Commission may . . . deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . to have willfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

2

Kelsoe was associated with Morgan Keegan at all relevant times, and was a registered representative of the firm from August 1994 through November 2008.

4. <u>Weller</u>, 44 years of age, is a resident of Memphis, Tennessee. Weller has been employed by Morgan Keegan since 1992. During the relevant period, he was Morgan Keegan's Controller and head of its Fund Accounting Department. He holds Series 7, 27, and 66 licenses and is a CPA who was previously licensed in the State of Tennessee. That license is currently lapsed. Since at least January 1, 1993, Weller has been associated with the investment adviser arm of Morgan Keegan. Additionally, from at least December 1997 through the present, Weller has been a registered representative associated with the broker-dealer arm of Morgan Keegan.

B.     <u>OTHER RELEVANT ENTITIES</u>

5. Helios Select Fund, Inc., formerly known as Morgan Keegan Select Fund, Inc. ("Select Fund"), incorporated in Maryland on October 27, 1998, has been an investment company registered with the Commission since its inception. In 2007, the Select Fund contained three open-end portfolios: the Select High Income portfolio, the Select Intermediate Bond portfolio, and the Select Short Term Bond portfolio.

6. Helios High Income Fund, Inc., formerly known as RMK High Income Fund, Inc., a closed-end fund incorporated in Maryland on April 16, 2003, has been an investment company registered with the Commission since its inception.

7. Helios Multi-Sector High Income Fund, Inc., formerly known as RMK Multi-Sector High Income Fund, Inc., a closed-end fund incorporated in Maryland on November 14, 2005 and has been an investment company registered with the Commission since its inception.

8. Helios Strategic Income Fund, Inc., formerly known as RMK Strategic Income Fund, Inc., a closed-end fund incorporated in Maryland on January 16, 2004 has been an investment company registered with the Commission since its inception.

9. Helios Advantage Income Fund, Inc., formerly known as RMK Advantage Income Fund, Inc., a closed-end fund incorporated September 7, 2004, has been an investment company registered with the Commission since its inception.

10. Morgan Asset, through Kelsoe, managed the Helios Select Fund, Inc., the Helios High Income Fund, Inc., the Helios Multi-Sector High Income Fund, Inc., the Helios Strategic Income Fund, Inc., and the Helios Advantage Income Fund, Inc. (collectively, the "Funds") from at least November 2004 through July 29, 2008.

C.    THE FRAUDULENT SCHEME

Overview

11.    During various periods between at least January 2007 and July 2007, the daily net asset value[3] ("NAV") of each of the Funds was materially inflated as a result of the fraudulent conduct of Respondents. Kelsoe, an employee of Morgan Asset and Morgan Keegan, was the portfolio manager for the Funds. Weller was an officer and treasurer of the Funds and signed and certified their periodic reports to the Commission.

12.    Respondent Morgan Keegan, a registered broker-dealer and registered investment adviser, was the principal underwriter and exclusive distributor of the Funds' shares. Morgan Keegan was designated in each of the Funds' prospectuses as authorized to consummate transactions in the securities of the respective Fund. The Funds' Boards of Directors were responsible for pricing the Funds' securities in accordance with the Funds' valuation policies and procedures. Each Fund's Board of Directors delegated this pricing responsibility to Morgan Keegan, by contract. Morgan Keegan priced each portfolio's securities and calculated its daily NAV through its Fund Accounting Department ("Fund Accounting"). Weller, Morgan Keegan's Controller and Head of Fund Accounting, along with other Morgan Keegan personnel, staffed a "Valuation Committee" that purportedly oversaw Fund Accounting's processes and evaluated the prices assigned to securities. Morgan Keegan and Weller failed, despite multiple red flags, to adequately fulfill Morgan Keegan's responsibilities, as delegated to it by the Funds' Boards of Directors, to price the Funds' securities in accordance with their valuation policies and procedures regarding valuation. For example, Fund Accounting accepted unsubstantiated "price adjustments" submitted by Kelsoe that inaccurately inflated the price of certain securities, contrary to the Funds' policies and procedures. Fund Accounting failed to document justifications for such pricing adjustments.

