# Exhibit V

**The Alabama Securities Commission**
**The Kentucky Department of Financial Institutions**
**The Mississippi Secretary of State's Office**
**The South Carolina Office of the Attorney General**

| | | |
|---|---|---|
| In the matter of | ) | |
| | ) | **Joint Administrative** |
| | ) | **Proceeding** |
| **MORGAN ASSET MANAGEMENT, INC., a** | ) | **File Nos.** |
| **wholly owned subsidiary of MK HOLDING, INC.,** | ) | **Alabama: SC-2010-0016** |
| **a wholly owned subsidiary of REGIONS** | ) | **Kentucky: 2010-AH-021** |
| **FINANCIAL CORPORATION; MORGAN** | ) | **Mississippi: S-08-0050** |
| **KEEGAN & COMPANY, Inc., a wholly owned** | ) | **South Carolina: 08011** |
| **subsidiary of REGIONS FINANCIAL** | ) | |
| **CORPORATION; JAMES C. KELSOE, JR.;** | ) | |
| **BRIAN B. SULLIVAN; GARY S. STRINGER;** | ) | |
| **and MICHELE F. WOOD,** | ) | |
| | ) | |
| **Respondents** | ) | |

---

## JOINT NOTICE OF INTENT TO REVOKE REGISTRATION
## AND
## IMPOSE ADMINISTRATIVE PENALTY

COME NOW, Joseph P. Borg, Director, Alabama Securities Commission; Charles A. Vice, Commissioner, Kentucky Department of Financial Institutions; Tanya G. Webber., Assistant Secretary of State for the Mississippi Secretary of State Securities and Charities Division; and Tracy A. Meyers, Assistant Attorney General for the State of South Carolina (collectively the "Agencies") and issue this Joint Notice of Intent to Revoke Registration and Impose Administrative Penalty against Morgan Asset Management, Inc. and Morgan Keegan & Company, Inc. for violating provisions of the Alabama Securities Act, the Kentucky Securities Act, the Mississippi Securities Act, and the South Carolina Securities Act.

The Agencies also seek to bar the individual Respondents, James C. Kelsoe, Jr., Brian B. Sullivan, Gary S. Stringer, and Michele F. Wood from further participation in the securities industry for violations of the above listed State Securities Acts.

In support thereof the Agencies respectfully submit as follows:

## I.  JURISDICTION AND VENUE

1.      Each of the Agencies is authorized to administer its Securities Act.  Further, each Agency is authorized to participate in and prosecute violations of their Acts jointly with other state securities regulators.

2.      Alabama is specifically authorized to administer the Alabama Securities Act pursuant to Code of Alabama 1975, § 8-6-50.

3.      Kentucky is specifically authorized to administer the Kentucky Securities Act pursuant to KRS § 292.500(1).

4.      Mississippi is specifically authorized to administer the Mississippi Securities Act pursuant to the Mississippi Securities Act § 75-71-107.

5.      The Attorney General of South Carolina is specifically authorized to administer the South Carolina Uniform Securities Act of 2005 (the "SC Act") pursuant to S.C. Code Ann. § 35-1-601(a).

6.      Venue is appropriate in any state represented by the participating Agencies. Further, Regions Financial Corporation ("RFC") is headquartered in Birmingham, Alabama.  All Respondents are wholly owned subsidiaries of RFC or subsidiaries of other companies which are wholly owned by RFC.

7.      All Agency Plaintiffs are authorized and empowered on behalf of their respective states and the citizens of their states to regulate the offer and sale of securities in or from their states, including the registration of broker-dealers and their agents and investment advisers and their representatives.

## II.  INTRODUCTION

8.      This action is brought by state security regulators against a broker-dealer, an investment adviser, a fund manager, and specified employees of the broker-dealer and investment adviser, for their management of certain proprietary funds (the "Funds"), misleading regulatory filings and marketing materials, and due diligence and supervisory failures.

9.      The Agencies allege that Respondents misled investors by failing to disclose the risks associated with the Funds; misrepresenting the nature of the Funds; misclassifying the securities held within the Funds; comparing the performance of the Funds to inappropriate peer groups (benchmarks); failing to accurately represent the amount of structured debt securities held in the Funds; and after the collapse of the Funds, recommending that investors should hold and/or continue to buy the Funds.

10.     The Agencies allege that Respondents engaged in unethical sales practices by inappropriately targeting customers who owned low-risk certificates of deposit ("CDs") and customers who were retired or nearing retirement.  Funds were sold in a manner which caused a lack of diversification in the customers' portfolios. Essentially, Respondents concentrated too large a percentage of many of their customers' assets in the Funds.  Moreover, Respondents failed to adequately acknowledge the risks associated with the Funds, particularly the Intermediate Bond Fund, which was marketed as being appropriate for investors seeking low-risk investment strategies.

11.     The Agencies allege that Respondents failed to fulfill their due diligence responsibilities.  Respondents failed to adequately examine and report about the Funds and their management to the broker-dealer's sales force and investors.

12.     The Agencies allege that Respondents withheld information from the broker-
dealer's sales force.

13.     The Agencies allege that Respondents provided preferential treatment to certain
customers to the detriment of other customers.

14.     The Agencies allege that Respondents failed in their supervisory responsibilities.
Respondents failed to adequately train their sales force about the proprietary
funds at issue, they failed to require the sales force to assess each customer's risk
tolerance, and they failed to oversee the management of the Funds.  The failures
of oversight allowed the misclassification of holdings within the Funds, and
resulted in material misrepresentations in publicly disseminated materials.   In
addition, corporate Respondents shielded the Funds' Manager, Respondent James
C. Kelsoe, Jr., from the established supervisory structure.

15.     The misrepresentations, omissions, and sales practices of Respondents enticed
investors to invest in the Funds.  The investment adviser's management of the
Funds, the broker-dealer's inadequate due diligence, and Respondents' overall
supervisory failures resulted in investor losses of approximately Two Billion
Dollars ($2,000,000,000.00).

### III.  FUNDS

16.     The six funds at issue are Regions Morgan Keegan Select Intermediate Bond
Fund, Regions Morgan Keegan Select High Income Fund, Regions Morgan
Keegan Advantage Income Fund, Regions Morgan Keegan High Income Fund,
Regions Morgan Keegan Multi-Sector High Income Fund and Regions Morgan
Keegan Strategic Income Fund.

a.      Regions Morgan Keegan Select Intermediate Bond Fund (MKIBX or "Intermediate Bond Fund") and Regions Morgan Keegan Select High Income Fund (MKHIX or "Select High Income Fund") were open-end mutual funds and include "A", "C", and "I" share classes. Prior to the merger of Regions Financial Corporation ("RFC") and Morgan Keegan Holdings, Inc., the two (2) open-end funds were part of Morgan Select Funds, Inc., and known as Morgan Keegan Select Intermediate Bond Fund and Morgan Keegan Select High Income Fund. Subsequent to the RFC acquisition of Morgan Keegan and Company, Inc. ("MKC"), the names of the Funds were changed to include "Regions" as a part of their names. The initial prospectus for the open-end funds is attached hereto as Exhibit 1.

b.      Regions Morgan Keegan Advantage Income Fund (RMA), Regions Morgan Keegan High Income Fund (RMH), Regions Morgan Keegan Multi-Sector High Income Fund (RHY), and Regions Morgan Keegan Strategic Income Fund (RSF) were all proprietary closed-end mutual funds. MKC was the lead underwriter for these four (4) proprietary closed-end mutual funds. The initial prospectuses for the closed-end funds are attached hereto as Exhibit 2, Exhibit 3, Exhibit 4, and Exhibit 5.

c.      All six (6) Funds were largely invested in the lower, implicitly leveraged, and most risky "tranches", or slices, of structured debt instruments. In structured debt instruments, an issuer takes a pool of assets, such as mortgages, credit card debt, or aircraft leases, which are used as collateral to issue securities. Instead of letting each investor own a share of the entire pool, the issuer divides the pool into several slices, or "tranches." The issuer defines which tranches receive payment

priority and enjoy certain loss protections.  Generally, payment priority is in order from the top tranche down, while losses are suffered in reverse order from the bottom tranche up.  A detailed explanation of the Funds' holdings and risks is attached as Exhibit 6.  The Funds were comprised of many of the same holdings. On June 30, 2007, approximately two-thirds (2/3) of the holdings of the four closed-end funds and the Select High Income Fund were identical. Approximately one quarter (1/4) of the Intermediate Bond Fund holdings corresponded to the holdings of the other five (5) Funds.  A spread sheet analysis of the holdings of the various funds is attached as Exhibit 7.  The Funds were highly correlated, meaning they behaved like each other under similar market conditions.  The combination of risky lower tranche holdings, mirrored holdings among the Funds, and the high correlation of the Funds caused investors owning more than one of these funds to have a heightened risk due to over-concentration.

d.     The Funds were managed by James C. Kelsoe, Jr.

e.     The chart below, Exhibit 8, illustrates both the high correlation of common holdings among the Funds and the precipitous drop in the value of the Funds.



## IV.  PARTIES

### A. AGENCIES

17.     The Alabama Securities Commission ("Alabama"), is an agency of the State of Alabama, headquartered in Montgomery, Alabama, and organized and validly existing under the Alabama Securities Act (§ 8-6-50 Code of Alabama, 1975).

18.     The Kentucky Department of Financial Institutions ("Kentucky") is an agency of the State of Kentucky, headquartered in Frankfort, Kentucky, and organized and validly existing under the Kentucky Financial Services Code Section KRS 286.1-001.

19.     The Mississippi Secretary of State ("Mississippi") is the constitutional officer of the State of Mississippi, headquartered in Jackson, Mississippi, and charged with administering the Mississippi Securities Act (Miss. Code 75-71-101, *et. seq*.).

20.     The South Carolina Attorney General ("South Carolina") is a constitutional officer of the State of South Carolina, headquartered in Columbia, South Carolina, and organized and validly existing under the South Carolina Constitution.  S. C. Const. Art. VI. §7.  Pursuant to the SC Act, the Attorney General serves as the State's Securities Commissioner and is responsible for enforcing the SC Act. S.C. Code Ann §§ 35-1-102(28), 35-1-601(a) (Supp. 2009).

### B. RESPONDENTS AND RELATED ENTITIES

21.     **Morgan Asset Management, Inc.** ("MAM") is a federal registered investment adviser with the United States Securities and Exchange Commission ("SEC") (CRD No. 111715) and at all relevant times was properly notice filed with the

Agencies.  MAM is headquartered in Alabama with a principal business address of 1901 6th Avenue North, 4th Floor, Birmingham, Alabama 35203.

22.   **Regions Financial Corporation** ("RFC"), a Delaware corporation (EIN No.  63-0589368), is a financial holding company providing banking and other financial services through its subsidiaries.  RFC is headquartered in Alabama with a business address of 1900 Fifth Avenue North, Birmingham, Alabama 35203.

