# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

In RE REGIONS MORGAN KEEGAN
SECURITIES, DERIVATIVE & ERISA
LITIGATION

**This Document Relates to:**

**In re Regions Morgan Keegan Closed-End
Fund Litigation,**

**No. 07-cv-02830-SHM-dkv**

No. 09-md-02009-SHM

---

## OBJECTION TO FINAL APPROVAL
## OF SETTLEMENT, OBJECTION TO SETTLEMENT CLASS CERTIFICATION AND
## NOTICE OF INTENT TO APPEAR AT SETTLEMENT HEARING
## BY JEROME M. CHRISTENSON, GLORIA T. CHRISTENSON and JEROME
## CHRISTENSON as IRA BENEFICIARY

---

Howard B. Prossnitz, Esq.
LAW OFFICES OF HOWARD PROSSNITZ
218 North Jefferson, Suite 300
Chicago, IL 60661
Tel. 312 382-8201
Fax 312 382-8203
howard@prossnitzlaw.com

March 21, 2013

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF CASES .......... ................................................................................................ ii

INTRODUCTION ..................................................................................................... 1

I. The Proposed Settlement Falls Outside the Range of Reasonableness ........................................5

    A. The Settlement Nets Only Two to Four Cents on the Dollar .......................................5

    B. The Value of the Claims is 35.35 Cents on the Dollar Based on a Five History of Litigation Against Morgan Keegan in FINRA Involving 1,000 Case Filings.................... 6

    C. The FINRA Arbitration Process Determined A Real World Value for the Claims Being Released as Ten Times More Than The Proposed Settlement ................................ 8

    D. The Economic Justification Offered for the Settlement is Singularly Weak ............. 9

    E. A Simple Compelling Jury Case Is Being Under Valued ..........................................10

II. The Settlement Ignores Sub Classes Whose Claims Have Very Different Values............... 14

    A. The Settlement Fails to Recognize That Shares Purchased Through a Morgan Keegan Account Have a Higher Claim Value............................................................ 14

    B. The Settlement Fails to Recognize that Shares Bought at the IPOs Have a a Higher Claim Value Than Shares Bought When The Share Price Had Fallen Nearly 50% ....................................................................................................... 15

III. The Settlement Fails to Meet Legal Standard for Approval............................................ 16

    A. The Settlement Fails to Meet the Law Requiring that Sub Classes With Markedly Different Interests Be Treated Differently .................................................. 16

    B. The Settlement Fails to Meet the Requirement of Being Fair, Reasonable and Adequate ................................................................................................................ 17

IV. CONCLUSION ............................................................................................... 18

# TABLE OF CASES

*Amchem Products, Inc. v. Windsor,*
521, 591 (1997) ................................................................................................ 16

*Diana Landau vs. Morgan Keegan & Company, Inc.,* (FINRA Case 08-01276)
(attached) .......................................................................................................... 9

*Grant v. Bethlehem Steel Corp.,* 823 F. 2d 20, 23 (2d Cir. 1987) ................ 17

*In re Baby Products Antitrust Litigation,* 2013 U.S. App. LEXIS 3379
(3rd Cir. Feb. 19, 2013) ................................................................................. 17

*In re General Motors Corp. Engine Interchange Litigation,* 594 F. 2d 1106, 1137
(7th Cir. 1979) ............................................................................................... 18

*In re GMC Pick-Up Litig.,* (3rd Cir. 1995)(citing *In re Corrugated Container
Antitrust Litig.,* 643 F. 2d 195, 217-18 (5th Cir. 1981) ............................... 18

*In Re: Literary Works in Electronic Databases Copyright Litigation,* 654 F. 3d 242
(2nd Cir. 2011) .............................................................................................. 16

*In Re: Southeastern Milk Antitrust Litigation,* 2012 U.S. Dist. LEXIS 76817
E.D. Tenn. June 1, 2012) ............................................................................... 17

*Kizer v. Shelby County Government,* 2009 U.S. Dist. LEXIS 123711
(W.D. Tenn. August 24, 2009) ...................................................................... 17

*Mirfasihi v. Fleet Mortgage Corp.,* 356 F. 3d 781, 785 (7th Cir. 2004)....... 17

*Murray v. GMAC Mortgage Corp.,* 434 F. 3d 948, 952 (7th Cir. 2006) ....... 5

*Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999)............................................ 16

