IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
(MEMPHIS DIVISION)

| | | |
|---|---|---|
| IN RE REGIONS MORGAN KEEGAN<br>SECURITIES, DERIVATIVE AND ERISA<br>LITIGATION | )<br>)<br>) | |
| | ) | |
| This document relates to: | ) | Case No. 2:09-cv-02009-SHM |
| *In re Regions Morgan Keegan ERISA Litig.,* | ) | |
| No. 2:08-cv-l02192-SHM-dkv | ) | |
| | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT AGREEMENT, SETTLEMENT SUBCLASS
CERTIFICATION AND APPROVAL OF PLAN OF ALLOCATION**

**TABLE OF CONTENTS**

I.      INTRODUCTION................................................................................................. 1

II.     PROCEDURAL AND FACTUAL BACKGROUND......................................... 2

      A.     Introduction to the Litigation ................................................................ 2

      B.     Course of Litigation............................................................................... 3

      C.     Investigation of Claims and Discovery ................................................. 5

      D.     Settlement Negotiations ........................................................................ 7

      E.     The Settlement Agreement.................................................................... 8

            1.     Settlement Amount and Scope of Release.................................. 8

            2.     Allocation of Fees and Costs Among the Subclasses Pursuant to the Settlement Agreement.................................. 10

      F.     Dissemination of Class Notice to the Four Subclasses ....................... 12

            1.     In-House Plans Subclasses Notice Program............................. 12

            2.     Customer Plans Subclass Notice Program................................ 13

      G.     Reasons for the Settlement.................................................................. 16

III.    ARGUMENT ...................................................................................................... 16

      A.     The Settlement should be Granted Final Approval if the Court Finds it to be Fair, Reasonable and Adequate........................................ 16

            1.     Likelihood of Success Weighed against the Amount and Form of Relief ................................................................ 17

            2.     Risks, Expense, and Delay of Further Litigation ..................... 22

            3.     The Judgment of Experienced Counsel .................................... 23

4.      Amount of Discovery Completed and Character of the Evidence Uncovered ....................................................................... 24

5.      Fairness to Unnamed Subclass Members .................................................. 25

6.      Objections Raised by Class Members........................................................ 25

7.      Whether the Settlement is the Product of Arms-Length Negotiations................................................................................................ 26

8.      Whether the Settlement is Consistent with Public Policy ...................... 27

B.      The Plan of Allocation is Fair and Reasonable..................................................... 28

C.      The Court Should Grant Class Certification for the Four Settlement Subclasses for the Purpose of Settlement.............................................................. 31

IV.     CONCLUSION ........................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bowers v. Windstream Kentucky East, LLC*,
  No. 09-440, 2013 WL 5934019 (W.D. Ky. Nov. 1, 2013) ................................................ *passim*

*C. Fred Daniels, as Trustee ad litem in substitution for Regions Bank, et al., dba
  Regions Morgan Keegan Trust as the trustee for the Keith Smith Company,
  Inc. Employee Profit Sharing Plan v. Morgan Asset Management, Inc., et al.*,
  No. 10-2514-SHM (W.D. Tenn.) ........................................................................................ 4

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) ................................................................................... 27

*Clark Equipment Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*,
  803 F.2d 878 (6th Cir. 1986) ............................................................................................ 17

*Dick v. Sprint Commc'ns Co. L.P.*,
  297 F.R.D. 283 (W.D. Ky. 2014) ........................................................... 17, 22, 26, 27

*Fifth Third Bankcorp v. Dudenhoeffer*,
  ___U.S. ___, 134 S.Ct. 2459 (2014) .............................................................................. 19

*Gascho v. Global Fitness Holding, LLC*,
  No. 11436, 2014 WL 1350509 (S.D. Ohio, April 4, 2014) ......................................... 18, 22, 27

*In re Global Crossing Sec. and ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................................... 28

*Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v.
  Ford Motor Co.*,
  No. 07-14845, 2008 WL 4104329 (E.D. Mich. Aug. 29, 2008) ................................... 23

*Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v.
  General Motors Corp.*,
  497 F.3d 615 (6th Cir. 2007) ............................................................................................ 17

*Meritan, Inc., et al. v. Regions Bank dba Regions Morgan Keegan Trust, et al.*,
  Nos. 08-2757, 08-2192, 2011 WL 2517060 (W. D. Tenn. June 23, 2011) ............................... 5

*Moulton v. U.S. Steel Corp.*,
  581 F.3d 344 (6th Cir. 2009) ............................................................................................ 27

*In re Regions Morgan Keegan Closed-End Mutual Fund Litigation*,
    No. 2:07-cv-02830-SHM-dvk (W.D. Tenn.) ................................................................21

*In re Regions Morgan Keegan ERISA Litig.*,
    692 F. Supp. 2d 944 (W.D. Tenn. 2010) ..................................................................4

*In re Regions Morgan Keegan ERISA Litig.*,
    741 F. Supp. 2d 844 (W.D. Tenn. 2010) ..................................................................4

*In re Regions Morgan Keegan Open-End Mutual Fund Litigation*,
    No. 2:07-cv-2784-SHM-dvk (W.D. Tenn.) ..............................................................21

*In re Regions Morgan Keegan Sec., Derivative and Employee Retirement Income
    Security Act (ERISA) Litig.*,
    598 F. Supp. 2d 1379 (W.D. Tenn. 2009) ................................................................3

*In re Regions Morgan Keegan Sec., Derivative and ERISA Litig.*,
    Nos. 10-2514, 08-2192, 2011 WL 1565966 (W.D. Tenn. April 25, 2011) ..............5

*In re Skechers Toning Shoe Prods. Liability Litig.*,
    No. 11-2308, 2013 WL 2010702 (W.D. Ky. May 13, 2013) ...................................18

*In re Southeastern Milk Antitrust Litig.*,
    No. 08-1000, 2012 WL 2236692 (E.D. Tenn. June 15, 2012) ......................... *passim*

*In re Teletronics Pacing Sys., Inc.*,
    137 F. Supp. 2d 985 (S.D. Ohio 2001) ....................................................................26

*Thacker v. Chesapeake Appalachia, L.L.C.*,
    695 F. Supp. 2d 521 (E.D. Ky. 2010) .....................................................................23

**Other Authorities**

Fed. R. Civ. P. 23 ...........................................................................................................31

Fed. R. Civ. P. 23(b)(3) .................................................................................................18

Fed. R. Civ. P. 23(e)(2) .................................................................................................16

Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.51 (3d ed. 1992) ...................26

# I.      INTRODUCTION

Plaintiffs file this motion to present the Settlement Agreement for final approval. The Settlement brings to a close six and a half years of litigation involving ERISA claims against the Regions Defendants asserted by participants in three Regions In-House retirement plans and over 460 Customer Plans for which Defendants provided trustee, custodial, investment advisory or investment management services. The ERISA claims asserted by the In-House plan participants arose from allegedly imprudent plan investments in Regions Stock, Regions Morgan Keegan ("RMK") proprietary Mutual Funds and RMK Bond Funds. The claims asserted by the Customer Plans arose from investment in the RMK Bond Funds.

The Settlement Agreement resolves claims asserted by four Settlement Subclasses, three for the In-House Plans and one for the Customer Plans, which the Court preliminarily certified for settlement purposes. The Settlement is an excellent result for the four Subclasses because it provides recovery of needed retirement funds for all class members without further protracted litigation. Plaintiffs present background describing the litigation, the course of discovery, and settlement negotiations. The memorandum continues with a description of the Settlement Agreement, including allocation of settlement funds among the four Subclasses, and the dissemination of Class Notice. Analysis of the factors supporting final approval of the Settlement under Sixth Circuit law follows and the memorandum closes by describing the proposed Plan of Allocation.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    Introduction to the Litigation

Plaintiffs originally filed this Action in March of 2008 on behalf of 401(k) plan participants in three Regions 401(k) Plans (the "In-House Plans"): (a) the Regions Financial 401(k) Plan; (b) the AmSouth Bancorp Thrift Plan; and (c) the Regions Financial Corporation 401(k) Plan. On April 1, 2008, the first two plans merged to form the third plan following Region's merger with AmSouth Bank.