13.    The Funds' valuation policies and procedures required that dealer quotes be obtained for certain securities. Unbeknownst to Fund Accounting and the Funds' independent auditor ("Independent Auditor"), Kelsoe actively screened and manipulated the dealer quotes that Fund Accounting and the Independent Auditor obtained from at least one broker-dealer. Kelsoe also failed to advise Fund Accounting or the Funds' Boards of Directors when he received information indicating that the Funds' prices for certain securities should be reduced.

14.    Each Fund held securities backed by subprime mortgages, and the market for such securities deteriorated in the first half of 2007. Kelsoe's actions fraudulently forestalled declines in the NAVs of the Funds that would have occurred as a result of the deteriorating market, absent his intervention. Morgan Keegan fraudulently published NAVs for the Funds without following procedures reasonably designed to determine that the NAVs were accurate.

---

[3]    The "net asset value" or "NAV" of an investment company is the company's total assets minus its total liabilities. An investment company calculates the NAV of a single share (or the "per share NAV") by dividing its NAV by the number of shares that are outstanding.

Acting Contrary to Disclosures

15. Each Fund held, in varying amounts, securities backed by subprime mortgages. Many of these securities lacked readily available market quotations and, as a result, were to be internally priced by the Funds' Boards of Directors, using "fair value" methods. Under Section 2(a)(41)(B) of the Investment Company Act, the Funds must use market values for portfolio securities with readily available market quotations and determine fair value for all other portfolio assets. The fair value of securities for which market quotations are not readily available is the price the Funds would reasonably expect to receive on a current sale of the security.[4]

16. The Funds adopted valuation procedures for pricing the Funds' portfolio securities and, by contract, assigned the task of following those procedures to Morgan Keegan. The Funds' valuation procedures for fair-valued securities mandated that such securities should be valued in "good faith" by the Valuation Committee, considering a series of general and specific factors including "fundamental analytical data relating to the investment," "an evaluation of the forces which influence the market in which the securities are purchased or sold" and "events affecting the security." The procedures, as set forth in the prospectus, required the Valuation Committee to maintain a written report "documenting the manner in which the fair value of a security was determined and the accuracy of the valuation made based on the next reliable public price quotation for that security." The procedures also required that prices assigned to securities be periodically validated through, among other means, broker-dealer quotes. The procedures specified that prices obtained from a broker-dealer could only be overridden when there was "a reasonable basis to believe that the price provided [did] not accurately reflect the fair value of the portfolio security." Whenever a price was overridden, the procedures mandated the basis for overriding the price to be "documented and provided to the Valuation Committee for its review."

17. In filings with the Commission, the Funds stated that the fair value of securities would be determined by Morgan Asset's Valuation Committee using procedures adopted by the Funds. In fact, the responsibility was delegated to Morgan Keegan, which primarily staffed the Valuation Committee. Morgan Keegan and the Valuation Committee failed to comply with the Funds' procedures in several ways. Among other things: (1) the Valuation Committee left pricing decisions to lower level employees in Fund Accounting who did not have the training or qualifications to make fair value pricing determinations; (ii) Fund Accounting personnel relied on Kelsoe's "price adjustments" to determine the prices assigned to portfolio assets, without obtaining any basis for or documentation supporting the price adjustments or applying the factors set forth in the procedures; (iii) Fund Accounting personnel gave Kelsoe excessive discretion in validating the prices of portfolio securities by allowing him to determine which dealer quotes to use and which to ignore, without obtaining documentation to support his adjustments; and (iv) the Valuation

---

[4] See AICPA Audit and Accounting Guide - Investment Companies (Sect. 2.35-2.39), which incorporates Accounting Series Release No. 118 ("ASR 118"). The Commission has provided interpretative guidance related to financial reporting in the Accounting Series Releases, which is included in the Codification of Financial Reporting Policies. Thus, conformity with the ASR 118 is required by Commission rules and complies with GAAP. See also Articles 1-01(a) and 6.03 of Regulation S-X.