23.   RFC's banking operations are conducted through Regions Bank ("Regions"), an Alabama chartered bank with a business address at 250 Riverchase Parkway East, Hoover, Alabama 35244.

24.   **Morgan Keegan & Company, Inc.** ("MKC") (CRD No. 4161), a Tennessee corporation, is a registered broker-dealer with the Agencies and the SEC, as well as a federal registered investment adviser with the SEC.  At all relevant times MKC was properly registered and notice filed with the Agencies.  MKC is a wholly owned subsidiary of RFC, and RFC is headquartered in Alabama. MKC's primary business address is 50 Front Street, Morgan Keegan Tower, Memphis, Tennessee 38103-9980.

25.   **Regions Morgan Keegan Trust, F.S.B.** ("RMKT") is the trust and asset management unit of RFC and operates as a unit of MKC.

26.   **Wealth Management Services** ("WMS"), a division of MKC, develops and implements asset allocation strategies for MKC and ostensibly performed due diligence on traditional and alternative funds and fund managers for the benefit of MKC, its Financial Advisers ("FAs"), and its investor clients.

27.     **James C. Kelsoe, Jr.** ("Kelsoe") (CRD No. 2166416) was Senior Portfolio Manager of the Funds and was responsible for selecting and purchasing the holdings for the Funds.  Kelsoe was an employee of MAM.

28.     **Brian B. Sullivan** ("Sullivan") (CRD No. 2741207) was President and Chief Investment Officer of MAM.   Sullivan was responsible for the overall management of MAM including oversight of the Funds.

29.     **Gary S. Stringer** ("Stringer") (CRD No. 2917717) was Director of Investments for WMS.  Stringer was responsible for overseeing the due diligence performed on products included on MKC's "Select List."  The Select List was a list of products, including mutual funds, separate account managers, and alternative investments, which MKC represented as having passed due diligence screening and appropriate for use in client portfolios.  The Select List was available to MKC FAs and was found to have been used by MKC FAs when making investment recommendations to their clients.   In addition, WMS, under the direction of Stringer, created and maintained mutual fund allocation portfolios to be used in the discretionary and non-discretionary platforms used by the FAs.

30.     **Michele F. Wood** ("Wood") (CRD No. 4534832) served as Chief Compliance Officer of the Funds, Chief Compliance Officer of MAM, and Senior Attorney and First Vice President of MKC.


## V.   INVESTIGATION

31.     Between March 31, 2007 and March 31, 2008, the Funds lost approximately Two Billion Dollars ($2,000,000,000.00).  Fund losses are calculated from the Annual and Semi-Annual Shareholder Reports (Forms N-CSR and N-CSRS filed

with the SEC) and are summarized and attached as Exhibit 9. Based on complaints regarding the losses, thirteen (13) state securities regulators formed a task force to investigate the management, sales practices, and supervisory/compliance procedures related to the Funds.

32.     The task force coordinated and conducted investigations into Respondents' management, marketing, sales, and supervision of the Funds. The state regulators conducted nine (9) on-site branch exams in seven (7) states, interviewed approximately eighty (80) present and former sales representatives, managers, and officers, interviewed customers, and reviewed thousands of e-mail communications, reports, and other records provided by Respondents.

## VI. FINDINGS OF FACT

### A. MORGAN ASSET MANAGEMENT

33.     MAM, the investment adviser, is a wholly owned subsidiary of MK Holding, Inc., which, in turn, is a wholly owned subsidiary of RFC, which is headquartered in Alabama.

34.     Prior to the 2001 acquisition of MKC by RFC, MAM was a wholly owned subsidiary of MKC, the broker-dealer. Subsequent to the acquisition, MAM became a wholly owned subsidiary of MK Holding, Inc., a wholly owned subsidiary of RFC.

35.     Pursuant to investment adviser agreements between MAM and Morgan Keegan Select Fund, Inc., MAM was responsible for the overall investment management of the open-end Funds. Pursuant to similar investment adviser agreements with each of the closed-end funds, MAM was also responsible for the overall

investment management of the closed-end funds.  Management of the Funds included managing the investments and other affairs of each fund and directing the investment of each fund's assets.  According to the closed-end funds' prospectuses, the valuation of the closed-end funds' portfolios was delegated to MAM.  MAM's management fee was a percentage of the average daily assets for each fund.

## B. MORGAN KEEGAN

36.    MKC is a full-service regional brokerage and investment banking firm.  MKC offers products and services including securities brokerage, asset management, financial planning, mutual funds, securities underwriting, sales and trading, and investment banking.  MKC also manages the delivery of trust services provided pursuant to the trust powers of Regions Bank.

37.    MKC was the principal underwriter of all six Funds.  MKC also provided an employee (Wood) to serve as the Funds' Chief Compliance Officer.  For the open-end funds, MKC acted as the distributor of the funds' shares, provided fund accounting services, which included valuation of the securities within the open-end funds' portfolios, and served as the transfer and dividend disbursing agent.

38.    As a distributor of the open-end funds, MKC was paid a percent of sales charged on the purchased shares.  MKC's compensation for sales was 2.00% for the sale of class "A" shares of the Intermediate Bond Fund, and 2.50% for sales of the Select High Income Fund.  The Funds' distribution plans allowed MKC to receive a service fee and a distribution fee from net assets.  The distribution fee was computed daily and paid quarterly.

39.     MKC also served as the open-end funds' transfer and dividend disbursing agent, for which it received a monthly fee.  MKC provided accounting services to each fund.  The accounting services included portfolio accounting, expense accrual, payment fund valuation, financial reporting, tax accounting, and compliance control services.  For these services, MKC received an additional monthly fee.

40.     In 2001, RFC purchased MKC with the intent of increasing Region's profitability. RFC sought to benefit from MKC's expertise in generating fee revenue.

41.     Regions' bank employees referred bank customers to MKC agents which were assigned to service the bank branches.  The bank employees contacted bank customers, scheduled appointments between bank customers and MKC agents, and were often present for the meetings between bank customers and the MKC agents.  These meetings were regularly held at bank branch offices.

## C. WEALTH MANAGEMENT SERVICES

42.     Wealth Management Services (WMS) is a division of MKC.  Among other things, it develops and implements asset allocation strategies for MKC and provides research and due diligence on mutual funds, separate account managers, and alternative investments comprising MKC's Select List, as well as certain stocks not covered by MK Equity Research. Exhibit 134.

43.     WMS consists of several departments.  The Investments Department of WMS is comprised of the Due Diligence, Alternative Investments, Sales and Consulting, Product and Platform Support, and Market Intelligence groups.

## D. RESPONDENTS, INDIVIDUALLY AND COLLECTIVELY, MADE UNTRUE STATEMENTS OF MATERIAL FACTS AND THEY OMITTED MATERIAL

**FACTS NECESSARY IN ORDER TO MAKE THE STATEMENTS MADE, IN
LIGHT OF THE CIRCUMSTANCES UNDER WHICH THEY WERE MADE,
NOT MISLEADING.**

## Failed to Disclose Risks in SEC Filings

44.     The lower, or subordinated, tranches of asset-backed securities represent the
most speculative parts of the asset-backed security.  The lower tranches receive
the lowest priority for distributions from income and return of principal related to
the underlying assets held within the pool and are the first to suffer loss of value
due to any payment failures or defaults within the entire pool.  In the Funds'
disclosure documents filed with the SEC, Respondents failed to adequately
disclose the risks of subordinated tranches as well as the amount of subordinated
tranches comprising the Funds. Exhibit 10 is the initial prospectus for the two (2)
open-end funds.  Exhibit 11, Exhibit 12, Exhibit 13 and Exhibit 14 are the initial
prospectuses for the four (4) individual closed-end funds.

45.     Despite listing generic risk factors, Respondents' prospectuses failed to notify
prospective customers that the Funds were largely composed of structured debt
instruments and the specific risks associated with structured debt instruments.

## Failed to Disclose Risks in Marketing Materials

46.     In marketing materials, Respondents likewise failed to adequately disclose the
risks to investors of investing in funds with the majority of their portfolios
invested in subordinated tranches of structured debt instruments.  Respondents
published two particular pieces of marketing material each quarter, the Fund
Glossies produced by MAM and the Fund Profiles produced by WMS.

47.     MAM produced quarterly Glossies for all six Funds.  Exhibit 15, Exhibit 16, Exhibit 17, Exhibit 18, Exhibit 19, and Exhibit 20.  In the Glossies, MAM failed to disclose the risks of owning the lower tranches of structured debt instruments and failed to acknowledge the large amount of such holdings within the Funds.

48.     MKC, through WMS, produced quarterly Fund Profiles for the Intermediate Bond, Exhibit 21, and the Select High Income, Exhibit 22, open-end funds.  Like MAM, MKC, through WMS, failed to disclose the risks of owning the lower tranches of structured debt instruments and failed to acknowledge the large amount of such holdings within the Funds.

## Misclassified Holdings within the Funds

49.     In SEC filings, MAM misclassified approximately four hundred million dollars ($400,000,000.00) of risky asset-backed securities as corporate bonds and preferred stocks.  In so doing, MAM misrepresented the diversification and risk of the underlying holdings of the Funds.  Exhibit 23.  Many of the holdings that were classified as "corporate bonds" or "preferred stock" were actually the lower and more risky tranches of asset-backed structured debt instruments. MAM eventually acknowledged these misclassifications when they reclassified many of these securities in the March 2008 Form N-Q Holdings Report for the two (2) open-end funds.  Compare the March 2007 Form N-Q, Exhibit 24, to the March 2008 Form N-Q, Exhibit 25.

50.     MAM misclassified other asset-backed securities as corporate bonds or preferred stocks but sold those securities before correctly reclassifying them.

51.     Some securities were correctly classified as asset-backed securities in 2006 but were changed to be incorrectly classified as corporate bonds in 2007, and then changed back to the correct classification in 2008. Exhibit 26.

**Compared Funds to Inappropriate Benchmarks**

52.     In SEC filings, MAM compared the four (4) closed-end funds and the Select High Income Fund (collectively the "RMK high yield funds"), which contained approximately two-thirds (2/3) structured debt instruments, to the Lehman Brothers U.S. High Yield Index (Lehman Ba Index.)  See pages 7, 25, 43, and 61 of Exhibit 27, and page 36 of Exhibit 28.[1]  The Lehman Ba Index is not an appropriate peer group for comparison because the holdings comprising the Lehman Ba Index are not comparable to the holdings within the RMK high yield funds.  The Lehman Ba Index only contained corporate bonds and no structured debt instruments.  Exhibit 29.