*UAW v. Gen. Motors Corp.,* 497 F. 3d 615, 631 (6th Cir. 2007) ..............1, 18

*Vassalle v. Midland Funding LLC,* 2013 U.S. App. LEXIS 3914
(6th Cir. Feb. 26, 2013) ..............................................................................1, 18

Objectors Jerome M. Christenson, Gloria T. Christenson, and Jerome M. Christenson as IRA beneficiary, submit this Objection to Final Approval of the Settlement. Objectors request the Court's permission to have their counsel speak at the Hearing. Objectors sustained losses of close to $100,000 in the RMK Multi-Sector High Income (RHY).[1]

### Introduction

This settlement fails the well known approval test for class action settlements recently reiterated by the Sixth Circuit in *Vassalle v. Midland Funding LLC*, 2013 U.S. App. LEXIS 3914 (6th Cir. Feb. 26, 2013). The Sixth Circuit reversed a district court's approval of a class settlement. The court wrote, "(b)efore a district court approves a settlement, the court must find that the settlement is 'fair, reasonable, and adequate.'" citing *UAW v. Gen. Motors Corp.*, 497 F. 3d 615, 631 (6th Cir. 2007). This settlement is neither fair, reasonable nor adequate.

Unlike most class settlements, the actual value of the claims being released here has been established through five years of Financial Industry Regulatory Authority (FINRA) arbitration. The claims being released have been litigated and valued in the FINRA forum.[2] Hundred of cases were filed with FINRA over the Morgan Keegan closed end funds. The Morgan Keegan cases typically involved claims of omission and misrepresentation, breach of fiduciary duty, fraud, negligence, state security claims, violation of FINRA and NASD rules. These claims are being released under the

---

[1] See Exhibit A listing dates and number of shares for their purchases. Objectors' counsel is filing *pro hac vice* Motion, and Motion for Leave for Objectors to Intervene. Objectors' counsel requests leave to speak at hearing and to cross-examine any witnesses called by settlement proponents.

[2] According to the Settlement Notice, the only types of claims not released are claims to enforce the settlement, claims to victim compensation funds set up by the SEC and States, and derivative action claims.

proposed class settlement for a pittance of their established real value. The five year history of FINRA cases shows that the claims in this class action should be settled for more money or tried.

An estimated 1,000 or more cases were filed with FINRA involving the Morgan Keegan funds.[3] Most of the cases settled. At least 203 of them, however, went to a final evidentiary hearing – the functional equivalent of a trial. A table of the 203 results is attached hereto as Exhibit B. So we do not have to speculate about how much the claims against Morgan Keegan are worth. We have a statistically significant sample of cases that have actually gone to "trial". The amount recovered is on average ten times what this settlement offers. It is very rare to have this amount of data available when a class action settlement comes up for approval.

Here is the proposed class settlement by the numbers:

| Decline in the net asset value of the four closed end Morgan Keegan Funds between March 31, 2007 and March 31, 2009 | $1.4 billion |
|---|---|
| Net settlement after legal fees and costs | $42.85 million |
| Settlement Notice's Estimate of Average Recovery Per Damaged Share | 62 cents - RMH<br>58 cents - RSF<br>63 cents - RMA<br>86 cents - RHY<br><br>Average of 67 cents per closed end fund |
| Estimated attorney fees and costs per share | 22 cents |
| Estimated net average recovery per share | 45 cents (67 cents minus 22 cents) |
| Cents on the dollar as applied to overall loss | 3 cents   ($42.85 million/$1.4 billion) |

---

[3]See "SEC charges Morgan Keegan founder over asset pricing", www.reuters.com, December 10, 2012, "Morgan Keegan has faced more than 1,000 arbitration cases over the bond funds, which invested in risky mortgage-backed securities while being marketed as safe."

| | |
|---|---|
| Net cents on the dollar for investor who bought closed end funds at $15 per share after fees and costs | 3 cents ($.45/ $15.00) <br><br> or 3% recovery |
| Estimated number of FINRA arbitration cases filed against Morgan Keegan relating to its failed bond funds | 1,000 or more |
| Number of Morgan Keegan arbitration cases that went to final hearing or "trial" | 203 |
| Amount recovered in 203 arbitrations | $37 million |
| Effective cents on dollar recovery for Morgan Keegan cases actually litigated to final disposition through FINRA arbitration hearing | 35.35 cents |
| Difference between effective average recovery in FINRA arbitration and proposed settlement | 1,178% |
| Number of depositions taken in class case (referenced in Motion for Preliminary Approval) | 0 |
| Number of interrogatories and requests to admit propounded in class case (referenced in Motion for Preliminary Approval) | 0 |
| Proposed attorneys' fees and costs | $19.15 million |
| What settlement should be based on five year history of FINRA arbitration setting value of claims at 35.35 cents on the dollar | $495 million instead of $62 million |