The In-House Plans participant plaintiffs filed ERISA breach of fiduciary duty claims alleging imprudence arising from three types of investment options: (a) Regions Stock that lost significant value; (b) excessive fees charged in RMK proprietary Mutual Funds; and (c) RMK proprietary Bond Funds that collapsed. In October of 2010, Plaintiffs added a fourth group of claims on behalf of participants in Customer Plans to which Defendants provided trustee, custodial, investment advisory or investment management services. These claims alleged ERISA breach of fiduciary duty for inclusion of the RMK Bond Funds on the approved list of Customer Plan investment options.

The case is organized into the following Subclasses which the Court preliminarily approved for purposes of settlement:[1]

> 1.47.1  "In-House Plans Regions Stock Settlement Subclass" means all Persons, other than Defendants and Defendants' officers and directors subject to Section 16 of the Securities Exchange Act of 1934, who were Participants in or

---

[1] Paragraph references are to the Settlement Agreement, a copy of which (with Appendices A-C) is attached as Ex. 1 to the Declaration of Derek W. Loeser in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement Agreement, for Settlement Subclass Certification, and for Approval of Plan of Allocation, And Plaintiffs' Motion for Award of Attorneys' Fees and Expenses and Named Plaintiff Case Contribution Awards ("Loeser Decl."). A copy of the Settlement Agreement with Appendices and Attachments is located at Dkt. No. 319-1.

Beneficiaries of the In-House Plans at any time between January 1, 2007 and
December 31, 2010 and whose Plan accounts were invested in Regions Stock at
any time during this period.

1.47.2  "In-House Plans Excessive Fee Settlement Subclass" means all Persons,
other than Defendants and Defendants' officers and directors subject to Section
16 of the Securities Exchange Act of 1934, who were Participants in or
Beneficiaries of the Legacy Plan and/or the Regions 401(k) Plan at any time
between May 1, 2003 and May 15, 2009 and whose Plan accounts were invested
in one or more of the RMK Select Funds at any time during this period.

1.47.3  "In-House Plans Bond Fund Settlement Subclass" means all Persons, other
than Defendants and Defendants' officers and directors subject to Section 16 of
the Securities Exchange Act of 1934, who were Participants in or Beneficiaries of
the Legacy Plan and/or the Regions 401(k) Plan at any time between November 9,
2006 and July 29, 2008 and whose Plan accounts were invested at any time during
this period in one or more of the RMK Bond Funds.

1.47.4  "Customer Plans Settlement Subclass" means the Customer Plans and all
Persons, other than Defendants, who were Participants in, Beneficiaries of, or
Fiduciaries of any Customer Plan that at any time between November 9, 2006 and
July 29, 2008 had plan assets invested in one or more of the RMK Bond Funds.
Excluded from the Customer Plans Settlement Subclass are the Customer Plans
that either (a) previously signed agreements releasing one or more of the
Defendants from claims encompassed by the Released Plaintiffs' Claims, or (b)
validly and timely seek exclusion from the Customer Plans Settlement Subclass,
and the Participants in, Beneficiaries of, and Fiduciaries of the Customer Plans
described in Section 1.47.4 (a) or (b) above.

Loeser Decl., ¶ 22 and Ex. 1.

## B.      Course of Litigation

Plaintiffs filed three class actions in this Court and in the United States District Court for

the Northern District of Alabama in March 2008. On Plaintiffs' motion, this Court consolidated

the actions, appointed Keller Rohrback and Feinstein Doyle Payne & Kravec as Interim Co-Lead

Counsel and approved the proposed case schedule in the Order dated October 8, 2008 (Dkt. No.

47). On February 12, 2009, the case was consolidated into a multi-district action (MDL 2009).

*See In re Regions Morgan Keegan Sec., Derivative and Employee Retirement Income Security*

*Act (ERISA) Litig*., 598 F. Supp. 2d 1379 (W.D. Tenn. 2009). Plaintiffs filed their Consolidated Class Action Complaint for Violation of ERISA on February 24, 2009 (Dkt. No. 69). The Consolidated Class Action Complaint alleged ERISA breach of fiduciary duty claims regarding the Regions Stock, RMK Mutual Fund and RMK Bond Fund investment options. *Id*; Loeser Decl., ¶ 5.

Defendants filed a series of motions to dismiss the Consolidated Complaint beginning on April 10, 2009 (Dkt. Nos. 108, 111). On Plaintiffs' motion, the Court granted leave to file a supplemental complaint on January 4, 2010 (Dkt. No. 169). Plaintiffs filed the Consolidated Supplemental Class Action Complaint for Violation of ERISA the same day (Dkt. No. 170). On March 9, 2010, the Court issued its Order Granting in Part and Denying in Part Defendants' Motions to Dismiss (Dkt. No. 172). *See In re Regions Morgan Keegan ERISA Litig*., 692 F. Supp. 2d 944 (W.D. Tenn. 2010). The Court denied the majority of Defendants' motions to dismiss, granting only the motion to dismiss the co-fiduciary liability claim in Count V against Defendants Morgan Keegan and Morgan Asset Management ("MAM"). Defendants moved on April 8, 2010 to certify the Court's Order of March 9, 2010 for interlocutory appeal and to stay this action (Dkt. No. 176). On June 13, 2010, the Court entered its Order Denying Defendants' Motion to Certify Order for Interlocutory Appeal (Dkt. No. 188). *See In re Regions Morgan Keegan ERISA Litig*., 741 F. Supp. 2d 844 (W.D. Tenn. 2010). Loeser Decl., ¶ 6.

Following his June 2008 appointment by the Jefferson County, Alabama Probate Court, the Trustee *ad Litem* commenced a separate Customer Plan ERISA class action, titled: *C. Fred Daniels, as Trustee ad litem in substitution for Regions Bank, et al., dba Regions Morgan Keegan Trust as the trustee for the Keith Smith Company, Inc. Employee Profit Sharing Plan v.*

*Morgan Asset Management, Inc., et al.*, No. 10-2514-SHM (W.D. Tenn.) ("TAL ERISA

Action"). By Order of October 26, 2010, the Court granted Plaintiffs leave to file a Second

Consolidated Amended Complaint asserting bond fund claims on behalf a class of Customer

Plans (Dkt. No. 203). Plaintiffs filed their Second Amended Consolidated Complaint on October

28, 2011 (Dkt. No. 204). The Court granted Defendants' motion to consolidate by Order of April

12, 2011, consolidating the TAL ERISA Action into this Action (Dkt. No. 219). *See In re*

*Regions Morgan Keegan Sec., Derivative and ERISA Litig*., Nos. 10-2514, 08-2192, 2011 WL

1565966 (W.D. Tenn. April 25, 2011).[2] On July 15, 2011, Plaintiffs filed the Corrected Third

Amended Consolidated Class Action Complaint for Violations of ERISA ("Third Amended

Complaint") (MDL Dkt. No. 117). Loeser Decl., ¶ 7.

      Defendants moved to dismiss portions of the Third Amended Complaint on August 8,

2011 (MDL Dkt. No. 138 and Hamby Dkt. No. 254). By Order of March 30, 2012, the Court

denied the more significant motion to dismiss filed by Defendants Morgan Keegan, MAM and

several individual Defendants (Dkt. No. 299). The motion to dismiss filed by Defendants

Regions Financial Corporation, Regions Morgan Keegan Trust and individual defendants limited

to the Customer Plan claims and certain claims against individual Defendant Alderman remained

pending at the time of settlement. Loeser Decl., ¶ 8.