5

Committee and Fund Accounting did not ensure that the fair value prices assigned to many of the portfolio securities were periodically re-evaluated, allowing them to be carried at stale values for many months at a time.

18. Morgan Asset adopted its own procedures to determine the actual fair value to assign to portfolio securities and to "validate" those values "periodically." Among other things, those procedures provided that "[q]uarterly reports listing all securities held by the Funds that were fair valued during the quarter under review, along with explanatory notes for the fair values assigned to the securities, shall be presented to the Board for its review." Morgan Asset failed to fully implement this provision of its pricing policy.

19. Between at least January 2007 and July 2007, Kelsoe had his assistant send approximately 262 "price adjustments" to Fund Accounting. These adjustments were contained in approximately 40 emails sent by the assistant to a staff accountant in Fund Accounting who calculated the Funds' NAVs. The adjustments were communications by Kelsoe to Fund Accounting concerning the price of specific portfolio securities. In many instances, these adjustments were arbitrary and did not reflect fair value.

20. Kelsoe's price adjustments were routinely entered upon receipt by the staff accountant into a spreadsheet used to calculate the NAVs of the Funds.

21. Kelsoe knew his prices were being used to compute the Funds' NAVs. Among other things, he received bi-weekly reports on the Funds' holdings and their prices which, by comparison with previous reports, indicated that his price adjustments were being used and were directly affecting the NAVs.

22. Fund Accounting did not request, and Kelsoe did not supply, supporting documentation for his price adjustments. Fund Accounting and the Funds did not record which securities had been assigned prices by Kelsoe.

23. As part of the Funds' valuation procedures, Fund Accounting sometimes requested third party broker-dealer quotes as a means to validate the prices it had assigned to the Funds' securities. The Funds' Independent Auditor used similar requests for third party broker-dealer quotes as part of its annual year-end audits of the Funds. Fund Accounting or the Independent Auditor would periodically send such requests to broker-dealers asking them to provide quotations for various portfolio securities.

24. When month-end dealer quotes were received by Fund Accounting, an employee of Fund Accounting performed a cursory review to estimate whether they contained any securities prices that varied from current portfolio prices by more than five percent. If so, then Kelsoe determined whether the current price should be maintained or a new price—which may or may not have been the price given by the broker-dealer—should be assigned to the security. Thus, Fund Accounting routinely allowed Kelsoe to determine whether dealer quotes were used or ignored.

25. Fund Accounting did not record which dealer quotes had been overridden at Kelsoe's instruction.

26. Weller was the head of Fund Accounting and a member of the Valuation Committee. He knew, or was highly reckless in not knowing, of the deficiencies in the implementation of valuation procedures set forth above, and did nothing to remedy them or otherwise to make sure fair-valued securities were accurately priced and the Funds' NAVs were accurately calculated. Among other things, Weller knew that: (i) the Valuation Committee did not supervise Fund Accounting's application of the valuation factors; (ii) Kelsoe was supplying fair value price adjustments for specific securities to Fund Accounting; (iii) the members of the Valuation Committee did not know which securities Kelsoe supplied fair values for or what those fair values were, and did not receive supporting documentation for those values; and (iv) the only pricing test regularly applied by the Valuation Committee was the "look back" test, which compared the sales price of any security sold by a Fund to the valuation of that security used in the NAV calculation for the five business days preceding the sale. The test only covered securities after they were sold; thus, at any given time, the Valuation Committee never knew how many securities' prices could ultimately be validated by it. Weller nevertheless signed the Funds' annual and semi-annual financial reports on Forms N-CSR, filed with the Commission, including certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

27. Morgan Keegan, acting through Weller and Fund Accounting, failed to employ reasonable procedures to price the Funds' portfolio securities and, as a result of that failure, did not calculate accurate NAVs for the Funds. Despite these failures, Morgan Keegan recklessly published daily NAVs of the Funds which it could not know were accurate and, as distributor of the Funds' shares, sold shares to investors based on those NAVs.