53.     The RMK high yield funds were riskier than the portfolio within the Lehman Ba Index.   Until their ultimate collapse in 2007, the RMK high yield funds performances were deceptively higher than that of the index used for comparison. Exhibit 30.

54.     Respondent MKC used different but equally inappropriate and misleading index comparisons in the Select High Income Fund "Profile" sheets produced by WMS.  These profile sheets compared the Select High Income Fund to the Credit Suisse First Boston High Yield Index, Exhibit 31, as well as the Merrill Lynch US High Yield Cash BB Index, Exhibit 32.   The two indices are not representative of the holdings within the Select High Income Fund because the

---

[1] Page numbers correspond to the pages of the .pdf file, not the page numbers of the original document.

two indices only contain corporate bonds and no structured debt instruments. Exhibit 33 and Exhibit 34.  The Select High Income Fund was riskier than the portfolios within either of the two indices.  Until their ultimate collapse in 2007, the Select High Income Fund's performance was deceptively higher than that of the two indices used for comparison.  Exhibit 35 and Exhibit 36.

### Used Misleading Pie Charts to Obscure Asset-backed Holdings

#### Intermediate Bond Fund (MKIBX) - Glossies

55.  Marketing glossies prepared by MAM for the Intermediate Bond Fund (MKIBX) contained allocation pie charts dividing the categories of holdings by percentages of the total portfolio.  Between June 2004 and March 2005, the pie charts evolved significantly:  MAM divided the category originally titled "asset-backed securities" into multiple categories.  This marketing tactic obscured the fact that the majority of the portfolio continued to be invested in asset-backed securities.  The tactic created the illusion that the MKIBX holdings were more diversified than they actually were.

56.  In the MKIBX glossy dated June 30, 2004, Exhibit 37, the Asset-Backed Securities (ABS) and Commercial Mortgage Backed Securities (CMBS) are listed under a single heading comprising seventy percent (70%) of the portfolio.

57.  In the MKIBX glossy dated December 31, 2004, Exhibit 38, the pie chart was revised and the ABS and CMBS are shown as separate categories, but together still comprise seventy-six percent (76%) of the portfolio.

58.  The MKIBX glossies dated March 31, 2005, Exhibit 39, show the ABS category further split into six (6) categories which, together with CMBS, comprised

seventy-seven percent (77%) of the portfolio.  Subsequent glossies continue to show the ABS split into six (6) categories.

59.     The pie charts from each of these MKIBX glossies are re-created below. The charts reflect changes in the way the assets are categorized.  The categorizations, as depicted in the pie charts, appear to indicate changes in the fund through greater diversification.   However, the changes in the pie charts do not reflect a material change in the underlying holdings of the portfolios and created a false sense of diversification.



**Select High Income Fund Glossies (MKHIX)**

60.     Marketing glossies prepared by MAM for the Select High Income Fund contained allocation pie charts dividing the categories of holdings by percentages of the total portfolio.   Between June 2004 and March 2005, the pie charts evolved significantly:   MAM divided the category originally titled "asset-backed securities" into multiple categories. This marketing tactic obscured the fact that the majority of the portfolio continued to be invested in asset-backed securities. The tactic created the illusion that the MKHIX holdings were more diversified than they actually were.

61.     In the glossy dated June 30, 2004, <u>Exhibit 40</u> the Asset Backed Securities (ABS) and Commercial Mortgage Backed Securities (CMBS) are listed under a single heading comprising sixty percent (60%) of the portfolio.

62.     In the glossy dated December 31, 2004, <u>Exhibit 41</u>, the pie chart was revised and the ABS and CMBS are shown as separate categories, but together, still comprise fifty-nine percent (59%) of the portfolio.

63.     The glossy dated March 31, 2005, <u>Exhibit 42</u>, shows the ABS category further split into six (6) categories which, together with CMBS, comprised sixty-four percent (64%) of the portfolio.  Subsequent glossies continue to show the ABS split into six (6) categories.

64.     The pie charts from each of the Select High Income Fund glossies are re-created below.  The charts reflect changes in the way the assets are categorized.  The categorizations, as depicted in the pie charts, appear to indicate changes in the fund through greater diversification.   However, the changes in the pie charts do not reflect a material change in the underlying holdings of the portfolios, and created a false sense of diversification.



**<ins>Misrepresented and Mischaracterized the Funds and</ins>**

**<ins>Their Holdings in Marketing Material</ins>**

**<ins>Intermediate Bond Fund Glossies (MKIBX)</ins>**

65.     Through the use of marketing materials and reports, Respondent MAM misled investors by minimizing the risks and volatility associated with investing in funds largely comprised of structured debt instruments.  In the June 30, 2007 glossy, Exhibit 43, and previous quarterly glossies created by MAM, Respondents marketed MKIBX as the fund for "Capital Preservation & Income." The glossy further stated:

> If Your Objective is:  Capital Preservation and Income
> This Fund Provides:
> * A higher level of current income than typical money market investments
> * A **<ins>greater stability in principal value than that of long-term bonds</ins>**
> * **<ins>A diversified portfolio</ins>** of investment-grade debt instruments

Exhibit 43 (emphasis added).

66.     Only after the collapse of the funds did MAM acknowledge these critical distortions when it revised the MKIBX glossy in September 2007, Exhibit 44, and removed the caption "Capital Preservation & Income" and replaced it with "Income & Growth".  Respondents also removed the word "stability".

67.     Investors were misled regarding the degree of other risks associated with the MKIBX.  MKIBX was marketed as being diversified across a wide variety of debt and equity linked securities.  Specifically, the glossy prepared by MAM dated June 30, 2007, Exhibit 43, included the following statement:

> **Minimize Risk**
> The single best way to reduce the risk of any portfolio is through **<ins>adequate diversification</ins>**.  The Intermediate portfolio **<ins>is diversified</ins>** not only with regard to issuer, but

also **industry, security type and maturity**.  Furthermore, the Select Intermediate Bond Fund **does not invest in speculative derivatives.**

Exhibit 43 (emphasis added).

68.    This statement was materially false and misleading to investors and potential investors about MKIBX's diversification.  As of March 31, 2007, almost two-thirds of MKIBX was invested in structured debt instruments.  Exhibit 45, page 8.

69.    The MKIBX glossies dated June 30, 2007 and September 30, 2007, state that MKIBX "…does not invest in speculative derivatives."   However, Kim Escue, the WMS fixed income analyst, on page 7 of her June 30, 2007 annual on-site due diligence review and findings, reported that MKIBX does use derivatives. Exhibit 46.

70.    MKIBX did in fact contain derivatives.  The Webster CDO was one-third (1/3) cash and two-thirds (2/3) synthetic derivative.  Tranche D of Tahoma CDO Ltd 2006-1A and Tranche D of Tahoma CDO Ltd 2007-2A were also synthetic derivatives.  Exhibit 47.

**Intermediate Bond Fund Profiles (MKIBX)**

71.    Respondent MKC, through WMS, misled investors by misrepresenting the nature and risk of MKIBX, which was largely comprised of structured debt instruments.  In the series of "Fund Profile Sheets" produced quarterly by WMS, MKC labeled MKIBX with varying and deceptive names, all of which failed to accurately portray MKIBX and its considerable exposure to structured debt instruments.

72.    In the first profile sheet, dated September 30, 2006, Exhibit 48, MKIBX was labeled "Taxable Fixed Income."  In a second profile sheet, also dated September

30, 2006, Exhibit 49, MKC labeled MKIBX as "Enhanced Low-Correlation Fixed Income." In a third profile sheet, dated December 31, 2006, Exhibit 50, MKC labeled the fund "Intermediate Gov't/Corp Bond".

73.    None of the three labels used by MKC accurately represented the nature of MKIBX, of which approximately two-thirds (2/3) of the portfolio was invested in the lower tranches of structured debt instruments. The label "Gov't/Corp Bond," which first appeared on the December 31, 2006 profile sheet, was never changed after that date.

74.    The WMS profile sheet "Intermediate Gov't/Corp Bond" label falsely implied that the holdings were predominately government and corporate bonds carrying a certain degree of safety. In fact, the Form N-CSRS (Certified Shareholder Report) filed by MAM with the SEC shows that MKIBX only contained 1.7% Government and Agency securities and 2.2% U.S. Treasury Obligations as of December 31, 2006. Exhibit 51.

**Select High Income Fund Glossies (MKHIX)**

75.    Respondent MAM misled investors by indicating that risks and volatility were minimized in the MKHIX portfolio when, in fact, MKHIX was largely composed of structured debt instruments. In the June 30, 2007 glossy, Exhibit 53, and previous quarterly glossies created by MAM, Respondents marketed MKHIX's broad diversification of asset classes three times on the first page of each of the glossies. The statements were untrue because approximately two-thirds (2/3) of the MKHIX portfolio was composed of structured debt instruments. Exhibit 45, page 8.

76.     Furthermore, the glossies emphasized MKHIX's net asset value as being less
volatile than typical high-yield funds.  The claim was misleading because it does
not explain that the primary reason for lower volatility is that the structured debt
instruments within MKHIX were not actively traded and were not regularly fair-
valued each day, thereby creating an illusion of a stable net asset value ("NAV")
history.

**The Four Closed-End Fund Glossies**

77.     Like the open-end Select High Income Fund, the four closed-end funds, Exhibit
54, Exhibit 55, Exhibit 56, and Exhibit 57,  also advertised diversification among
asset classes when, in fact, approximately two-thirds (2/3) of each closed-end
fund was composed of structured debt instruments.  Exhibit 45, page 8.

**Misled Investors and the Sales Force About the True
Condition of the Funds During Their Collapse, Even
Suggesting to Hold Funds or Buy More**

78.     MKC, through its sales force, discouraged investors from selling the Funds when
fund prices collapsed, by advising investors to "hold the course".  MKC advised
investors to continue to buy the Funds through statements characterizing the
collapse as "a buying opportunity."   The following excerpts are from customer
statements characterizing advice received from MKC's sales force:

> *It is going to come back. . . I own these funds and I'm not
> selling. The fund will come back and then they will not let
> you back in.*  Exhibit 58.

> *I have been advised to instruct clients that the fund would
> return back to recover losses.*  Exhibit 59.

> *These funds are well managed by our company. . .
> The fund is low so you can't sell now.*  Exhibit 60.

> *By conference call with Manager James Kelsoe, I have
> been given repeated assurances that the fund is safe, will
> continue to pay the same dividend yield, and will turn
> around.* Exhibit 61.
>
> *I just met with MK Executives.  Hold the funds.* Exhibit
> 62.
>
> *We expect the funds to turn around . . . You haven't lost
> until you sell*. Exhibit 63.
>
> *Hold the funds. . . . Kelso assures the funds are safe.*
> Exhibit 64.