Thus, the proposed settlement is demonstrably inadequate in light of the results obtained in five years of FINRA arbitration. An estimated 1,000 cases were filed with FINRA against Morgan Keegan – one of the largest, if not the largest, number of case filings in FINRA's history. 203 of these cases went all the way to "trial", ie. a final disposition by the arbitrators. Over 140 cases went

to full evidentiary hearing before three person panels.[4] This is tantamount to having 140 bellwether cases go to trial. The litigated results establish that the claims are worth ten times as much as the proposed settlement here. They are worth 35.35 cents on the dollar, not two to four cents. It is not fair to class members to surrender their claims for two to four cents on the dollar when the litigated cases have yielded ten times better results. The settlement is plainly inadequate.

Further, the settlement does not take into account serious conflicts of interest between subclasses. Claims arising from transactions recommended by Morgan Keegan financial advisors have gotten higher awards in the FINRA arbitrations than claims for purchases made through self-directed accounts.[5]

The settlement also ignores the difference between people who purchased RHY at the IPO price of $15 a share and people who purchased RHY at lower prices later – like $8.43 on August 12, 2007. The person who bought at $8.43 a share instead of $15.00 would have more reason to suspect that RHY was not the stable bond fund which had been promised. By August 12, 2007, RHY had significantly underperformed the benchmark index. The same issue exists for the three other closed end funds.

---

[4] The remaining 60 of the 203 cases were simplified cases which get decided on the pleadings by one arbitrator.

[5] If a customer had both types of purchases of the closed end bond funds - some placed through Morgan Keegan accounts with involvement of a Morgan Keegan advisor and some through third parties, the claims should be valued differently.

## I. The Proposed Settlement Falls Outside the Range of Reasonableness

### A. The Settlement Nets Only Two to Four Cents on the Dollar

The Class Notice estimates a gross recovery per share of 62 cents for RMH, 58 cents for

RSF, and 63 cents for RMA – an average of 61 cents for these three funds.[6] Attorney fees and

expenses are 22 cents per share according to the Notice. The net recovery rate for these three funds

is 39 cents per share. Before the funds imploded in the middle of 2007, they were trading at $15 per

share or higher. Someone who bought at $15 a share in 2007 is getting a recovery of 3 cents on the

dollar. An investor who bought at $16 a share in 2006 is getting 2 cents on the dollar. Judge

Easterbrook pointed out in *Murray v. GMAC Mortgage Corp.*, 434 F. 3d 948, 952 (7th Cir. 2006)

that when a class case settles for one cent on the dollar, it is either frivolous or class counsel have

settled too cheaply. The same conclusion applies to a 3 cents on the dollar settlement. This case was

not frivolous. It was settled too cheaply.

Another way to get to the same conclusion is to consider the total damages here which are

$1.4 billion. The four end closed end funds had a combined net asset value of $1.548 billion as of

March 31, 2007.[7] This number went down to $134 million by March 31, 2009[8], a loss in value of

$1.4 billion. The proposed settlement is $43 million after $19.15 million in legal fees and costs.

---

[6]The estimate for RHY is higher at 86 cents but this was the smallest of the funds with net assets of $115 million at the end of 2007 as compared to an average of $152 million for the other three closed end funds. The class period for RHY is the shortest since its inception date was January 19, 2006. The combination of the shorter class period and the fact that it was the smallest fund explains the 86 cent payout instead of the 61 cent average for the other three funds. Someone who bought RHY at $15.71, the share price on March 31, 2007, would get a net recovery of 4 cents on the dollar ($.64/$15.71).

[7] Annual Report for Closed End Funds dated March 31, 2007.

[8]Helios Annual Report for Closed End Funds dated March 31, 2009.

Thus, the settlement is 3 cents on the dollar. This suggests that Morgan Keegan has a 97% chance of winning which is incorrect.