## C.    Investigation of Claims and Discovery

      Co-Lead Class Counsel issued three sets of interrogatories and seven sets of requests for

production directed to both the corporate and individual defendants and initiated deposition

---

[2] On June 23, 2011, the Court granted Defendants' motion to consolidate a second action with this case.  This
second action was entitled *Meritan, Inc., et al. v. Regions Bank dba Regions Morgan Keegan Trust, et al.*, Nos. 08-
2757, 08-2192, 2011 WL 2517060 (W. D. Tenn. June 23, 2011).

discovery. A complete list of Plaintiffs' discovery activities is attached as Ex. 2 to the Loeser

Decl. Plaintiffs also subpoenaed documents from third parties PricewaterhouseCooper LLP,

Ernst & Young, R.V. Kuhns & Associates, Inc., Constangy, Brooks & Smith, Ayco, Alston Bird

and Prima Capital, each of which were service providers to the Regions In-House Plans. Loeser

Decl., ¶ 9.

Plaintiffs reviewed, analyzed and organized a document database of hard copy documents

and ESI totaling 786,500 documents or 7,360,500 pages received from Defendants and third

party sources. *Id.* at ¶ 10. Receipt of these discovery materials followed multiple meet and confer

conferences with defense counsel to negotiate the parties' agreement on ESI discovery, including

each of the individual custodians and ESI sources from which ESI would be collected and

processed as well as the search terms carefully selected to target relevant documents. *Id.* This

process required Plaintiffs to retain an ESI expert to address and negotiate the use of cutting edge

electronic discovery technologies. Plaintiffs also obtained and reviewed transcripts and

documents from the state and federal securities investigations. *Id.*

Based on the document and ESI discovery, Plaintiffs initiated depositions, beginning with

Defendant Chris A. Glaub who was a member of the Regions Financial Corporation Legacy Plan

Benefits Management Committee as of March 14, 2007 and Plan Administrator of both the

Legacy and AmSouth Plans. *Id.* at ¶ 11. During the day-long deposition, Plaintiffs obtained

testimony on the operation and administration of the Legacy and AmSouth Plans. Additional

depositions of Defendants were noted and pending when the Parties entered mediation. *Id*.

Plaintiffs also conducted an in-depth review of publicly available Plan documents

regarding the In-House Plans, documents provided by participants in the In-House Plans, and

media reports and public filings concerning the Corporate Defendants' financial condition. *Id.* at
¶ 12. Plaintiffs negotiated access to and reviewed documents from Defendants' files maintained
for each of the over 460 Customer Plan Accounts in the Customer Plan Settlement Subclass. *Id.*

Plaintiffs completed extensive legal research and factual analysis on the many issues
raised by this case and Plaintiffs retained and worked with consulting experts to assist with the
investigation and analysis of the Regions Stock, Bond Fund and excessive fee claims at issue in
the case. *Id.* at ¶ 13.

Plaintiffs also responded to extensive interrogatories and requests for production issued
by Defendants to each of the Named Plaintiffs and each of the Representative Customer Plans.
Plaintiffs met with the Named Plaintiffs, obtained and reviewed documents to respond to
discovery, provided discovery responses and participated in meet and confer conferences with
Defendants on the scope of discovery responses. *Id.* at ¶ 14.

**D.     Settlement Negotiations**

Following the Court's denial of the more significant motion in Defendants' second round
of motions to dismiss, the Parties proceeded into deposition discovery and Plaintiffs planned to
file their motion for class certification. Loeser Decl., ¶ 15. Aware of the cost of full discovery
and the risk of depleting available insurance coverage, Co-Lead Class Counsel agreed to a
mediation process in June 2012. The Parties retained Judge Daniel Weinstein of the Weinstein
Mediation Center in Northern California. *Id.*

Plaintiffs set forth their factual evidence in an extensive mediation brief supported by
detailed and voluminous citations to Defendants' documents and diagrams showing key lines of
communication within Defendants' organizations. *Id.* at ¶ 16.

The Parties mediated for twelve hours on August 20, 2012 at the Mediation Center and participated in extensive additional discussions facilitated by the Mediation Center from August 2012 through June 2013. *Id.* at ¶ 17. Following lengthy and contentious arm's length negotiations, the Parties reached an agreement in principle to settle the Action for $22,500,000.00 and agreed to the terms of a Mediator's Proposal on June 10, 2013. *Id.* Further intense negotiations followed from June 10, 2013 to December 18, 2013 to achieve agreement to and execution of the Settlement Agreement. *Id.* The Settlement Amounts for each Subclass were separately negotiated throughout the mediation and settlement process through the mediator as independent Settlements. *Id.*

**E.      The Settlement Agreement**

      **1.      Settlement Amount and Scope of Release**

In return for a release of all claims, Defendants will pay the sum of $22,500,000.00 ("Settlement Amount") allocated as follows:

| Settlement Subclass | Allocation Percentage | Approximate Amount |
|---|---|---|
| In-House Plans Regions Stock Settlement Subclass | 63.555% | $14,300,000.00 |
| In-House Plans Excessive Fee Settlement Subclass | 10.667% | $2,400,000.00 |
| In-House Plans Bond Fund Settlement Subclass | 15.111% | $3,400,000.00 |
| Customer Plans Settlement Subclass | 10.667% | $2,400,000.00 |

Settlement Agreement § 8.2.1. *See* Loeser Decl., Ex 1.

8

With respect to the three In-House Plans Settlement Subclasses, the Settlement Agreement releases all Defendants from ERISA based claims for breach of fiduciary duty arising from the inclusion of Regions Stock, the RMK Bond Funds and the RMK Mutual Funds as investment options in the In-House Plans. With respect to the Customer Plans Settlement Subclass, the Settlement Agreement similarly releases all Defendants from ERISA based claims for breach of fiduciary duty arising out of inclusion of the RMK Bond Funds on the approved list of investment options for the Customer Plans. Loeser Decl., ¶ 19.

The Released Claims exclude certain "Carved Out Actions" as set forth in detail in Section 4.1 of the Settlement Agreement and repeated here as follows:

> *provided, however*, that the Released Plaintiffs' Claims exclude:
>
> (1) claims to enforce this Settlement;
>
> (2) claims by any Customer Plan that timely and validly seeks exclusion from the Customer Plans Settlement Subclass, including claims by any Participant, Beneficiary or Fiduciary if the Customer Plan timely and validly seeks exclusion from the Customer Plans Settlement Subclass;
>
> (3) any governmental or regulatory agency's claims in any criminal, civil, or administrative action or proceeding against any of the Defendant Releasees, or any claims or rights to compensation from the SEC Fair Fund, the States' Fund, or other victim compensation funds resulting from any such governmental or regulatory agency action, including without limitation the actions listed in Appendix C; and
>
> (4) (i) any claims under federal or state securities laws that are or have been alleged, or in the future may be alleged through an amended pleading, in any of the actions currently within the Multi-District Litigation ("MDL") captioned: *In re Regions Morgan Keegan Securities, Derivative and Employee Retirement Income Security Act (ERISA) Litigation*, 2:09-md-2009 SHM (the "MDL Actions"), including, but not limited to, those listed below; and (ii) with respect to any putative class members who validly opt out of any of the MDL Actions, any state or federal securities laws claims that they may assert that arise out of any of the same acts, omissions, facts, matters, transactions, or occurrences alleged in one or more of the MDL Actions:

9

    a.   *In re Regions Morgan Keegan Open-End Mutual Fund Litigation*, Case No. 2:07-2784-SHM-dkv;

    b.   *In re Regions Morgan Keegan Closed-End Fund Litigation*, Case No. 2:07-cv-02830-SHM-dkv;

    c.   *Landers et al., v. Morgan Asset Management, Inc. et al*., 2:08-cv-02260-SHM (any right to participate in any recovery in this derivative action is also excluded from the Released Plaintiffs' Claims); and

    d.   *In re Helios Closed-End Funds Derivative Litigation*, 2:11-cv-02935-SHM (any right to participate in any recovery in this derivative action is also excluded from the Released Plaintiffs' Claims).

Settlement Agreement, § 4.1. Loeser Decl., ¶ 20 and Ex. 1.

In addition, Section 4.3 of the Settlement Agreement states as follows regarding the

"Carved Out Actions":

    4.3    *Claims Not Released.* Without limiting the scope of the exclusions or qualifications following "*provided however*" in Section 4.1 (B) above, neither this Settlement Agreement or the Settlement, nor the Final Approval Order and Judgment, shall in any way bar, limit, waive, release or discharge any right, remedy, claim, action, or cause of action by members of the Settlement Subclasses to recover any moneys or any other relief in the actions listed in Appendix C or the Carved Out Actions or any claims relating to the covenants and or obligations set forth in this Settlement Agreement.