Kelsoe's Fraudulent Manipulation of the Funds' Securities Prices

28. Between at least January 2007 and July 2007, Kelsoe manipulated the dealer quotes obtained from at least one broker-dealer ("the Submitting Firm"). At about the time Fund Accounting or the Independent Auditor sent requests for dealer quotes to the Submitting Firm, Kelsoe would confer by e-mail or phone with his contact there (the "Salesman") regarding the quotes. Among other times, Kelsoe had such conversations concerning the month-end quotes for December 31, 2006, February 28, 2007, and March 31, 2007.

29. In some instances, even after causing the Submitting Firm to increase its quotes, Kelsoe subsequently provided price adjustments to Fund Accounting that were higher than even the Submitting Firm's increased quotes. These adjustments were not consistent with the Funds' procedures. Kelsoe and the Salesman also discussed, and the Submitting Firm frequently provided, interim quotes that were lower than the prices at which the Funds were valuing certain bonds, but higher than the initial quotes that the Submitting Firm had intended to provide. The interim quotes were accommodations to Kelsoe to enable him to avoid marking down the securities to the fair value in one adjustment. Kelsoe knew that the interim quotes did not reflect fair value, that the Submitting Firm would provide lower quotes in response to future pricing validation requests, and that he would be required to mark down the securities over time, but he did not

7

disclose that information to Fund Accounting, the Funds' Boards of Directors or the Independent Auditor.

30. For example, on April 25, 2007, the Salesman and Kelsoe spoke by phone about dealer quotes that would be submitted in connection with the March 31, 2007 audit by the Independent Auditor. The Salesman then told Kelsoe that the Submitting Firm's trading desk had priced down many of the bonds in the Funds. Kelsoe asked the Salesman not to provide low dealer quotes that reflected actual bid prices.

31. As a result of the conversation, on April 30, 2007, the Submitting Firm provided quotes to the Independent Auditor reflecting interim prices for certain bonds, which were higher than the quotes the Submitting Firm originally intended to supply, but lower than the Funds' then current values. For example, the Submitting Firm priced down one bond ("the Long Beach bond") from the previous confirmation price of $81 to $65 as an "interim" step. This interim reduction to $65 was approximately half of the mark-down to $50 that the Submitting Firm's trading desk initially had told the Salesman to communicate to the Independent Auditor for the Long Beach bond. On April 26, 2007, Kelsoe sent a price adjustment to Fund Accounting marking down the price of the Long Beach bond from $78, the price at which the Funds' were valuing the bond at that time, to $72. Fund Accounting promptly entered the $72 price, which was substantially higher than fair value, into the spreadsheet used to calculate the Funds' NAV.

32. The Submitting Firm also refrained from submitting certain quotes to Fund Accounting, where the quotes would have been lower than the current valuations being used by the Funds, as the result of conversations between Kelsoe and the Salesman.

33. Kelsoe did not disclose to Fund Accounting or the Funds' Boards that he had received quotes from the Submitting Firm which were lower than the current valuations recorded by the Funds, and that the Submitting Firm had refrained from submitting quotes to Fund Accounting or had submitted quotes at higher prices than it had originally planned. Kelsoe also did not disclose that he caused the Submitting Firm to alter or withhold quotes.

### The Knollwood Bonds

34. In July 2006, Kelsoe purchased from the Submitting Firm, for one or more of the Funds, a Knollwood Collateralized Debt Obligation ("Knollwood bond"), with the guarantee that the Submitting Firm would make a "locked market" and buy it back in six months at the same price, less two coupon payments that the Funds were to receive in the interim. In January 2007, Kelsoe agreed with the Submitting Firm to continue holding the Knollwood bond. On March 30, 2007, the Independent Auditor requested quotes from the Submitting Firm on a number of the Funds' bonds, including the Knollwood bond, for its year-end audit. On April 30, 2007, the Submitting Firm returned the requested quotes to both the Independent Auditor and Kelsoe; however, it did not provide a quote for the Knollwood bond. Consequently, the Knollwood bond continued to be maintained at $92, a price higher than fair value, in the NAV of the relevant Funds.