79.    In e-mails between an investor and Courtney Nash, Director of Marketing for

MAM, Nash blamed Bear Stearns for the Funds' drop in value.  Nash redirected

the investor's attention to the dividends paid by the fund.  Exhibit 65.

80.    Nash also encouraged broker-dealer agents to hold the course.   Exhibit 66.

81.    In an e-mail inquiry from Todd Tindall to Nash, Tindall asked, "Where is the

bottom of this pricing"   Nash  responded:  ". . . I think this is a buying

opportunity".

Exhibit 67.

82.    On August 1, 2007, MAM's President, Brian Sullivan, sent an e-mail (excerpt

below) to MAM personnel reminding them that the Funds' three (3) and five (5)

year returns were still ahead of average despite their ongoing collapse in value:

> As you cannot help but notice the high yield fund market has come under
> considerable pressure.  Problems started in sub-prime securities and has
> distributed to a lesser extent to all of high yield.  The slump in housing
> makes the sub-prime problems logical but why would all corporate bonds
> suffer?  Why would spreads widen on a Texas electric utility?  If housing
> slows do we buy a lot less electricity?
>
> In Trust we have substantial exposure to the to the RMK Intermediate Fund
> and it is included in our model portfolios (10% of our bonds).  Our overall
> exposure is much less to the RMK High Income Fund.  Both of these funds own
> high yield securities.
>
> Any time you have performance which is either very good or very bad it is
> an opportunity to talk to your client about risk and reward.  As part of a
> diversified portfolio, risk can be taken in measured amounts to the benefit

of the overall portfolio.  I have attached two Morningstar pages that I find useful in keeping current events in perspective.  These funds have ranked at the very top of their categories and the very bottom.  This may be appropriate for your clients and it may not.  Talk to them.

Jim Kelsoe and his team are very knowledgeable and experienced in high yield investing.  The market they operate in is however, not functioning properly.  In my opinion, investors were pricing these securities assuming a perfect scenario at the beginning of 2007.  Now they are pricing in disaster.  The truth is likely somewhere in-between.

Intermediate Fund  <<<<---Click
    Notice that although the fund is down and under performing, the returns most of our clients have experience over the last three and five years are still ahead of average.  Also note that the year to date loss is 3.7%.

High Income Fund <<<<<<--- Click
    The loss year to date is more substantial here but maybe less than you might think from reading the papers.
Exhibit 68.

83.    Through statements by its officers to its sales force and investors, MKC indicated

it stood behind the Funds and would support them:

> ...It's by no means the end of the world...Kelsoe funds, both closed-end and open-end, account for less than 2% of the total of our customer assets.....We will get through this. We will come out of this and I think we will continue to provide our customers with the kind of service, the kind of products, and most of all the attention of our FA's that allows them to have confidence in us and our abilities. ....We all have the funds in our own accounts and our managed accounts and we have confidence in Jim.  If we didn't have confidence in Jim, we wouldn't have money in those accounts.  ..... The company is committed to these funds.  We've supported the funds through this period when liquidity has been tough.   We have done as good a job as anybody in the industry has .....You couldn't find a harder working bunch of individuals, and a more conscientious bunch of individuals than the people you do have working to solve these problems.  So, I would ask you to hang in there. Again, I think Jim's done about all he can do through this period, and, you know, he's done it in a way that really exemplifies, you know, our commitment to doing the right thing for our customers.
> Comments of Doug Edwards, November 15, 2007, Exhibit 70.

> I own all these funds myself personally. And I have family members that do, and I certainly have clients like the rest of

> *you that do. ..... today I would tell you that the problems in
> the credit markets are terrible, but we do have some real
> value there and it looks to me like we should try to see this
> through ..... It will correct itself at some point. I think
> we're closer to a bottom certainly than we've been to a top.
> .....There are better times after there are bad times, always.
> Comments of Allen Morgan, November 15, 2007,* Exhibit
> 70*.*

84.     In an August 2007 e-mail from Doug Edwards, President of MKC, to all Morgan

Keegan associates, MKC announced that an affiliate was supporting MKHIX by

purchasing shares.  Exhibit 71.

85.     RFC, through its subsidiary Morgan Properties, LLC, provided support to the

open-end Select High Income Fund.  Between August 7, 2007 and August 13,

2007, Morgan Properties, LLC purchased 7,648,949 shares of the Select High

Income Fund.  However, on or about September 28, 2007, Morgan Properties,

LLC sold 3,361,344 of those shares without notice to MKC's sales force or

investors.  The sale contributed to a reduction of liquidity and more pressure on

the fund's NAV.  Exhibit 72.

86.     Kelsoe also failed to make important disclosures to the sales force during the

collapse of the Funds.  In conference calls with the sales force, Kelsoe cited sub-

prime fears and liquidity as the primary factors for the Funds' collapse rather than

explain to the sales force that the Funds were largely composed of the lower

tranches of structured debt instruments.  Exhibits 73A, 73B, 73C, 73D, 73E, 73F,

73G, 73H, 73I, 73J, 73K, and 73L.

E.      **RESPONDENTS FAILED TO FULFILL THEIR DUE DILIGENCE
RESPONSIBILITIES THEREBY CAUSING INVESTORS AND THE SALES
FORCE TO MAKE UNINFORMED INVESTMENT DECISIONS.**

87.     In MKC's marketing materials, MKC touted their "exceptional due diligence."
On the Morgan Keegan website, MKC made the following claim:

> Mutual Fund Research Sets Morgan Keegan Apart
> Your Morgan Keegan financial adviser has just recommended that
> you add a certain mutual fund to your portfolio to strengthen your
> assets and increase the diversity and stability of your holdings.  But
> how do you know that the mutual fund your advisor is offering is
> best for you?  The answer:  **Morgan Keegan's exceptional due
> diligence.  At Morgan Keegan, mutual funds are subject to one
> of the most detailed, thorough and exhaustive due diligence
> processes in the industry.**  It is just another example of how
> Morgan Keegan puts the interest of our clients before everything
> else. . .  We go beyond the past performance records provided by
> the services like Morningstar.

> Exhibit 74 (emphasis added).

**WMS - Due Diligence Division of MKC**

88.     The WMS Due Diligence Policy, Exhibit 75, approved by MKC for use with

investors and potential investors, provides the process for due diligence.

Included in the process are nine or more "touches" by WMS per year to include

an annual on-site visit to the fund manager (Kelsoe) and company (MAM).

89.     WMS did not complete a thorough annual on-site review of MAM and Kelsoe in

2007.  Kim Escue, a fixed income analyst for WMS, attempted to perform an

annual on-site due diligence review of MAM and Kelsoe in the summer of 2007,

but was thwarted due to MAM's uncooperativeness.  Subsequently, WMS failed

to notify the MKC sales force or the MKC compliance department of MAM's

refusal to cooperate with the annual on-site due diligence review.  An incomplete

report was submitted by Escue but never released.  Escue's frustration with

MAM's obstruction was demonstrated by her e-mails on July 23, 2007, Exhibit

76, and again on July 31, 2007, Exhibit 77.

90.     On July 31, 2007, WMS dropped coverage of all proprietary products, which

        included the very funds for which Escue could not produce a thorough report.

        Exhibit 78.

91.      WMS had a due diligence responsibility to report to MKC's sales force on its

        analysis of the Funds and their management.  WMS failed in its responsibility by

        not reporting MAM's obstruction of the 2007 due diligence review.

92.     Based on Escue's one (1) page, one (1) paragraph report of the August 18, 2006

        on-site due diligence review, the due diligence visits by the WMS fixed income

        analyst were cursory as opposed to "detailed, thorough, and exhaustive" as

        advertised by MKC.  Escue's report does not address the risks associated with

        the holdings, questions concerning the classifications of the holdings, or

        questions concerning the benchmarks.  Exhibit 79.

93.     Six (6) weeks after Escue's 2006 on-site visit, WMS produced a profile dated

        September 30, 2006, Exhibit 80, describing the holdings ("issues") within the

        Regions Morgan Keegan Intermediate Bond Fund (MKIBX) portfolio.    An

        excerpt from the Investment Philosophy section of this Profile stated in pertinent

        part:

              *Issues included in the portfolio are generally the inferior
              tranches in structured deals.  They trade at large discounts due
              to a lack of demand and liquidity.*

        Escue's 2006 on-site report failed to identify or discuss the inferior issues

        contained within the MKIBX portfolio.

94.     The language from the Investment Philosophy section from the profile was short-

        lived and not seen again in subsequent profiles for MKIBX.

95.    There were contradictions and misstatements in the profiles produced by WMS.
There are two (2) WMS profiles of MKIBX dated September 30, 2006.  The
sections titled "investment philosophy" in the profile sheets differ critically.

96.    The first WMS profile for MKIBX, based on the information for the quarter
ending September 30, 2006, is titled "Taxable Fixed Income".   Exhibit 81.

97.    The first profile, much like previous quarterly profiles, does not reference any of
the holdings as "inferior tranches," nor does it mention potential lack of demand
and lack of liquidity.  Further, it includes an inaccurate statement that "The fund
does not use derivatives or leverage."   MKIBX did contain derivatives; for
example, the Webster CDO was one-third (1/3) cash and two-thirds (2/3)
synthetic derivative and Tranche D of Tahoma CDO Ltd 2006-1A and Tranche D
of Tahoma CDO Ltd 2007-2A were both synthetic derivatives.

98.    Escue's 2007 due diligence report stated MKIBX does use derivatives.  Exhibit
46.  MKC never released Escue's 2007 due diligence report.

99.    The second profile, dated September 30, 2006, labeled MKIBX as "Enhanced
Low Correlation Fixed Income."  It contains the excerpt in paragraph 93 above.
Exhibit 80.

100.   The second profile inaccurately states that "The fund does not use derivatives or
leverage".

101.   All WMS profiles after September 30, 2006 for MKIBX fail to mention any
inferior tranches or the lack of demand and lack of liquidity.  MKC's failure to
include the language related to inferior tranches and lack of demand and lack of
liquidity in subsequent profiles it prepared demonstrates that MKC withheld
material information from its sales force and ultimately from investors.

102.   WMS's changing of the MKIBX profile label indicated either WMS's inability or
unwillingness to accurately categorize the Fund.  Within one (1) quarter, WMS
identified the MKIBX three (3) different ways:

> September 30, 2006 - Taxable Fixed Income
> September 30, 2006 - Enhanced Low Correlations Fixed Income
> December 31, 2006 - Intermediate Gov't/Corp Bond

103.   MKIBX profiles dated December 31, 2006 and thereafter labeled the Fund as
"Gov't/Corp Bond."  Exhibit 82.

104.   The "Gov't/Corp Bond" label was misleading because it implied that MKIBX
holdings were predominately government and corporate bonds carrying a certain
degree of safety.   The characterization was a failure of the due diligence duty of
MKC.