If we apply the 35.35 cent number from the FINRA cases actually tried to potential damages of $1.4 billion, the settlement should be $495 million not $62 million.

## B. The Value of the Claims is 35.35 Cents on the Dollar Based on a Five History of Litigation Against Morgan Keegan in FINRA Involving 1,000 Case Filings

The table attached as Exhibit B shows that Morgan Keegan Claimants recovered money 55% of the time in FINRA arbitrations over the last five years.[9] In other words, 55% of the time, Claimants against Morgan Keegan were successful in getting an award of more than zero. When they did recover money, they recovered on average 64.27% of the amount sought. Thus, the average successful recovery on a $100,000 claim was $64,270, not $2,000 to $3,000. This recovery rate in Morgan Keegan cases is almost twice as high as the average FINRA recovery rate for all types of cases which underscores the strength of the claims against Morgan Keegan.[10]

If we take into account the chances of getting any money at all in a Morgan Keegan arbitration and the amount recovered if a Claimant does win, we can come up with an estimated recovery rate. The estimated recovery rate is calculated as follows:

*Estimated Recovery Rate = Percentage of Claimants Who Win x Percentage of Request Awarded*

---

[9] This is substantially better than the average FINRA win rate of 45%. (See 2012 article "Who Wins FINRA Cases and Why?" *PIABA Bar Journal*, Vol. 19, No. 12 (2012) attached as Exhibit C.)

[10] See "Who Wins FINRA Cases and Why?", supra note 2, at p. 143. Median FINRA recovery rate for all cases where Claimants win more than zero is only 37.28% of amount sought as compared with Morgan Keegan recovery rate of 64.27%.

For the 203 Morgan Keegan cases that went to final hearing before FINRA, the estimated recovery rate is 55% (the percent who get more than zero) x 64.27% (the average percent awarded of the amount requested) = 35.35%. This calculation establishes the worth of the claims. The number should be viewed as a floor for the value of the claims because for every FINRA case that goes to hearing, three cases settle.[11] In the settled cases, the Claimant has a 100% chance of recovery not the 55% in the above calculation. The calculated estimated recovery rate assumes a 45% chance of losing. Thus, the fact that three times as many cases settle as go to hearing means the estimated recovery rate is a conservative number.

Another way to recognize how inadequate the settlement is to consider the total sum awarded in the arbitration cases. The 203 FINRA cases that went to hearing yielded a total $37 million in awards. Class counsel has been quoted in *The Commercial Appeal* as saying that the number of investors in the proposed settlement class is "probably in the tens of thousands" (Exhibit D.) Assume tens of thousands means at least 20,000 investors.[12] With 20,000 investors participating in the settlement, the average payout per investor would be $2,150 ($43 million divided by 20,000). Contrast this settlement payout with an average FINRA award per successful Morgan Keegan case of $333,333.33 ( $37 million divided by 111 wins).[13]

---

[11]http://www.finra.org/ArbitrationAndMediation/FINRADisputeResolution/AdditionalResources/Statistics/

[12]According to *Memphis Commercial Appeal*, December 11, 2012, "How Morgan Keegan experience makes case for bringing Glass-Steagall back", there were 30,000 account holders in all seven proprietary funds.

[13]Even if the FINRA cases all had multiple claimants (and many did not), the average actual amount achieved per person is greatly in excess of what the settlement provides.

The settlement amount is patently inadequate. This case should be tried or settled for substantially more money. Simply put, the proposed settlement flies in the face of what has been established by dozens of lawyers who have actually tried these claims over the last five years. Basic math shows the settlement is inadequate.

## C. The FINRA Arbitration Process Determined A Real World Value for the Claims Being Released as Ten Times More Than The Proposed Settlement

The FINRA arbitration procedure established a floor for what would happen if these claims were tried to a jury. If anything, the FINRA results are skewed downwards. The Consolidated Amended Class Action Complaint seeks a jury trial. The FINRA evidentiary hearings are more akin to bench trials. The arbitrators are typically securities lawyers and finance industry professionals. They want to be chosen on future panels so their incentive is for middle of the road decisions. They understand that appeals are rarely granted. Until recently, an industry representative had to be included on the three person panel. The securities industry lobbied for creation of the mandatory arbitration process since it reduces the risk to a Respondent of a large jury verdict. A 2007 study concluded that Claimants could only expect to recover 12% of the amount they sought in FINRA cases.[14] The success rate in Morgan Keegan cases has been triple that amount.