Loeser Decl., ¶21 and Ex. 1.

    **2.**    **Allocation of Fees and Costs Among the Subclasses Pursuant to the Settlement Agreement**

The Settlement Agreement allocates fees and costs to be paid from the Settlement

Amount to the Settlement Subclasses. Loeser Decl., ¶ 23 and Ex. 1.[3] Pursuant to § 11.1 of the

Settlement Agreement, Attorneys' fees and costs awarded to all Plaintiffs' counsel will be

---

[3] All section references in this paragraph are to the Settlement Agreement attached as Ex. 1 to the Loeser Decl.

allocated to the Settlement Subclasses in the percentages set forth in § 8.2.1 of the Settlement

Agreement. Pursuant to § 9.4.6, costs incurred by the Claims Administrator for class notice,

calculations pursuant to the Plan of Allocation and distribution of funds for the Customer Plans

Settlement Subclass will be paid solely from the Customer Plans Subclass Settlement Amount.

Pursuant to § 9.4.7, costs incurred by the Claims Administrator for class notice and calculations

pursuant to the Plan of Allocation will be paid by the respective In-House Plans Settlement

Subclass for which they were incurred. Pursuant to § 9.4.8, costs incurred by the Regions 401(k)

Plan record keeper for distribution of Settlement Amounts will be paid out of the respective In-

House Plans Settlement Subclass Settlement Amounts and will be included in the Claims

Administrator's calculations pursuant to the Plan of Allocation. Pursuant to § 9.4.9, costs that

can be allocated specifically to a Settlement Subclass will be so allocated. Where specific

allocation is not feasible, costs will be allocated on the basis of the percentages set forth in §

8.2.1. Approximately $10,000 of the $60,000 billed by the Independent Fiduciary retained

pursuant to § 3.2.7.1 will be allocated to the In-House Plans Settlement Subclasses under §

3.2.7.2. [4]   Case Contribution Awards related to the Customer Plans Settlement Subclass will be

paid by the Customer Plans Subclass Settlement Amount and Case Contribution Awards related

to the In-House Plans Subclasses will be allocated among the In-House Settlement Subclasses in

proportion to the percentages set forth in § 8.2.1.[5] Pursuant to § 8.1.1, all tax liabilities of the

---

[4] The proportional allocation based on the percentages in § 8.2.1 in the Settlement Agreement will be Regions Stock
Subclass (71.145%); Excessive Fee Subclass (11.941%); and Bond fund Subclass (16.914%).  Loeser Decl.,  23.
[5] *See* fn.4, *infra*.

Qualified Settlement Fund will be paid by the Qualified Settlement Fund and allocated to the

Settlement Subclasses on the basis of the percentages in § 8.2.1 pursuant to § 9.4.9.

**F.       Dissemination of Class Notice to the Four Subclasses**

The court-appointed Claims Administrator, GCG, Inc., has executed the Notice Program

as set forth in the Preliminary Approval Order (Dkt. No. 327). The Court approved seven notice

forms as explained below. Copies of the court approved notices are attached as Exs. A-E to the

Declaration of Jennifer M. Keough Regarding Notice Dissemination and Publication ("Keough

Decl.").

**1.       In-House Plans Subclasses Notice Program**

GCG received a spreadsheet containing 49,482 names and addresses of members of the

In-House Plans Subclasses under § 3.2.3.2 of the Settlement Agreement. Keough Decl., ¶ 4.

GCG analyzed the names and addresses electronically to update addresses through the National

Change of Address database maintained by the U. S. Postal Service. *Id.* at ¶ 5. On July 23, 2014,

GCG sent a copy of the In-House Plans Subclass Notice by first class U.S. Mail to 49,482

members of the In-House Plans Subclasses. *Id.* at ¶ 6. A copy of the In-House Plans Subclass

Notice is attached as Ex. A to the Keough Decl. On August 1, 2014, the In-House Plans Subclass

Publication Notice appeared in *Investors Business Daily* and on August 4, 2014, it was

transmitted by PR Newswire. *Id.* at ¶ 9. The In-House Plans Subclass Publication Notice is

attached as Ex. D to the Keough Decl. In addition, as of July 23, 2014, the In-House Plans

Subclass Notice, the In-House Plans Subclass Publication Notice, the Order Preliminarily

Approving Settlement and Providing for Notice, the Class Action Settlement Agreement, and the

12

proposed Plan of Allocation have been posted on the website maintained by the Claims

Administrator for this case. *Id*. at ¶ 11.

The In-House Plans Subclass Notice summarized the salient terms of the Settlement and

the Plan of Allocation, and disclosed that Co-Lead Class Counsel would apply for an award of

attorneys' fees of up to 30% of the Settlement Amount and an award of expenses and that Co-

Lead Class Counsel would seek Case Contribution Awards for the Named Plaintiffs, with the

exception of the Trustee *ad Litem*. Keough Decl., Ex. A. The In-House Plans Subclass Notice

also advised Subclass members of their right to object to the Settlement, the Plan of Allocation,

Co-Lead Class Counsel's application for attorneys' fees and expenses, and/or the request for

Case Contribution Awards for the Named Plaintiffs. The In-House Plans Subclass Notice

disclosed the means by which In-House Plans Settlement Subclass members could object to the

proposed Settlement, and the deadline for any such objection, which must be filed and received

by all counsel listed in the In-House Plans Subclass Notice by October 28, 2014. *Id*.

###   2.      Customer Plans Subclass Notice Program

GCG received a spreadsheet containing 480 names and addresses of plan sponsors[6] of the

Customer Plans in the Customer Plans Subclass under § 3.2.3.3 of the Settlement Agreement. Of

those 480 records, 423 concerned Customer Plan Accounts represented by the court-appointed

Trustee ad Litem ("TAL").[7]  The remaining 57 records concerned the Customer Plan Accounts

---

[6] The list of plan sponsors included more than one contact for a Customer Plan Account where it was appropriate to
include interested parties or successors-in-interest to facilitate notice to a particular Customer Plan Account.  As
used in this section, the term plan sponsor includes these additional contacts.

[7] The role of the Trustee *ad Litem* is further described in § 1.48 of the Settlement Agreement. *See* Loeser Decl., Ex.
1.

in the Subclass that are not represented by the TAL. Keough Decl. at ¶ 4. GCG analyzed the
names and addresses electronically to update addresses through the National Change of Address
database maintained by the U. S. Postal Service. *Id.* at ¶ 5.

       On July 23, 2014, GCG sent a copy of the Customer Plans Subclass Notice by first class
U.S. Mail to the Plan Administrator of each Customer Plan Account that is not represented by
the TAL at the name and address of the plan sponsor pursuant to §3.2.3.4 of the Settlement
Agreement.  *Id.* at ¶ 6. The Customer Plans Subclass Notice instructed Plan Administrators to
communicate the enclosed court-approved Customer Plans Subclass Summary Notice to
participants in their Customer Plan within sixty days. A copy of the Customer Plans Subclass
Notice and the Customer Plans Subclass Summary Notice are attached as Ex. B to the Keough
Decl.

       Also on July 23, 2014, GCG sent a copy of the Customer Plans Subclass Notice (TAL) to
the Plan Administrators of each Customer Plan Account that is represented by the TAL at the
name and address of the plan sponsor pursuant to §3.2.3.4 of the Settlement Agreement.  The
court approved Customer Plans Subclass Notice (TAL) includes additional information
explaining how to contact the TAL with questions. The Customer Plans Subclass Notice (TAL)
instructed Plan Administrators to communicate the enclosed court-approved Customer Plans
Subclass Summary Notice (TAL) to participants in their Customer Plan within sixty days. A
copy of the Customer Plans Subclass Notice (TAL) and the Customer Plans Summary Subclass
Notice (TAL) are attached as Ex. C to the Keough Decl. *Id*. at ¶ 6.