35.     On May 16, 2007, when Morgan Keegan was still valuing the Knollwood bond at $92, Kelsoe and the Salesman discussed the fact that Morgan Keegan would be requesting another quote for it from the Submitting Firm. Kelsoe told the Salesman not to provide a quote to Morgan Keegan unless it was $87.50 or higher. On May 18, 2007, the Salesman advised Kelsoe that he had obtained a $65 quote from the Submitting Firm's trading desk for the Knollwood bond. On June 5, 2007, Kelsoe communicated his unhappiness about the $65 quote to the Submitting Firm, and threatened to stop doing business with it. On June 7, Kelsoe provided a price adjustment for the Knollwood bond at $88, which was not consistent with fair value. On June 22, as a result of Kelsoe's comments, the Submitting firm provided a list of requested quotes to Morgan Keegan, but left the space for the Knollwood quote blank. As a result, the Funds continued to price the Knollwood bond at $88, substantially higher than fair value. Kelsoe did not advise Fund Accounting, the Independent Auditor or the Funds' Boards of Directors that the Submitting Firm had provided to Kelsoe a quote lower than the price at which the Funds were holding the bonds, or that he had prevailed upon the Submitting Firm not to supply the quotes to Fund Accounting or the Independent Auditor.

### The Terwin Bonds

36.     In addition to engaging in affirmative misconduct to inflate the NAVs of the Funds, Kelsoe also failed to inform Fund Accounting in March 2007—in breach of his fiduciary duty as portfolio manager to the Funds—that he had become aware that seven Terwin Mortgage Trust bonds ("Terwin bonds") held by the Funds had declined substantially in value.

37.     On or about March 15, 2007, Kelsoe placed a call to a broker-dealer that was the issuer, distributor, and market maker for the Terwin bonds, to discuss a swap transaction. In discussing the terms of the swap, Kelsoe learned that the values of the Terwin bonds had decreased substantially and that the Submitting Firm would be lowering its dealer quotes in response to a request that would shortly be sent out by Fund Accounting in connection with the Funds' audit, for prices as of March 31, 2007.

38.     Despite receiving this news in mid-March 2007, Kelsoe's first communication with Fund Accounting concerning reducing the price of certain Terwin bonds came in the form of a price adjustment submitted to Fund Accounting by Kelsoe's assistant via e-mail on Thursday, March 29, 2007. Over the next day and weekend, Kelsoe informed Fund Accounting of the news he had heard two weeks earlier. On April 2, 2007, before the market opened, Fund Accounting lowered the value of all seven of the Terwin bonds effective as of March 31, 2007.

39.     As the result of Kelsoe's delay, the bonds were materially overvalued by the Funds during the last two weeks of March 2007.

### Misrepresentations to Investors and the Funds' Boards of Directors

40.     Kelsoe also made fraudulent misrepresentations and omissions of material fact directly to the Funds' investors concerning the Funds' performance. Specifically, in each of the Funds annual and semi-annual reports filed with the Commission on Forms N-CSR during the

9

relevant period (including, among others, the Annual Report for the Morgan Keegan Select Fund, Inc. for the year-ended June 30, 2007 filed with the Commission on October 4, 2007), Kelsoe included a signed letter to investors reporting on the Funds' performance "based on net asset value." Given his actions to manipulate the Funds' NAVs, Kelsoe knew the performance he reported was materially misstated. Kelsoe and, through him, Morgan Asset made untrue statements of material fact concerning the Funds' performance in the Funds' annual and semi-annual reports filed with the Commission on Forms N-CSR. Morgan Asset, through Kelsoe, also defrauded the Funds by providing a quarterly valuation packet reflecting inflated prices for certain securities to the Funds' Boards, failing to disclose to the Funds' Boards information indicating that the Funds' NAVs were inflated, and that Kelsoe was actively screening and manipulating dealer quotes and providing Fund Accounting with unsubstantiated price adjustments. In addition, the prospectuses described Morgan Asset as responsible for fair valuation of the Funds' portfolios.