105.   In addition, all profiles for MKIBX from March 31, 2006 through June 30, 2007
state that Kelsoe is joined by Rip Mecherle ("Mecherle") as assistant portfolio
manager.  Exhibit 83.  Mecherle left MAM in 2004.  The failure to detect the
errors in promotional materials relating to management does not reflect "detailed,
thorough, and exhaustive due diligence."

106.   The profiles and glossies prepared by the different Regions Financial Corporation
subsidiaries and operating units contradicted each other.   Specifically, the
materials prepared by MKC's due diligence division, WMS, contradicted
materials prepared by MAM.

107.   WMS published profiles of the open-end funds each quarter. Those profiles
coincided with the publication of MAM's quarterly glossies.  Examination of the
two publications side-by-side revealed several repeated discrepancies between the
different publications.  As shown in the example below comparing the MAM

MKHIX "Glossy" (Exhibit 84) and the WMS MKHIX "Profile" (Exhibit 85) both dated June 30, 2007, the two publications contain conflicts regarding the credit ratings of the holdings within the Fund, discrepancies as to the Fund's performance, and fail to agree on the Fund's date of inception.

CREDIT QUALITY

| MAM Glossy | Credit Quality | WMS Profile |
|---|---|---|
| 4.61% | AAA | 7% |
| 0% | AA | 1% |
| 2.14% | A | 0% |
| 12.5% | BBB | 8% |
| 23.49% | BB | 24% |
| 15.67% | B | 31% |
| 41.58% | Below B | 29% |

PERFORMANCE

| MAM Glossy | A-Shares (Max load) | WMS Profile |
|---|---|---|
| 8.04% | 3 years | 7.13% |
| 10.15% | 5 years | 9.59% |

108.    Similar discrepancies are found comparing the MAM glossy for MKIBX on June 30, 2007, Exhibit 86, and the WMS profile for MKIBX on June 30, 2007, Exhibit 87.

**MKC's Due Diligence for the Funds Failed to Provide**

**Meaningful and Open Disclosures Relating to Certain Known**

**Material Deficiencies with the Funds**

109.    By failing to disclose material information and by making material misrepresentations, MKC contributed significantly to investor losses.  MKC, through WMS, made sporadic attempts to provide meaningful disclosures to the

sales force and the investor.  However, WMS' knowledge about the composition and risk of the Funds was closely held.

110.   WMS' treatment of the Funds was not consistent with its treatment of other funds, even other RMK proprietary funds.   For example, when WMS dropped coverage of other funds, it announced the drop in coverage, recommended their liquidation, and offered replacement fund suggestions.  Exhibit 88.   WMS made no similar announcement concerning the Funds at issue when they dropped coverage of all proprietary funds in July 2007.

111.   As demonstrated in its September 30, 2006 MKIBX profile, Exhibit 80, WMS knew the true composition of MKIBX was largely inferior tranches of structured debt instruments.  WMS chose not to continue to provide this critical information in subsequent profiles of either of the open-end funds.

112.   On January 19, 2007, WMS announced it was reclassifying MKIBX on the Select List from "Fixed Income" to "Non-Traditional Fixed Income." Exhibit 89. Meanwhile, WMS profiles for MKIBX continued to label it the "Intermediate Gov't/Corp Bond" implying an inaccurate level of investment safety.

113.   In the spring of 2007, a New York Times article about sub-prime debt was published.  Exhibit 90.  About that same time, the closed-end bond funds dropped abruptly.   These events and the general publicity about sub-prime generated increasing discussion within MKC about the Funds.   Exhibit 91, Exhibit 92, Exhibit 93, and Exhibit 94.

114.   Excerpts from an e-mail chain from Gary S. Stringer of WMS shows the dichotomy of WMS "public" versus "private" due diligence.  (Complete email attached as Exhibit 95).   In the email, Stringer enumerates the significant and

unique risks associated with the types of holdings within the portfolio of MKIBX;
the inappropriateness of MKIBX as a core fixed income holding in an investor's
portfolio; and, the general lack of knowledge of the sales force and investors as it
relates to risks associated with an investment in MKIBX.

> **From:** Stringer Gary [Gary.Stringer@morgankeegan.com]
> **Sent:** Tuesday, May 15, 2007 4:10 PM
> **To:** Hennek, Roderick
> **Subject:** Re: RMK Intermediate Bond Fund
>
> Rod,
>
> I did notice that you didn't cc anyone on your email, and I aperciate that.
> We've always had good, candid conversation.
>
> You have a good point in that we have some low correlation equity
> strategies on the Traditional side. What worries me about this bond fund
> is the tracking error and the potential risks associated with all that asset-
> backed exposure. **Mr & Mrs Jones don't expect that kind of risk from
> their bond funds. The bond exposure is not supposed to be where
> you take risks. I'd bet that most of the people who hold that fund
> have no idea what's it's actually invested in. I'm just as sure that
> most of our FAs have no idea what's in that fund either.** They think
> the return are great because the PM is so smart. He definately is smart,
> but it's the same as thinking your small cap manager is a hero because
> he beat the S&P for the last 5 years.
>
> **If people are using RMK as their core, or only bond fund, I think it's
> only a matter of time before we have some very unhappy investors.**

Exhibit 95 (emphasis added).

115.    Stringer's e-mails highlighted the core basis for this action.  Stringer conceded
that MKIBX was significantly different from a traditional bond fund and carried
far more risks.  Stringer stated that he believed neither the sales force nor the
investors were aware of the composition of MKIBX or the associated risks.
Meanwhile, WMS profiles for MKIBX continued to label it the "Intermediate
Gov't/Corp Bond."

116.    Despite Stringer's (and WMS') knowledge and position on MKIBX, WMS failed
to inform its sales force regarding the risks of MKIBX and its inappropriateness

as a core bond holding prior to the collapse of the fund.  This omission was apparent in the MKIBX due diligence reports and MKIBX profiles.

117.    On July 30, 2007, WMS dropped coverage of the Funds, which included MKIBX, which was the only one of the Funds WMS used within its "Preferred Funds" managed portfolios.  The drop in coverage meant WMS would no longer issue opinions about the Funds, nor would they field questions from the sales force about the Funds.  Exhibit 96.

118.    WMS did not notify the sales force of the decision to drop coverage.

119.    WMS dropped coverage of MKIBX while it currently held a five percent (5%) position of MKIBX in WMS managed accounts.   Stringer failed to explain to a WMS employee the decision to continue to hold the (5%) position of MKIBX from a due diligence perspective, despite WMS' decision to drop coverage of the Funds.  Exhibit 97.  Further, Stringer told the WMS employee that he's "making too much out of it", relating to WMS' duty to perform due diligence on all securities, in this case MKIBX, in which WMS held positions in the managed accounts.  Exhibit 98.

120.    Within one week after dropping coverage, WMS had made plans and was on the verge of liquidating the Intermediate Bond Fund from all of its managed portfolios by August 7, 2007.  Exhibit 99.  Stringer postponed the transactions until August 15th, 2007, at which time WMS liquidated 1,304,202 shares of the Intermediate Bond Fund from its managed accounts.  Exhibit 100.  The MKC sales force was not notified before or after these transactions.  Exhibit 101.

121.    WMS' failure to notify the MKC sales force relating to WMS' drop of coverage and subsequent liquidation of the Intermediate Bond Fund from WMS' managed

accounts created an unfair advantage for those clients in the WMS managed account programs.

122.   MKC showed preferential treatment of the WMS managed account investors by liquidating their holdings in the Intermediate Bond Fund and never notifying the rest of the retail sales force.  On August 16, 2007, Morgan Keegan Properties, LLC infused thirty million ($30,000,000.00) dollars into the Intermediate Bond Fund by purchasing approximately four (4) million shares of the Intermediate Bond Fund.  The effect of this "trading ahead" combined with the MKC infusion of cash from MK Properties, LLC's purchase of Intermediate Bond Fund shares, is that the investors in the WMS managed accounts potentially received higher proceeds from liquidations than the ordinary retail customers received in subsequent liquidations of their holdings in the Intermediate Bond Fund.

123.   Open-end mutual fund redemptions require the liquidation of actual holdings within the mutual fund itself to the extent that redemptions exceed cash assets.  It has already been shown that the Intermediate Bond Fund contained a large amount of structured debt instruments – holdings that had limited marketability. By liquidating the WMS managed accounts first, those account holders could potentially benefit from the sale of the more marketable fund holdings, while subsequent investor liquidations would be funded by the sale of the less marketable and potentially less valuable holdings.


**MAM**

124.   MAM's Fund Management fundamental and qualitative research was touted in marketing and research material.  Exhibit 102 and Exhibit 103.

125.   Prior to purchasing holdings for the Funds, MAM and Kelsoe did not properly
investigate and evaluate the holdings.  Al Landers was a MAM employee and a
portfolio analyst to Kelsoe regarding Fund management.  On numerous occasions,
Landers requested information about certain fund holdings from dealers from
whom MAM had purchased the holdings.  Many times, Landers was inquiring
long after MAM had purchased the holding.  Exhibits 104A, 104B, 104C, 104D,
104E, 104F, 104G, 104H, 104I, and 104J.   Excerpts from some of Landers'
emails are below.

Feb 23, 2007.  I think we bought NORMA 07-1A E from you
guys…can you tell me what kind of CDO it is (CLO, RMBS,
Trust, Pfd, CRE, etc)?  Also, if you have any docs and/or mktg
materials for it please pass those along.

Feb 23, 2007.  Can you tell me what kind of CDO Silver Elms is
(RMBS, CLO, Trust, Pfd, CRE, etc)?

Feb 26, 2007.  Is GSAM2 2A backed mostly by corp hy bonds?
It's not a CLO is it?  Also, what type of CDO is Ischus CDO III?

Apr 24, 2007.  …am I correct in thinking that Centurion VII is a
CLO?  If not, please let me know what it is.
REPLY: IT'S A HYBRID CLO/CDO.  MOSTLY USCREDITS,
SOME EURO.
Reply: When you say it's a hybrid, do you mean that it has
exposure to other assets besides corp credits?  If so, what other
kind of assets and how much is corp credits vs. other assets?  If
you have a mktg book for this I imagine that would cover those
questions…

May 1, 2007.  …do you have a marketing book or something
along those lines for the Squared CDO (SQRD) we bought
recently?  …I want it mainly to determine what type of CDO it
is…

May 29, 2007.  ..can you send along any deal docs and/or
marketing materials for MAC Capital, including something that
would tell me what kind of deal it is?

June 26, 2007.  It looks like we bought Broderick CDO from you guys back in March.  Do you have a mktg book for that and/or any of the offering docs.  I'm trying to get a handle on how much subprime exposure we have in our CDO's (we're getting asked a lot of questions by shareholders, as you can probably imagine), so I'm hoping those docs might clue me in to how much is in this deal.