The non-simplified Morgan Keegan arbitration hearings usually last at least three days and sometimes two weeks or more if there are multiple claimants. The proceedings are tantamount to trials with pre-hearing briefing, motions in *limine*, opening statements, direct and cross examination of witnesses, investor testimony, Morgan Keegan broker testimony, Morgan Keegan executive

_____

[14]O'Neal and Solin, "Mandatory Arbitration of Securities Disputes - A Statistical Study of How Investors Fare " (2007) -
http://adrresources.com/docs/adr/2-2-809/arbitraje-inversiones-eeuu-2007-us-mandatory-securiti es-arbitration.pdf

testimony (including testimony of fund manager Kelsoe in some cases), expert witnesses testimony, closing arguments and sometimes post hearing briefing.

The claims asserted in the arbitration proceedings rely upon the same fraud and omissions that underlie the federal securities law claims here. For instance, in *Diana Landau vs. Morgan Keegan & Company, Inc.*, (FINRA Case 08-01276 - award attached as Exhibit E hereto), the Panel described the claims as follows:

> Claimant asserted the following causes of action: misrepresentations and omissions; violations of the Missouri Securities Act of 2003; breach of fiduciary duty; violation of NASD conduct rules; negligence; failure to supervise; breach of contract; fraudulent misrepresentation and vicarious liability. The causes of action related to the recommendation that Claimant invest significant portions of her account in proprietary Morgan Keegan mutual funds including the Regions Morgan Keegan Advantage Income Fund ("RMA"), the Regions Morgan Keegan Multi-Sector High Income Fund ("RHY"), and the Regions Keegan Select Intermediate Bond Fund in Class I shares ("RIBIX"), collectively referred to as the "Funds". ... Claimant alleged that her loss was the result of Respondent's failure to disclose facts about the Funds; that the Funds' assets were invested in violation of restrictions on the amount of illiquid securities in which the Funds were permitted to invest; that the Funds investment exceeded the 25% limit on investments in a single industry; and that the Funds' portfolios were exposed to concentrations of credit risk because of heavy investments in collateralized debt obligations. (Award pp. 1-2.)

These allegations are similar to those fact allegations found in the Consolidated Amended Class Action Complaint. Some of the allegations such as breach of the representations that 25% of the portfolio would be in the same industry are identical to allegations in the class complaint.[15]

### D. The Economic Justification Offered for the Settlement is Singularly Weak

The economic argument offered for the settlement does not pass muster– the settlement proponents argue that this is an "excellent result for the Class" by citing median settlement amounts

---

[15] The arbitration did not involve a case where Regions Bank was the Trustee of the account.

for *all* securities class actions. Comparing this settlement to the average amounts of settlements tells us very little. It says nothing about the strength of the other cases versus this particular case. The average numbers do not inform us to whether this particular settlement is good or bad. We do not know how big the other cases were, how good the claims were, and how large the classes were. Surely none of them had the data of 1,000 filed FINRA cases and 203 final awards as a benchmark comparison. The apt comparison would be securities class actions settlements where there were $1.4 billion in losses, a Fund Manager barred from the industry, consent decrees with the States, a consent decree with the S.E.C., and a five year history of 203 FINRA awards.

What is missing from the discussion by the settlement proponents is any analysis of potential damages, or any attempt to quantify the likelihood of success. How was the $62 million number arrived at? Was it pulled out of the air? We do not know.

## E.  A Simple Compelling Jury Case is Being Under Valued

There is compelling evidence that is being abandoned. Much of this evidence was compiled through live testimony at 200 plus FINRA arbitration from Morgan Keegan witnesses. Morgan Keegan employees and ex-employees, and Morgan Asset Management employees including Fund Manager Kelsoe, Al Landers, Michelle Wood, Gary Stringer and Michael Gibbs gave valuable testimony supporting Plaintiffs' claims. None of these people appear to have been deposed in this case. Thus, their testimony does not even appear to have been considered in valuing the claims here.

Morgan Keegan failed to disclose that the RMK funds were heavily concentrated in the lower tranches of structured products. Morgan Keegan failed to adequately disclose that the closed end funds were often buying the bottom tranche of structured deals. Each tranche is sold separately with a separate CUSIP identification number. In an Indymac deal, Morgan Keegan Funds were

buying the M-11 tranche. Before the M-11 tranche would receive a single dollar of payment in the cash waterfall, all tranches above it had to be paid. This fact was not disclosed. Put another way, if 5% of the mortgages in the collateral pool stop paying, the M-11 tranche is in danger of getting nothing and never getting anything.