       On August 1, 2014, the Customer Plans Subclass Publication Notice appeared in
*Investors Business Daily* and on August 4, 2014, it was transmitted by PR Newswire. *Id.* at ¶ 9.

The Customer Plans Subclass Publication Notice is attached as Ex. E to the Keough Decl. In

addition, as of July 23, 2014, the Customer Plans Subclass Notice, the Customer Plans Summary

Subclass Notice, the Customer Plans Subclass Notice (TAL), the Customer Plans Summary

Subclass Notice (TAL), the Customer Plans Subclass Publication Notice, the Order Preliminarily

Approving Settlement and Providing for Notice, the Class Action Settlement Agreement, and the

proposed Plan of Allocation have been posted on the website maintained by the Claims

Administrator for this case. *Id*. at ¶11.

　　　The Customer Plans Subclass Notices and Summary Notices (TAL and non-TAL)

summarized the same information explained above with respect to the In-House Plans Subclass

Notice. In addition, the Customer Plans Subclass Notices and Summery Notices (TAL and non-

TAL) explained the means by which Customer Plans could opt-out of the Customer Plans

Settlement Subclass. One or more fiduciaries of a Customer Plan could mail a written request to

be excluded from the Settlement postmarked no later than October 31, 2014 and received no later

than November 7, 2014 by GCG, the Claims Administrator. An exclusion on behalf of a

Customer Plan is binding on all participants and beneficiaries of the Customer Plan.[8]

　　　Finally, GCG established a toll-free number on July 23, 2014 with an interactive voice

response system dedicated to the Settlement. As of September 19, 2014, GCG had received 754

incoming calls to the Call Center. *Id*. at ¶ 10. GCG responded to each message promptly and will

continue to accommodate inquiries from Subclass members. *Id*.

---

[8] By letter of August 7, 2014, the Senior Services Retirement Plan sponsored by Meritan, Inc. notified the Claims
Administrator of its decision to Opt-Out of the Customer Plans Subclass. By letter of September 19, 2014, the
Senior Services Retirement Plan notified the Claims Administrator of its withdrawal of the Opt-Out and its
decision to remain a member of the Customer Plans Settlement Subclass. Keough Decl. ¶13.

G.     **Reasons for the Settlement**

Plaintiffs have entered into this proposed Settlement with an understanding of the strengths and weaknesses of their claims. This understanding is based on: (1) the motion practice undertaken by the Parties; (2) the investigation, research, and discovery as outlined above; (3) the likelihood that the Court would certify each Subclass to proceed as a class; (4) the likelihood that each Subclass would prevail at trial and, if necessary, on appeal; (5) the range of possible recovery; (6) the substantial complexity, expense, and duration of litigation necessary to prosecute this Action through trial and, if necessary, through appeal; (7) Defendants' determination to fight and contest every aspect of the case; and (8) the significant risk that any available insurance would be depleted over the course of the litigation. Having undertaken this analysis, Co-Lead Class Counsel and the Named Plaintiffs and Representative Customer Plans have concluded that the Settlement is fair, reasonable, and adequate, and should be presented to the Court for approval. Loeser Decl., ¶ 28.

### III.     ARGUMENT

A.     **The Settlement should be Granted Final Approval if the Court Finds it to be Fair, Reasonable and Adequate**

The Court should approve a class action settlement pursuant to Fed. R. Civ. P. 23(e)(2) if, following direct notice in a reasonable manner to all class members who would be bound, the Court determines that the settlement "is fair, reasonable, and adequate." In *In re Southeastern Milk Antitrust Litig. ("Milk Antitrust")*, No. 08-1000, 2012 WL 2236692, at *2 (E.D. Tenn. June 15, 2012), the court reaffirmed the multiple factors that guide final settlement approval in the Sixth Circuit: (a) the likelihood of success on the merits when weighed against the amount and form of the relief offered in the settlement; (b) the risks, expense and delay of further litigation;

(c) the judgment of experienced counsel who have competently evaluated the strength of their

proofs; (d) the amount of discovery completed and the character of the evidence uncovered; (e)

whether the settlement is fair to the unnamed class members; (f) objections raised by class

members; (g) whether the settlement is the product of arm's length negotiations as opposed to

collusive bargaining; and (h) whether the settlement is consistent with the public interest. *Id*. at

*2 (citing *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983), and *In re Cardizem CD*

*Antitrust Litig*., 218 F.R.D. 508, 522 (E.D. Mich. 2003)). In evaluating a proposed settlement of

a class action, a district court must examine the terms of the settlement and the process by which

the settlement was arrived at, to make sure that the terms are reasonable and that the settlement is

not the product of fraud, overreaching, or collusion. *See Clark Equipment Co. v. Int'l Union,*

*Allied Indus. Workers of Am., AFL-CIO*, 803 F.2d 878, 880 (6th Cir. 1986) (*per curiam*).

Evaluation and approval of the settlement is committed to the sound discretion of the district

court and its judgment is reviewed deferentially. *Id*.

### 1.  Likelihood of Success Weighed against the Amount and Form of Relief

"The fairness of each settlement turns in large part on the strength of the parties' legal

dispute."  *Milk Antitrust*, 2012 WL 2236692, at *2. "The court must also weigh the likelihood of

success on the merits in considering whether the settlement is fair, reasonable and adequate."

*Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 296 (W.D. Ky. 2014). The Sixth Circuit

characterizes analysis of this factor as follows:

> Although this inquiry understandably does not require [the court] to "decide the
> merits of the case or resolve unsettled legal questions," [the court] cannot "judge
> the fairness of a proposed compromise" without "weighing the plaintiff's
> likelihood of success on the merits against the amount and form of the relief
> offered in the settlement."

*Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. General Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007) (quoting *Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)).

This analysis looks first to the strengths and weaknesses of Plaintiffs' legal and factual claims. As a threshold question, the Court should consider the risk presented by class certification. As set forth in detail in Plaintiffs' memorandum in support of motion for preliminary approval (Dkt. No. 318), class certification is relatively routine for ERISA breach of fiduciary duty claims asserted by participants in a single plan against plan fiduciaries. Certification of the Customer Plan Subclass for purposes of trial presented Plaintiffs with a greater challenge. *Gascho v. Global Fitness Holding, LLC*, No. 11-436, 2014 WL 1350509, at *18 (S.D. Ohio, April 4, 2014) (Defendant "has contested class certification and asserted various defenses that present financial risks to the class"). The "class of plans" format for certification of the Customer Plans Subclass, including the requirements for certification under Rule 23(b)(3), opens the door to many more challenges to certification. While cases are trending in favor of certification in "class of plan" cases, Plaintiffs identified class certification of the Customer Plans Subclass as a significant risk for the Customer Plans Subclass.

A second significant risk faced Plaintiffs in all four Subclasses at trial. To prevail on ERISA breach of fiduciary duty claims, Plaintiffs have to prove that the individual Defendant fiduciaries knew or should have known the various investment options were imprudent, meaning too risky to be included as investments in the Plaintiffs' 401(k) plans. Plaintiffs pieced together evidence of key information that passed to ERISA fiduciaries, for example during investment committee meetings, through their detailed analysis of Defendants' documents. Nevertheless, at

18

trial Plaintiffs faced significant risks "in connection with establishing the factual bases to support some of the classes' legal theories ...." *In re Skechers Toning Shoe Prods. Liability Litig.*, No. 11-2308, 2013 WL 2010702, at *5 (W.D. Ky. May 13, 2013) (citing *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010)).

The function of time presented a third litigation risk to Plaintiffs because the law on various issues relevant to ERISA breach of fiduciary duty claims continues to evolve. Most recently, the Supreme Court's ruling in *Fifth Third Bankcorp v. Dudenhoeffer*, ___ U.S. ___, 134 S.Ct. 2459 (2014), addressed threshold pleading issues in ERISA breach of fiduciary duty cases, potentially making it far more difficult for plaintiff participants to survive motions to dismiss. Plaintiffs discuss further risks created by developing ERISA law in Section III.A.3(a) of Plaintiffs' Memorandum in Support of Co-Lead Counsel's Motion for Award of Attorneys' Fees and Expenses and Named Plaintiff Case Contribution Awards, filed simultaneously with this motion.