D.     VIOLATIONS

41.    As a result of the conduct described above, Respondents Morgan Asset, Kelsoe, Morgan Keegan and Weller willfully violated Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5, thereunder; which prohibit fraudulent conduct in the offer and sale of securities and in connection with the purchase or sale of securities.

42.    Alternatively, Morgan Asset and Morgan Keegan willfully violated Section 17(a) of the Securities Act; Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Respondents Kelsoe and Weller willfully aided and abetted and caused violations of Section 10(b) of the Exchange Act and Rule 10b-5, thereunder.

43.    As a result of the conduct described above, Respondent Morgan Asset willfully violated, and Respondent Kelsoe willfully aided and abetted and caused violations of, Section 206(4) and of the Advisers Act and Rule 206(4)-7 thereunder; which prohibit fraudulent, deceptive or manipulative practices or courses of business by an investment adviser, and requires investment advisers to adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and the rules thereunder by their supervised persons, respectively.

44     As a result of the conduct described above, Respondent Morgan Asset willfully violated, and Respondents Kelsoe and Morgan Keegan willfully aided and abetted and caused violations of, Sections 206(1) and 206(2) of the Advisers Act; which prohibit fraudulent conduct by an investment adviser.

45.    As a result of the conduct described above, Respondents Morgan Asset, Kelsoe and Weller willfully violated, and Respondent Morgan Keegan willfully aided and abetted and caused violations of, Section 34(b) of the Investment Company Act, which prohibits untrue statements of material fact or omissions to state facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in any registration statement, report or other document filed pursuant to the Investment Company Act or the keeping of which is required pursuant to Section 31(a) of the Investment Company Act.

46. As a result of the conduct described above, Respondent Morgan Keegan willfully violated, and Respondents Morgan Asset, Kelsoe and Weller willfully aided and abetted and caused violations of, Rule 22c-1 promulgated under the Investment Company Act, which makes it unlawful for registered investment companies issuing redeemable securities, persons designated in such issuer's prospectus as authorized to consummate transactions in such securities, and principal underwriters of or dealers in such securities, to sell, redeem, or repurchase such securities except at prices based on their current net asset values.

47. As a result of the conduct described above, Respondents Morgan Asset, Morgan Keegan, Kelsoe, and Weller willfully aided and abetted and caused violations of Rule 38a-1 promulgated under the Investment Company Act, which requires that a registered investment company adopt and implement written policies and procedures reasonably designed to prevent violation of the federal securities laws, including policies and procedures that provide for oversight of compliance by the investment company's investment adviser.

III.

In view of the allegations made by the Division of Enforcement, the Commission deems it necessary and appropriate in the public interest that public administrative and cease-and-desist proceedings be instituted to determine:

A. Whether the allegations set forth in Section II are true and, in connection therewith, to afford Respondents an opportunity to establish any defenses to such allegations;

B. What, if any, remedial action is appropriate in the public interest against Respondent Morgan Keegan pursuant to Section 15(b)(4) of the Exchange Act and against Morgan Asset, Kelsoe and Weller pursuant to Section 15(b)(6) of the Exchange Act, including, but not limited to, disgorgement and civil penalties pursuant to Section 21B of the Exchange Act;

C. What, if any, remedial action is appropriate in the public interest against Respondents Morgan Keegan and Morgan Asset pursuant to Section 203(e) of the Advisers Act, and against Respondents Kelsoe and Weller pursuant to Section 203(f) of the Advisers Act, including, but not limited to, civil penalties pursuant to Section 203(i) of the Advisers Act;

D. What, if any, remedial action is appropriate in the public interest against Respondents Morgan Keegan, Morgan Asset, Kelsoe and Weller pursuant to Section 9(b) of the Investment Company Act, including, but not limited to, civil penalties pursuant to Section 9(d) of the Investment Company Act;