July 2, 2007.  We bought Aladdin 2006-3A (cusip 45667JAA5) from you last July/August.  If you have any of the original deal docs on this such as Offering Circular/Memorandum, please send them along when you get a chance.

126.   From these e-mails and others, it is evident that MAM failed to perform due diligence as it pertained to researching prospective purchases for the Funds.  As a result, MAM did not know the type/category of some of the securities purchased, their ratings, or the subprime exposure associated with them until after their acquisition by the Funds.  Without this information, accurate portrayal of the Funds to investors was impossible.

127.   Michele F. Wood, an MKC employee who also served as Chief Compliance Officer for MAM during all times relevant to this order, failed in her oversight responsibilities.   As evidenced by her testimony in the arbitration filed by Kraemer L. Diehl against MKC (FINRA Case No. 08-0061), Wood performed only cursory reviews of marketing materials produced by MAM.  Exhibit 107. During the arbitration, Wood was asked about her role in the preparation of sales glossies:

Q.     Who writes them?

A.      Well, keep in mind, when I came on board in April of 2006, those materials had been used previously and had been, according to my predecessor, submitted to NASD, now FINRA, for approval.  So when you say write, it's not like they are rewritten every quarter.  The materials are the same from quarter to quarter with only the performance information and the, you know,

some of the other information like the pie charts and the credit distributions, that sort of thing changes, but the wording did not change from quarter to quarter.  …

Q.    Was there somebody - - and it may have been you; I'm not sure - - at Morgan Keegan who needed to review and approve these materials before they were given to either Morgan Keegan brokers or Morgan Keegan clients?

A.    Yes.

Q.    And who was that person?

A.    I reviewed them before the materials were printed.

Q.    And when you performed your review, what is it that you were looking for?

A.     I was looking for, as I mentioned before, that the substantive wording in the materials had not been changed.  I was looking generally to make sure that the numbers appeared to make sense.  And when I say that, I'm not saying that I sat there with a calculator and actually computed whether the numbers were correct, but just that from a general standpoint the things - - you know, percentages matched.  For instance, if there is a pie chart, that the numbers came to a hundred percent, things of that sort.

128.    Wood denied having knowledge of the source of the numbers used in the pie charts found in the glossies prepared by MAM for use by MKC's sales force. She further denied attempting to correlate the numbers on the pie charts or bar graphs with SEC filings.

129.    Wood did not use, nor was she aware of, other internally produced analyses of the Funds.   Specifically, Wood was unaware of the WMS quarterly fund profile analyses posted on "WealthWeb," MKC's internal website, until D'Shay Brown's e-mail to her of July 30, 2007.  Exhibit 108.

130.    Had Wood followed up and investigated the WMS profiles once she had been made aware of their existence, she would have detected some of the

misrepresentations.   At minimum, she would have seen that Rip Mecherle continued to be shown as portfolio manager and Assistant Portfolio Manager on the WMS MKIBX Fund Profiles for three years after he was no longer employed by MAM.

131.   WMS was charged with performance of annual on-site reviews of the Funds and Fund management (MAM and Kelsoe).   MAM and Kelsoe failed to cooperate with the 2007 on-site due diligence review conducted by MKC through WMS.   E-mails to Chet Pinkernell, Manager of the due diligence group of WMS, from Kim Escue, Vice-President with MKC and due diligence analyst, document MAM and Kelsoe's failure to fully cooperate in the facilitation of on-site review.

> **From:** Escue Kim [mailto:Kim.Escue@morgankeegan.com]
> **Sent:** Monday, July 23, 2007 12:04 PM
> **To:** Pinckernell, Chet
> **Subject:** Due Diligence
>
> Chet,
>
> I started my attempts to get a meeting with Jim Kelsoe.  I was told originally that he might be able to see me on 6/6/2007.  I wanted to do our annual onsite early this year due to all volatility surrounding the subprime fallout.  I had talked to Jim on the phone several times during the quarter and was given attribution and told that the funds had lowered exposure to subprime.  I also talked to Jim several times during the quarter about the defaults in the portfolio.  I was told that the Intermediate fund had experienced no defaults and the High Yield product had experienced no more defaults than what would be expected given its investment strategy and high yld style.  When conditions began to worsen, I called the office and talked to Jim on Monday 6/4/2007.  He told me that he could probably see me the afternoon of 6/6/2007.  I explained to him that I wanted to come sit with him while he worked to get a better idea of what he was doing.  He then said he would have to check on this and call me back.  **I did not hear anything back** so I sent Al Landers the email on 6/6/2007.  Al said he could only talk to me by phone on Thursday or give me an onsite the following week., I needed an onsite visit especially with all the turmoil surrounding the fund.    I requested an onsite by replying to Al by email on 6/6/2007.  **I never heard back**.  During the week of June 11, 2007 **I continued to call and request a meeting**.  Each time the someone would answer and supposedly leave a message for someone to call me back.  **No one would return my calls**.  The next week I called and got Jennifer Brown and asked her if she could let someone know that I needed my onsite meeting so that I could put out a research report and recommendation for the field especially in light of all the questions coming into their department and ours.  **I told her that if I could not get my onsite meeting that** I would need to go ahead and put out a report based on my conference calls over the past quarter with Jim **and would have to indicate that they would not see me.**  I did not want to do this , but the matter was urgent.  Jim called me back within an hour.  I told him that I was just trying to schedule the onsite we discussed the first week of June and that I was going to come out early this year because of the

issues.  I again told him that I would like to sit with him a while and watch his investment process while he was working and then meet with David Tanehill to go over how he had improved the corporate credit research process and get a feel for how he looks at corporates versus how rip looked at them.  Jim then told me that the only time they could see me was late afternoon on July 3, 2007.  While I knew that the bond market would be closing early that day and I would not get the opportunity to see them in action, I accepted the meeting because I was afraid that by declining I would be delayed even more.  That day on June 20th I sent Jennifer Brown a list of items that go into our new report template and our normal pre meeting questionnaire.  Courtney was out of the office getting married and I felt bad putting Jennifer so much to worry about why she was trying to cover.  I sent her this long list of stuff and then at the end attempted to make light of a stressful situation with a joke that was apparently taken the wrong way.  I immediately sent everyone ---including Jim an apology and explanation for my joke so they would understand I was just trying to be funny after being such a pest.  Courtney was out so I told her to please not worry about my stuff until she returned on July 2nd and that I would not start writing the report until after the meeting.  **I received the bios that I requested for some of the other team members but they were not updated as requested.**  Spencer Hope and I met with Jim and David on July 3rd.  For the first hour of our meeting we sat in Jim's office while he held a conference call with consulting services group.  A lot of the same information that we would cover was covered on the call so it was not a problem and they did give us our full 2 hours.  We talked to Jim about his process of looking at bonds and what set him apart.  We read to him the past description of his investment process to see if he could expand on anything or if it did not provide an accurate description of his research method.  He said it was fine and then we talked about why it was special and what he did different from other managers.  Then we discussed how they work together as a team and then talked to Tannehill about his corporate credit research process to see if there were changes. We went over a new team members role.  When we returned we sent Thank you emails to the team.  **We never received any of our information requests back outside of the old bios.  I then started my reports without them.  I tried to find information but it was outdated and the prospectus was not exactly clear on some items. I tried to call again about the information and left a message about the recommendation on the high income fund to give them a heads up.  They did not call back,** however, Casey King came to my desk and was apparently called to come ask me for my report and to let me know that they "the team" did not have time to help me write my report.  I told Casey that they do not help me write my report, but that we have information that is in our new report templates that are generally confirmed and verified by the manager.    I sent the reports to Jim, David, and Courtney.  I then talked to Courtney several times on the phone and was sent some cash flow information for the funds.  **She said that she had some items to go over regarding the reports, but then never called me back or sent our information spreadsheets back.**  I then adjusted the reports to reflect not available for any info that we did not seem to have for the current portfolio, or items where the prospectus was not clear.  I then emailed David Tannehill to ask about a pricing indicator he uses and to get some clarity.  He called me and went over this.  The reports were completed and ready for release to the field the following week as I got tired of waiting for the spreadsheets and being delayed further.  The items that I was unsure of were labled not available and I did the best I could with the info I had to do team turnover information and trends.


Kim Escue, CFA
Vice President
Morgan Keegan & Co.
50 North Front Street
Memphis, TN 38103
901-579-4907
kim.escue@morgankeegan.com


**Exhibit 109** (emphasis added).

132.   About a week later, Escue forwarded Pinkernell the following e-mail:

> **From:** Escue Kim [Kim.Escue@morgankeegan.com]
> **Sent:** Tuesday, July 31, 2007 5:11 AM
> **To:** Pinckernell, Chet
> **Subject:** FW: Intermediate Bond Report
>
> I assume they finally called me back because they know we have dropped coverage of proprietary products and that we will no longer need the info I have requested or comments from them. They have let me sit for nearly 3 weeks with no comments, feedback, or information that I have requested.
>
> I called her back and she said that she just heard right after she sent the email. They were in no way going to continue providing us with information or allow us to do our due diligence. This was their way of trying to look like they were after the fact. She would not even stay on the phone with me for more than about 3 seconds. I told her that I was going to be calling today to let them know about Wealth Management dropping coverage of all proprietary products and she immediately said "I know, I just heard after I sent the email", I started to talk and she just let me go immediately. I have been stalled and put off since the get go on this and it is definitely in our best interest to drop coverage if we cannot do our regular due diligence.
>
> Kim Escue, CFA
> Vice President
> Morgan Keegan & Co.
> 50 North Front Street
> Memphis, TN 38103
> 901-579-4907
> kim.escue@morgankeegan.com
>
> Exhibit 110.

133.   The interference by MAM with Escue's attempted due diligence exam resulted in critical information being withheld from the sales force, and ultimately the investors.  Exhibit 111 and Exhibit 112.

134.   As a consequence of MAM's refusal to cooperate with the WMS annual due diligence review, Kim Escue's 2007 due diligence report for the two open-end funds, Exhibit 113, could not be adequately completed, and there is no evidence that Escue's report was released to the MKC sales force.

F.    **RESPONDENTS RECOMMENDED THE PURCHASE, SALE, OR EXCHANGE OF SECURITIES WITHOUT REASONABLE GROUNDS TO BELIEVE THAT SUCH TRANSACTIONS OR RECOMMENDATIONS WERE SUITABLE FOR THE CUSTOMER BASED UPON REASONABLE INQUIRY CONCERNING THE CUSTOMER'S NEEDS, AND ANY OTHER RELEVANT INFORMATION KNOWN BY THE BROKER-DEALER.**

### MKC Failed to Obtain and Consider Adequate Suitability Information from Investors

135.    MKC and its sales force failed to obtain adequate suitability information, specifically, information regarding risk tolerance, from regular brokerage account customers necessary to determine suitability for using the Funds.  New account forms for regular brokerage accounts provided a menu of four investment objectives to choose from: Preservation of Capital, Growth, Income, and Tax-Advantaged; however, risk tolerance was not addressed by the form.  Exhibit 114 and Exhibit 115.