Morgan Keegan failed to disclose this waterfall effect meaning that top tranches get paid first and the bottom tranches get paid last. A small default problem in the order of 5% can wipe out a bottom tranche particularly when the underlying collateral pool consists of subprime mortgages. For instance, in the Indymac Trust 2005 C deal bought by Fund Manager Kelsoe, 98% of the borrowers in the underlying collateral pool had prior credit problems. Kelsoe bought the M-11 tranche which

11

was towards the very bottom of the deal. Once the M-11 tranche stopped getting payments from the cash waterfall, it could never recover. Nowhere does Morgan Keegan disclose this Achilles' heel in its Funds. In essence, Fund Manager James Kelsoe engineered a bait and switch whereby retirees looking for income products were lured into so-called bond funds which were anything but bond funds.

By selling *de facto* hedge funds to people who wanted income funds, Kelsoe grew the Morgan Keegan funds from a few million dollars in assets to over $2 billion in assets. He benefited handsomely. Despite being barred from the industry, he has no financial worries unlike the retirees who put their life savings into these closed end funds.

The Morgan Keegan income funds were sold to unsuspecting investors as diversified high income bond funds. It was represented that the funds had 300 diversified bonds in them, mainly junk bonds. At the height of the financial crisis, however, the junk bond default rate was only 11.3%. Historically, junk bond default rates are about 5% or less. Morgan Keegan funds lost 90% of their value. These were not junk bond funds. Junk bonds would have been fine. These were structured finance funds.

Put another way, the Funds had a fatal *undisclosed* Achilles' heel known to Morgan Keegan, but not disclosed to investors.[16] The Achilles' heel was that the Funds were heavily concentrated in the lower tranches or slices of sub-prime deals. Even a careful reading of the prospectuses for the Funds by a sophisticated investor would not have revealed this fact. Instead of adequate disclosure, Morgan Keegan put out misinformation about the Funds' concentration in toxic assets.

---

[16] Morgan Keegan refers to Morgan Keegan and Co., Inc. Morgan Keegan was the Lead Underwriter for the funds. In addition, Morgan Keegan provided the Chief Compliance Officer for the funds, reviewed SEC filings before they were made for the funds, and provided accounting and administrative services to the funds.

A lower tranche is incredibly more risky than a senior tranche – sometimes 100 times more risky. This was not disclosed. After a lower slice of a structured finance product absorbs the early defaults in a pool of loans, the lower slice gets wiped out. This was not disclosed.

Further, in the Fund prospectuses, SEC filings and marketing materials, Morgan Keegan promises a "diversified portfolio" in which assets will be analyzed with "a value investing" ""bottom up" approach". Yet, there was no bottoms up analysis. There was no value investing. In managing billions of dollars, Kelsoe had no team helping him with structured product. Instead, he had one "financial analyst" aiding him with structured product and that was a person named Al Landers. Yet, Mr. Landers repeatedly testified in FINRA cases that Human Relations at Morgan Keegan made a mistake when they gave him the title of Financial Analyst on his business card. He said he never analyzed anything on a substantive basis. He never made buy sell decisions. He described his job as being an administrative assistant to Mr. Kelsoe. So we have one person doing structured finance analysis for funds that had billions of dollars in structured product and that was Mr. Kelsoe.

The Fund prospectuses and SEC filings compared their performance to the Lehman Brothers Ba U.S. High Yield Index. The Lehman index measures U.S. intermediate high yield issues. It is not an appropriate benchmark for alternative investment funds. In the March 31, 2008 Annual Report, it states that the net asset value for the closed end funds was down almost 70% while the Lehman index had declined only 1.25%. The Lehman index should never have been used.

Another compelling argument that is being abandoned is that Fund Manager Kelsoe was manipulating the prices of the illiquid assets in the Funds to inflate the net asset value and share price. The procedure mandated in the public filings was not followed. Morgan Keegan's defense in the arbitrations was that he did not do it for a very long time and that it did not materially affect

share price. This is equivalent to saying "I only stole a few cookies from the jar".

All of these claims have greater value than pennies on the dollar. There is not a 97% chance that Morgan Keegan would win at trial.