Under this analysis, the Court weighs the litigation risk against the amount recovered for each Subclass in the Settlement. *Milk Antitrust*, 2012 WL 2236692, at *2. Plaintiffs evaluate the settlement amounts recovered as follows:

### a.   In-House Plans Regions Stock Subclass

If Plaintiffs prevail at trial on the Regions Stock claim, they have a realistic range of recovery for the Regions Stock Subclass claims of zero to $409 million, with the most likely recovery at about $22.7 million. Assuming Plaintiffs prevail at trial, the damages recovery would turn primarily on two issues, both of which present significant challenges. First, Defendants would argue for zero damages because the value of the stock has since recovered to its former

value at the point in time when Plaintiffs could prove Regions stock became an imprudent investment option. Second, Defendants would argue that Plaintiffs are only entitled to recover purchaser damages, *i.e.,* losses suffered by plan participants who purchased Regions Stock during the Subclass period, not the much larger losses suffered by plan participants who owned Regions Stock before the Subclass period and held the stock during the class period. If Plaintiffs were able to prove Regions Stock became an imprudent investment for the Regions 401(k) Plans by January 1, 2007, the purchaser damages totaled $22.7 million. The $14.5 million Settlement Amount for the In-House Plans Regions Stock Subclass is 63.85% of the $22.7 million damage figure.

### b.  In-House Plans Excessive Fee Subclass

Assuming Plaintiffs prevail at trial on the Excessive Fee claim, Plaintiffs would seek damages of $14,938,225 based on publically available information about the expense ratios of the proprietary RMK Mutual Funds. Defendants would argue in response that they provided significant rebates of these fees to In-House Plan participants. If Defendant's proof is successful, the damages figure falls to approximately $6,121,788. The $2.4 million Settlement Amount is 39.9% of the discounted damages figure and 16% without the discount.

### c.  In-House Plans Bond Fund Subclass

Plaintiffs' original damages figure on the In-House Plans Bond Fund claim was $24,866,202. Since Plaintiffs filed this action, three other potential sources of recovery for the In-House Plans Bond Fund losses have appeared: (a) the States' Fair Fund obtained by the States attorneys general arising from state securities claims;[9] (b) the SEC Fair Fund obtained by the

---

[9] *See* Appendix C to the Settlement Agreement, ¶ 1 (Loeser Decl., Ex. 1).

SEC arising from federal securities claims;[10] and (c) the Open End Bond Fund Securities

action.[11]  To date, the States Fair Fund distribution has resulted in a $5,949,695 recovery for

members of the In-House Plans Bond Fund Subclass. The amounts that may or may not become

available for Subclass members from the other two sources are unknown. At a minimum,

Defendants will argue Plaintiffs' damages should be discounted by $5,949,695, leaving total

damages of $18,916,507. The $3.4 million Settlement Amount for the In-House Plans Bond

Fund Subclass is 18% of this discounted figure. Plaintiffs anticipate members of the In-House

Plans Bond Fund Subclass may also receive funds from the SEC Fair Fund distribution and any

recovery in the Open End Bond Fund Securities case.

        **d.**      **Customer Plans Subclass**

Plaintiffs anticipate Defendants would argue the original Customer Plans damage figure

of $16,897,537 should be discounted by the $2,778,360 recovered by members of the Customer

Plans from the States' Fair Fund, leaving a discounted damage total of $13,119,177. The $2.4

million Settlement Amount recovered by the Customer Plans Subclass is 17% of this discounted

figure. Plaintiffs anticipate members of the Customer Plans Subclass may also receive funds

from the SEC Fair Fund distribution, any recovery in the Open End Bond Fund Securities case

and the $62 million recovered but not yet distributed in the Closed End Bond Fund Securities

litigation.[12]

---

[10] *See* Appendix C to the Settlement Agreement, ¶¶ 2 – 5 (Loeser Decl., Ex. 1).

[11] *In re Regions Morgan Keegan Open-End Mutual Fund Litigation*, No. 2:07-cv-2784-SHM-dvk (W.D. Tenn.).

[12] *In re Regions Morgan Keegan Closed-End Mutual Fund Litigation*, No. 2:07-cv-02830-SHM-dvk (W.D. Tenn.).

The "'parties face enormous risk if the case is tried,' and given the complexity of the issues in this litigation and their hotly contested nature, as well as the inherently unpredictable nature of a … trial, there is clearly risk of recovery of little or nothing at trial." *Milk Antitrust*, 2012 WL 2236692, at *2 n.3. This factor weighs in favor of approval.

## 2.      Risks, Expense, and Delay of Further Litigation

The Court also weighs recovery under the Settlement against the risks, expense, and delay Plaintiffs would confront if they pursued their claims through trial and appeal. *Dick*, 297 F.R.D. at 295. Class actions are "inherently complex and settlement avoids the costs, delays, and multitude other problems associated with them." *Gascho*, 2014 WL 1350509, at *18 (citing *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1013 (S.D. Ohio), *decision clarified*, 148 F. Supp. 2d 936 (S.D. Ohio 2001)). In this case, further delay of this protracted litigation would deny Plaintiffs recovery of needed retirement funds in their 401(k) plans. After six and a half years, the opportunity to recover funds and distribute them to the Plaintiff Plan participants is an important goal of this Settlement. Moreover, the factual and legal complexity of this case, particularly given the four Subclasses, has contributed to the time and expense incurred by Plaintiffs. In light of the litigation risks explored above, the conclusions reached by another Court in this Circuit apply equally here:  "further litigation would more likely expose Plaintiffs to greater risk than it would increase their recovery."  *Bowers v. Windstream Kentucky East, LLC*, No. 09-440, 2013 WL 5934019, at *2-3 (W.D. Ky. Nov. 1, 2013) (The case "has already been the subject of numerous lengthy opinions by the Court involving the most complex matters. To litigate this further on Plaintiffs' part would only risk losing many of their already hard fought legal victories"). This factor weighs in favor of approval.

### 3.    The Judgment of Experienced Counsel

"In deciding whether a proposed settlement warrants approval, the informed and reasoned judgment of plaintiffs' counsel and their weighing of the relative risks and benefits of protracted litigation are entitled to great deference." *Thacker*, 695 F. Supp. 2d at 531 (citing *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003)); *Bowers*, 2013 WL 5934019, at *3 (citing *Rankin v. Rots*, No. 02-71045, 2006 WL 1876538, at *3 (E.D. Mich. June 28, 2006) ("the Court should also consider the judgment of counsel and the good faith bargaining between the contenting parties")); *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. v. Ford Motor Co.*, No. 07-14845, 2008 WL 4104329, at *26 (E.D. Mich. Aug. 29, 2008) ("The endorsement of the parties' counsel is entitled to significant weight, and supports the fairness of the class settlement").

Co-Lead Class Counsel are or have been lead or co-lead class counsel in important ERISA breach of fiduciary duty cases throughout the nation. For example, Keller Rohrback has served as lead or co-lead counsel in ERISA fiduciary breach class actions filed against American International Group, Fremont General Corp., Bear Stearns, Wachovia, Enron, WorldCom, Global Crossing, Merrill Lynch, Countrywide, IndyMac, and Washington Mutual. To date, Keller Rohrback has achieved settlements for its ERISA clients in excess of $1 billion to employees and retirees. Loeser Decl., ¶ 41. Additional information regarding Keller Rohrback can be found in its firm resume, attached as Ex. 3 to the Loeser Decl. Feinstein Doyle Payne & Kravec have also served as lead counsel in many ERISA fiduciary duty cases over the past fifteen years. Additional information regarding Feinstein Doyle Payne & Kravec's experience in this field can be found in its firm resume attached as Ex. 4 to the Loeser Decl. In addition,

recovery in this case would not have been possible without expertise in and relevant knowledge

of insurance law, banking, trusts, securities matters and accounting. Co-lead Class Counsel

possessed and demonstrated expertise in all of these areas in this Action.