E. Whether, pursuant to Section 8A of the Securities Act, Section 21C of the Exchange Act, Section 203(k) of the Advisers Act, and Section 9(f) of the Investment Company Act, Respondents Morgan Asset, Kelsoe, Morgan Keegan and Weller should be ordered to cease and desist from committing or causing violations of and any future violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder;

11

F. Whether, pursuant to Section 8A of the Securities Act, Section 21C of the Exchange Act, Section 203(k) of the Advisers Act, and Section 9(f) of the Investment Company Act, Respondents Morgan Asset, Morgan Keegan, and Kelsoe should be ordered to cease and desist from committing or causing violations of and any future violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, Rule 206(4)-7 thereunder, and Section 34(b) of the Investment Company Act;

G. Whether, pursuant to Section 8A of the Securities Act, Section 21C of the Exchange Act, Section 203(k) of the Advisers Act, and Section 9(f) of the Investment Company Act, Respondents Morgan Asset and Kelsoe should be ordered to cease and desist from committing or causing violations of and any future violations of Sections 206(4) of the Advisers Act and Rule 206(4)-7 thereunder;

H. Whether, pursuant to Section 8A of the Securities Act, Section 21C of the Exchange Act, Section 203(k) of the Advisers Act, and Section 9(f) of the Investment Company Act, Respondents Morgan Asset, Morgan Keegan, Kelsoe and Weller should be ordered to cease and desist from committing or causing violations of and any future violations of Rule 22c-1, promulgated under the Investment Company Act;

I. Whether, pursuant to Section 8A of the Securities Act, Section 21C of the Exchange Act, Section 203(k) of the Advisers Act, and Section 9(f) of the Investment Company Act, Respondents Morgan Asset, Morgan Keegan, Kelsoe and Weller should be ordered to cease and desist from committing or causing violations of and any future violations of Rule 38a-1, promulgated under the Investment Company Act;

J. Whether, pursuant to Section 4C of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice, it is appropriate to censure or deny Respondent Weller the privilege of appearing or practicing before the Commission; and

K. Whether Respondents should be ordered to pay disgorgement pursuant to Section 8A(e) of the Securities Act, Section 21C(e) of the Exchange Act, Section 203(i) of the Advisers Act and Section 9(e) of the Investment Company Act.

IV.

IT IS ORDERED that a public hearing for the purpose of taking evidence on the questions set forth in Section III hereof shall be convened not earlier than 30 days and not later than 60 days from service of this Order at a time and place to be fixed, and before an Administrative Law Judge to be designated by further order as provided by Rule 110 of the Commission's Rules of Practice, 17 C.F.R. § 201.110.

IT IS FURTHER ORDERED that Respondents shall file an Answer to the allegations contained in this Order within twenty (20) days after service of this Order, as provided by Rule 220 of the Commission's Rules of Practice, 17 C.F.R. § 201.220.

If Respondent fails to file the directed answer, or fails to appear at a hearing after being duly notified, the Respondent may be deemed in default and the proceedings may be determined against him upon consideration of this Order, the allegations of which may be deemed to be true as provided by Rules 155(a), 220(f), 221(f) and 310 of the Commission's Rules of Practice, 17 C.F.R. §§ 201.155(a), 201.220(f), 201.221(f) and 201.310.

This Order shall be served forthwith upon Respondent personally or by certified mail.

IT IS FURTHER ORDERED that the Administrative Law Judge shall issue an initial decision no later than 300 days from the date of service of this Order, pursuant to Rule 360(a)(2) of the Commission's Rules of Practice.

In the absence of an appropriate waiver, no officer or employee of the Commission engaged in the performance of investigative or prosecuting functions in this or any factually related proceeding will be permitted to participate or advise in the decision of this matter, except as witness or counsel in proceedings held pursuant to notice. Since this proceeding is not "rule making" within the meaning of Section 551 of the Administrative Procedure Act, it is not deemed subject to the provisions of Section 553 delaying the effective date of any final Commission action.

By the Commission.

Elizabeth M. Murphy
Secretary