136.    Supervisory or compliance personnel had no way of distinguishing which customers might be high-risk junk bond investors versus conservative low-risk bond investors by reviewing the new account forms. In contrast, MKC required detailed risk tolerance information from those investors in WMS managed accounts.  Exhibit 116.

### MKC Used the Funds Without Regard for Concentration in Customer Accounts

137.    While the models for WMS managed accounts limited the use of the Intermediate Bond Fund to certain percentages, usually no more than fifteen percent (15%) of

any client's portfolio, Exhibit 117, many of the MKC sales force did not. In fact, customer accounts frequently contained in excess of twenty percent (20%) concentration of the Intermediate Bond Fund.[2] Exhibit 118.

138.     Concentrations above twenty percent (20%) indicate the use of the Intermediate Bond Fund as more of a "core fixed income holding" in the portfolios than a "supplemental alternative fixed income holding". WMS, the due diligence arm of MKC, advised that MKIBX was not recommended as a core bond fund holding in January 2007, six months before the collapse of the fund. Exhibit 119.

139.     Loss-calculation data provided by MKC, Exhibit 118, show that older customers were more likely to have concentrations greater than twenty percent (20%) of the Intermediate Bond Fund. This indicates that the Intermediate Bond Fund was used as a traditional bond fund for older, generally more conservative investors.

## MKC Created Over-Concentration by Using Multiple Bond Funds

140.     Notwithstanding inappropriate concentrations of MKIBX, many customers were sold combinations of MKHIX and/or the closed-end Funds in addition to MKIBX.

141.     Because of the similarity of holdings and correlation between all the Funds as shown in paragraphs 16(c) and (e), investing in multiple funds magnified the customer's exposure to the risks of structured debt instruments.

142.     In the letter below from an MKC agent to a prospective client's granddaughter, the agent recommends splitting her investment between MKIBX and MKHIX. The letter was approved by a supervisor as demonstrated by the initials in the upper right-hand corner. Exhibit 121.

---

[2] Concentration figures provided by Morgan Keegan and Company, Inc. include margin balances.

143.    MKC brokers and branch managers interviewed during the investigation stated that they received no guidance as to appropriate concentrations of the Funds to use within customers' regular brokerage accounts.  In the thousands of MKC e-mails reviewed, no guidance was found regarding concentration of the Funds in customer accounts.  Contrast this lack of guidance to the WMS announcement below on August 24, 2007, about the Osterweis Fund, which was the replacement for the quietly liquidated MKIBX.  Clearly, WMS stressed using no more than a 5% initial concentration as highlighted in **bold** by WMS in the excerpt below**.**

> Osterweis Strategic Income (OSTIX)
>
> The TIG is recommending the fund be added to the Non-Traditional fixed income list **and be used in no more than a 5% allocation initially.**
> Exhibit 122.

**MKC Targeted Regions Bank Depository Customers with**
**Maturing Certificates of Deposits or other Depository Assets**

144.    RFC purchased MKC with the intent of converting Regions Bank customers to MKC customers.  RFC sought to increase fee-based profits by cross-selling MKC fee-based products to bank customers.  More money could be made on broker-dealer fees than on the interest spread on interest-bearing deposits.  Exhibit 123.

145.    It is also clear, from several interviews with MKC's agents, that agents were assigned to bank branches, and that those agents actively marketed MKC products to bank customers in those branches.  Exhibit 124.  These interviews also reveal a planned referral program designed to funnel bank customers to MKC agents.

146.    As noted in the interviews, bank customers that were referred to MKC agents were often referred for the purpose of obtaining better interest or income than could be obtained from CDs or other bank products.  These bank customers were

generally offered MKIBX as an alternative to CDs because MKIBX provided a higher yield with perceived principal stability.   However, because the Funds, including MKIBX, were largely comprised of lower subordinated tranches of structured debt instruments, they presented an enormous risk relative to traditional bank products.  Respondents had a duty to explain the risks of the Funds to their customers.   Respondents also had the duty to use the Funds in portions or allocations consistent with those risks.

147.    Attached as Exhibit 125 is a letter from an agent of MKC to a prospective customer who had a Seventy Thousand Dollar ($70,000) maturing CD.  The letter was approved by a supervisor.  In the letter, the agent recommends placing the entire Seventy Thousand Dollars ($70,000) into the Intermediate Bond Fund.  At the same time, the agent failed to sufficiently and accurately describe the holdings of the fund, minimized the risk, and attempted to compare the performance of the fund to a CD without also disclosing the additional risk factors.

148.    Another agent of MKC provided a customer with a self-made chart assuming the hypothetical growth of One Hundred Thousand Dollars ($100,000) over five (5) years, and comparing the rate of return on CDs to the return on the Intermediate Bond Fund.  Exhibit 126 and Exhibit 127.   The chart (shown below) failed to address any risks of investing in the fund, save the caption "Not FDIC Insured."



## G.   RESPONDENTS ENGAGED IN UNETHICAL SALES PRACTICES

149.   The MKC agent referred to in the preceding paragraph created a sales illustration in which he compared MKIBX to traditional bank CDs.  The agent used the illustration in order to market MKIBX to bank customers.  The agent stated that he created the illustration and that the illustration was not reviewed or approved by appropriate supervisory personnel of MKC.  Exhibit 126 and Exhibit 127.  The chart (shown above) fails to address any risks of investing in MKIBX, save the caption "Not FDIC Insured".

150.   MAM encouraged the use of the Intermediate Bond Fund by including the fund in many of the Trust Mutual Fund Portfolio Models, Exhibit 128 (slide 9) and conducted a sales contest whereby the top producers were eligible for a trip to St. Thomas.  Exhibit 129.

## H.   RESPONDENTS FAILED TO ESTABLISH AND IMPLEMENT SUPERVISORY/COMPLIANCE PROCEDURES NECESSARY TO PREVENT AND DETECT VIOLATIONS OF THE STATES' SECURITIES ACTS.

**Respondents Failed to Adequately Review E-Mail and**

**Correspondence**

151. An adequate review of Landers' e-mails by MAM would have revealed a critical lack of documentation relating to the underlying assets of the Funds.  It would have raised concerns relating to fund management's understanding of the details of the holdings, as well as concerns relating to the performance of fund management's due diligence responsibilities.

152. An adequate review of correspondence by MKC, would have detected misleading comparisons of the Funds to CDs and potentially unsuitable recommendations to clients. Exhibit 121 and Exhibit 125.

**Respondents Failed to Adequately Review Marketing Material**

153. As noted in Michele Wood's testimony previously provided, the review of marketing material was cursory.  As evidenced in an e-mail between Michele Wood and D'Shay Brown, Wood, as Chief Compliance Officer for MAM, was not aware of the WMS quarterly profiles published on WealthWeb.  MAM, WMS, and MKC failed to adequately review sales materials.  The discrepancies between MAM's quarterly glossies and WMS' quarterly profiles were not reconciled, and Rip Mecherle was listed in marketing materials as an assistant fund manager for several years after his departure from MAM.

154. Proper compliance review of the holdings within the Fund portfolios would have detected millions of dollars of holdings that had been misclassified.  The misclassification caused the creation of incorrect prospectuses, inaccurate SEC filings, and misleading marketing material.

**MKC Failed to Address Over-Concentration in Customer Accounts**

155.    As demonstrated in paragraphs 137-141, many customer accounts contained an over-concentration of the Funds.  Many customers also owned more than one of the Funds which did not create diversification but instead, because of the similarity of holdings and correlation between the Funds, magnified their exposure to the risks of structured debt instruments.

156.    At no time did Respondents issue any compliance notice to the field regarding concentrations of the Funds in customer accounts.  This is consistent with broker and branch manager interviews conducted during the investigation.

**MAM failed to Adequately Supervise Jim Kelsoe by Allowing Him to Operate Outside the Organizational Chart**

157.    Carter Anthony, President of MAM from 2001 until the end of 2006, was explicitly instructed by MKC President Doug Edwards and former MKC President Allen Morgan that Kelsoe, a person clearly subject to Anthony's supervisory responsibility under MAM's organizational structure, was "to be left alone," effectively exempting Kelsoe from Anthony's supervision or the supervisory authority of anyone else within MAM's organizational structure. Exhibit 130 (page 17).

158.    Anthony normally conducted performance reviews of all MAM mutual fund managers which included reviews of their portfolios and trading.  However, he was prohibited from providing the same supervisory review and oversight to Kelsoe and the Funds.

159.    Because of the removal of Kelsoe and the Funds from Anthony's oversight, Anthony tried to discourage use of the Funds by MAM personnel and trust

accounts managed by persons under Anthony's direct supervision.  Anthony was discreet in his discouragement of the use of the Funds for fear of reprisals.

160.   Kelsoe signed a new account form as branch manager, when he, in fact, was never a branch manager nor held any supervisory/compliance licenses.  Exhibit 131. Proper supervision of Kelsoe's activities would have detected such unauthorized actions on his part.

### MKC Failed to Adequately Train the Sales Force and Supervisory Personnel Regarding the Funds

161.   Brokers and managers interviewed during the investigation stated that MKC failed to provide adequate training regarding the risk and appropriate use of the Funds. Exhibit 132.  Following the collapse of the Funds, MKC failed to provide adequate training and support to agents and managers on how to handle issues involving the failure of the Funds.

162.   Almost every MKC agent interviewed stated they: 1) relied on the Funds' past track record; 2) relied on the Morningstar "Star" ratings; and 3) relied on Kelsoe, the Funds' manager.

163.   No agent or manager interviewed described any holdings within any of the Funds as lower tranches of structured debt instruments or structured asset-backed securities.

### Respondents Knew, or With the Exercise of Reasonable Care, Should Have Known, of the Wrongful Conduct, and Participated, Directly or Indirectly, in the Wrongful Conduct.

164.   Jim Kelsoe knew or should have known what types of securities he was purchasing for the Funds and the amounts of those securities within the Funds.

165.   MKC through WMS knew or should have known the types of securities the Funds contained and the risks to which those securities subjected investors.

166.   Respondents should have monitored concentration of the Funds in customer accounts and failed to do so.

167.   Respondents should have reviewed marketing materials and SEC filings for inconsistencies and misrepresentations concerning the Funds and failed to do so.