## II. The Settlement Ignores Sub Classes Whose Claims Have Very Different Values

### A. The Settlement Fails to Recognize That Shares Purchased Through a Morgan Keegan Account Have a Higher Claim Value.

The FINRA arbitration history is that people who had accounts at Morgan Keegan and had Morgan Keegan financial advisors recommending the Funds fared much better than investors who were not Morgan Keegan customers. These non-customers or non-privity Claimants typically bought the funds on their own through independent discount brokers such as Scottrade. While the overall average effective recovery was 35.35 cents on the dollar in FINRA awards, the results for those with Morgan Keegan accounts was higher. The average effective recovery for people with Morgan Keegan financial advisors was as high as 110%. (See chart attached as Exhibit F). The result was above 100% due to the recovery of attorneys' fees.

The settlement does not distinguish between shares bought through Morgan Keegan accounts and shares bought elsewhere. The shares purchased in reliance upon advice from Morgan Keegan brokers should be treated differently. Morgan Keegan owed suitability duties and fiduciary duties with respect to these shares. This failure to differentiate between subclasses renders the settlement unjust for those purchases made upon the advice of Morgan Keegan brokers.

14

## B. The Settlement Fails to Recognize that Shares Bought at the IPOs Have a a Higher Claim Value Than Shares Bought When The Share Price Had Fallen Nearly 50%

The following chart for the price performance of the Multi-Sector Fund (from yahoo finance covering the period January 19, 2006 to March 18, 2013 shows that by mid August 2007, the price had fallen substantially.



Persons who bought in June or July 2007 have weaker claims than those who bought in early 2006.

The people who purchased later were arguably on notice that these funds were not stable bond funds.

The proposed settlement does not recognize the difference in value of claims.

15

## III.  The Settlement Fails to Meet the Legal Standards for Approval

### A.  The Settlement Fails to Meet the Law Requiring That Sub Classes With Markedly Different Interests Be Treated Differently

In the seminal case of *Amchem Products, Inc. v. Windsor*, 521 591 (1997), the U.S. Supreme Court upheld the Third Circuit's decision to vacate a settlement class certification that aggregated into one settlement class subgroups with different interests.  Then in *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), the Court rejected a settlement class that failed to distinguish between more valuable and less valuable claims.

Next, in *In Re: Literary Works in Electronic Databases Copyright Litigation*, 654 F. 3d 242 (2nd Cir. 2011), the Second Circuit rejected a class settlement.  It ruled that a district court had abused its discretion in certifying the class for settlement purposes.  Objectors had argued that subgroups within the class had conflicting interests.  The court agreed and said that the presence of impartial mediators in what had been a intense protracted adversarial settlement negotiation did not compensate for the absence of independent representation for conflicting subclasses.

The court remanded for sub-classing.  Different subgroups in the class had claims of differing legal merit.  It was insufficient for single class counsel to allocate values to the different claims. The appellate court ruled that the subclasses required separate certification and separate legal representation.  The problem in this case is even worse because there has been zero recognition that Morgan Keegan customers have stronger claims than non-customers according to the FINRA history of litigation.[17]  The subclass of Morgan Keegan customers should have separate representation.

These same principals concerning conflicts between subclasses have been recognized in this

_____

[17] Of course, there are exceptions, some non-privity clients were able to get large FINRA awards.  The general trend, however, in the arbitrations was against them.

Court. In denying class certification in *Kizer v. Shelby County Government*, 2009 U.S. Dist. LEXIS 123711 (W.D. Tenn. August 24, 2009), this Court recognized that class representatives have the burden of showing commonality and typicality at the certification stage. In *In Re: Southeastern Milk Antitrust Litigation*, 2012 U.S. Dist. LEXIS 76817 (E.D. Tenn. June 1, 2012), a subclass was decertified until it had separate legal representation due to a conflict with another subclass that made joint representation inappropriate.

Therefore, the settlement should be redrawn so as to take into account the difference in the value of the claims of the Morgan Keegan customers and those investors who were not Morgan Keegan customers.

## B. The Settlement Fails to Meet the Requirement of Being Fair, Reasonable and Adequate

A "district court ha[s] fiduciary responsibility to the silent class members" to see that the settlement is fair and adequate. *Grant v. Bethlehem Steel Corp.*, 823 F. 2d 20, 23 (2d Cir. 1987). This is particularly true in a case such as this where class counsel are seeking close to $19 million in fees and costs, whereas class members are getting two to four cents on the dollar. As stated in *Mirfasihi v. Fleet Mortgage Corp.*, 356 F. 3d 781, 785 (7th Cir. 2004), "(b)ecause class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of the proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class a whole".