Co-Lead Class Counsel provided the necessary expertise garnered from their experience

serving in numerous ERISA company stock, excessive fee and class of plans cases in which they

have dealt with similar factual and legal issues to those presented in this case. Their discovery

and investigation in this case has been thorough and comprehensive. In their view, the Settlement

provides an excellent result for the Settlement Subclasses in an increasingly difficult legal

climate for ERISA breach of fiduciary duty claims.

### 4. Amount of Discovery Completed and Character of the Evidence Uncovered

Here the Court considers whether the Parties conducted sufficient investigation and

discovery to allow them to be "thoroughly familiar with the evidence and the issues in the case"

so they "could realistically evaluate the strengths and weaknesses of their case." *Milk Antitrust,*

2012 WL 223692, at *3. "Although the amount of discovery completed is a factor to be

considered in the settlement approval process, there is no minimum or definitive amount of

discovery that must be undertaken to satisfy this factor." *Bowers*, 2013 WL 59344019, at*2

(citing *In re Jiffy Lube Sec. Litig*., 927 F.2d 155, 159 (4th Cir. 1991)).

Here Plaintiffs propounded seven sets or requests for production to Defendants and

issued seven third party document subpoenas which yielded hard copy documents and

electronically stored information (ESI) totaling 786,500 documents or 7,360,500 pages. Loeser

Decl., ¶ 10; Ex. 2. Plaintiffs reviewed, analyzed, coded and organized these documents into a

database. The documentary evidence, together with extensive informal investigation, enabled

Plaintiffs to piece together the evidence they would need at trial prove the Defendant ERISA

fiduciaries knew or should have known the three investment options at issue became imprudent

early in the class period. Plaintiffs also started into depositions, taking the testimony of

Defendant Chris A. Glaub who was a member of the Regions Financial Corporation Legacy Plan

Benefits Management Committee as of March 14, 2007 and Plan Administrator of both the

Legacy and Am South Plans. Loeser Decl., ¶ 11.

Plaintiffs set forth their factual evidence in an extensive mediation brief supported by

detailed and voluminous citations to Defendants' documents and diagrams showing key lines of

communication within Defendants' organizations. *Id.* at ¶ 16. The long months of settlement

negotiations included further exchange of information about the parties' claims and defenses.

"All of this information ultimately allowed the parties to frankly evaluate the merits and risks

inherent in their respective case and to determine the appropriate settlement value." *Bowers*,

2013 5934019, at *3. This factor weighs in favor of settlement approval.

### 5.      Fairness to Unnamed Subclass Members

This factor is relevant only where the Named Plaintiffs receive a recovery under the

Settlement that is not available to the unnamed Subclass members. That is not the case here. As

explained below, the proposed Plan of Allocation sets forth the formula that will govern

allocation for all members of each Settlement Subclass.

### 6.      Objections Raised by Class Members

Pursuant to the Preliminary Approval Order, Subclass members have until October 28,

2014 to file any objections, which is approximately five weeks after Plaintiffs will have filed this

motion. Under the Preliminary Approval Order, Plaintiffs will respond to objections, if any, by

November 29, 2014, and will address this factor at that time.

> **7.      Whether the Settlement is the Product of Arms-Length Negotiations**

"The court must also make sure that any settlement is the product of arm's length

negotiations as opposed to collusive bargaining." *Milk Antitrust*, 2012 WL 2236692, at *4 (citing

*Bronson v. Board of Educ.*, 604 F. Supp. 68, 73 (S.D. Ohio 1984)). "Courts presume the absence

of fraud or collusion in class action settlements unless there is evidence to the contrary." *Dick*,

297 F.R.D. at 295 (citing *Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 838 (E.D. Mich.

2008)). *See also In re Teletronics Pacing Sys., Inc.,* 137 F. Supp. 2d 985 at 1016 (S.D. Ohio

2001) (citing Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.51 (3d ed. 1992)

(attached as Ex. 1 to Wetherald Decl.) ("Courts respect the integrity of counsel and presume the

absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is

offered")).

The course of litigation, the scope and nature of discovery, and the protracted period

required for settlement negotiations and negotiation of the Settlement Agreement reflect the hard

fought and arm's length nature of both the litigation and the Settlement. In addition, the

Settlement was only possible through the active involvement of Judge Weinstein as the mediator,

both during the mediation and during the following ten months of negotiations to reach an agreed

Mediator's Proposal. Loeser Decl., ¶ 17. From the beginning of the mediation process, the

Settlement Amounts for each Subclass were negotiated separately, as independent Settlements.

*Id.* This is a good faith Settlement in which there is no risk of fraud or collusion.

### 8.      Whether the Settlement is Consistent with Public Policy

"[T]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources."  *In re Cardizem*, 218 F.R.D. at 530 (quoting *Granada Inv., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)). *Dick*, 297 F.R.D. at 297 (citing *Ehrheart v. Verizon Wireless*, No. 08-4323, 2010 WL 2365867, at *3 (3d Cir. June 15, 2010) ("Settlement agreements are to be encouraged because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts")).

The public interest weighs in favor of the parties' resolution of this protracted litigation through the Settlement. The Settlement provides finality, with a substantial recovery of the retirement funds to the Plaintiff Plan participants. Proceeding to trial in a case of this complexity would require substantial judicial resources as the parties completed discovery, summary judgment and pre-trial motions and trial. *Gascho*, 2014 WL 1350509, at *19 (citing *In re Nationwide Fin Servs. Litig.*, No. 08-00249, 2009 WL 8747486, at *8 (S.D. Ohio Aug. 18, 2009) ("[T]here is certainly a public interest in settlement of disputed claims that require substantial federal judicial resources to supervise and resolve")); *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009) (finding no collusion where the settlement agreement was entered into after four years of complex and contested litigation and the agreements was the product of supervised negotiations). This factor weighs in favor of approval.

When viewed individually and together, the relevant factors weigh decisively in favor of final settlement approval.

**B.**     **The Plan of Allocation is Fair and Reasonable**

"As part of its examination of a class-action settlement, a court must ensure that the

distribution of the settlement proceeds is equitable." *Bowers*, 2013 WL 5934019, at *4 (citing

*Oritz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999)); *In re Global Crossing Sec. and ERISA*

*Litig.*, 225 F.R.D. 436 (S.D.N.Y. 2004). The Court considers the fairness and reasonableness of

the allocation separately from the general settlement terms. *Bowers*, 2013 WL 5934019, at *4

(citing *Crawford v. Lexington-Fayette Urban County Gov't,* No. 06-299, 2008 WL 4724499, at

*9 (E.D. Ky. Oct. 23, 2008)).

The proposed Plan of Allocation[13] sets forth an allocation formula for each of the four

Settlement Subclasses summarized here as follows:

**a.**     **Regions Stock Settlement Subclass**

The Regions Stock Subclass Settlement Amount will be allocated to each In-House Plan

Participant Account in this Subclass based on the account's proportionate losses on the

investment in Regions Stock during the Regions Stock Subclass period. Each In-House Plan

Participant Account with a proportionate recovery of thirty dollars ($30.00) or below is

designated as a De Minimis Account and will receive an allocation of zero. Any recoveries

allocable to De Minimis Accounts will be reallocated proportionately within the Regions Stock

Subclass. The Claims Administrator will calculate the Final Dollar Recovery for each In-House

Plan Participant Account that held Regions Stock during the Subclass period. Loeser Decl., ¶

25(a).

---

[13] The proposed Plan of Allocation is attached as Ex. 5 to the Loeser Decl.

### b.    Excessive Fee Settlement Subclass

The Excessive Fee Settlement Subclass Amount will be allocated to each In-House

Participant Plan Account in this Subclass based on the proportionate share of the RMK Select

(Mutual) Fund Balances held by the In-House Participant Plan Account. Each In-House Plan

Participant Account with a proportionate recovery of thirty dollars ($30.00) or below is

designated as a De Minimis Account and will receive an allocation of zero. Any recoveries

allocable to De Minimis Accounts will be reallocated proportionately within the Excessive Fee

Subclass. The Claims Administrator will calculate the Final Dollar Recovery for each In-House

Plan Participant Account that held RMK Select (Mutual) Funds during the Subclass period. *Id*. at

¶ 25(b).