168.   Respondents were given notice as to their sales practice obligations in connection with bonds and bond funds in the NASD (now FINRA) April 2004 Notice to Members 04-30. Exhibit 133. A portion of the Notice is quoted below:

> The purpose of this Notice, therefore, is to remind firms of their sales practice obligations in connection with bonds and bond funds.  The obligations include:
>
> ► Understanding the terms, conditions, risks, and rewards of bonds and bond funds they sell (performing a reasonable-basis suitability analysis);
>
> ► Making certain that a particular bond or bond fund is appropriate for a particular customer before recommending it to that customer (performing a customer-specific suitability analysis);
>
> ► Providing a balanced disclosure of the risks, costs, and rewards associated with a particular bond or bond fund, especially when selling to retail investors;
>
> ► Adequately training and supervising employees who sell bonds and bond funds; and
>
> ► Implementing adequate supervisory controls to reasonably ensure compliance with NASD and SEC sales practice rules in connection with bonds and bond funds.

169.   Despite having clear notice of their sales practice obligations in connection with the Funds, Respondents failed to fulfill these obligations.

## III. CONCLUSIONS OF LAW

A.    **VIOLATIONS BY MORGAN KEEGAN AND COMPANY, INC.**

1.    The Alabama Securities Commission**,** Kentucky Department of Financial Institutions, Mississippi Secretary of State's Office, and the South Carolina Office of the Attorney General find that Respondent Morgan Keegan and Company, Inc. engaged in fraudulent, dishonest, or unethical business practices in the securities business under <u>Code of Alabama 1975</u>, § 8-6-17, KRS 292.320, Mississippi Securities Act §75-71-501,  and S.C. Code Ann. §35-1-501 and that the conduct constitutes grounds to revoke their registration under <u>Code of Alabama 1975</u>, § 8-6-3(j)(7), KRS 292.330(13)(a), Mississippi Securities Act §75-71-321,  and S.C. Code Ann. §35-1-412(d)(13).  Such conduct is evidenced by:

a.    Making material omissions and misrepresentations in marketing materials;

b.    Withholding information from and misrepresenting information concerning the funds to the MKC sales force;

c.    Providing preferential treatment to certain customers;

d.    Making misleading comparisons between the Funds and Certificates of Deposit;

e.    Failing to obtain adequate suitability information from customers; and

f.    Failing to make suitable recommendations concerning purchase and concentration of the funds in customer accounts;

2.    The Alabama Securities Commission**,** Kentucky Department of Financial Institutions, Mississippi Secretary of State's Office, and the South Carolina Office of the Attorney General find that Respondent Morgan Keegan and Company, Inc. failed to establish and implement supervisory/compliance procedures necessary to prevent and detect violations of the states' securities acts, and that the conduct constitutes grounds to revoke their registration under <u>Code of Alabama 1975</u>, § 8-

6-3(j)(10), KRS 292.330(13)(a), Mississippi Securities Act §75-71-321, and S.C.

Code Ann. §35-1-412(d)(9).  Such conduct is evidenced by:

a.        Failing to adequately review correspondence;

b.        Failing to adequately review marketing materials;

c.        Failing to adequately review and/or address overconcentration;

d.        Failing to adequately train the MKC sales force;

e.        Failing to supervise Kelsoe; and

f.        Failing to perform adequate due diligence on the Funds.

3.        The Alabama Securities Commission, Kentucky Department of Financial

Institutions, Mississippi Secretary of State's Office, and the South Carolina Office

of the Attorney General find that the actions and conduct of Respondent Morgan

Keegan and Company, Inc. named in this action constituted a practice or course

of business which operated as a fraud or deceit upon investors in violation of

Code of Alabama 1975, § 8-6-17, KRS 292.320(1), Mississippi Securities Act

§75-71-501,  and S.C. Code Ann. §35-1-501.

B.        **VIOLATIONS BY MORGAN ASSET MANAGEMENT**

1.        The Alabama Securities Commission, Kentucky Department of Financial

Institutions, Mississippi Secretary of State's Office, and the South Carolina Office

of the Attorney General find that Respondent Morgan Asset Management, Inc.

engaged in fraudulent, dishonest, or unethical business practices in the securities

business under Code of Alabama 1975, § 8-6-17, KRS 292.320, Mississippi

Securities Act §75-71-501,  and S.C. Code Ann. §35-1-501, and that the conduct

constitutes grounds to revoke the their registration under Code of Alabama 1975,

§ 8-6-3(j)(7), KRS 292.330(13)(a), Mississippi Securities Act §75-71-321, and S.C. Code Ann. §35-1-412(d)(13).  Such conduct is evidenced by:

a.    Making material omissions and misrepresentations in regulatory filings;

b.    Making material omissions and misrepresentations in marketing materials;

c.    Withholding information from and misrepresenting information concerning the Funds to the MKC sales force; and

d.    Obstructing the due diligence process.

2.    The Alabama Securities Commission, Kentucky Department of Financial Institutions, Mississippi Secretary of State's Office, and the South Carolina Office of the Attorney General find that Respondent Morgan Asset Management, Inc. failed to establish and implement supervisory/compliance procedures necessary to prevent and detect violations of the states' securities acts, and that the conduct constitutes grounds to revoke the their registration under Code of Alabama 1975, § 8-6-3(j)(10), KRS 292.330(13)(a), Mississippi Securities Act §75-71-321, and S.C. Code Ann. §35-1-412(d)(9).  Such conduct is evidenced by:

a.    Abdicating supervisory responsibility of Kelsoe;

b.    Failing to adequately review correspondence;

c.    Failing to adequately review marketing materials; and

d.    Failing to perform adequate due diligence.

3.    The Alabama Securities Commission, Kentucky Department of Financial Institutions, Mississippi Secretary of State's Office, and the South Carolina Office of the Attorney General find that the actions and conduct of Respondent Morgan Asset Management, Inc. named in this action constituted a practice or course of business which operated as a fraud or deceit upon investors in violation of Code

_of Alabama 1975_, § 8-6-17, KRS 292.320(1), Mississippi Securities Act §75-71-501,  and S.C. Code Ann. §35-1-501.

C.   **VIOLATIONS BY INDIVIDUAL PERSONS**

1.   The Alabama Securities Commission**,** Kentucky Department of Financial Institutions, and the South Carolina Office of the Attorney General further find that Respondents Kelsoe, Wood and Stringer engaged in fraudulent, dishonest, or unethical business practices in the securities business under Code of Alabama 1975, § 8-6-17, KRS 292.320, and S.C. Code Ann. §35-1-501 and that the conduct constitutes grounds to bar said individuals from the securities industry in the states of Alabama, Kentucky, and South Carolina under Code of Alabama 1975, § 8-6-3(j)(7), KRS 292.330(13)(a), and S.C. Code Ann. §35-1-412(d)(13).

   a.   James C. Kelsoe, Jr.

      (1).   Made or caused to be made material omissions and misrepresentations in regulatory filings and marketing materials;

      (2).   Made or caused to be made misrepresentations regarding the condition of the Funds during their collapse; and

      (3).   Obstructed the due diligence process.

   b.   Michelle F. Wood

      (1).   Failed to adequately perform her supervisory responsibilities;

      (2).   Made or caused to be made material omissions and misrepresentations in marketing materials.

   c.   Brian Sullivan

      (1).   Failed to adequately perform his supervisory responsibilities as President of MAM.

   d.   Gary S. Stringer

      (1).   Made or caused to be made material omissions and misrepresentations in marketing materials;

      (2).    Withheld information from and misrepresented information concerning the funds to the MKC sales force; and

      (3).    Provided, or caused to be provided, preferential treatment to certain customers.

2.    The Alabama Securities Commission**,** Kentucky Department of Financial Institutions, and the South Carolina Office of the Attorney General find that the actions and conduct of the individuals named in this action, along with the conduct of other Respondents, together constituted a practice or course of business which operated as a fraud or deceit upon investors in violation of <u>Code of Alabama 1975</u>, § 8-6-17, KRS 292.320(1), and S.C. Code Ann. §35-1-501.

### V. NOTICE OF INTENDED ACTION

Respondents are ordered to show cause why their registrations should not be revoked in the states of Alabama, Kentucky, Mississippi, and South Carolina.  Respondents are further ordered to show cause why they should not be barred from further participation in the securities industry in the states of Alabama, Kentucky and South Carolina.

The imposition of administrative action shall become effective thirty (30) days after receipt of this Notice unless a written request for an administrative hearing is provided as set out in VII below before the expiration of said thirty (30) days.

It is the intention of the Agencies to seek restitution of investor losses, imposition of administrative penalties, reimbursement of investigative costs, and revocation of registration.

## VI. PUBLIC INTEREST

This Notice of Intent to Revoke Registration and to Impose Administrative Penalty is issued in the public interest and for the protection of investors consistent with the purpose of each Agencies' authority.

## VII. RIGHT TO AN ADMINISTRATIVE HEARING

An administrative hearing may be requested in this matter.  Any such request must be made in writing within thirty (30) days from the date of receipt of this Notice.

Each respondent requesting a hearing must file a written request for an administrative hearing.

The written request for an administrative hearing may be served on all Agencies by service on Joseph P. Borg, Director, Alabama Securities Commission at 401 Adams Avenue, Suite 280, Montgomery, Alabama  36104.

If an administrative hearing is requested, written notice of the date, time, and place will be given to all parties by certified mail, return receipt requested.  Said notice will also designate a Hearing Officer.

In the event such a hearing is requested, the Respondents may appear, with or without the assistance of an attorney, at the date, time and place specified and cross-examine witnesses, present testimony, evidence and argument relating to the matters contained herein. Upon request, subpoenas may be issued for the attendance of witnesses and for the production of books and papers on the Respondents' behalf at the hearing relating to the matters contained herein.  In the event such written notices are not received within said thirty (30) day period of time, a FINAL ORDER REVOKING REGISTRATION AND ORDER IMPOSING ADMINISTRATIVE PENALTY may be entered in this proceeding with no further notice.

## VIII. AMENDMENTS

The Agencies hereby reserve the right to amend this Notice of Intent to Revoke

Registration and Impose Administrative Penalty to allege additional violations.

**JOINTLY ISSUED**, this, the _____day of _____, 2010.


BY ORDER OF JOSEPH P. BORG
Director, Alabama Securities Commission


_____

**JOINTLY ISSUED**, this, the _____day of _____, 2010.

                                   BY ORDER OF CHARLES A. VICE
                                   Commissioner, Kentucky Department of Financial Institutions


                                   _____

**JOINTLY ISSUED**, this, the _____day of _____, 2010.

BY: _____

        TANYA G. WEBBER
        Assistant Secretary of State
        Securities and Charities Division
        Mississippi Secretary of State's Office

**JOINTLY ISSUED**, this, the _____day of _____, 2010.

_____

Tracy A. Meyers
Assistant Attorney General
Securities Division
Office of the Attorney General
Rembert C. Dennis Building
1000 Assembly Street
Columbia, S. C. 29201
(803) 734-4731