The Third Circuit recently rejected a class settlement, *In re Baby Products Antitrust Litigation*, 2013 U.S. App. LEXIS 3379 (3rd Cir. Feb. 19, 2013), because the court did not have the factual basis needed to determine whether the settlement was fair to the class. The factors to be

looked at include the complexity, expense and duration of continued litigation, the amount of discovery engaged in by the parties, and the likelihood of success on the merits. *UAW v. Gen. Motors Corp.*, 497 F. 3d, 615, 631 (6th Cir. 2007). Here, there is a simple theory to be presented at trial concerning non-disclosure. There has been no discovery except document production. The likelihood on success on the merits as established by the FINRA history is ten times greater than what the settlement offers.

Taking a straw poll of the number of objectors and number of opt outs is not a proxy for fulfillment of the fiduciary duty of analyzing the fairness of the settlement. Failure of many class members to object or opt out is not informed consent to the settlement. "[A] combination of observations about the practicalities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement". *In re GMC Pick-Up Litig.*, (3rd Cir. 1995)(citing *In re Corrugated Container Antitrust Litig.*, 643 F. 2d 195, 217-18 (5th Cir. 1981). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F. 2d 1106, 1137 )(7th Cir. 1979). In *Vassalle*, supra, the court reversed the district court's approval of a class settlement even though the opt out rate was .3% and objection rate was .004%. The court found the settlement to be deficient for various reasons including the fact that class members could have collected damages under state law claims that would have exceeded the value of monetary relief in the settlement.

## Conclusion

For the aforesaid reasons, Objectors request that the settlement not be approved and that separate sub classes with separate counsel be established for those class members who were Morgan Keegan customers and those who were not.

Jerome and Gloria Christenson, Objectors,


By *Howard B. Prossnitz /s/*



Howard B. Prossnitz, Esq., *Pro Hac Vice*
LAW OFFICES OF HOWARD PROSSNITZ
218 North Jefferson, Suite 300
Chicago, IL 60661
Tel. 312 382-8201
Fax 312 382-8203
howard@prossnitzlaw.com

March 21, 2013

I, Howard Prossnitz, an attorney, certify that I sent a copy of the foregoing by Federal Express overnight delivery to the following persons on this 21st day of March 2013 and that I shall also cause the same to be filed electronically with the Court's CM/ECF system on March 21, 2013:

COURT:
Clerk of the Court
U.S. Dist. Ct W. D. Tennessee
Clifford Davis/ Ordell Horton Federal Building
167 North Main Street
Room 242
Memphis, TN 38103

ATTORNEYS FOR THE TAL:
R. Carlton Smyly, Esq.
CABANISS JOHNSTON
2001 Park Place North, Suite 700
Birmingham, AL 35203

ATTORNEYS FOR THE MORGAN KEEGAN DEFENDANTS
Britt K. Latham, Esq.
BASS BERRY
150 Third Avenue South, Suite 2800
Nashville, TN 37201

ATTORNEYS FOR THE CLOSED END FUNDS:
Kevin C. Logue, Esq.
PAUL HASTINGS
75 East 55th Street
N.Y.,N.Y. 10022

LEAD COUNSEL:
Joel H. Bernstein, Esq.
LABATON SUCHAROW
140 Broadway
N.Y.,N.Y. 10005

ATTORNEYS FOR RFC:
Peter S. Fruin, Esq.
MAYNARD COOPER
1901 6th Avenue North, Suite 2400
Birmingham, AL 35203

ATTORNEYS FOR ALLEN B. MORGAN, JR., J. KENNETH ALDERMAN, BRIAN B. SULLIVAN, JOSEPH T. WELLER and JAMES C. KELSOE, JR.
S. Lawrence Polk, Esq.
SUTHERLAND ASBILL
999 Peachtree St., NE
Atlanta, GA 30309

ATTORNEYS FOR CARTER E. ANTHONY:
R. Hal Meeks, Esq.
PURSLEY LOWERY
260 Peachtree Street, NW, Suite 2000
Atlanta, GA 30303

*Howard B. Prossnitz /s/*