### c.    Bond Fund Settlement Subclass

The Bond Fund Subclass Settlement Amount will be allocated to each In-House Plan

Participant Account in this Subclass based on the account's proportionate losses on the

investment in RMK Bond Funds during the Bond Fund Subclass period. Each In-House Plan

Participant Account with a proportionate recovery of thirty dollars ($30.00) or below is

designated as a De Minimis Account and will receive an allocation of zero. Any recoveries

allocable to De Minimis Accounts will be reallocated proportionately within the Bond Fund

Subclass. The Claims Administrator will calculate the Final Dollar Recovery for each In-House

Plan Participant Account that held RMK Bond Funds during the Subclass period. *Id*. at ¶ 25(c).

### d.    Customer Plans Subclass

Each Customer Plan Account will be allocated $100.00 from the Customer Plans

Settlement Amount. The Remaining Customer Plan Proceeds will be allocated to each Customer

Plan Account based on each Account's proportionate losses on the investment in RMK Bond
Funds during the Customer Plans Subclass period minus the Account's recovery from the States
Fair Fund Distribution. Each Customer Plan Account with a proportionate recovery of thirty
dollars ($30.00) or below is designated as a De Minimis Account and will receive an allocation
of zero. Any recoveries allocable to De Minimis Accounts will be reallocated proportionately
within the Customer Plans Subclass. The Claims Administrator will calculate the Final Dollar
Recovery for each Customer Plan Account that held RMK Bond Funds during the Subclass
period. *Id. at ¶* 25(d).

    Each In-House Plans Settlement Subclass member may preserve the tax status of the
retirement funds at issue. Each active In-House Plan Participant Account will receive the
distribution in the Plan Account. The distribution will be allocated in accordance with the most
recent contribution investment direction on file for that Account. Where an In-House Plan
Participant Account is not active, further distribution from that account will be governed by
applicable provisions of the Regions 401(k) Plan. A distribution to an account that is not active
will be invested in accordance with the Regions 401(k) Plan's default investment procedures. *Id*.
at ¶ 26.

    The Claims Administrator will distribute the Customer Plans Subclass Settlement
Amount to Customer Plan Accounts by check directed to the "Plan Administrator of the [name
of the Customer Plan Account] with instructions that the distribution should be contributed to the
Customer Plan Account or a successor plan. The Plan of Allocation sets forth procedures in the
event a Customer Plan Account cannot be located or has been terminated. *Id*. at ¶ 27.

30

**C.      The Court Should Grant Class Certification for the Four Settlement Subclasses for the Purpose of Settlement**

The Court previously granted preliminary class certification of the four Subclasses for settlement purposes. *See* Preliminary Approval Order at pp. 3-4 (Dkt. No. 327). The Court set forth the manner in which the four Subclasses meet the requirements of Fed. R. Civ. P. 23 for class certification. *Id.* at pp. 5-7. The Court also preliminarily appointed Interim Co-Lead Class Counsel as Co-Lead Class Counsel. *Id.* at p. 10. Nothing has occurred since then to cast doubt on whether the applicable prerequisites of Rule 23 are met. On that basis, Plaintiffs' respectfully request final certification of the four Subclasses for settlement purposes and final appointment of Co-Lead Class Counsel as Co-Lead Class Counsel for the Settlement Subclasses.

## IV.      CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant final approval to the proposed Settlement, approve the Plan of Allocation, grant final class certification for the four Subclasses for settlement purposes and finally appoint of Co-Lead Class Counsel and enter the proposed Final Approval Order and Judgment.

Respectfully submitted this 23rd day of September, 2014.

Respectfully Submitted,

/s/ Margaret E. Wetherald
Lynn L. Sarko
Derek W. Loeser
Margaret E. Wetherald
Matthew M. Gerend
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel.:  (206) 623-1900
Fax:  (206) 623-3384
Email: lsarko@kellerrohrback.com

dloeser@kellerrohrback.com
mwetherald@kellerrohrback.com
mgerend@ kellerrohrback.com

*Co-Lead Counsel for the Sub-Classes and Co-
Counsel for Plaintiffs Harrison, C. Smith and J.
Smith*

Ellen M. Doyle
Pamina Ewing
Stephen M. Pincus
Edward J. Feinstein
FEINSTEIN DOYLE PAYNE & KRAVEC, LLC
1705 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Tel: (412) 281-8400
Fax:(412) 281-1007
Email: edoyle@fdpklaw.com
        pewing@fdpklaw.com
        spincus@fdpklaw.com
        efeinstein@fdpklaw.com

*Co-Lead Counsel for the Sub-Classes and Co-
Counsel for Plaintiffs Hamby and Jackson*

Jeffrey Harris
Brian Giles
STATMAN, HARRIS & EYRICH, LLC
441 Vine Street
3700 Carew Tower
Cincinnati, OH 45202
Tel:  (513) 621-2666
Fax:  (512) 345-8289
Email: jharris@statmanharris.com
        bgiles@statmanharris.com

*Co-Counsel for Plaintiffs Harrison and Smith*

Jon C. Goldfarb
WIGGINS CHILDS PANTAZIS FISHER &
GOLDFARB, LLC
The Kress Building
301 19th Street N

32

Birmingham, AL  35203
Tel.:  (205) 314-0500
Fax:  (205) 254-1500
Email: jgoldfarb@wigginschilds.com

*Co-Counsel for Plaintiffs Hamby and Jackson*

Joseph H. Meltzer
Edward W. Ciolko
KESSLER TOPAZ MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
Email: jmeltzer@ktmc.com
       ecioko@ktmc.com

*Co-Counsel for Plaintiff Williams*

Peter H. Burke (BPR024012)
BURKE HARVEY, LLC
2151 Highland Ave. S., Suite 120
Birmingham, AL  35205
Tel.:  (205) 930-0991
Email: pburke@burkeharvey.com

*Co-Counsel for Plaintiff Shamblin*

Gregory Porter
BAILEY & GLASSER LLP
910 17th Street NW, Suite 800
Washington, DC 20006
Tel:  (202) 543-0226
Fax:  (202) 463-2103
Email: gporter@baileyglasser.com

Brian McTigue
MCTIGUE LAW LLP
4530 Wisconsin Avenue NW, Suite 300
Washington, DC  20016
Tel:  (202) 364-6900
Fax:  (202) 364-9960
Email: bmctique@mctiguelaw.com

*Co-Counsel for Plaintiff Shamblin*

Garrett W. Wotkyns
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104-4207
Phone:  (415) 421-7100
Fax:  (415) 421-7105
Email:  gwotkyns@schneiderwallace.com

*Co-Counsel for Plaintiff Shamblin*

## CERTIFICATE OF SERVICE

**I hereby certify that I have on September 23, 2014 filed**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT AGREEMENT, SETTLEMENT SUBCLASS
CERTIFICATION AND APPROVAL OF PLAN OF ALLOCATION**

**electronically with the Clerk of Court, which will send notification of such filing to**

**counsel in this matter.**

| | | |
|---|---|---|
| W. Brantley Phillips<br>bphillips@bassberry.com | Matthew M. Curley<br>mcurley@bassberry.com | Michael A. Brady<br>mbrady@bassberry.com |
| Wendee M. Hiderbrand<br>whilderbrand@bassberry.com | Michael Prame<br>mprame@groom.com | Sarah A. Zumwalt<br>szumwalt@groom.com |
| Thomas F. Fitzgerald<br>tff@groom.com | Richard Davis<br>rdavis@maynardcooper.com | William B. Wahlheim<br>wwahlheim@maynardcooper.com |
| Peter S. Fruin<br>pfruin@maynardcooper.com | John David Collins<br>jcollins@maynardcooper.com | Robert E. Craddock, Jr.<br>rcraddock@wyattfirm.com |
| Scott S. Brown<br>sbrown@maynardcooper.com | Thomas S. Gigot<br>tgigot@groom.com | |

/s/ Margaret E. Wetherald
Margaret E. Wetherald